# UNITED STATES COURT OF APPEALS
## For The
## DISTRICT OF COLUMBIA CIRCUIT

*In re* SI WIRELESS, LLC
    **Petitioner,**

    **v.**                         **No. 26-_____**

**FEDERAL COMMUNICATIONS COMMISSION**
    **Respondent.**

---

## SECOND PETITION FOR MANDAMUS TO COMPEL AGENCY ACTION CONTINUING TO BE UNLAWFULLY WITHHELD OR UNREASONABLY DELAYED

---

June 5, 2026

Stephen C. Leckar
Kalbian Hagerty LLP
888-17th St., NW, Twelfth Floor
Washington, DC 20006
(202) 223-5600
sleckar@kalbianhagerty.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certify that:

**A.     Parties and Amici**

The parties in this case are Petitioner, SI Wireless, LLC ("SI"), a Limited Liability Corporation organized under the laws of Illinois, and Respondent, Federal Communications Commission ("FCC"), an independent agency of the United States.

Counsel for Petitioner are not aware of any *amici.*

**B.     Rulings Under Review**

There is no agency ruling below.  This Second Petition for Mandamus seeks to require the FCC to decide a matter that continues to remain unlawfully withheld or unreasonably delayed by the agency, namely the FCC Staff's suspension of Petitioner's funding, which was imposed without notice on July 11, 2024, and was renewed a year later.  On October 1, 2025, this Court denied without prejudice Petitioner's initial application for mandamus but stated that it was "confident that the FCC will act promptly in resolving any application for review ... and in otherwise deciding whether to maintain the funding freeze." *In re SI Wireless, LLC*, No. 25-1112, Order at 2 (D.C. Cir. Oct. 1, 2025) (per curiam) (unpublished).

On December 3, 2025, Petitioner filed before the FCC a request that it direct that SI's funding be resumed or state when a decision would issue.  The FCC has neither responded nor acted on SI's request.

**C.      Related Cases**

On April 17, 2025, Petitioner first sought mandamus relief before this Court. On June 25, 2025, while that action was pending, Petitioner filed a suit against the United States in the Court of Federal Claims and sought damages under the Tucker Act.  That action was dismissed for lack of jurisdiction on May 13, 2026.  *SI Wireless, LLC v. United States*, 2026 WL 1358910 (Fed. Cl. May 13, 2026).

**Table of Contents**

**Table of Authorities** ............................................................................ iii

**Glossary** ........................................................................................... viii

**Jurisdiction and Relief Sought** ............................................................4

**Procedural Background and Issue Presented** ........................................5

**Statement of Facts** ..............................................................................9

    I.     SI was an established provider of advanced communications services ...10

    II.    The FCC urged providers with Huawei equipment to participate in the SCRP and made no demands for "normal" service and cash flow ..........12

        A.     The FCC "applauded" providers for removing Huawei equipment ahead of the program's start without demanding any level of service ..........................................................................................12

        B.     SI's business plans fully disclosed its then-current reduced customer base and its intent to remove and rebuild its system ......15

        C.     The FCC knew that greatly diminished funding and programmatic delays justified accepting SI's modified plan .................................16

        D.     Despite being affected by Program-wide dysfunctions and receiving no operating funds for three years, SI has materially accomplished much of its approved construction. Yet it remains unpaid for work invoiced years ago ...................................................................18

    III.   SI's customer base was sufficient at all relevant times ...........................20

    IV.   The freeze's timing, coupled with the CFO's brandishing the POST story and mischaracterizing Mr. Williams' statements, reflects retaliation for SI's disclosures ..................................................................................23

    V.    The FCC's protracted inaction harms the public interest .........................26

**Reasons Why the Writ Should Issue** .................................................27

**Summary of Argument**..................................................................................28

**Standing** ..............................................................................................................29

**Argument** ...........................................................................................................30

      I.     **The governing statute** ........................................................30

      II.    **The TRAC standards**........................................................31

      III.   **Applying the *TRAC* standards to the facts** ......................32

      IV.   **Relief Sought** ....................................................................40

**Certificate of Compliance**...........................................................................42

# Table of Authorities

## Cases

*Afghan and Iraqi Allies v. Blinken*,
103 F.3d 807 (D.C. Cir. 2024)..................................................................31, 36, 37, 39

*Air Line Pilots Ass'n v. Civ. Aeronautics Bd*.,
750 F.2d 81 (D.C. Cir. 1984) ...................................................................................32

*American Broadcasting Co., Inc. v. FCC*,
191 F.2d 492 (D.C. Cir. 1951)..................................................................................37

*Am. Hospital Association v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016) .................................................................30, 31, 32

*Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987) .................................................................................37

*DHS v. Regents of the University of California*,
591 U.S. 1 (2020) .....................................................................................................34

*EDF v. Hardin*,
428 F.2d 1093 (D.C. Cir. 1970) ...............................................................................29

*FEC v. Rose*,
806 F.2d 1081 (D.C. Cir. 1986) ...............................................................................37

*Heckler v. Chaney*,
470 U.S. 821 (1985) .................................................................................................25

*In re Am. Rivers & Idaho Rivers United*,
372 F.3d 413 (D.C. Cir. 2004) .................................................................................33

*In re Barr Laboratories, Inc.*,
930 F.2d 72 (D.C. Cir. 1991) ...................................................................................39

*In re Core Communications, Inc.*,
531 F.3d 849 (D.C. Cir. 2008) .................................................... 30, 31, 32, 33, 36, 41

*In re Monroe Communications Corp.,
    840 F.2d 942 (D.C. Cir. 1988) ......................................................32, 37, 40

In re United Mine Workers of America International Union,
    190 F.3d 545 (D.C. Cir. 1999) ...............................................................41

In the Matter of Sponsorship Identification Requirements for Foreign Government-Provided Programming,
    36 FCC Rcd. 7702 (2021) ......................................................................23

Loper Bright Enters. v. Raimondo,
    144 S. Ct. 2244 (2024) ...........................................................................34

Mashpee Wampanoag Tribal Council v. Norton,
    336 F.3d 1094 (D.C. Cir. 2003) ........................................................33, 38

MCI Telecomms. Corp. v. FCC,
    627 F.2d 322 (D.C. Cir.1980) ........................................................4, 33, 37

Midwest Gas Users Ass'n v. FERC,
    833 F.2d 341 (D.C. Cir.1987) .................................................................33

Nat'l Lifeline Ass'n v. FCC,
    983 F.3d 498 (D.C. Cir. 2020)................................................................29

Norton v. S. Utah Wilderness All.,
    542 U.S. 55 (2004) ...........................................................................30, 31

Orion Communications Ltd. v. FCC,
    131 F.3d 176 (D.C. Cir. 1996) ...............................................................34

RKO General, Inc. v. FCC,
    670 F. 2d 215 (D.C. Cir. 1981) ...............................................................23

Sierra Club v. Thomas,
    828 F.2d 783 (D.C. Cir. 1987)................................................................38

*Telecommunications Research & Action Center v. FCC,
    750 F.2d 70 (D.C. Cir. 1984)........................................4, 30, 31, 32, 33, 35, 36, 38, 39

*Trinity Broadcasting of Florida, Inc. v. FCC,*
    211 F.3d 618 632 (D.C. Cir. 2000) ..................................................................34

**Statutes**

5 U.S.C. § 555(b) ........................................................................................30

5 U.S.C. § 706(1) .....................................................................................4, 30

5 U.S.C. §1603(d)(6)(A)-(C) ......................................................................5

28 U.S.C. § 1651(a) ..................................................................................4, 30

47 U.S.C. § 153(2) .....................................................................................23

47 U.S.C. § 1608(10) ...................................................................................9

47 U.S.C. § 1601 ...........................................................................5, 12, 26, 33

47 U.S.C. §1603(b)(1) ................................................................................22

47 U.S.C. § 1603(d)(5)(A) ..........................................................................36

47 U.S.C. § 1603(d)(6) ...........................................................................26, 36

47 U.S.C. §1608(6)(A)-(B) .........................................................................22

47 U.S.C. §1609 ..........................................................................................33

**Other Authorities**

Eva Dou, Funding Shortfall for New Tech Endangers Rural Cell Service, FCC Says, WASHINGTON POST (May 2, 2024) (FCC order to remove Huawei equipment threatens rural phone, internet service - The Washington Post/)..............................6

*Eighteenth Section 706 Report and Notice of Inquiry*, GN Docket No. 24-214, (Sept. 6, 2024) ...................................................................................................26

FCC Affordable Connectivity Program, Frequently Asked Questions (June 30, 2024) (https://www.fcc.gov/sites/default/files/ACP-FAQs-Post-ACP-Ending.pdf ..........37

*FCC Announces a Webinar for the Secure and Trusted Communications Networks Reimbursement Program*, DA 21-1164 (Sept. 16, 2021) ....................................13

FCC Public Notice, *Additional Congressional Funding,* DA 24-1279 (Dec. 26, 2024) (DA-24-1279A1.pdf)...........................................................................13

FCC SCRP Webinar (Sept. 27, 2021) (https://youtu.be/9cFEeHgMYgo (webinar); https://www.fcc.gov/news-events/events/2021/09/secure-and-trusted-communications-networks-reimbursement-program-webinar) ...............................13

General Accounting Office, *Closing the Digital Divide for the Millions of Americans without Broadband* (Feb. 1, 2023) (https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-broadband) ....................................................26

Lewis Carroll, ALICE'S ADVENTURES IN WONDERLAND (New York: D. Appleton and Co., 1866) ................................................................................................................35

Mike Dano, *The Huawei 'rip and replace' program is a mess, argues SI Wireless*, LIGHT READING (Oct. 18, 2023). (https://www.lightreading.com/security/the-huawei-rip-and-replace-program-is-a-mess-argues-si-wireless) ............................21

Secure and Trusted Communications Networks Act of 2019" (116th Cong., 1st Sess., Dec. 16, 2019); 165 CONG. REC. H.1022-10286 (Dec. 16, 2019); 47 U.S.C. § 1601 *et seq*; Second Report and Order at 2-15, (https://docs.fcc.gov/public/attachments/FCC-20-176A1_Rcd.pdf ) .....................12

Wireline Competition Bureau, *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd 11423 (2019) ...........................................................................................................11

*Wireline Competition Bureau, *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs,* Second Report and Order, WC Docket No. 18-89, 35 FCC Rcd (Dec. 11, 2020) (https://docs.fcc.gov/public/attachments/FCC-20-176A1_Rcd.pdf ) .....................12

Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fourth Report to Congress* at 9, WC Docket No. 18-89 (July 1, 2024) (https://docs.fcc.gov/public/attachments/DOC-403626A1.pdf.) ........................6, 19

Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fifth Report to Congress*, at 13-14 (Dec. 30, 2024) https://docs.fcc.gov/public/attachments/DOC-408520A1.pdf) ...............................6

Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Seventh Report to Congress* at 7-8, WC Docket No. 18-89 (December 15, 2025) ([https://docs.fcc.gov/public/attachments/DOC-416757A1.pdf](https://docs.fcc.gov/public/attachments/DOC-416757A1.pdf)) ....................................................................................6

# Glossary

CFO—Chief Financial Officer, FCC

EB—Enforcement Bureau, FCC

FCC—Federal Communications Commission

SCRP—Secure and Trusted Communications Act

SI—SI Wireless, LLC

**UNITED STATES COURT OF APPEALS**
**For The**
**DISTRICT OF COLUMBIA CIRCUIT**

*In re* **SI WIRELESS, LLC**
　　　**Petitioner,**
　　　**v.**
**FEDERAL COMMUNICATIONS COMMISSION**
　　　**Respondent.**

**SECOND PETITION FOR MANDAMUS TO COMPEL AGENCY ACTION
CONTINUING TO BE UNLAWFULLY WITHHELD OR
UNREASONABLY DELAYED**

Petitioner SI Wireless, LLC ("SI") is a small wireless broadband provider that historically served rural Southern Illinois, Tennessee and Kentucky. It participates in the FCC's Secure and Trusted Communications Networks Act's Reimbursement Program ("SCRP"). Congress created the SCRP in 2020 to underwrite providers' speedily removing and replacing—a year being the statutorily expressed preference—Chinese equipment from domestic networks. The FCC vigorously urged SI and other providers to participate in the Program. In 2022 the FCC approved SI's business plans. Yet reimbursements proved haphazard and paltry.

In May 2024, the WASHINGTON POST featured SI's experience as exemplifying how mismanagement was thwarting Congress' intent. In July 2024, the FCC's Chief Financial Officer ("CFO") cited that article and froze SI's reimbursements. The CFO focused on whether SI had customers taking service

1

when it sought SCRP funding and whether SI provided "normal" service while breaking down and rebuilding its network.  The FCC's Enforcement Bureau ("EB") also launched a concurrent investigation of SI.

Whether a SCRP applicant must provide service to customers when applying for funding is a legal question.  Whether SI then had customers is an uncomplicated factual question.  It provided the FCC documentary evidence and customers' sworn declarations that SI was providing their wireless service when it sought SCRP funding.  And whether its twice-approved plans to "scrape and replace" its network required maintaining a "normal" level of business—a counterintuitive notion—is a legal question that implicates its reliance interests.  It also is hard to see these matters as justifying the EB's serving several thousand discrete discovery requests on SI.

Because of the FCC's institutional unresponsiveness, SI sought a writ of mandamus in April 2025 to direct the agency to decide whether to end the funding hold. In July, the CFO extended the hold another year. Last October 1st, the Court denied SI's petition without prejudice, expressing "confiden[ce] that the FCC will act promptly in resolving any application for review ... and in otherwise deciding whether to maintain the funding freeze."[1] That expectation proved misplaced.

---

[1]  *In re SI Wireless, LLC*, No. 25-1112, Order at 2 (D.C. Cir. Oct. 1, 2025) (unpublished).

The FCC continues to disregard SI's requests to decide this matter. The

Government's representation that "Petitioner can apply to the FCC for relief from

that funding freeze and, if the FCC denies relief, can seek judicial review of that

denial," has rung hollow.[2]

Adding insult to injury, SI's plans disclosed that while removing and

rebuilding its network it would have little or no operating income. Approximately

$14.8 million in reimbursement requests remain frozen, some invoices have gone

unreviewed for years. Another $32.6 million in construction and related work can't

be invoiced because the FCC hasn't acted on a pending modification request, and

millions of additional dollars needed for replacement-equipment costs also remain

unreimbursed.

SI does not receive federal Universal Service Fund ("USF") subsidies. The

administrative inaction severely impairs SI's ability to complete a congressionally

mandated national-security program, while consumers in its service area continue

to be deprived of competitive wireless service. Why two years have passed

without a final agency order is unfathomable; surely it can decide this matter

speedily. The Court should direct it to take prompt action and retain jurisdiction to

ensure that happens.

---

[2] *Id.*

**Jurisdiction and Relief Sought**

On December 3, 2025, two months after the Court's disposition of the prior case, SI informed the FCC Commissioners that the CFO and the Commission's uppermost managers were remaining unresponsive to SI's requests to rescind the funding hold. SI asked that the Staff be instructed to act or that SI be informed when action would occur.[3] Nobody replied.

SI again seeks mandamus under the All Writs Act[4] to "compel agency action unlawfully withheld or unreasonably delayed."[5] The FCC's inaction, in a matter involving a single small provider, continues on and now verges on two years—a sign that something's amiss.[6] Its ignoring the Court's stated expectations confirms that further delay is "so egregious as to warrant mandamus."[7]

---

[3] Letter from Stephen Leckar-The Hon. Brendan Carr, *et al* (FCC, filed Dec. 3, 2026) (App'x:299-301).

[4] 28 U.S.C. § 1651(a).

[5] 5 U.S.C. § 706(1) (Administrative Procedure Act ("APA")).

[6] *MCI Telecommunications Corp. v. FCC*, 627 F.2d 322, 341 (D.C. Cir. 1980) (expecting that administrative decisionmaking "will be finally decided within a reasonable time encompassing months, occasionally a year or two, but not several years").

[7] *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*").

**Procedural Background and Issues Presented**

In 2020 Congress determined that Chinese equipment posed a national security risk and the public interest lay in reimbursing providers who under FCC-approved plans promptly removed, destroyed and replaced those materials. SI responded to that call, understanding that under the law and FCC regulation it was to accomplish its work within a year of receiving funding, absent good cause for an extension.[8]

---

[8] 47 U.S.C. §§ 1601, 1603(d)(6)(A)-(C) (2020); *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Second Report and Order, 35 FCC Rcd 14284, at 14354, ¶ 169 (2020) ("2020 Supply Chain Order").

In May 2024 SI's principal, Leslie Williams ("Williams"), told the POST how the FCC's misadministration of the SCRP had affected SI and caused large gaps in wireless service nationwide.[9]  His statements presaged deficiencies that the FCC admitted in Reports to Congress.[10]

His disclosures also came at a price.  The CFO's July 2024 funding hold cited the POST article as a catalyst.[11] The EB also leaped in by imposing massive informational demands on SI—of which more later.[12]

---

[9]  Eva Dou, Funding Shortfall for New Tech Endangers Rural Cell Service, FCC Says, WASHINGTON POST (May 2, 2024) (FCC order to remove Huawei equipment threatens rural phone, internet service - The Washington Post). (App'x:327-330).

[10]  *E.g.,* Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fourth Report to Congress* at 9, WC Docket No. 18-89 (July 1, 2024) ("Fourth Report") (https://docs.fcc.gov/public/attachments/DOC-403626A1.pdf.); Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fifth Report to Congress*, at 13-14 (Dec. 30, 2024) ("Fifth Report") ( https://docs.fcc.gov/public/attachments/DOC-408520A1.pdf); Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Seventh Report to Congress* at 7-8, WC Docket No. 18-89 (December 15, 2025) (https://docs.fcc.gov/public/attachments/DOC-416757A1.pdf).

[11]  (App'x:030-033). The freeze order copied the agency's then-uppermost staff.

[12]  *See* Letter from Meghan Ingrisano, Chief, Enforcement Bureau Fraud Div'n-Leslie Williams (July 11, 2024) (App'x:035-051).

The CFO (and EB) posited that SCRP participants had to maintain "normal" service to an active paying customer base and generate "normal" cash flow even after removing the network needed to serve customers. SI's response to the CFO (and EB) contested this theory as legally meritless and motivated by a desire to suppress honest criticism. SI stated that it had relied on identified communications from the FCC and Staff, which urged providers to purge Chinese equipment expeditiously, given the national emergency, and that the firm's SCRP application and plans were candid. SI provided the CFO (and EB) with sworn responses and the data equivalent of 84 sets of the ENCYCLOPEDIA BRITANNICA.[13]

Subsequently, SI sent further information to both offices and Mr. Williams voluntarily met with three EB lawyers and an investigator at Thanksgiving 2024. The next month SI answered further requests for information.[14]

Because the FCC wouldn't address SI's application to the Commissioners for agency action, on April 17, 2025, SI sought mandamus. On July 11, 2025,

---

[13] Letter from Stephen Leckar-John Corbin, Esq. (EB) & Dan Daly, Esq. (CFO) (Sept. 17, 2024) & Leslie Williams Declaration (App'x:053-144).

[14] SI provided supplemental information to the CFO and EB between late September-November 2024. (App'x:146-147, 149-151, 155-209). After Mr. Williams' interview, SI thrice answered follow-up requests. (App'x:211-216, 218-220, 222-223). And on December 23, 2024, SI updated the CFO the freeze's harming competition in the firm's market. (App'x:225-229).

amid that litigation, the CFO extended the hold for another year.[15]  It claimed that those whom SI had identified to it and the EB as being wireless service customers when SI applied for SCRP did not confirm that representation.[16]  The CFO denied SI's request for documents substantiating that allegation by stating that the EB wouldn't allow it, thereby implicitly showing the CFO's lack of independence.[17]

Furthermore, by saying nothing about the agency's representations and assurances which SI had identified, the CFO's renewed freeze evaded addressing SI's reliance interests.[18]

On August 15, 2025, SI provided the CFO with sworn declarations from four customers and the technician who'd installed SI's devices.  They confirmed active service beyond late 2022.[19]  The FCC remained non-responsive.

---

[15]  Letter from Timothy Siekerka, CFO-Leslie Williams re: Notice of Funding Hold (July 11, 2025) (App'x:231-235) ("Siekerka Letter").

[16]  Siekerka Letter at 2-3. (App'x:232-233).

[17]  Letter from Stephen Leckar- Dan Daly, Esq. re: SI at 2 (July 21, 2025) (App'x:237-238); E-mail from Daniel Daly-Steve Leckar re: Notice of Funding Hold (July 29, 2025) (App'x:240-241).

[18]  *See id.*

[19]  Letter from Leslie Williams, SI Wireless-Jae Song, CFO re: Response to Funding Hold at 2-3 & Attachment A (Aug. 15, 2025) (declarations) ("Williams Response") (App'x:243-283).

On October 10, 2025, SI asked the CFO and Staff principals to lift the freeze or state when a decision would be reached. SI noted this Court's expectation that the FCC would "'act promptly….'"[20] Nobody responded.

On December 3, 2025, SI wrote to the Commissioners and described the Staff's silence and unwillingness to take prompt action. The continuing delay, SI added, was inimical to consumers' interests and the agency's credibility in managing the SCRP program.[21] No response ensued.

The question presented is whether the FCC's continuing unwillingness to take final agency action on the CFO's funding hold, despite this Court's concerns with further delay, is egregious and warrants judicial interposition.

**Statement of Facts**

SI has a long history as a "provider of advanced communications services."[22] In answering the funding freeze, SI informed the Staff that even before Congress appropriated monies for the program the FCC had exhorted it and other

---

[20] Letter from Stephen Leckar-Dan Daly, Esq., re: SI Wireless (Oct. 10, 2025) (App'x:294-297). Copies were sent to the Chief of the Wireline Bureau, the EB Director, the FCC's then-Managing Director, and its General Counsel, whom the CFO's July 11th freeze notice had copied.

[21] Letter from Stephen Leckar-The Hon. Brendan Carr, *et al* re: SI Wireless (Dec. 3, 2025) (App'x:299-301). SI again copied the Staff. *Id.* at 3.

[22] 47 U.S.C. § 1608(10) (definitions).

carriers to begin remediation and then participate in the SCRP. And SI demonstrated that its twice-approved plans and subsequent reports disclosed what it intended to accomplish and then what it had accomplished. In addition, SI explained to the Staff that their idea that participating in the SCRP with cash-paying customers using a temporarily ripped-out network defies commonsense—and that SI had met the requirements to participate in the SCRP.

Following the CFO's peremptorily renewing the freeze and the FCC Reply brief's bald claim that the agency was questioning the presence of customers,[23] SI supplied the CFO (and the Court) with declarations from customers and a technician confirming SI's providing wireless service when it applied to the SCRP. The FCC never responded.

I. <u>SI was an established provider of advanced communications services</u>.

SI had a historic customer base of about 30,000. In May 2019 it had nearly eleven thousand customers.[24] It earned revenue from those customers and didn't receive USF subsidies.[25]

---

[23] FCC Opposition, *In re SI Wireless, LLC*, No. 25-1112, at 9-10 (D.C. Cir. Aug. 1, 2025).

[24] (App'x:003-004,18, 065; 087).

[25] (App'x:004, 055). The USF provides participants funding through programs enhancing broadband connectivity in rural and low-income markets. *See* (https://www.usac.org/).

SI, like many of its counterparts, used equipment made by Huawei, a Chinese concern. Once that gear's presence became a national defense concern, SI tracked proposals before Congress and the FCC to fund the equipment's removal.[26] After the SCRP's enactment, SI submitted a statement of interest to participate in the program.[27]

In 2020, SI transitioned 3000 customers to another carrier. Afterwards SI began removing Huawei equipment because the FCC proclaimed the Program's establishment was imminent.[28]

---

[26] (App'x:007, 056). In 2018, SI was one of seven carriers whose estimates prompted the FCC to recognize that "the impact of a rip-and-replace requirement is large…." *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd 11423, ¶ 114 (2019).

[27] (App'x:007).

[28] (App'x:018, 056-057).

II. The FCC urged providers with Huawei equipment to participate in the SCRP and made no demands for "normal" service and cash flow.

Ripping and replacing a functioning network isn't "normal" and the SCRP's legislative history, statute and FCC regulations never demanded a "normal" operation or cash flow for SCRP support.[29]  When the FCC urged SI and other providers to participate quickly, the agency never demanded paying customers nor any level of broadband service during the transition.

A. The FCC "applauded" providers for removing Huawei equipment ahead of the program's start without demanding any level of service.

SI's January 2022 SCRP application followed its studying the FCC's December 2020 Second Report, attending an FCC webinar, and receiving the Staff's confirmation that those who began remediating immediately and removing Chinese equipment under approved plans and procedures would be reimbursed their reasonable covered expenses.

1. In December 2020 the FCC "applauded" providers' "proactively taking steps to increase the security of their networks" and promised to "allow

---

[29] H.R. Rep. 116-352, "Secure and Trusted Communications Networks Act of 2019" (116th Cong., 1st Sess., Dec. 16, 2019); 165 CONG. REC. H.1022-10286 (Dec. 16, 2019); 47 U.S.C. § 1601 *et seq*; Second Report and Order at 2-15, (https://docs.fcc.gov/public/attachments/FCC-20-176A1_Rcd.pdf ).

providers to obtain reimbursement for costs reasonably incurred prior to the creation and funding of the Reimbursement Program …."[30]

2. Mr. Williams observed a September 2021 webinar where Wireline Competition Bureau heads recognized that providers faced a "complex task" which "will not be simple …. "[31] They recognized—in words pertinent here—that "in some cases this will mean starting over from scratch" and pressed providers to "make no mistake—the time is now to remove this equipment from our networks …."[32]

3. Swift reimbursement was effectively assured: "We understand that many of these carriers are small carriers that may not have the

---

[30] Second Report at ¶ 130 (App'x:009, 057).

[31] Public Notice, *FCC Announces a Webinar for the Secure and Trusted Communications Networks Reimbursement Program*, DA 21-1164 (Sept. 16, 2011); (App'x:009,058). The FCC delivered a similar message at a February 2021 Rural Wireless Association ("RWA") seminar. (App'x:231).

[32] FCC SCRP Webinar (Sept. 27, 2021) (https://youtu.be/9cFEeHgMYgo (webinar) (App'x:009-010, 058); https://www.fcc.gov/news-events/events/2021/09/secure-and-trusted-communications-networks-reimbursement-program-webinar) and Tr. at 11) (remarks of Bureau Chief Harkrader). The FCC's theme of exigency was overarching. *See id.* at 5 ("you can also start going ahead now; there's no need to wait to compile vendor quotes, invoices and other documentation") (App'x:010, 058).

resources to float paying all these expenses while they wait to be reimbursed."[33]

4. The FCC's clarion call was reinforced more directly. SI was concerned with removing its Huawei equipment but not recovering the outlay. In mid-September 2021, its regulatory counsel informed its Project Manager: "I just spoke to the FCC. As long as you have everything documented and can show that the equipment has been rendered unusable and that no data is accessible (and that it is destroyed here and not overseas) then you should be good to go."[34]

The FCC wanted networks to be remediated speedily and knew or must have known that this drastic process could temporarily result in at best limited customer service. Despite these green lights and others identified below, it has looked away from its prior stance and ignored SI's reliance interests.

---

[33] (App'x:010, 058) (remarks of Acting Associate Bureau Chief Faulb).

[34] (App'x:010, 058-059). SI's lawyer also represented the Competitive Carriers Association and RWA. (App'x:059).

B. SI's business plans fully disclosed its then-reduced customer base and its intent to remove and rebuild its system.

Primed by the FCC's pledges, SI started shedding Huawei equipment before the program's inception and sought to rebuild its network within the presumptive one-year term using FCC-sanctioned materials.

SI's first approved SCRP application defined its then-present business and its goals.

1. SI stated that it "ha[d] begun the de-installation of its [Huawei] equipment and expect[ed] to have the de-installation, destruction and recycling completed by the time it receives its first reimbursement from allocation."[35]

2. SI wrote that its "Form 477 [quarterly report] shows only a small group of subscribers as services were transitioned for most of our customers to other providers in late December 2019/early 2020 after it became apparent that the federal government would undertake this [remediation] program and after Sprint terminated the Company's roaming [affiliation] due to Sprint's impending sale to T-Mobile...."[36]

---

[35] (App'x:011, 060).

[36] App'x:011-012, 060). The FCC's approving that deal required T-Mobile's excluding Huawei goods from the network.

C. <u>The FCC knew that greatly diminished funding and programmatic delays justified accepting SI's modified plan</u>.

The FCC initially claimed that $1.9 Billion in appropriations to launch the SCRP would be sufficient. Its insistence on providers using a standard cost catalog caused that figure to skyrocket. Ultimately it sought $5.6 billion, which took four years to secure.[37]

Meanwhile participants were allocated only 39.5% of their awards, with no assurance of additional monies. Having removed its network, SI's partial funding wouldn't support rebuilding a replacement network alongside its old one. Without a network SI could not earn revenues, a conundrum exacerbated by not receiving USF subsidies. To remain viable while fulfilling commitments to its customers and vendors, SI chose fixed wireless service over 100-plus sites instead of full mobility over a 204-site network, pending full funding.[38]

The FCC then approved SI's December 2022 modified plan, which affirmed that SI had "follow[ed] the original proposal which provided for the Company's temporarily transitioning customers to other networks, then disassembling its

---

[37] FCC Public Notice, Additional Congressional Funding, DA 24-1279 (Dec. 26, 2024) (DA-24-1279A1.pdf); (App'x:059).

[38] SI's approved $181 million program dropped to $71 million.

existing network, and then bringing up the replacement network, restoring former customers and adding new customers to a modernized network."[39] SI explained:

1. "[T]he decommissioning work is substantially accomplished and SIW has made substantial reimbursement requests so that it can pay costs associated with the decommissioning and destruction process. The delay in processing these invoices exceeds 5 months in some cases and has put SIW in peril with its vendors…..."[40]

2. SI reaffirmed transitioning most of its customers to other carriers to "offer[] them continuity of services …[and to have] cut nearly all of [its] revenue sources" while "expenses associated with the network with much fewer customers are still being incurred."[41]

3. SI's October 2022 quarterly "SCRP-5640" report was equally candid: "Our company has chosen to no[t] hot cut but rather to move subs, take down and redeploy the network. We are a small business without extensive funding and it[']s essential that we be able to complete this job

---

[39] (App'x:013, 061).

[40] (App'x:013-014, 061-062).

[41] (App'x:014, 062).

in a short time frame as all our incoming cash flow has been turned off

for this process and to date none brought in from reimbursements.[42]

4. In January 2023, SI restated that "[u]nlike some of the other

applicants, SIW has been able to migrate its customer base to another

network while the equipment is being replaced rather than build a new

network and then migrate customers to it.  SIW has been able to

proceed at a much quicker pace as a result[] but is now stuck because

it has not been reimbursed for its efforts thus far."[43]

SI's representations triggered no contemporaneous angst.  Nobody

demanded "normal" (or any level) of service.

D. <u>Despite being affected by Program-wide dysfunctions and receiving no operating funds for four years, SI has materially accomplished much of its approved construction. Yet it remains unpaid for work invoiced years ago</u>.

SI has installed equipment on 88 replacement sites fully and 14 sites

partially, exceeding what its second approved plan envisioned.

SI accomplished this despite the reasons for delays given in the FCC's

Fourth and Fifth <u>Reports to Congress</u>, which appeared after the POST article's

---

[42]  (App'x:163).

[43]  (App'x:169).

publication.  Those transmittals identified the "(1) absence of full funding; (2) supply chain delays; (3) labor shortages; (4) weather-related challenges; and (5) extended review times in the processing of requests for reimbursement" as causing many providers to experience problems.[44]  That bland claim beclouds important facts.

The FCC obscured its role in underfunding the SCRP and causing delays to become common because its policy wouldn't allow invoices or modifications to be processed when others were pending, even reneging on the Program Administrator's commitments to get funding expedited.[45]  Thus SI faced a major reimbursement backlog even before the freeze.

SI timely alerted the powers-that-be to those issues. Between the fall of 2022-early 2023, for instance, Mr. Williams and SI's regulatory counsel importuned the Staff to examine how the delayed reimbursements impacted its particular configuration.[46] SI's quarterly "Form 5640" reports to the FCC reflect such concerns.[47]  For instance, its July 2023 "5640" stated that: "Some continuity

---

[44]  (App'x:014-015, 062) (quoting Fourth Report, at 9 (https://docs.fcc.gov/public/attachments/DOC-403626A1.pdf.)).

[45]  (App'x:015, 062-063).

[46]  (App'x:015, 063).  By then, SI was confronting payment lag. *Infra* at p. 20.

[47]  (App'x:015; 153-158, 159-209).

of who is doing the reviews combined with some channels for communication above is needed especially for companies like ours that have started earlier than others and are going about this in a different order (ie [*sic*] ripping then replacing instead of a simultaneous process.  We have invited those reviewing our project to the market to gain an understanding of each others['] needs to get through this together in the easiest manner…."[48]  These and similar disclosures  fell on deaf ears.

The delay and continuing freeze have severely prejudiced SI. As of the filing of this Petition, approximately $14.8 million in submitted reimbursement requests, extending as far back as October 2022, are pending before the FCC administrators. Because the FCC administrators have failed to act on a pending $32.6 million modification request. SI therefore is unable to submit claims for those costs.  Nor can it seek additional millions of dollars to acquire replacement equipment to rebuild its network after meeting the FCC's directives.[49]

III.     SI's customer base was sufficient at all relevant times.

To bolster the notion that a SCRP provider must have a "normal" business the Staff conjured a theory that an active paying customer base was necessary

---

[48]  (App'x:185).

[49]  *E.g.* SI Form 5640 Report (Mar. 30, 2026) (App'x:311-317).  Another $12.5 million remains in "Submitted" status and have never been reviewed.

during network replacement. However, the statute and FCC regulations lack such a demand, and the Staff's revisionist interpretation would command no deference in any event.[50]

In addition to having reasonably relied on the FCC's written and oral commitments and its approval of SI's business plans, SI explained that it always had a customer base and maintained a small group when it applied to SCRP:

> (i) Neither the statute, legislative history, nor FCC rules require a provider to have active customers—or generate cash flow—during network replacement. The FCC's January 10, 2023, Report to Congress outlines required elements such as cost estimates, equipment details, timelines, and certifications, but didn't reference customer metrics.[51]

> (ii) Even if the timing of customer status were relevant—which it is not—SI had several thousand customers in 2019–2020 when it first expressed interest in the SCRP.[52]

> (iii) The statute only requires having under 2 million customers, which SI never approached.[53]

---

[50] (App'x:017, 072-073).

[51] (App'x:017,146).

[52] (App'x:018, 056, 065).

[53] *Id.*

(iv) SI informed the CFO (and EB) that the firm had retained a limited group of customers when it applied to SCRP, and provided the underlying agreements.[54] Last August, after the CFO claimed that the customers did not "confirm[] taking any service from SI at the time of its application," SI tendered sworn declarations stating otherwise from four customers plus the technician who'd installed SI's devices at five customers' locations, which verified service through at least late 2022.[55]

(v) In addition, the Act deems a provider's Affiliates and its customers to be that provider's customer.[56] Since September 2021 Mr. Williams has held a directorship and the position of Interim General Manager of Rural Connect ("RC"), a provider with a discrete customer base. He also bought 41% of RC in June 2022.[57] Because he exercises control of RC (and his ownership interest in RC exceeds 10%), RC is an

---

[54] (App'x:019, 60, 62, 65-66).

[55] *Compare* Siekerka Letter at 2-3 (App'x:232-233) *with* Williams Response, Att. A (App'x:260-270) (declarations).

[56] 47 U.S.C. §§ 1603(b)(1) (eligibility), 1608(6)(A)-(B) (defining "customer").

[57] (App'x:019, 070-072).

"Affiliate" of SI.[58]  RC takes wholesale service from SI, and had over 1200 customers as of January 2022, when SI applied for the SCRP.[59]

(vi) Nothing in the Act requires that customers generate interim cash flow. Nor do the statute nor FCC precedent prohibit barter transactions, such as SI's accessing RC's towers in return for providing RC wireless service.[60]

In all respects, SI met the statutory eligibility framework and reasonably relied on the FCC's commitments and guidance.

IV.  <u>The freeze's timing, coupled with the CFO's brandishing the POST story and mischaracterizing Mr. Williams' statements, reflects retaliation for SI's disclosures.</u>

When the POST article appeared, Mr. Williams was no stranger to the FCC. He had spoken with the Staff and commented frequently in trade publications about programmatic shortfalls.[61]

---

[58]  47 U.S.C. § 153(2).

[59]  (App'x:019, 021, 066-067).

[60]  (App'x:019, 066); (App:218-219). FCC cases approving barter arrangements include *RKO General, Inc. v. FCC*, 670 F. 2d 215, 226 & n.31(D.C. Cir. 1981); *In the Matter of Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 36 FCC Rcd. 7702, 7717 & n. 91 (2021).

[61]  *E.g.,* Mike Dano, *The Huawei 'rip and replace' program is a mess, argues SI Wireless*, LIGHT READING (Oct. 18, 2023) (App'x:027) (hyperlinking listed articles).

In May 2024, following the POST's publication, the FCC's Wireline Competition Bureau sent SI a Request for Information ("RFI"), citing a concern—purportedly based on the article—that SI lacked active customers. But when the staff followed up, their focus shifted to whether SI was earning revenue from advanced communications services.

The POST story—cited in the FCC's initial freeze notice—accurately described SI's dismantling and rebuilding under approved plans. Although the story mentioned rural service gaps, it never claimed SI lacked customers. As stated, SI retained a small customer group while ripping-and-replacing and provided wholesale service to Rural Connect, which had 81 active customers on SI's network.[62] When asked about revenue, Mr. Williams referred the Bureau to Rural Connect, which he controls and which obtains wholesale service from SI.[63]

SI protested to the FCC that the freeze, following the POST story's breaking, the CFO's misreading of that article, the newly professed insistence on "normal" business, and the Staff's misunderstanding Mr. Williams' response to the Bureau, were sufficiently unjustified as to suggest a retaliatory motivation.

---

[62]  (App'x:020-021, 067, 070-072), 218).

[63]  (App'x:054, 067).

In turn, the EB's concurrent RFIs were so prolix and unrelated to the FCC's ostensible concern with SI's having customers that they corroborate SI's theory of an institutional commitment to punish protected speech.[64]  Take EB RFI 31:

> Describe the business relationships between and among the Company and any of its parents, subsidiaries, members, and associates.[10] Your description must identify all functions or services each person or entity performs and the entity for whom it performs such functions or services (e.g., an intermediate holding company that performs no functions, holds or manages assets such as leases office space, is a contracting party, performs responsible organization functions for affiliates, oversees finances such as keeping accounts, is the named entity on bank accounts, performs billing and collection, provides management functions, etc.). The Company's response must specifically state whether the Company or any of its owners or management (including managers, members, officers, or directors) have at any time had any relationship with these persons or entities. For any identified relationship, provide the following information:
> a. Explain the nature of and relevant dates associated with the relationship.
> b. Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity.
> c. A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity.
> d. A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity.
> e. A description of any shared financial assets and obligations including banking and credit accounts, and tax filings.[65]

---

[64]  SI is not seeking to interdict the EB's agenda.  *Heckler v. Chaney*, 470 U.S. 821 (1985).  SI wants the Commission to act on the CFO's unending funding freeze.

[65]  (App'x:022).

How such minutiae (and other examples reproduced in the Appendix) could show whether SI qualified for the SCRP is hard to discern. SI nevertheless responded fully to the EB and copied the CFO. Neither claimed SI's answers were deficient. Yet nearly two years have passed and the freeze endures.

V. <u>The FCC's protracted inaction harms the public interest</u>.

Promptly removing, destroying, and replacing Huawei equipment is of explicit public concern.[66] Congress and the FCC expected that it would only take a year for providers to accomplish this task after receiving their funding.[67]

Providing wireless service to an underserved rural market also is of public interest. "In the post-pandemic era, broadband has become indispensable to every aspect of modern life."[68] Consumers in underserved rural segments benefit from competitive cost, innovation, and customer care.[69] SI's price points are expected to

---

[66] 47 U.S.C. § 1601.

[67] 47 U.S.C. § 1603(d)(6); Second Report and Order, 35 FCC Rcd at 14354, ¶ 169.

[68] *Eighteenth Section 706 Report and Notice of Inquiry*, GN Docket No. 24-214 at 2, ¶ 2 (Sept. 6, 2024).

[69] (App'x:024, 074) (citing General Accounting Office*, Closing the Digital Divide for the Millions of Americans without Broadband* (Feb. 1, 2023)). (https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-broadband)).

be a quarter to one-half of the rates charged by the dominant major carriers, who typically receive government subsidies.[70]

## Reasons Why the Writ Should Issue

Neither the statute nor regulations condition SCRP eligibility on customer metrics, define when customers must be counted, if at all, nor demand that customers be paying. In any event, SI's SCRP application and business plans were accurate and it had sufficient customers to qualify for funding.

Moreover, the FCC cannot retaliate against entities who provide honest information about programmatic deficits. The circumstances which SI has described evince such misconduct occurring.

Even if the continuing freeze was validly undertaken and extended (which it was not) the FCC must decide within a reasonable time matters presented to it. It has not done so here. It did not discuss SI's arguments and evidence presented in opposition to the 2024 freeze order. Next the CFO unilaterally extended the freeze a year later and refused to disclose materials supposedly supporting its claim that SI lacked customers taking service. SI's requests for a timely decision about lifting the extended freeze have been ignored. After many additional months of consideration, the FCC has had ample time to determine whether its concerns are valid or whether the freeze should remain in place.

---

[70] (App'x:228-229) (SI letter to CFO).

**Summary of Argument**

SI was a longstanding wireless provider. It relied on the FCC's assurances that providers who expeditiously removed and replaced Huawei materials from their networks would receive SCRP funding. SI informed the FCC that it had transitioned its customers and suspended most service to undertake a rip-and-then-replace program. The FCC twice approved SI's business plans. The firm's quarterly reports disclosed what it was doing and explained that timely payments were necessary to restore the network and resume operations.

After SI began pointing out that deficiencies in the SCRP administration were impeding accomplishing its goals, the firm's reimbursements began lagging substantially. By early 2024, SI's reimbursements were sparse and sporadic—of alarm to a small firm lacking customer revenues and USF subsidies. Shortly after the POST highlighted SI's plight as exemplifying widespread problems in the SCRP, the FCC cited that article to clamp SI's funding and launch an exceptionally intrusive parallel investigation of it.

The FCC's behavior reflects hallmarks of retaliation. These include SI's protected truthful speech, a temporally proximate adverse action invoking questionable legal theories, an unwillingness to recognize that the FCC encouraged SI to participate in the SCRP and approved its business plans, a resistance to

providing documents that supposedly validate its contention that SI lacked customers and declining any dialogue with SI.

Abundant time has passed for this matter to be decided. Although Congress and the FCC expected that SCRP participants' renovation would take a year (absent an extension for good cause), SI enters its fifth SCRP year unable to complete its abbreviated construction plan, in substantial part because the FCC froze its funding and failed to act on reimbursement requests and modification submissions. The protracted delay financially cripples SI, disserves Congress' intent, and disrespects the Court's stated expectation, all while immunizing SI's rural marketplace from competition. In effect the FCC has "preclude[d] judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief."[71] A writ of mandamus directing it to issue a judicially reviewable response promptly should issue, with the Court retaining jurisdiction to see that accomplished.

## Standing

SI, as a participant in the SCRP, possesses standing.[72]

---

[71] *EDF v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970).

[72] *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 508–09 (D.C. Cir. 2020).

## Argument

### I.    The governing statute

A petitioner challenging an agency's unreasonable delay must show that the agency has "failed to take a discrete agency action that it is required to take."[73] Administrative bodies must decide matters presented to them[74] and federal courts may "compel agency action unlawfully withheld or unreasonably delayed."[75]

SI also brings claim under the All Writs Act, seeking a writ of mandamus to compel agency action unreasonably delayed, where needed to uphold a court's "interest in protecting its future jurisdiction."[76]  The plaintiff must "demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists."[77]

---

[73]  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted).

[74]  5 U.S.C. § 555(b).

[75]  5 U.S.C. § 706(1).

[76]  *In re Core Communications, Inc.*, 531 F.3d 849, 856 (D.C. Cir. 2008); *TRAC*, 750 F.2d at 75. *See also* 28 U.S.C. § 1651(a).

[77]  *Am. Hospital Association v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (cleaned up).

Review of agency inaction is identical under each theory.[78] The dispositive issue is "'whether the agency's delay is so egregious as to warrant mandamus.'"[79] The statutes "empower[] a court only to compel an agency 'to perform a ministerial or non-discretionary act[ ]' ... without directing how it shall act."[80]

## II.     The *TRAC* standards

"There is 'no per se rule as to how long is too long' to wait for agency action."[81] *TRAC* laid out six principles that offer "useful guidance" for analyzing claims of unreasonably delayed agency action.[82]  These are:

---

[78]  *Core Communications*, 531 F.3d at 855.

[79]  *Am. Hosp. Ass'n*, 812 F.3d at 189 (D.C. Cir. 2016) (cleaned up).

[80]  *Norton*, 542 U.S. 55, 64 (2004) (emphasis omitted).

[81]  *Norton*, 542 U.S. at 63 (quoting ATT'Y GEN.'S MANUAL ON THE ADMIN. PROC. ACT 108 (1947)); *Core Communications*, 531 F.3d at 855 (cleaned up).

[82]  *Afghan and Iraqi Allies v. Blinken*, 103 F.4th 807, 815 (D.C. Cir. 2024) (citing *TRAC*, 750 F.2d at 80).

(1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.[83]

Those factors "are not 'ironclad,' but rather are intended to provide 'useful guidance in assessing claims of agency delay.'"[84] "'Each case must be analyzed according to its own unique circumstances.'"[85]

### III. Applying the *TRAC* standards to the facts

The FCC's unbated delay fails the *TRAC* methodology.

**1.** The first *TRAC* factor—that an agency follow "a rule of reason" that justifies its timeline—is the "most important factor."[86] "[A] reasonable time for

---

[83] *Am. Hosp. Assn*, 812 F.3d at 189 (quoting *TRAC*, 750 F.2d at 80). *See also In re Monroe Communications Corp.*, 840 F.2d 942, 945 (D.C. Cir. 1988) (applying *TRAC*).

[84] *Core Communications*, 531 F.3d at 855 (quoting *TRAC*, 750 F.2d at 80).

[85] *Am. Hosp. Ass'n*, 812 F.3d at 189 (quoting *Air Line Pilots Ass'n v. Civ. Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984)).

[86] *Core Communications*, 531 F.3d at 855.

agency action is typically counted in weeks or months, not years."[87]  And in the

context of an FCC case, "this court has stated generally that a reasonable time for

an agency decision could encompass 'months, occasionally a year or two, but not

several years or a decade.'"[88]  Whether the FCC satisfies that "rule of reason"

depends on "the complexity of the task at hand, the significance (and permanence)

of the outcome, and the resources available to the agency."[89]

SI meets *TRAC*'s first element.

- The "task at hand," as we begin Year 5 of a Congressionally-defined
  presumptive one-year project, is not complex.  The CFO and EB
  quibble over whether SI had a "normal" operation and cash flow,
  something required neither by the SCRP[90] nor common sense. This is
  an issue of law, over which the FCC cannot ponder limitlessly.[91]

---

[87]  *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004).

[88]  *Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 359 (D.C. Cir.1987) (quoting *MCI*, 627 F.2d at 340).

[89]  *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003).

[90]  47 U.S.C. §§ 1601-1609.

[91]  *Core Communications*, 531 F.3d at 859.

- The Staff's belief that SI should have had and lacked active customers doesn't present an esoteric issue and is not entitled to deference. Again, SI historically had a healthy customer base, migrated most of them after the SCRP's enactment, and with the FCC's encouragement, began ripping and replacing before appropriations, intending to restore full service once the new network was erected. SI's business plans and Form 5640 reports disclosed its history and diminished customer base, the market dynamics, and its intent to remove and destroy the Huawei equipment and defer customer revenue while committing tens of millions of dollars to removing and rebuilding its network and then reestablishing full service. The FCC's failure to consider and address SI's reasonable reliance interests is a conspicuous omission in an APA matter.[92]
- The absence of any demand in the organic statute that normal operations and customer service be maintained during a rip-and-replace process casts a further shadow over the Staff's position.[93]

---

[92] *DHS v. Regents of the University of California*, 591 U.S. 1, 30-33 (2020); *Trinity Broadcasting of Florida, Inc. v. FCC*, 211 F.3d 618, 631-632 (D.C. Cir. 2000) (citing *Orion Communications Ltd. v. FCC*, 131 F.3d 176, 180-181 (D.C. Cir. 1996)).

[93] *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

- Nine months ago, SI provided to the FCC sworn declarations rebutting the FCC's claim of possessing evidence that SI lacked customers—which the CFO won't substantiate. That sentence-first-verdict-later attitude would make the Queen of Hearts proud.[94]

SI also has the better argument over the "significance and permanence of the outcome" and "the agency's resources."

- The FCC's freeze is existential. It cripples SI's ability to pay vendors and restore full service, after expending massive, borrowed sums to dismantle everything and beginning to erect a replacement network. These consequences force a firm with years of service which heeded the agency's drumbeat to move quickly with remediation, even before any approved program, out of business. (The unending freeze's impact on SI's marketplace is analyzed in SI's discussion of the public interest, *TRAC* Factor Three.) Ironically, having crimped SI's cash flow, the FCC remains hunkered down and oblivious to how its delay impedes SI's earning income.

---

[94] Lewis Carroll, ALICE'S ADVENTURES IN WONDERLAND (New York: D. Appleton and Co., 1866).

**2.** The second *TRAC* factor considers the "statutory scheme [that] may supply content for this rule of reason."[95] Congress expected that shedding, destroying, and replacing the Chinese equipment would be completed within one year from reimbursement funds being distributed, with extensions for good cause.[96] But for the FCC's fitful oversight and irregular reimbursements, followed by the CFO's extended freezes, SI long ago should have been reimbursed and operational. It is unreasonable for the FCC, after urging SI to act swiftly, approving its business plans, and then starving its cash flow, to suppress funding unendingly.

Moreover, the FCC has not acted "equitably" in administering the program.[97] Providers with parallel networks, who can concurrently rip and replace, are funded. SI, whose approved plans call for ripping, destroying and then replacing its Huawei equipment, has faced bewildering bureaucratic impediments.

**3.** Next, *TRAC*'s third step evaluates the public interest. Surely it is in the public interest that a federal agency meet an appellate court's stated expectations. As well, Congress and the Executive branch declared that removing Chinese

---

[95] *Core Communications*, 531 F.3d at 855. *See also Afghan and Iraqi Allies*, 103 F.4th at 816-817.

[96] 47 U.S.C. § 1603(d)(6).

[97] 47 U.S.C. § 1603(d)(5)(A).

equipment from the nation's broadband networks is a "national security" priority, presumptively to be accomplished in a year.[98]

Those weighty considerations aside, the financial consequences to SI from the passage of time are manifest. The freezes have precluded SI's recovering tens of millions of dollars in reimbursement requests and reimbursement-eligible costs. An applicant's "[e]conomic harm is clearly an important consideration and will, in some cases, justify court intervention" in a case of agency inaction.[99]

Moreover, "agency delay is least tolerable" in cases "in which human health and welfare are at stake."[100] Wireless communications impact public welfare, and the ability to access the internet is a factor to be considered in appraising where the public interest lies.[101] The FCC's foot-dragging has left wide swaths of SI's rural marketplace without efficient lower-cost competition since the Affordable Connectivity Program ended.[102]

---

[98]  N. 8, *supra*.

[99]  *Cutler v. Hayes*, 818 F.2d 879, 897 (D.C. Cir. 1987) (citing, *inter alia*, *MCI*, 627 F.2d at 341-342; *American Broadcasting Co. v. FCC*, 191 F.2d 492, 501 (D.C. Cir. 1951)).  *See also Afghan and Iraqi Allies*,103 F.4th at 818.

[100]  *FEC v. Rose*, 806 F.2d 1081, 1092 n.17 (D.C. Cir. 1986).

[101]  *Monroe Communications*, 840 F.2d at 945 n.4.

[102]  FCC Affordable Connectivity Program, Frequently Asked Questions (June 30, 2024) (https://www.fcc.gov/sites/default/files/ACP-FAQs-Post-ACP-Ending.pdf.

In any event, the third "factor alone can hardly be considered dispositive when ... virtually the entire [FCC] docket ... involves issues of this type," namely, economic regulation.[103]

**4.** The fourth *TRAC* factor, "the effect of expediting delayed action on agency activities of a higher or competing priority," cannot be held against SI. Expediting relief for it would not disrupt higher-priority agency activities. Although relief that would rearrange a "queue" is inappropriate,[104] the FCC has never claimed that a queue exists or shown SI's place there, much less whether other providers in that line receive USF subsidies, unlike SI.

That last point matters, given Congress's directive to distribute funds equitably under the SCRP. Although some providers have received ongoing support, such as through USF subsidies, SI has been cut off, creating a disparity that Congress sought to avoid. Granting relief, then, would correct an unjust delay.

**5.** The fifth *TRAC* factor assesses the "nature and extent of the interests prejudiced by delay."[105] Two distinct interests are present. One is that of SI, which responded to Congress and the FCC's invitations to participate in a program

---

[103] *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987).

[104] *Mashpee*, 336 F.3d at 1100 (cleaned up).

[105] *TRAC*, 750 F.2d at 80.

essential to national security. SI relied on the FCC and its Staff's urging to start remediation before appropriations, disclosed its business operation and plan, and removed the offending equipment, installed much of its replacement network pursuant to FCC-approved plans, and incurred substantial uncompensated costs in carrying out the program.

Furthermore, the interests of consumers in SI's underserved rural marketplace should be considered. They are being denied the benefits of price competition and innovationda.

**6.** Finally, a *TRAC* appraisal considers any alleged "improprieties in the administrative process." Although the Court need not find that an impropriety existed,[106] "[w]here the agency has manifested bad faith..., the agency will have a hard time claiming legitimacy for its priorities."[107] Such evidence exists here.

- The FCC had a motive to retaliate for SI's truthfully disclosing to the WASHINGTON POST and other media outlets the agency's persistent programmatic deficits.

- Temporal proximity to the protected speech and questionable comments about it exist. The CFO linked the freeze to the POST story

---

[106] *Afghan and Iraqi Allies*, 103 F.4th at 820) (citing *TRAC*, 750 F.2d at 80).

[107] *In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("especially shabby treatment of one applicant" may justify judicial intervention).

and questioned SI's lacking "normal" business and cash flow—notwithstanding the agency's seminars and public announcements explicitly recognizing that participants' revenues likely would decline during reconstruction; its approving SI's business plans and "5640" reports, which showed how the firm would meet the SCRP's purpose.

- The FCC's actions *ante litem* and its current posture differ markedly. It approved of SI's suspending almost all service to rip and then replace the network.

- The funding freeze is based on legal theories that ignore the statute and precedent.

- The FCC remains nonresponsive to SI's seeking final agency action on the CFO's continuing funding freeze, notwithstanding the Court's stated expectations.

These events' confluence reflects bad faith.[108]

## IV. Relief Sought

SI asks only that the FCC be required to take final agency action after nearly two years of an unresolved suspension. A writ of mandamus is necessary to

---

[108] In *Monroe Communications*, this Court declined mandamus but retained jurisdiction where the FCC's delay followed an unrebutted allegation of bad faith — namely, that it stalled action to avoid a required result. 840 F.2d at 946–47. SI has presented a more compelling record of administrative abuse.

compel that relief.  The panel should retain jurisdiction and direct the FCC to submit monthly reports until a final agency disposition of this matter occurs.[109]

Respectfully submitted,

/s/Stephen C. Leckar
Stephen C. Leckar, D.C. Bar # 281691
Kalbian Hagerty, LLP
888-17th St., NW, Twelfth Floor
Washington, D.C. 20006
(202)223-5600
sleckar@kalbian-hagerty.com

---

[109] *E.g., Core Communications*, 531 F.3d at 861; *In re United Mine Workers of America International Union,* 190 F.3d 545, 555 (D.C. Cir. 1999).

# Certificate of Compliance

1. This brief complies with type-volume limits and Circuit Rule 21 because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 7792 words.

2. This brief complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14pt Times New Roman style.

Dated: June 5, 2026

/s/ Stephen C. Leckar
*Counsel for Petitioner*

## Certificate of Filing and Service

I certify that on this 5th day of June 2026, I caused this Second Petition and Appendix to be filed electronically with the Clerk of the Court and will cause a copy to be mailed promptly to the Federal Communications Commission at the address which by Internet Notice (https://www.fcc.gov/general/electronic-and-hard-copy-filing-address) the Federal Communications Commission has directed such filings be accomplished:

> Federal Communications Commission
> Attn: Marlene H. Dortch, Secretary
> Federal Communications Commission
> Office of the Secretary
> 45 L Street NE
> Washington, DC 20554

And by hand service to:

> The Honorable Todd Bove
> Acting Attorney General
> United States Department of Justice
> 950 Pennsylvania Avenue NW
> Washington DC 20530-0001

> /s/ Stephen C. Leckar
> *Counsel for Petitioner*

*In re* SI WIRELESS, LLC
      **Petitioner,**

                                  **No. 26-_____**

      **v.**

**FEDERAL COMMUNICATIONS COMMISSION**
      **Respondent.**

### Rule 26.1 Certificate

Pursuant to Rule 26.1, Fed. R. App. P., and Circuit Rule 26.1, Petitioner SI Wireless, LLC, states:

1.      Petitioner is a Limited Liability Corporation organized under the laws of Illinois.  Its parent company is Integrated Business Networks, LLC, a Limited Liability Corporation organized under the laws of Delaware.  Neither firm is publicly held and no publicly-held company has a 10% or greater ownership interest (such as stock or partnership shares) in either entity.

2.      Petitioner is a small wireless broadband provider serving rural Southern Illinois, Tennessee and Kentucky.

                    Respectfully submitted,

                    /s/Stephen C. Leckar
                    Stephen C. Leckar, D.C. Bar # 281691
                    Kalbian Hagerty, LLP
                    888-17th St., NW, Twelfth Floor
                    Washington, D.C. 20006
                    (202) 223-5600/ (202) 223-6625 (Fax)
                    sleckar@kalbian-hagerty.com.

# UNITED STATES COURT OF APPEALS
## For The
## DISTRICT OF COLUMBIA CIRCUIT

**In re SI WIRELESS, LLC**
      **Petitioner,**

  **v.**                                          **No. 26-**

**FEDERAL COMMUNICATIONS COMMISSION**
      **Respondent.**


## APPENDIX TO SECOND PETITION FOR MANDAMUS TO COMPEL AGENCY ACTION CONTINUING TO BE UNLAWFULLY WITHHELD OR UNREASONABLY DELAYED


June 5, 2026

Stephen C. Leckar
Kalbian Hagerty LLP
888-17th St., NW, Twelfth Floor
Washington, DC 20006
(202) 223-5600
sleckar@kalbianhagerty.com

**Exhibits to Petition for Mandamus to Compel Agency Action Continuing to Be Unlawfully Withheld or Unreasonably Delayed**

Application to FCC (Mar. 12, 2025) ............................................................... APP 001
Letter from Jae Seong, CFO-Leslie Williams (July 11, 2024) APP 030
Letter from Meghan Ingrisano, Chief, Enforcement Bureau Fraud Div'n, -Leslie
Williams (July 11, 2024) ............................................................................ APP 035
Letter from Stephen Leckar-John Corbin, Esq. (EB) & Dan Daly, Esq. (CFO) (Sept. 17, 2024)
& accompanying Declaration of Leslie Williams & Attachment of Open Invoices .......... APP 053
    -SI Ans. EB RFI 15 (Removal of Covered Equipment)
    -SI Ans. EB RFI 24 (Email thread)
    -SI Ans. EB RFI 25 (Business Plan & Updated Plan)
    -SI Ans. EB RFI 31 (Grid reflecting contractors, etc)
    -SI Ans. EB RFI 38 (Response to Bureau)
    -SI Ans. RFI 49 (Leslie Williams' experience)
Letter from Stephen Leckar-John Corbin, Esq. & Dan Daly, Esq.
    (Sept. 25, 2024) ..................................................................................... APP 146
Letter from Stephen Leckar-John Corbin, Esq. & Dan Daly, Esq.
    (Nov. 7, 2024) ....................................................................................... APP 149
Letter from Stephen Leckar-John Corbin, Esq. et al (Nov. 19, 2024)
    -Form 5640 reports ................................................................................ APP 153
Letter from Stephen Leckar-John Corbin, Esq. et al (Dec. 13, 2024) ..................... APP 211
Letter from Stephen Leckar-John Corbin, Esq. et al (Dec. 20, 2024) ..................... APP 218
Letter from Stephen Leckar-John Corbin, Esq. et al (Dec. 23, 2024) ..................... APP 222
Letter from Stephen Leckar-Dan Daly, Esq. (Dec. 23, 2024) ............................... APP 225
Letter from Timothy Siekieka, CFO's Office-Leslie Williams re: Renewed Hold
 (July 11, 2025) ........................................................................................... APP 231
Letter from Stephen Leckar-Dan Daly, Esq. (July 21, 2025) ............................... APP 237
E-mail from Dan Daly-Steve Leckar (July 29, 2025) ........................................ APP 240
Letter from Leslie Williams-Jae Seong, CFO re Response to Renewed Hold
    August 15, 2035 .................................................................................... APP 243
    -Sworn Declarations
        -Thomas Karnes Aug. 5, 2025) (Customer) ........................... APP 261
        -Robert W. Wood, Jr. (July 18, 2025) (Customer) .................. APP 262
        -Robert W. Wood, III (July 18, 2025) (Customer) ................. APP 264
        -Linda McAlpin (July 21, 2025) (Customer) .......................... APP 266
        -Kasey Krueger (July 31, 2025) (Customer) ........................... APP 268
        -Michael Houston (Aug. 11, 2025) (Installer/Monitor) ........... APP 269
    -E-mail from Cari Bennett, Esq. re: Equipment Destruction ................. APP 271
    -SI Confidential Plan (Jan. 20, 2022) ........................................... APP 273
    -SI Confidential Plan (Mar. 6, 2023) ............................................ APP 276
    -Declaration of Patrik Melander (July 28, 2025) ............................ APP 283
SI Form 5640 Report (Sept. 30, 2025) ........................................................ APP 285
Order, *In re: SI Wireless, LLC* (D.C. Cir., No. 25-112, filed Oct. 1, 2025) ............ APP 291

Letter from Stephen Leckar-Dan Daly, Esq. re: SI Wireless (Oct. 10, 2025) ............... APP 294
Letter from Stephen Leckar-The Hon. Brendan Carr, *et al* (Dec. 3, 2025) ............... APP 299
SI Form 5640 Report (Dec. 29, 2025) ............... APP 302
SI Form 5640 Report Mar. 30, 2026) ............... APP 311
Letter from Leslie Williams-Marlene Dortch, FCC re: Extension ............... APP 319
Wireline Competition Bureau, Order, Protecting Against National Security Threats
 (WC Docket No. 18-89 (May 1, 2026)) ............... APP 322
Ava Dou, Small carriers fight to survive amid delayed Huawei rip and replace Funds,
 WASHINGTON POST (May 2, 2004) ............... APP 327

## Before the
## FEDERAL COMMUNICATIONS COMMISSION
### Washington, DC 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| SI Wireless, LLC | ) | |
| | ) EB -FD-24-00036576/SCRP0001013 | |
| | ) | |
| To: The Commission | ) | |

RECEIVED & INSPECTED

MAR 1 2 2025

FCC MAIL ROOM

---

## APPLICATION TO COMPEL AGENCY ACTION UNLAWFULLY DELAYED AND VACATE FUNDING FREEZE

---

March 10, 2025

Stephen C. Leckar
Kalbian Hagerty LLP
888-17th St., NW, Twelfth Floor
Washington, DC 20006
(202) 223-5600
sleckar@kalbianhagerty.com

**APP 001**

**Table of Contents**

*Summary of Argument*......................................................................................1

*Background*......................................................................................................3

*Argument*.........................................................................................................5

    I.      The FCC and its staff led SI to commit time and capital into the Program...................5

         A.  The FCC's invitations required no specific level of customer service ...................6

         B.  SI's business plan fairly disclosed its intent ...........................................9

         C.  As SI continued removal and destruction, greatly diminished funding and undue delay in the Program's administration required modifying its plan and operation..................................................................................11

         D.  Despite being affected by Program factors which the FCC has reported as being dysfunctional, SI has materially finished much of its approved construction. Yet it remains unpaid for work it did years ago..................................................12

    II.     SI's customer base was not required but nonetheless has been sufficient at all relevant times ...........................................................................................15

    III.    The Staff's focus on Mr. Williams' remarks to the media and his response to an RFI from the Bureau misinterpret his statements ...............................................18

    IV.   The RFI's exceptionally onerous demands suggest a retaliatory agenda ....................19

    V.    The private and public interests favor a prompt disposition in SI's favor, as the unjustified Staff actions have harmed it immeasurably while significantly harming consumers in SI's underserved geographic market. ....................................21

*Conclusion*.....................................................................................................23

Addendum........................................................................................................25

**APP 002**

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| SI Wireless, LLC | ) |
| | ) EB -FD-24-00036576/SCRP0001013 |
| | ) |
| To: The Commission | ) |

**Application to Compel Agency Action Unlawfully Delayed and Vacate Funding Freeze**

SI Wireless, LLC ("SI") participates in the Secure and Trusted Communications Networks Act's Reimbursement Program ("SCRP"). It asks the Commission to require the Chief Financial Officer ("CFO") to lift its freeze order on SI's funding and promptly reimburse SI's long-delayed funds, and compel the Enforcement Bureau ("EB") to terminate its unjustified investigation of SI. These actions followed the WASHINGTON POST 's report of SI's experience in the SCRP as exemplifying how waste and mismanagement have permeated this program.

**Summary of Argument**

The CFO linked its freeze to the POST article and a belief that a rip-and- replace process should operate with normal customer patronage and cash revenue. That notion is mistaken: ripping, remediating and then replacing a network is not normal business.

Furthermore, neither the statute, regulation nor any FCC public notice condition SCRP eligibility on any customer metrics or qualities nor define when customers must be counted, if at all. The law calls for providers with under two million customers to submit proposals to remove and replace the proscribed equipment; for the FCC to approve meritorious plans; and for successful applicants to seek to purge and restore their networks within a year.[1] SI satisfied those criteria. In 2019, when it had 11,000 customers, SI filed papers with the FCC declaring its

---

[1]    47 U.S.C. § 1603(d)(6)(A)-(C).)

intent to participate in a rip-and-replace program. In July 2020, it migrated most of its customers. The company promptly began removing Huawei materials and continued doing so during 2021. SI's approved SCRP application disclosed that it would cleave and destroy that gear and resume full service after buying, testing and installing new equipment. Meanwhile to protect its spectrum SI maintained several customers' agreements.

In committing energy and capital to the SCRP, SI reasonably relied on the FCC's public assurances, such as <u>Reports to Congress</u>, which urged providers to start remediation and replacement—even before appropriations. In webinars, including one attended by Leslie Williams, SI's Managing Member, and in communications with SI's regulatory counsel, the FCC staff exhorted SI and others to move forward with innovative designs. This encouragement was important as SI doesn't get Universal Service Fund subsidies. Nobody ordained that it or any provider couldn't suspend service while removing and then replacing a network.

The funding freeze and investigation were based on the belief that Mr. Williams had told the POST that SI lacked customers. What he said was that there were "dead zones" in SI's former market area where "[c]urrently customers are without service." This was true. SI had been Sprint's roaming partner prior to T-Mobile acquiring it, which left gaps in cell phone service. Limited appropriations and the Administrator's persistent tardiness and red tape blocked SI's ability to fulfill its business plan and restore service in those areas. But no law or rule requires paying customers to be maintained on a removed network. The concept is senseless.

Nor must customers pay cash for service. Several of SI's customers have received service as an offset against amounts due for performing work for SI at agreed-upon rates. In

2

addition, it provides wholesale service to its Affiliate, Rural Connect ("RC"), to offset sums SI would owe RC for tower space. The FCC has long recognized such in-kind arrangements.

This case centers on legal questions and strong public interest concerns. No FCC or Administrator's representative ever made site visits or audits, presented SI with specific allegations of dishonesty, or questioned its work. SI is akin to a trusted customer who pressures a contractor to do a job using the customer's pricing but midway through suddenly walks away, sticking the contractor with massive bills and interest obligations. That's not right: the government should honor its contractual obligations. The SCRP's inefficient administration— the FCC ignored SI's entreaties to address programmatic deficits—has left the underserved rural communities that comprise its market to the whim of large government-funded fiber providers.

**Background**

The POST related Mr. Williams' account of how the SCRP's lackluster administration has caused inordinate delays in providers' payments and led to large gaps in customer service. He said nothing about SI's individual experience in the program that the FCC's <u>Reports to Congress</u> haven't stated in the aggregate.[2] There is a major difference. Having endured the Program Administrator's irregular policies and chronic inability to process payments, SI stepped forward in a national publication of general interest and disclosed how the firm has been buffeted by institutional dysfunctions which the FCC has tolerated for years.

---

[2]  Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fourth Report to Congress* at 9, WC Docket No. 18-89 (July 1, 2024) ("Fourth Report"), https://docs.fcc.gov/public/attachments/DOC-403626A1.pdf.); Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fifth Report to Congress*, at 13-14 (Dec. 30, 2024) ("Fifth Report"), https://docs.fcc.gov/public/attachments/DOC-408520A1.pdf).

**APP 005**

SI's revelations came at a price. The CFO's July 11th Notice of Funding Hold ("Notice") revealed that it had secretly frozen SI's funding following the POST article—which the CFO unabashedly cited as a catalyst.[3] Concurrently the EB served SI with massive Requests for Information. When disaggregated into subparts, EB posed thousands of demands on a small, minority-owned business, which in mid-September provided lengthy sworn response and an accompanying 84.0 Gigabytes of information—about 84 sets of the ENCYCLOPEDIA BRITANNICA.[4]

Since then, the CFO hasn't answered SI's requests to resume funding and the EB won't discuss whatever case it thinks exists. SI believes it has committed no wrong. It has spared no effort to address the EB's requests, to the point of Mr. Williams voluntarily meeting with its staff for a five-hour interview and then responding to several further requests for information.[5]

The Staff's coordinated actions seem rooted in the assumption that a SCRP participant must constantly maintain service to an active paying customer base. This legally meritless belief adds gloss to the Staff actions' timing and expansive investigative demands. Collectively it

---

[3]   Letter from Jae Seong, CFO-Leslie Williams at 2n.2 (July 11, 2024) (**Ex. 1**) (citing Eva Dou, Funding Shortfall for New Tech Endangers Rural Cell Service, FCC Says, Wash. Post, May 2, 2024) (https://www.washingtonpost.com/technology/2024/05/02/huawei-rip-remove-order-threatens-service/).

[4]   *Compare* Letter from Meghan Ingrisano, Chief, Enforcement Bureau Fraud Div'n, -Leslie Williams (July 11, 2024) ("EB RFI") (**Ex. 2**) *with* Letter from Stephen Leckar-John Corbin, Esq. (EB) & Dan Daly, Esq. (CFO) at 1(Sept. 17, 2024) & accompanying Declaration of Leslie Williams & selected exhibits ("SI Response") (**Ex. 3**).

[5]   *E.g,* Letter from Stephen Leckar-John Corbin, Esq. & Dan Daly, Esq. (Sept. 25, 2024) (**Ex. 4**); Letter from Stephen Leckar-John Corbin, Esq. & Dan Daly, Esq. (Nov. 7, 2024) (**Ex. 5**); Letter from Stephen Leckar-John Corbin, Esq. *et al*. (Nov. 19, 2024 (**Ex. 6**); Letter from Stephen Leckar-John Corbin, Esq., *et al*. (Dec. 13, 2024) (**Ex.** 7); Letter from Stephen Leckar-John Corbin, Esq., *et al*. (Dec. 20, 2024) (**Ex. 8**); Letter from Stephen Leckar-John Corbin, Esq., *et al*. (Dec. 23, 2024) (**Ex.** 9); Letter from Stephen Leckar- Dan Daly, Esq. (Dec. 23, 2024) (**Ex. 10**); Letter from Lisa Zaina, Esq.,-Stephen Leckar (Dec. 23, 2024) (**Ex. 11**).

suggests a retaliatory animus. Yet no one in the CFO or EB will meet to discuss this matter, let alone make decisions. It is past time to end the unjustified lingering freeze and probe.

**Argument**

After outlining SI's history as a broadband supplier and explaining how the FCC led it to participate in the Program, SI reviews its experience in the Program. SI will explain that in addition to having strong reliance interests, the notion that there must be customers on a ripped network is senseless, and the firm satisfies any questions about having customers.

I.    The FCC and its staff led SI to commit time and capital into the Program.

SI served a largely rural market in Southern Illinois, Kentucky and Tennessee. Like many providers, SI relied on Huawei equipment. Once that became a national issue, SI closely tracked proposals before Congress and the FCC to fund removing this equipment.[6] In May 2019, just after the new law's signing, SI submitted a statement of interest to participate in the SCRP.[7] After August 2020, SI began removing Huawei equipment in anticipation of the Program's establishment, as the FCC openly confirmed would be forthcoming.[8]

Although the EB's Letter of Investigation and the CFO's Notice questioned whether SI has "normal business operations and cash flow," their focus is misplaced. The SCRP wasn't designed to be "normal business"—ripping up a network and then starting anew isn't "normal." None of the relevant Congressional or FCC resources conditioned eligibility and funding on any

---

[6]    SI Response at 4 & n.3 (**Ex. 3**).
[7]    SI Supply Chain Filing (May 21, 2020).
[8]    SI Response at 4 & n.7 (**Ex. 3**) (citing SI Ans. EB RFI 15 and supporting invoices).

**APP 007**

provider's having a "normal" operation or cash flow.[9]  Indeed, the FCC "recognize[d] the removal, replacement, and disposal of covered equipment <u>may</u> in the case of mobile wireless networks, entail setting up parallel network core and RAN components and then migrating existing customers to the new network."[10]  Using "may" signified that there could be various other approved ways—SI's being a different one—to meet the common goal.  The SCRP was not a "one size fits all" concept.   As well, everyone understood that some providers might suffer customer attrition and diminished revenues from the discontinuities that would result during the process.  The sole "penalty" was that the Program would not reimburse those lost revenues.[11]

As applied here, a Rip and then Replace network migration business model is what SI presented and the FCC then formally approved. SI never proposed and the FCC never demanded setting up parallel networks that would have allowed for paying customers during the transition, much less insisted on SI having any level of customers and service.

A.  <u>The FCC's invitations required no specific level of customer service</u>.

SI's January 2022 SCRP application followed its studying the Second Report, attending FCC webinars, and receiving its lawyer's confirmation from the staff that providers who started remediating early would be reimbursed for their documented reasonable expenses.  Nobody expressed concerns with suspending service.  Rather, it was all about removing the equipment:

---

[9]  H.R. Rep. 116-352, "Secure and Trusted Communications Networks Act of 2019" (116th Cong., 1st Sess., Dec. 16, 2019); 165 CONG. REC. H.1022-10286 (Dec. 16, 2019); 47 U.S.C. § 1601 *et seq*; *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Second Report and Order at pp. 2-15, WC Docket No. 18-89, 35 FCC Rcd (Dec. 11, 2020) ("Second Order").

[10]  Second Report and Order, ¶ 134 (emphasis added).

[11]  *Id.*

1. The FCC encouraged providers to begin renovating before congressional appropriations.  Mr. Williams studied its December 2020 Second Report, which "applauded" providers for "proactively taking steps to increase the security of their networks" and confirmed that "we will allow providers to obtain reimbursement for costs reasonably incurred prior to the creation and funding of the Reimbursement Program…."[12]  By then, SI had been removing Huawei materials since that past August.

2. Uppermost-level FCC staff followed suit.  Mr. Williams attended a September 2021 webinar where the Wireline Competition Bureau's heads recognized that providers faced a "complex task" of "evaluating base station after base station, router after router," and admitted  that "this will not be simple: removing insecure equipment from existing networks after installation is challenging because historically these systems have been closed and deeply integrated with little opportunity to mix and match equipment from different vendors."[13]

3. The Bureau overseers conceded that "in some cases this will mean starting over from scratch" and urged providers to "make no mistake—the time is now

---

[12] Second Report and Order at ¶ 130; SI Response at 5 & n.14 (**Ex. 3**).  Mr. Williams has been a Certified Project Manager and in the telecommunications industry since 2004.  *Id.* at 5 & n.15 (citing Ans. EB RFI 49).

[13] Public Notice, *FCC Announces a Webinar for the Secure and Trusted Communications Networks Reimbursement Program*, DA 21-1164 (Sept. 16, 2011); SI Response at 6 & n.16 (**Ex. 3**) (citing Ans. EB RFI 24).  A similar message was given at a February 8, 2021, webinar under the Rural Wireless Association's ("RWA") auspices.  Letter from Lisa Zaina, Esq.-Stephen Leckar re: FOIA Control No. FCC-2025-000231 at 2 (Dec. 23, 2024) (**Ex. 11**).

**APP 009**

to remove this equipment from our networks ….”[14]  And it was stated that “We understand that many of these carriers are small carriers that may not have the resources to float paying all these expenses while they wait to be reimbursed.”[15]

    4.   The palpable sense of urgency imparted by the government was driven home to SI via a more direct channel.  Before the September Public webinar, SI had begun significant removal operations but was concerned with accelerating the pace and not recovering its associated expenses. In mid-September, SI's regulatory counsel wrote to its Project Manager: “I just spoke to the FCC.  As long as you have everything documented and can show that the equipment has been rendered unusable and that no data is accessible (and that it is destroyed here and not overseas) then you should be good to go.”[16]

SI reasonably relied on these representations.  The FCC never insisted on maintaining any level of service while providers reconfigured their networks.

---

[14]  SI Response at 6 & n.17 (**Ex. 3**) (citing Ans. EB RFI 24) (https://youtu.be/9cFEeHgMYgo (webinar); https://www.fcc.gov/news-events/events/2021/09/secure-and-trusted-communications-networks-reimbursement-program-webinar) and Tr., pp. 1 (quoting remarks of Bureau Chief Trent Harkrader)).  The theme of exigency was emphasized repeatedly. *See id.* at pp. 5 (“you can also start going ahead now; there's no need to wait to compile vendor quotes, invoices and other documentation”), 15 (recognizing that lines of credit might have been obtained by “a program participant that has begun the remove replace and dispose process prior to applying for and receiving their funding allocation from the reimbursement program”) (quoting remarks of Acting Associate Bureau Chief Justin Faulb).

[15]  SI Response at 6 & n.18 (**Ex. 3**) (Faulb).

[16]  SI Response at 7 & n.19 (**Ex. 3**) (quoting Ans. EB RFI  24) (Email thread of September 1—13, 2021, between Eric Steinmann-Cari Bennet, Esq.) (SIWIRELESS 24-000003.) Ms. Bennet was counsel for the Competitive Carriers Association and the RWA.

B.    SI's business plan fairly disclosed its intent.

SI submitted a successful proposal for $181 million, although Congressional funding constraints later lowered the allowance to $71 million.  SI's representations were accurate.

1.  Its application correctly disclosed that it had "[f]ewer than two million customers."  SI also wrote that it hadn't ceased being an advanced communications provider: its determination to undertake ripping, replacing and then bringing back a full complement of revenue-paying customers was fundamental to its approved plan.  Meanwhile it maintained a small group of customers taking broadband service.

2.  SI stated that it "ha[d] begun the de-installation of its equipment and expect[ed] to have the de-installation, destruction and recycling completed by the time it receives its first reimbursement from allocation."[17]  It explained that it first would yank and destroying the Huawei equipment.

3.  In addition, SI advised that its "Form 477 shows only a small group of subscribers as services were transitioned for most of our customers to other providers in late December 2019/early 2020 after it became apparent that the federal government would no longer support Huawei equipment and services and after Sprint terminated the Company's roaming

---

[17]  SI Response at 8 & n.22 (**Ex. 3**) (quoting SI WIRELESS, LLC, FRN: 0019623834, COMPANY BACKGROUND AND THE PLAN, p.1 (business plan accompanying submission of FCC Form 5640, SCRP Application Request for Funding Allocation (Jan. 19, 2022)). (Ans. EB RFI  25 & SI WIRELESS 25-000026) ("SI Business Plan").

[affiliation] due to its impending sale to T-Mobile,"[18] which didn't want to be encumbered by the Huawei equipment.  As discussed below, to protect its spectrum licenses SI retained a few customers who were reported on its Form 477s as it went forward to Rip and then Replace.

None of this means that SI was any less a "provider of advanced communications services."  By an analogy, a baseball pitcher temporarily sidelined by Tommy John surgery has not abandoned his occupation while recovering before resuming pitching.  As applied here, SI always had been a broadband service provider, it remained one while it radically modified its network infrastructure, and it remains one today as it serves some but not all its intended customer base.  When the artificial funding constraints are lifted, it will return to active full service. Had SI instead provided intermittent service to customers while simultaneously ripping as well as replacing, it would have destroyed its business reputation irreparably.  SI would have been shouldering the burden of complying with the Program while serving existing customers on the very Chinese equipment it was scheduled to rip out, and without the roaming capacity demanded by customers. As well, SI would have been unable to remove and destroy the offending equipment and rebuild efficiently, which it now has substantially accomplished.

In sum, SI did nothing nefarious. Unexpected intervening matters forestalled its ability to complete its approved plan and recapture its customers and lost revenue.  We address this below.

---

[18]   SI Response at 8 & n.23 (**Ex. 3**) (quoting SI Business Plan, p.1).

C. <u>As SI continued removal and destruction, greatly diminished funding and undue delays in the Program's administration required modifying its plan and operations.</u>

After Congress slashed the SCRP's appropriations, SI was required to revise its original business plan and offer Fixed Wireless Service instead of mobility over an initial 100-plus sites out of an internally constructed 427-site network. SI intended to serve a comparable footprint until full funding would permit accomplishing its initial approved plan.

Accordingly, in December 2022 SI submitted a modified business plan to accommodate the drop in appropriations to 39% of what was approved originally. The Commission approved SI's modified plan, which "follow[ed] the original proposal which involved the Company first shutting down its existing network, temporarily transitioning customers to other networks, and then bringing up the replacement network, restoring former customers and ultimately adding new customers to the new network."[19]

1. SI stated that "the decommissioning work is substantially accomplished and SIW has made substantial reimbursement requests so that it can pay costs associated with the decommissioning and destruction process. The delay in processing these invoices exceeds 5 months in some cases and has put SIW in peril with its vendors because it has not been able to make timely payments for the completed work and is beginning to lose

---

[19] SI Response at 9 & n.26 (**Ex. 3**) (quoting SI UPDATED/PHASE ONE PLAN TO DEAL WITH PARTIAL FUNDING, p.1 (Business Plan accompanying submission of Form 5640, SCRP Application Request for Funding Allocation) (SI WIRELESS 25-000029 - Updated Plan).

credibility with its vendors who will not continue to do the work needed to complete the project."[20]  (This delay was to become commonplace.)

2. SI again wrote that it had transitioned its customers to "offer[] them continuity of services …[and] cut nearly all of [its] revenue sources. Meanwhile, expenses associated with the network [during the replacement process] with much fewer customers are still being incurred."[21]

3. SI clarified that it had submitted a "plan revision which is going from mobility to fixed wireless (and then layering in mobility if, and when, additional funding and/or national carrier affiliation becomes available…."[22]

SI justifiably relied on the FCC's approval of the firm's modified business plan, in addition to its first plan, while continuing to incur added substantial expenses.

D. <u>Despite being affected by Program factors which the FCC has reported as being dysfunctional, SI has materially finished much of its approved construction. Yet it remains unpaid for work it did years ago</u>.

SI has installed equipment on 88 sites fully and another 14 sites partially, thus exceeding what was approved. It is optimizing the equipment to the extent that it can afford to do so to ensure it is transmitting at high levels of speed—even though the Program Administrator and CFO have throttled funding for its work.  SI nonetheless pursued its goal in the face of withheld or mismanaged federal funding. Meanwhile SI was buffeted by several of the deleterious factors

---

[20]   SI Response at 9-10 & n.27 (**Ex. 3**) (quoting Updated Plan at 2).
[21]   *See id.* at 10 & n.28.
[22]   *See id.* at 10 & n.29 (quoting Updated Plan 3, 4).

listed in the FCC's Fourth and Fifth Reports to Congress, which identified the"(1) absence of full funding; (2) supply chain delays; (3) labor shortages; (4) weather-related challenges; and (5) extended review times in the processing of requests for reimbursement" as causing many SCRP providers to experience problems.[23] This is an understatement in SI's case: cuts in SCRP funds forced it to reconfigure and then secure the FCC's approval of its modified business plan. That shut down all payments and submittals for many months, during which SI could not submit invoices or modifications, even when the modifications had been made at the Administrator's behest, supposedly to prompt processing.[24] This inconsistency caused a huge backlog for SI.

SI alerted the FCC to these issues: Mr. Williams and SI's regulatory counsel spoke with FCC personnel between the fall of 2022-early 2023, seeking to persuade the Staff to examine the processing and payment delay or present questions that SI could address.[25] SI sought here to draw the EB and CFO's attention to its quarterly SCRP reports, which reflect its transformation from an enthusiastic SCRP supporter to one respectfully suggesting how to resolve observed dysfunctions to just asking whether anyone in authority cared.[26] And SI has urged the CFO to call on the FCC's Chief Operating Officer and Performance Improvement Officer to employ the

---

[23]  SI Response at 10 & n.30 (**Ex. 3**) (citing and quoting Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fourth Report*, at p. 9, WC Docket No. 18-89 (July 1, 2024) ("Fourth Report"), https://docs.fcc.gov/public/attachments/DOC-403626A1.pdf.)

[24]  SI Response at 11-12 (**Ex. 3**).

[25]  SI Response at 11 & n.31 (**Ex. 3**) (detailing efforts by Mr. Williams and SI's counsel, Ms. Bennett, to alert the FCC staff and the Program Administrator of recurring delays and offering suggestions on ameliorating issues with the Program's administration).

[26]  Letter from Stephen Leckar-John Corbin, Esq. *et al,* at 3-6 (Nov. 19, 2024) (**Ex. 6**) and accompanying reproduced Form 5640 reports).

GPRA Modernization Act of 2010, 31 U.S.C. §§ 1115, 1123-1124, to address the widespread evidence that the SCRP program has ossified.[27]

Some representative examples of the continued delays and now a freeze that we claim is arbitrary and retaliatory, follow:

1. Currently 212 SI invoices are over 120 days old, 163 240 days behind, and 106 over 360 days, with one over 670 days. These total $14.67 million.[28]

2. That total pales in comparison to what is due for work SI performed but cannot be submitted due to the Program's rules. An additional $32.1 million in invoices is tied up due to the Administrator s policy that an unapproved modification would hold up a next-needed modification for additional equipment.

Another way of looking at SI's situation is to do it graphically, building on the data on SI's Response last September to the EB and CFO, and factoring the intervening 5.5 months.[29] The average length of time awaiting approval as of March 7, 2025, is 475 days.

---

[27] Letter from Stephen Leckar-John Corbin, *et al*. at 6 (Nov. 19, 2024) (**Ex. 6**) (copied to Dan Daly, Esq. (CFO)) (recommending the FCC's Chief Operating Officer and its Performance Improvement Officer employ GPRA Modernization Act of 2010, 31 U.S.C. §§ 1115, 1123-1124, to address evidence that an agency program has ossified).

[28] SI Response at 11 & n.32 (**Ex. 3**) (reflecting SI, *Open Invoices Awaiting Repayment* (Ex.1 thereto, now updated). Last September SI was awaiting payment for 344 days on two invoices totaling $976,000. *See id*. at p.4. Six more months have passed with no payments.

[29] SI Response at 13 (**Ex. 3**).

**APP 016**

| | | |
|---|---|---|
| Invoices Waiting for Reimbursement Approval | 271 | $14,681,310.58 |
| # of Days Oldest Invoice Has Been Awaiting Reimbursement Approval | 870 | (submitted 10/19/22) |
| # Of Modifications | 6 | |
| # Of Days Awaiting Modification Approval or Denial | 598 | $32,656,228.22 |
| # of Invoices Awaiting Reimbursement Over 365 Days | 186 | |
| # of Invoices Awaiting Reimbursement Over 180 Days | 271 | |
| # of Invoices in Submitted Status (haven't been addressed at all) | 140 | |
| # of Days Oldest Invoice Has Been Sitting in Submitted Status | 612 | $47,126,769.88 |

The Program was a government-industry compact. It provided funds to underwrite removal and replacement within about a year of equipment antithetical to the Nation' s defense. Providers would receive prompt payment of reasonable costs if they could accept a temporary loss of subscribers and revenues. For SI, obtaining these goals remain dramatically elusive.

II.     <u>SI's customer base was not required but nonetheless has been sufficient at all relevant times</u>.

To shore up their mistaken notion that a SCRP provider must have a "normal" business the CFO and EB conjured a theory demanding an active customer base during the remediation. That no support for this appears in the law suggests a *Loper-Bright* concern, as "'courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.'"[30]  Not only did SI justifiably expect that the FCC would honor its written and

---

[30]  *Amazon Services, Inc. v. Department of Agriculture,* 109 F.4th 573, 581-582 (D.C. Cir. 2024) (granting petition for review) (quoting *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024)).  *See also Lake Region Healthcare Corp. v. Becerra,* 113 F.4th 1002, 1007 (D.C. Cir. 2024).

oral commitments to providers who followed its siren calls to remediate right away, any question of whether SI was required to have and/or maintain a customer base can be resolved readily:

(i) Neither the Act nor the FCC rules specify when, if ever, a Program applicant must have customers. The FCC's January 10, 2023, <u>Report to Congress</u> is instructive. In describing what data was required of applicants, the FCC focused on "estimates of cost," "detailed information on the covered communications equipment," a business "plan and timeline," and "certifications that [they] will comply with Reimbursement Program Rules."[31] The FCC's report omitted any reference to a customer count.

(ii) If it were necessary to decide on a given time to take a customer census, a logical point for SI would be to identify when it, with a demonstrated history of customer service, took proactive steps signifying its desire to participate in the SCRP. SI had put forth such evidence as early as May of 2019, when its Form 477 reported nearly eleven thousand customers. In August 2020, a mere month after it transitioned customers, SI began removing and destroying covered equipment. And it continued to do so steadily afterwards.[32]

(iii) A plausible case also can be made that zero is a number and a provider with no customers but a plan to resume service would be eligible for SCRP funding.[33]

---

[31] Letter from Stephen Leckar-John Corbin, Esq. & Dan Daly, Esq. at 1(Sept. 25, 2024) (**Ex. 4**).

[32] SI Response at 4 & n.7, 5 13 (**Ex. 3**) (citation omitted).

[33] *Id.* at 13, 16 & n.41 (**Ex. 3**) (quoting Robert Kaplan, THE NOTHING THAT IS: A NATURAL HISTORY OF ZERO (Oxford University Press, 2000) (https://www.scientificamerican.com/article/history-of-zero/).

**APP 018**

(iv)  If customers were required as of the application's submittal, SI would qualify. By April 2021, SI was ripping out covered equipment and knew that the FCC was "applauding" providers for that.  That month, SI entered into agreements with five customers (one had two lines) to take service.  SI's business plan advised it had "only a small group of subscribers" and had "begun the de-installation of its equipment and expect[ed] to have the de-installation, destruction and recycling completed by the time it receives its first reimbursement from allocation."[34]

(v)  Nothing in the Act requires that customers generate cash flow, either. Nor does it prohibit an exchange of services for equipment or access to towers or providing service to contractors on-site in SI's construction trailers, as SI informed the staff has been occurring here.  The FCC recognizes barter arrangements.[35]

(vi) The SCRP Act also deems providers' Affiliates to be customers.[36]  Since September 2021, Mr. Williams has held a directorship and 41% of SI's Affiliate, Rural Connect.  In addition, he had been its Interim General Manager.[37]  Rural Connect has been taking service from SI in return for giving SI access to tower

---

[34]  SI Response at 17-18 & n44, (**Ex. 3**) (quoting Company Background and the Plan, p.1 (Ans. EB RFI 25).

[35]  SI Response at 18-20 (**Ex. 3**). (citing Ans. EB RFIs 6, 23, 25, 30); Letter from Stephen Leckar-John Corbin, Esq., *et al* at 2 (Dec. 20, 2024) (**Ex. 8**) (identifying contractors provided service at trailer sites).  Representative FCC cases approving barter arrangements include *RKO General, Inc. v. FCC*, 670 F. 2d 215, 226 & n.31(D.C. Cir. 1981); *In the Matter of Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 36 FCC Rcd. 7702, 7717 & n. 91 (2021) (cleaned up); *Fuqua Communications, Inc.*, Memorandum Opinion and Order, 30 FCC 2d 94, 97 (1971) (finding that legal consideration includes barter of goods or services and "trade-outs").

[36]  47 U.S.C. §§ 1603(b)(1) (eligibility), 1608(6)(A)-(B) (defining "customer").

[37]  SI Response at 18 & nn.47-48 (**Ex. 3**) (citing Ans. EB RFIs 23, 30).

**APP 019**

space. Rural Connect had about 1256 customers in January 2022, when SI applied for SCRP, and had about 300 when SI responded to the EB and CFO.[38]

Moreover, as SI wrote the CFO and EB, any full-scale interruption of business—as its approved applications had stated would occur— would result in a period of no or skeletal service to customers.  Nor would it have been sensible to offer segmented continued full service during a Rip-and-then-Replace: nobody would want such fitful availability.[39]

### III. The Staff's focus on Mr. Williams' remarks to the media and his response to an RFI from the Bureau misinterpret his statements.

Mr. Williams had spoken privately to the Staff in 2022-2023, as discussed previously, and commented publicly when asked to do so over his concerns with the Program's funding and administration.[40]  He received an RFI in May 2024, shortly after the POST conveyed to a national audience his disappointment with the Program's untimely processing and reimbursement— deficiencies recognized two months later in the FCC's Fourth Report. He told the truth to the newspaper. And when the FCC came calling, he did so again—this time in response to the staff's asking about a different topic.

First, SI's network had been down under two approved plans that stated it would not be offering full service while it was Ripping and then Replacing but it was offering limited service

---

[38]  SI Response at 14 (**Ex. 3**).

[39]  *See id.* at 16 (**Ex. 3**).

[40]  *Id.* at 14 & n.37 (**Ex. 3**) (citing Carl Weinschenk, *SI Wireless Criticizes Rip and Replace Program*, TELECOMPETITOR (July 14, 2024) (https://www.telecompetitor.com/si-wireless-criticizes-rip-and-replace-program-administration/); Mike Dano, *The Huawei 'rip and replace' program is a mess, argues SI Wireless*, LIGHT READING (Oct. 18, 2023) (https://www.lightreading.com/security/the-huawei-rip-and-replace-program-is-a-mess-argues-si-wireless)). *See also* Letter from Stephen Leckar-John Corbin, Esq., *et al* at 2 (Nov. 7, 2024) (**Ex. 5**) (stating that SI's concerns with SCRP had been cited in a dozen articles in the trade media). The accompanying Addendum lists each of them.

**APP 020**

to a few customers.  In addition, the POST juxtaposed his correct statement about customers lacking service next to his accurate observation that many of SI's former and anticipated customers were now experiencing "dead zones" in rural stretches.  However, Mr. Williams neither said nor was quoted as saying that SI lacked *any* customers.  And as discussed above, it maintained service to its Affiliate Rural Connect, to the discrete license-save customers, and as a benefit to contractors living and working out of SI's trailer sites.[41]

In addressing the Bureau's different question sent in May 2024 of whether SI was "currently receiv[ing] revenue from providing advanced communications service to customers," Mr. Williams referred to the five license-protect customers receiving service and SI's Affiliate, Rural Connect.   It takes wholesale service from SI and then provides that to 81 customers.  In return, SI offsets a monthly amount due for using Rural Connect's tower space.  Both sets of customers are accounted for on an accrual basis, with payment deferred and offset later.[42]

The EB LOI and the CFO's Notice were served two months afterwards.

IV.     The RFI's exceptionally onerous demands suggest a retaliatory agenda.

The funding freeze's imposition, coming shortly after the POST report broke, coupled with the CFO's mentioning the article and professing wonder why SL lacked a "normal" business, are puzzling.  Added to that, EB's exceedingly granular RFIs suggest an agenda of overkill.

EB RFI 31, reproduced in full, instructed SI as follows:

---

[41]   SI Response at 15, 18-20 (**Ex. 3);** Letter from Stephen Leckar-John Corbin, Esq. *et al* at 1(Dec. 20, 2024) (**Ex. 8)**.

[42]   SI Response at 15 & n.39 (**Ex. 3**) (citing Ans. EB RFI 38 and Letter from Leslie Williams-FCC re: SC-CN0077090 Request for Information, p.4 (May 10, 2024) (SIWIRELESS 38-000007)).

**APP 021**

Describe the business relationships between and among the Company and any of its parents, subsidiaries, members, and associates.[10] Your description must identify all functions or services each person or entity performs and the entity for whom it performs such functions or services (e.g., an intermediate holding company that performs no functions, holds or manages assets such as leases office space, is a contracting party, performs responsible organization functions for affiliates, oversees finances such as keeping accounts, is the named entity on bank accounts, performs billing and collection, provides management functions, etc.). The Company's response must specifically state whether the Company or any of its owners or management (including managers, members, officers, or directors) have at any time had any relationship with these persons or entities. For any identified relationship, provide the following information:

a. Explain the nature of and relevant dates associated with the relationship.

b. Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity.

c. A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity.

d. A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity.

e. A description of any shared financial assets and obligations including banking and credit accounts, and tax filings.

If this wasn't a headscratcher, EB RFI 31's Footnote 10 defined "associates" to mean:

This list includes, but may not be limited to: Leslie Williams; Eric Steinmann; Linda George; Amy McFarling; Chuck Roberts; Dave Sikut; Dogan Koslu; Greg Belknap; Jacquie Cossey; Jason Holliday; Jeffrey Sikut; Joseph Clark; John Hehman; Kenneth Nickerson; Paula Nowell; Phillip Comer; Ray Harvey; Thomas Karnes; Tom Sams; Troy Bruce; Integrated Business Networks, LLC; Clear 9 Communications, LLC; ESIRF LLC; Flat Wireless LLC; Minghelli LLC; NTCH-West Tenn Inc.; NTCH-NM, LLC; PTA-FLA Inc.; Rural Connect LLC; Z Best Logistics, LLC; Sikut, Inc.; Business Solutions, LLC; Hardrock Enterpreises, LLC; MiTawn Services; Koslu LLC; Sparqworx; MLC Strategies, LLC; Fisher Telecommunications; Tower Engineering Solutions, LLC; Barrett Browning, LLC; Partner Engineering & Science, Inc.; Marahute Mechanics; Solano Communications, LLC; World Tower; Socratica Consulting, LLC; Good Works Digital, LLC; Greywolves; Flat Wireless. [43]

And for good measure there is EB RFI 32, which demanded of SI:

---

[43]  SI's September 17, 2024, response to EB RFI 31 (**Ex. 3**) appears in the accompanying Appendix, albeit in a reduced format in order to fit the page.

Provide a chart for each company identified in response to Inquiry 31, including any additional companies you identify in response to Inquiry 33 (collectively, including the Company, the "Associated Companies," and each one singularly an "Associated Company"). Each chart must: show the internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility); specify the names of all owners (and percentage of ownership or membership interest); identify all directors or board members (including addresses and telephone numbers); identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity); and identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual. going back years before its current owners purchased it, and also demanding minute information about literally dozens of independent vendors, their employees, and their business relationships.[44]

SI lodged objections to these demands' undue burdensomeness, dubious relevancy and unintelligibility. It nevertheless answered them to the best of its ability last September. Six months have passed while the freeze lingers on.

V. <u>The private and public interests favor a prompt disposition in SI's favor, as the unjustified Staff actions have harmed it immeasurably while significantly harming consumers in SI's underserved geographic market</u>.

The Staff's opacity disserves the underlying private and public interests.[45] It is time to bring the EB investigation to an end and lift the funding freeze and place this matter on a fast track to process SI's invoices and pay it what is due. Insofar as SI's direct interests are

---

[44] SI's, response to EB RFI 32 (**Ex. 3**) also appears in the accompanying Appendix.
[45] Meanwhile the Staff slow-rolled SI's FOIA requests made last September 6th. Much of SI's requests remains unanswered. It took until March 6, 2025, just to ascertain that the FCC has awarded Ernest & Young, the Program Administrator, $14,9 million between FY 2022-FY 2024. (Notably in June 2022 E&Y paid the SEC $100 million after admitting that its auditors had systematically cheated on CPA ethics exams. https://www.sec.gov/newsroom/press-releases/2022-114 (last accessed March 4, 2025)).

concerned, it has committed no wrong.  There are strong grounds for holding the government

responsible for fulfilling its contractual obligations.[46]

And there is an equally strong argument to be made in favor of others whose interests

stand to be served by requiring the FCC to honor its agreement with SI, *viz*., the everyday

consuming public in its marketplace. "In the post-pandemic era, broadband has become

indispensable to every aspect of modern life. Every single day, Americans turn to their

broadband connections for work, education, healthcare, commerce, and communication [and]

access to broadband is not a luxury, but a necessity."[47]  When SI is paid what it is owed and can

complete its project and resume operations, consumers in the segments of Tennessee and

Kentucky whom it served and who benefited from robust competition can reap those benefits

once again.  These include fair cost, innovation, and customer care.  That will encourage similar

behavior from other carriers.  The Digital Divide is as much about these factors as speed of

service.[48]

The FCC's opening a proceeding examining T-Mobile's proposed acquisition of

UScellular's wireless operations suggests that providing consumer interests in speedy and

---

[46] *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) ("[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."); *Security Federal Sav. Bank of Florida v. Director, Office of Thrift Supervision*, 747 F.Supp. 656, 660 (N. D. Fla. 1990) ("public interest is best served by requiring the government to honor its obligations. This promotes certainty in the market and encourages private individuals and business entities to invest in regulated institutions.").

[47] *Eighteenth Section 706 Report and Notice of Inquiry*, GN Docket No. 24-214 at 2, ¶ 2 (Sept. 6, 2024).

[48] *See* General Accounting Office*, Closing the Digital Divide for the Millions of Americans without Broadband* (Feb. 1, 2023) (https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-broadband).

**APP 024**

inexpensive service, such as SI has identified to the FCC as a prime need in its marketplace, warrant serious attention and consideration.[49] The CFO's unjustifiable funding freeze and the EB's concurrent investigation disserve those interests.

## Conclusion

SI has weathered a bevy of problems that no business reasonably could have expected to arise or be tolerated. Notwithstanding these issues, which have been akin to engaging in a game of bureaucratic Whack-a-Mole, its approved plans to strip the covered equipment and then replace it will bear fruit. It has largely completed construction work and is configuring those sites. Nonetheless SI can't complete its work without funding and must be mindful of vendors' reluctance to reengage without assurance of payment. Meanwhile technology marches on: SI is experiencing challenges obtaining last-generation equipment required by this program that was supposed to have been finished long ago—or so Congress expected. There is no recovery for the harm SI has sustained by the incessant delays and artificial demands that have been imposed on it.

---

[49] *Federal Communications Commission Opens Docket for Proposed Transfer of Wireless Operations, Customers, and Certain Spectrum Licenses and Spectrum Leases of UScellular to T-Mobile*, GN Docket No. 24-286 (Sept. 11, 2024).

SI asks the Commission to: (a) restore SI's funding pipeline and direct the Staff to ensure that all pending invoices be processed and paid on an expedited basis and (b) direct the EB to terminate the investigation, to prevent further harm to the company and because no basis exists to continue hindering consumer choice in SI's rural Tennessee and Kentucky marketplace, which is much in need of low-cost wireless service. However, if this matter cannot be resolved within thirty days, SI will be constrained to seek judicial interposition.

Respectfully submitted,

/s/Stephen C. Leckar
Stephen C. Leckar, D.C. Bar # 281691
Kalbian Hagerty, LLP
888-17th St., NW, Twelfth Floor
Washington, D.C. 20006
(202)223-5600
sleckar@kalbian-hagerty.com

**Certificate of Service**

I caused a copy of the foregoing and supporting exhibits to be served this 10th day of March 2025, via email, followed by First Class Mail, on:

John A. Corbin, Esq.
Investigative Counsel, Fraud Division
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

Dan Daly, Esq.
Office of the Chief Financial Officer
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

/s/Stephen C. Leckar
Stephen C. Leckar

24

**APP 026**

**Addendum**
**Trade Press and News Reports Referring to SI Wireless' SCRP Participation**

1. Leslie Stimson, *SI Wireless Rips "Rip & Replace"* Inside Towers (July 17, 2024) (https://insidetowers.com/si-wireless-rips-rip-replace/)

2. Carl Weinschenk, *SI Wireless Criticizes Rip and Replace Program*, TELECOMPETITOR (July 14, 2024) (https://www.telecompetitor.com/si-wireless-criticizes-rip-and-replace-program-administration/)

3. Paul Lipscombe, *Mediacom on course to meet rip and replace deadline*, THE TELECOMS AND CONNECTIVITY CHANNEL (July 8, 2024) (https://www.datacenterdynamics.com/en/news/mediacom-on-course-to-meet-rip-and-replace-deadline/)

4. Paul Lipscombe, *SI Wireless fears for future amid slow progress of rip and replace of Huawei gear,* THE TELECOMS & CONNECTIVITY CHANNEL (May 14, 2024) (https://www.datacenterdynamics.com/en/news/si-wireless-fears-for-future-amid-slow-progress-of-rip-and-replace-of-huawei-gear/)

5. Michael Kan, *Effort to 'Rip and Replace' Huawei, ZTE Tech in USBackfires Due to Funding Woes*, PCMAG (May 2, 2024) (https://www.pcmag.com/news/effort-to-rip-and-replace-huawei-zte-tech-in-us-backfires-due-to-funding)

6. Eva Dou, *Funding shortfall for new tech endangers rural cell service, FCC says*, THE WASHINGTON POST (May 2, 2024)

7. Jeff Williams, Walters Kluwer Vital Law, *SI Wireless Seeks More Rip-and-Replace Process Reforms* (Jan 23, 2024)

8. KETV-7, Companies enrolled in FCC program seek deadline extensions (Nov. 14, 2023) (https://www.ketv.com/article/companies-enrolled-in-fcc-program-seek-deadline-extensions/45842341)

9. Mike Dano, *The Huawei 'rip and replace' program is a mess, argues SI Wireless*, LIGHT READING (Oct. 18, 2023) (https://www.lightreading.com/security/the-huawei-rip-and-replace-program-is-a-mess-argues-si-wireless)

10. Hanna Agro, *Rip and Replace, Biden AI Order,Telesat Seeks Permission to Launch*, BROADCAST BREAKFAST (Oct. 30, 2023) (https://broadbandbreakfast.com/rip-and-replace-biden-ai-order-telesat-seeks-permission-to-launch/)

11. Ahmad Hatout, *SI Wireless Complains of Rip and Replace Payment Delay*, BROADBAND BREAKFAST (April 11, 2023 (https://broadbandbreakfast.com/si-wireless-complains-of-rip-and-replace-payment-delay/);

12. SI Wireless Details Concerns With FCC's Rip-and-Replace Program, COMMUNICATIONS DAILY (Jan 24, 2023) (https://communicationsdaily.com/news/2023/01/24/SI-Wireless-Details-Concerns-With-FCCs-RipandReplace-Program-2301230043 ).

RECEIVED & INSPECTED

MAR 1 2 2025

FCC MAIL ROOM

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, DC 20554

| | |
|---|---|
| In the Matter of | ) |
| SI Wireless, LLC | ) |
| | ) EB -FD-24-00036576/SCRP0001013 |
| | ) |
| To: The Commission | ) |

## Appendix

**Exhibits to Application to Compel Agency Action Unlawfully Delayed and Vacate Funding Freeze**

1. Letter from Jae Seong, CFO-Leslie Williams (July 11, 2024)
2. Letter from Meghan Ingrisano, Chief, Enforcement Bureau Fraud Div'n, -Leslie Williams (July 11, 2024)
3. Letter from Stephen Leckar-John Corbin, Esq. (EB) & Dan Daly, Esq. (CFO) (Sept. 17, 2024) & accompanying Declaration of Leslie Williams & Attachment of Open Invoices
    -SI Ans. EB RFI 15 (Removal of Covered Equipment)
    -SI Ans. EB RFI 24 (Email thread)
    -SI Ans. EB RFI 25 (Business Plan & Updated Plan)
    -SI Ans. EB RFI 31 (Grid reflecting contractors, etc)
    -SI Ans. EB RFI 38 (Response to Bureau)
    -SI Ans. RFI 49 (Leslie Williams' experience)
4. Letter from Stephen Leckar-John Corbin, Esq. & Dan Daly, Esq. (Sept. 25, 2024)
5. Letter from Stephen Leckar-John Corbin, Esq. & Dan Daly, Esq. (Nov. 7, 2024)
6. Letter from Stephen Leckar-John Corbin, Esq. *et al* (Nov. 19, 2024)
    -Form 5640 reports
7. Letter from Stephen Leckar-John Corbin, Esq. *et al* (Dec. 13, 2024)
8. Letter from Stephen Leckar-John Corbin, Esq. *et al* (Dec. 20, 2024)
9. Letter from Stephen Leckar-John Corbin, Esq. *et al* (Dec. 23, 2024)
10. Letter from Stephen Leckar- Dan Daly, Esq. (Dec. 23, 2024)
11. Letter Lisa Zaina, Esq., Chief of Staff-Stephen Leckar (Dec. 23, 2024)

**APP 028**

# EXHIBIT 1

APP 029



July 11, 2024

***VIA E-MAIL ATTACHMENT***

Leslie Williams
SI Wireless, LLC
P.O. Box 8826
Columbia, SC 29202
leslie.williams@siwirelessllc.com

Caressa D. Bennet
Womble Bond Dickinson
Counsel for SI Wireless
2001 K Street NW
Washington, DC 20006
Carri.bennet@wdb-us.com

**Re: Notice of Funding Hold: Secure & Trusted Communications Networks
Reimbursement Program**      SCRP Number: SCRP0001013      FRN: 0019623834

Mr. Williams:

By this letter, we are informing you that the Federal Communications Commission (FCC
or Commission) has placed a hold on disbursements from the Secure and Trusted
Communications Networks Reimbursement Program (SCRP or Reimbursement Program), as
administered by the Commission, the Wireline Competition Bureau (Bureau), and the Fund
Administrator (FA), to your company, SI Wireless, LLC (SI Wireless). Based on the totality of
the information available, we have determined that withholding disbursements is warranted due
to concerns about SI Wireless's eligibility to participate in the Reimbursement Program as a
provider of advanced communications services. The Reimbursement Program was established to
provide reimbursement to providers of advanced communications service with fewer than 10
million customers for reasonable costs incurred in removing, replacing, and disposing of Huawei
and ZTE communications equipment and services. In making these reimbursements, however,
Congress directed the Commission to take "all necessary steps" to avoid waste, fraud, or abuse in
order to ensure that the Reimbursement Program funds are used only for authorized purposes and
in accord with Program requirements.[1] The Commission takes this ongoing obligation seriously
and recognizes the importance of protecting the integrity of the Reimbursement Program,

---

[1] 47 U.S.C. § 1603(e)(1) ("The Commission shall take all necessary steps to avoid waste, fraud, and abuse with
respect to the Program."); 47 CFR § 1.50004(p) ("The Commission delegates authority to the Wireline Competition
Bureau, to adopt the necessary policies and procedures relating to allocations, draw downs, payments, obligations,
and expenditures of money from the Reimbursement Program to protect against waste, fraud, and abuse . . . .").

**APP 030**

particularly in light of the limited funds available. This includes ensuring that only entities that are eligible to participate in the Reimbursement Program receive reimbursements.

In May, we became aware that Mr. Williams was reported to have stated that the SI Wireless network has been shut down since 2022, which raised concerns that SI Wireless is not a provider of advanced communications service and called into question whether SI Wireless had made misrepresentations regarding its eligibility to the Commission during its participation in the Reimbursement Program.[2] On May 10, 2024, the Bureau sent the company Requests For Information (RFI) regarding the operation of SI Wireless's network and its provision of advanced communications service to customers. On May 24, 2024, SI Wireless submitted its RFI responses (Responses) to the Bureau.

We have now reviewed SI Wireless's Responses, which fail to demonstrate that SI Wireless is currently a provider of advanced communications service to United States customers, as required by section 1.50004(a) of the Reimbursement Program's rules. The company's responses to the RFI questions indicate that: (1) it "does not have normal business operations or cash flow"; (2) that SI Wireless's revenue from providing advanced communications services to customers "is minimal as [SI Wireless] has not launched commercially yet," and that it does "not have normal operations or cash flows during this process and this cannot be expected until [SI Wireless] complete[s] launching what [it] deem[s] a commercially launchable interim footprint that is ready to meet customer expectations for the entire area"; and (3) that SI Wireless's reference to a total of six direct customers indicates that the customers only "perform work on this project," which raises the question of whether they are in fact customers at all.[3]

In order to meet the criteria under the Secure and Trusted Communications Networks Act of 2019 to participate in the Reimbursement Program, SI Wireless must be a provider of advanced communications service to United States customers.[4] The certification language contained in each SCRP recipient's request for a funding allocation to participate in the Reimbursement Program makes clear that this is an ongoing requirement and includes an attestation to this effect. In connection with each of SI Wireless's requests for funding allocation, an SI Wireless officer certified under penalty of perjury, and in relevant part, that:

> The Applicant is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and

---

[2] Eva Dou, *Funding shortfall for new tech endangers rural cell service, FCC says*, Wash. Post, May 2, 2024, https://www.washingtonpost.com/technology/2024/05/02/huawei-rip-remove-order-threatens-service/

[3] SI Wireless RFI Response at 4. *But see* SI Wireless's FCC Form 5640 (answering "Yes" to the question asking "Is the applicant a Commercial Broadband Provider?") (May 25, 2022).

[4] *See* 47 U.S.C. § 1603(a); 47 CFR § 1.50004(a). The Secure and Trusted Communications Networks Act of 2019 limited eligibility in the Reimbursement Program to "providers of advanced communications service." 47 U.S.C. § 1603(a). In the *2020 Supply Chain Order*, the Bureau clarified that "[e]ligibility to participate in the Reimbursement Program is limited to 'providers of advanced communication service.'" *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Program*, WC Docket No. 18-89, Second Report and Order, 35 FCC Rcd 14284, 14332, para. 110 (2020) (*Second Report and Order*); *id.* at 14284, paras. 114-15 ("To identify customers of advanced communications service, providers must count those customers purchasing a service that includes a broadband connection with a speed of at least 200 kbps in one direction").

2

APP 031

orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.[5]

The Commission is statutorily required to limit eligibility in the Reimbursement Program to providers of advanced communications service.[6] SI Wireless's Responses to date provide a basis to reasonably believe, based on the totality of the circumstances, that all or part of further Reimbursement Program payments to SI Wireless would be in violation of the statute and rules governing the program. Specifically, SI Wireless's Responses raise questions of fact as to whether:

1) SI Wireless is in fact a provider of advanced communications service to customers and therefore eligible to participate in the SCRP; and
2) SI Wireless has made misrepresentations or otherwise lacked candor in its dealings with the Commission with respect to its eligibility and otherwise over the course of its participation in the SCRP.

It is unclear whether SI Wireless has ongoing network operations or whether it has been a provider of advanced communications service at any point during its participation in the Reimbursement Program. The Commission cannot deviate from the Secure Networks Act's requirement that an applicant must be a provider of advanced communications service to customers in order to be eligible for the Reimbursement Program. Moreover the Commission cannot authorize payments to be made in violation of Reimbursement Program rules.

For these reasons, the Bureau has referred SI Wireless to the FCC Enforcement Bureau to investigate this matter, including SI Wireless's eligibility to participate in the Reimbursement Program. The Commission will hold any and all payments to SI Wireless until it can assess the available facts and further consider what appropriate action should be taken consistent with the Commission's obligation to protect its programs from waste, fraud, and abuse. Please be advised that in addition to this hold, the Commission may seek to recover other amounts that are determined to have been disbursed to SI Wireless from the Reimbursement Program in violation of statutory requirements or Commission rules.

SI Wireless is permitted to demonstrate why payments from the Reimbursement Program should not be held, in whole or in part. Among the factors we may take into account are the nature and scope of the issues, the amount of money potentially involved, the ability to repay the funds if found to be improperly paid, and the effect a hold would have on customers. SI Wireless has until 30 days from the date of the letter to respond to this notice with any information that it believes the Commission should consider. If SI Wireless does not respond to this notice, then any requested reimbursements may be permanently denied.

---

[5] *Wireline Competition Bureau Announces Best Practices for Equipment Disposal and Revises FCC Form 5640 Certifications for the Secure and Trusted Communications Networks Reimbursement Program*, WC Docket No. 18-89, Public Notice, 36 FCC Rcd 14061, 14083, Appx. B: Revised Certifications for FCC Form 5640: SCRP Application Request for Funding Allocation, Section 1.50004(c) (Part C) (Certification 2).

[6] 47 U.S.C. § 1603(a); 47 CFR § 1.50004(a); *Second Report and Order*, 35 FCC Rcd at 14332, para. 110.

3

**APP 032**

If you have any questions, please contact Dan Daly, who can be reached at 202-418-1832, or at <u>Daniel.Daly@fcc.gov</u>.

Sincerely,

JAE SEONG Digitally signed by JAE SEONG
Date: 2024.07.11
10:36:17 -04'00'

Jae Seong
Chief Financial Officer
Federal Communications Commission

cc: Trent Harkrader, Chief, Wireline Competition Bureau, FCC
Loyaan Egal, Chief, Enforcement Bureau, FCC
Mark Stephens, Managing Director, FCC
P. Michele Ellison, General Counsel, FCC

**APP 033**

# EXHIBIT 2

APP 034

 


**July 11, 2024**

**VIA E-MAIL AND CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Leslie Williams
President
SI Wireless, LLC
P.O. Box 8826
Columbia, SC 29202
leslie.williams@siwirelessllc.com

Caressa D. Bennet
Womble Bond Dickinson
Counsel for SI Wireless, LLC
2001 K Street NW
Washington, DC 20006
Carri.bennet@wdb-us.com

       **Re:    File No. EB-FD-24-00036576**

Dear Mr. Williams:

The Enforcement Bureau is investigating possible violations of the Communications Act of 1934, as amended (Act),[1] and the Federal Communication Commission's (the FCC or Commission) rules[2] and orders[3] governing participation in the Supply Chain Reimbursement Program (SCRP) in file number EB-FD-24-00036576 (Investigation),[4] and has determined that SI Wireless, LLC (SI Wireless, SIW, or the Company) may possess relevant information. Accordingly, we direct SIW, pursuant to Sections 4(i), 4(j), 218, and 403 of the Act, to provide the information and documents requested herein within **thirty (30) calendar days** of the date of this letter of inquiry (LOI).

This LOI constitutes an order of the Commission to produce the documents and information requested herein.[5] To knowingly and willfully make any false statement or conceal

---

[1] 47 U.S.C. §§ 154(i), 154(j), 201, 218, 254, 403.

[2] 47 CFR §§ 1.50000-1.50007.

[3] *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs et al.*, WC Docket No. 18-89 et al., Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd 11423 (2019).

[4] Any entity that is a "Small Business Concern" as defined in the Small Business Act (Pub. L. 85-536, as amended) may avail itself of rights set forth in that Act, including rights set forth in 15 U.S.C. § 657, "Oversight of Regulatory Enforcement," in addition to other rights set forth herein.

[5] *See* 47 U.S.C. § 155(c)(3).

**APP 035**

any material fact in reply to this inquiry is punishable by fine or imprisonment.[6] **Failure to respond appropriately to this LOI constitutes a violation of the Act and the Commission's rules.**[7]

The Attachment to this letter includes filing requirements and instructions for your response and definitions for certain terms in this LOI. Requests for confidential treatment or claims of attorney-client privilege or attorney work product must strictly meet the requirements stated in the attached instructions.

If the Enforcement Bureau determines that SI Wireless has continued to act or acted in violation of the Act and/or the Commission's rules, the continued noncompliant conduct after the receipt of this LOI may subject SI Wireless to additional penalties.

If you have any questions about this matter, please contact Aaron Gershbock at aaron.gershbock@fcc.gov, John Corbin at john.corbin@fcc.gov, and Sarah McNally at sarah.mcnally@fcc.gov.

Sincerely,

/s/ *Meghan Ingrisano*

Meghan Ingrisano
Chief
Fraud Division
Enforcement Bureau

**Attachment**

---

[6] *See* 18 U.S.C. § 1001; *see also* 47 CFR § 1.17.

[7] *See* 47 U.S.C. § 503(b)(1)(B); *see also Aura Holdings of Wisconsin, Inc.*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 3688, 3696, para. 21 (2018), *forfeiture order issued*, 34 FCC Rcd 2540 (2019) (imposing a $19,693 penalty for failure to respond to LOI); *ABC Fulfillment Services LLC d/b/a HobbyKing USA LLC and HobbyKing.com, and Indubitably, Inc. d/b/a/ HobbyKing Corp., HobbyKing USA LLC, HobbyKing and HobbyKing.com*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 5530 (2018), *aff'd*, Forfeiture Order, 35 FCC Rcd 7441 (2020), *recon. denied*, Memorandum Opinion and Order, 36 FCC Rcd 10688 (2021) (imposing a $39,278 forfeiture for failure to respond to LOI); *Net One Int'l, Net One, LLC, Farrahtel Int'l, LLC*, Forfeiture Order, 29 FCC Rcd 264, 267, para. 9 (EB 2014), *recon. denied*, Memorandum Opinion and Order, 30 FCC Rcd 1021 (EB 2015) (imposing a $25,000 penalty for failure to respond to LOI); *Conexions, LLC d/b/a Conexion Wireless*, Notice of Apparent Liability for Forfeiture and Order, 28 FCC Rcd 15318, 15325, para. 22 (2013) (proposing a $300,000 forfeiture for failure to provide timely and complete responses to an LOI); *Technical Commc'n Network, LLC*, Notice of Apparent Liability for Forfeiture and Order, 28 FCC Rcd 1018, 1020, para. 8 (EB 2013) (proposing a $25,000 forfeiture for failure to provide a complete response to an LOI); *SBC Commc'ns, Inc.*, Forfeiture Order, 17 FCC Rcd 7589, 7600, para. 28 (2002) (imposing $100,000 penalty for failing to submit a sworn written response).

## ATTACHMENT

### Inquiries: Information and Documents to be Provided

You must provide the following information and documents as requested below, and in accordance with the Instructions and Definitions below. Note that certain terms, such as "company" and "identify" are defined at the end of this Attachment. Please consider all Definitions when responding to the inquiries.

Unless otherwise indicated, the time covered by these inquiries is January 1, 2019 to the present.

### Requests for Information

1.   Describe the business structure of the Company (*e.g.*, corporation, sole proprietorship, partnership, limited liability company, etc.). If it is a corporation, give the date and location of its incorporation and describe what type of corporation it is (*e.g.*, public or privately held).[8] If it is a sole proprietorship, partnership, or limited liability company, identify each owner, partner or member, as applicable. In addition, identify all parent and affiliate companies of the Company and explain their relationship with the Company. Also provide the information in an organizational diagram.

2.   Identify the Company's officers and directors and the positions that they held, respectively, for each year from January 1, 2019 to the present.

3.   Identify the corporate headquarters address of the Company and the States in which the Company is authorized to do business; indicate whether it is in good standing in each such State. Identify the Tax Identification Number of the Company.

4.   Identify the registered agent of the Company within the United States.

5.   Identify the Company's FCC Registration Number(s) or FRNs of the Company and any parent and affiliate companies of the Company.

6.   Identify any licenses, permits, certificates, or other authorization, including any Section 214 authorization for the resale of international long-distance service, issued by the Commission and held by the Company and/or held by any parent or affiliate companies of the Company.

7.   State whether the Company has received any complaints or reports related to the Act or the FCC rules or, if the Company participates in the Affordable Connectivity Program (ACP), orders governing the Company's participation in ACP. If so, provide full details of such complaints, including the dates the complaints or reports were received, a description of the complaint or report, and the contact information of the complainant or reporter. In addition, if the Company has received any such complaints or reports, state what actions, if any, the Company has taken in response.

---

[8] In responding to this Inquiry, note the definition below of the term "Identify" when used in reference to an entity or person in the Instructions to this letter.

8. Provide a description by category and location of all Documents[9] and tangible things that the Company has in its possession, custody, or control that were relied upon in responding to the questions herein.

9. Identify all "fictitious" names under which the Company operates (*e.g.*, all "doing business as," "also known as," trade names, etc.), and the states where the Company is authorized or otherwise uses those names. Also, identify any and all web addresses used by the Company, including those web addresses involving fictitious names.

10. Provide a detailed description of the Company and any and all services it currently offers (directly or indirectly), including through an affiliate. Whenever the Company offers services through an affiliate, identify the affiliate, describe *all* services offered by the affiliate (including non-Company related services), and the relationship (ownership, contractual, other) that exists between the Company and the affiliate.

11. Provide a detailed description of the Company and any services it offered (directly or indirectly) at all times between January 2019 and January 2024, including through an affiliate. Whenever the Company offers services through an affiliate, identify the affiliate, describe *all* services offered by the affiliate (including non-Company related services), and the relationship (ownership, contractual, other) that exists between the Company and the affiliate. For any service that was offered in that timeframe that was ceased during that timeframe, including the date when each service was no longer offered and reasons why the service was no longer offered.

12. To the extent not provided in the Company's response to Inquiry 11, explain in full detail the Company's wind-down process or cessation of operations prior to the approval of its application to the Supply Chain Reimbursement Program (SCRP), including the reasons for the actions taken. Identify relevant documents, including letters of abandonment, that indicate the degree to which SIW had ceased operations.

13. Identify the Company's bank account information used to receive payments from the U.S. Treasury in connection with the Affordable Connectivity Program, including the bank name(s), routing number(s), and account numbers(s).

14. Identify the Company's bank account information used to receive payments from the U.S. Treasury in connection with the SCRP, including the bank name(s), routing number(s), and account numbers(s). If any of this information is different from the answers to the Inquiry 13, specify the difference(s) and explain the reason(s) for the difference(s).

15. For each calendar year, identify all equipment or services produced or provided by the Covered Companies to the Company that has been in place or use at any time by the Company since January 1, 2019, including but not limited to any equipment or service(s) obtained at auction, as a regular purchase, as a gift, or as a loan, including equipment or services stored or housed on towers the Company can no longer access.

    a. For all equipment or services identified in response to this Inquiry, please include the following:

        i. the date the equipment or service was deployed;

---

[9] In responding to this Inquiry, note the definition below of the term "Document" in the Instructions to this letter.

    ii.    the date the equipment or service was removed (if removed); and

    iii.    whether the equipment or service is still in use as of the date of this Letter of Inquiry.

b. For any equipment or service removed that was part of its initial application to the Reimbursement Program, describe what the Company did with the equipment or services after removal. If any equipment or service was not disposed of in a manner in compliance with normal procedures under the SCRP, specify the alternate procedure used, the reason for the alternate procedure, and what happened with the relevant covered equipment or covered services.

16. Identify all equipment or services purchased, leased, or rented by the Company to replace the Covered Companies' equipment or services since January 1, 2022, including:

    a. the date of purchase, lease, or rental;

    b. from whom the purchase was made;

    c. the amount paid by the Company; and

    d. the installation and use start date(s) of such equipment or services.

17. Identify all employees, agents, or contractors, including titles and responsibilities, involved in the removal of any equipment or services produced or provided by Huawei Technologies Company or ZTE Corporation.

18. From January 1, 2022 to the present, identify all employees, agents, or contractors, including titles and responsibilities, involved in completing or filing any certification with the FCC relating to SIW's participation in the SCRP.

19. Identify the amount of USF funds or any federal subsidy received by the Company through a program administered by the FCC to purchase, obtain, maintain, improve, modify, remove, or otherwise support any equipment or services produced or provided by the Covered Companies since June 30, 2020.

20. Identify the exact amount of SCRP funds used by SIW to remove and/or replace any equipment or services produced or provided by Huawei Technologies Company or ZTE Corporation as of the date of your response to the LOI.

21. For January 1, 2020 through December 31, 2021, identify the total number of customers the Company serviced each month, including a total monthly revenue amount.

22. Identify each and every customer the Company has serviced from January 1, 2022 to the present, including a summation of data per fiscal quarter and a breakdown of data by customer for the entire timeframe. For each customer, the breakdown should include:

    a. The customer name and address;

    b. The Geographic Identifier (GEOID) for each customer address;

    c. The services subscribed;

    d. The services actually provided;

    e. The date when promised service(s) began;

    f. The date when promised service(s) ended (if applicable; if not, specify which service is continuing);

**APP 039**

g. The reason service(s) ended (if applicable);

h. The months for which revenues were received;

i. The amount of revenue received per month;

j. The total revenue per customer received since January 2022; and

k. The relationship (if any) between each customer and any person or entity that has an ownership stake in SIW, its subsidiaries, its vendors, or any business partner thereof.

l. Any and all documentation of the funds received from each and every customer since SI Wireless has been a participant in the SCRP including but not limited to checks, credit card processing information, and bank deposits.

23. Provide a detailed narrative description of the Company's relationship with Rural Connect. Identify if any person shares ownership in both the Company (or any parent of subsidiary thereof) and Rural Connect (or any parent or subsidiary thereof). If so, explain the ownership interest.

24. Provide a detailed description of how the Company met the requirements to participate in the SCRP at the time the Company applied to participate in the SCRP.

25. Provide a detailed explanation of the Company's business plan when it initially applied and was accepted to participate in the SCRP and the Company's subsequent modifications to this plan, including any role Rural Connect or other vendors or business partners may have in the plan. Explain the need for the plan and all aspects thereof, including but not limited to:

a. The number of towers from which covered equipment will be removed (or ripped);

b. The number of existing towers where new equipment will be placed after the covered equipment is removed (or replaced);

c. The reason for any discrepancies between the numbers listed in a and b, above;

d. The number of new towers the Company will obtain, rent, or construct that do not contain covered equipment but where new equipment will be placed;

e. Any additional planned towers not specified above;

f. If any existing, new, or planned tower or underlying land is owned by any person with an ownership interest in the Company (including its parent corporations or subsidiaries) or any of its vendors or business partners, specify the name of the tower owner or owner of the underlying land;

g. The justification for each tower modification or new tower construction;

h. The justification for any increase or decrease in the total number of towers;

i. Insofar as not already explained, the explanation, as to each requested modification, of the Company's decision to modify its coverage area.

26. Identify all vendors and business partners who received money from the Company (or its parents or subsidiaries) for any work or service performed or promised in connection with the Company's participation in the SCRP. For each, specify relevant information,

**APP 040**

including but not limited to:

    a. The name of the vendor or business partner;

    b. The nature of the relationship with the Company;

    c. Line items description for SCRP eligible expenses;

    d. The amount of funds used or obligated in relation to the SCRP per project;

    e. The dates of any contracts or agreements related to use or obligation of funds;

    f. Whether the work was completed and date of completion (if applicable);

    g. If work was not completed, either a projected completion date or explanation;

    h. The vendor's point of contact(s) or business partner(s) involved in the transactions described above, including contact information.

27. Identify all instances where the Company, having submitted an invoice for repayment as part of the SCRP that was ultimately denied as ineligible by the Commission or its agents, submitted a new, subsequent request for the same specific expense or a new specific expense of the same nature or situation as the former (ineligible) expense. Provide a detailed description of the invoiced amounts and the work performed for every instance identified. Omit instances where, having sought reimbursement initially for an expense and having been told such an expense is not eligible, the Company did not again seek reimbursement for the same type of expense.

28. Identify all reimbursement request expenses the Company (or its parent or subsidiary) submitted pursuant to participation in the SCRP, payment of which was denied. For each, if not otherwise clear from the document(s) identified, specify:

    a. The nature of the request (what was sought);

    b. Was the request made through the proper portal or procedural channel;

    c. Was the request accompanied by a certification that the request complied with all program rules;

    d. The date the request was made;

    e. The amount of the request;

    f. The date the request was denied;

    g. The reason why the request was denied;

    h. Why the Company believed (or still believes) the request was proper;

    i. Whether there was any back-and-forth discussion on point with the Commission; and

    j. All supporting materials substantiating the claimed costs.

29. Describe in narrative form, in full and complete detail, the circumstances leading to Leslie Williams gaining his ownership share in the Company, and any disinvestment made by Leslie Williams from any entity or affiliate of the Company in response to the Company's participation in the SCRP.

30. Describe, in full and complete detail, the circumstances that led to Integrated Business Networks, LLC gaining its ownership share in the Company.

31. Describe the business relationships between and among the Company and any of its

parents, subsidiaries, members, and associates.[10] Your description must identify all functions or services each person or entity performs and the entity for whom it performs such functions or services (e.g., an intermediate holding company that performs no functions, holds or manages assets such as leases office space, is a contracting party, performs responsible organization functions for affiliates, oversees finances such as keeping accounts, is the named entity on bank accounts, performs billing and collection, provides management functions, etc.). The Company's response must specifically state whether the Company or any of its owners or management (including managers, members, officers, or directors) have at any time had any relationship with these persons or entities. For any identified relationship, provide the following information:

a. Explain the nature of and relevant dates associated with the relationship.

b. Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity.

c. A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity.

d. A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity.

e. A description of any shared financial assets and obligations including banking and credit accounts, and tax filings.

32. Provide a chart for each company identified in response to Inquiry 31, including any additional companies you identify in response to Inquiry 33 (collectively, including the Company, the "Associated Companies," and each one singularly an "Associated Company"). Each chart must: show the internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility); specify the names of all owners (and percentage of ownership or membership interest); identify all directors or board members (including addresses and telephone numbers); identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity); and identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual.

33. For each Associated Company, answer the following:

a. The headquarters and/or business address of each company.

---

[10] This list includes, but may not be limited to: Leslie Williams; Eric Steinmann; Linda George; Amy McFarling; Chuck Roberts; Dave Sikut; Dogan Koslu; Greg Belknap; Jacquie Cossey; Jason Holliday; Jeffrey Sikut; Joseph Clark; John Hehman; Kenneth Nickerson; Paula Nowell; Phillip Comer; Ray Harvey; Thomas Karnes; Tom Sams; Troy Bruce; Integrated Business Networks, LLC; Clear 9 Communications, LLC; ESIRF LLC; Flat Wireless LLC; Minghelli LLC; NTCH-West Tenn Inc.; NTCH-NM, LLC; PTA-FLA Inc.; Rural Connect LLC; Z Best Logistics, LLC; Sikut, Inc.; Business Solutions, LLC; Hardrock Enterpreises, LLC; MiTawn Services; Koslu LLC; Sparqworx; MLC Strategies, LLC; Fisher Telecommunications; Tower Engineering Solutions, LLC; Barrett Browning, LLC; Partner Engineering & Science, Inc.; Marahute Mechanics; Solano Communications, LLC; World Tower; Socratica Consulting, LLC; Good Works Digital, LLC; Greywolves; Flat Wireless.

b. Identify the state of incorporation and/or organization of each company. Identify states in which each company is authorized to conduct business. Identify (list) all trade names, fictitious names, "doing business as," or other name used by the companies to conduct business and each company using such trade names, fictitious names, "doing business as," or other name.

c. Identify the persons responsible for incorporating or otherwise creating each company and the relationship of such persons to the companies they incorporated or otherwise created (e.g., ownership interest, member, board member, officer, etc.).

d. Explain the nature of and relevant dates associated with the relationship. If the relationship comprises a transaction or series of transactions, identify the transactions and the dates or date range of such transactions.

e. From 2019 to the present, state whether any of the Associated Companies filed consolidated Federal tax returns and, if so, identify which companies did so and (a) identify the name (filer name) under which each consolidated return was filed and (b) the years consolidated returns were filed. If the filer of a consolidated Federal tax return is not one of the Associated Companies, describe the relationship (business and otherwise) between and among the filer and the companies on whose behalf the consolidated Federal tax return was filed. In the last four years before the date of this LOI, identify each company that files Federal tax returns (other than consolidated returns) in its own name. In the last four years before the date of this LOI, identify each company that has not filed a Federal file tax return in its own name (other than those identified above as part of a consolidated return). For any company that has not filed a Federal tax return, identify the reasons for non-filing (e.g., the company was incorporated within the current tax filing year).

f. Describe all physical or virtual facilities (e.g., office space) and assets (e.g., phone numbers, toll free numbers, computers, computer servers, back office systems, IT systems, billing systems or outsourced billing, contracts where one or more companies are the contracting parties or are beneficiaries or receives benefits from a contract entered into by a parent company or sister or affiliate company) that are shared by one or more of the Associated Companies. Include the address of any such facility, telephone number, or other shared resources.

g. Describe any shared financial assets and obligations, including banking and credit accounts.

h. List and describe all contracts or other business arrangements between or among the Associated Companies.

34. If not otherwise already answered, identify any person, corporation, or other entity with any amount of ownership interest in the Company, its parent corporations, or its subsidiaries, since 2019. For each, provide the amount of ownership interest held, when it was acquired, when it was divested (if applicable), and the amount of money the individual, corporation, or other entity has received (directly or indirectly) as a result of the Company's participation in the SCRP.

35. If not otherwise already answered, identify any person, corporation, or other entity with any amount of ownership interest in the Company, its parent corporations, or its subsidiaries, that also has any amount of ownership in, shares one or more parent

companies with, or has common ownership in at least one subsidiary of, any vendor or business partner that has worked with the Company, its parent corporations, or its subsidiaries, as part of the Company's participation in the SCRP since 2019.[11] For each vendor or business partner responsive to this question, specify the relevant vendor or business partner in which the person holds an interest, provide the amount of ownership interest held, and when the interest was acquired and (if applicable) divested.

36. State Leslie Williams' salary as President and CEO at the Company for each of the previous 6 years—since January 1, 2018—and provide documentation evidencing Leslie Williams' salary as President and CEO at the Company since January 1, 2018, including but not limited to tax returns for the relevant years, paystubs, relevant bank transactions, paycheck vendor receipts, and any other documentation evidencing salary distributions.

37. Describe how the Company has measured the level of interest in the Company's services in relevant geographic areas after completion of any SCRP projects.

## Requests for Documents

38. Provide copies of all Documents that serve as the basis for or otherwise support the responses to all the Inquiries above, to the extent not already provided.

39. Provide any and all Documents, including communications, in the Company's possession relating to or concerning:
    a. The Company's certificate(s) of incorporation or certificate(s) of formation;
    b. The Company's original and any revised articles of organization;
    c. The Company's Board of Directors meeting minutes;
    d. Organizational chart(s) showing the Company's organization and the Company's officers and directors, including, where applicable, any associated documents that contain the names, titles, and job description/duties of the Company's officers and directors;
    e. Organizational chart(s) containing or associating with any of the following information: entities that are in the same corporate structure as the Company, entities in which the Company has an ownership interest, and entities or individuals that have an ownership interest in the Company; and
    f. Any and all policies and procedures related to the Company's use of equipment or services produced or provided by the Covered Companies.

40. All Documents, including communications, relating to all equipment or services produced provided by Huawei Technologies Company and/or ZTE Corporation, that the Company removed from use.

41. All Documents, including communications, related to any revenue sharing agreement, or similar agreement, between the Company and Rural Connect, LLC.

42. All Documents, including communications, relating to all equipment or services produced or provided by Huawei Technologies Company and/or ZTE Corporation that

---

[11] Examples of potential vendors or business partners for which information might not have been already answered include, but are not limited to, NTCH West Tenn, NTCH NM LLC, Minghelli, LLC, ESIRF LLC, WGH, Daredevil, Inc., NTHC Colorado, Tri County Telephone Association, and Gallatin Wireless.

has been in use by the Company for any period of time since January 1, 2022.

43. All Documents, including communications, relating to the Company's sources of funding for any Covered Equipment or services purchased, obtained, maintained, improved, modified, removed, or otherwise supported since January 1, 2022.

44. All Documents, including communications, relating to whether the Company met the requirements to participate in the SCRP at the time the Company applied to participate in the SCRP.

45. For each submission made to the SCRP related to the construction or relocations of a new tower, provide all Documents, including communications and structural engineering reports, regarding each specific tower's structural analysis and other related study supporting the Company's conclusion that tower reinforcement was deemed not feasible, options considered other than building a new tower, and associated cost estimates considered for each solution.

46. Provide all invoices, billing statements, and related documentation issued to each customer the Company provided services to from January 2021 to the present.

47. Provide all certifications of compliance with program rules, including certifications for application to the program promising compliance and any later certification submitted in connection with a reimbursement request, updated plans, modifications, or other aspect of the SCRP.

48. Provide all contracts for services and/or employment, including related communications, between the Company and any individual or vendor performing work related to any reimbursement claim submitted to the SCRP.

49. Provide all employment, salary, and/or other payment contracts between the Company and Leslie Williams, including all Documents showing communications related to the development of the contracts or employment offer, approval of the contracts, or setting the salary set for forth in any contract.

50. Provide all employment, salary, and/or other payment contracts between the Company and Eric Steinmann, including all Documents showing communications related to the development of the contracts or employment offer, approval of the contracts, or setting the salary set for forth in any contract.

51. For tax years 2019 through the present, for all SIW personnel for whom SIW sought or received salary funding commitments or actual reimbursement through the SCRP, provide: (a) W-2s; (b) W-3s; and (c) 1099s.

52. From tax year 2019 to the present, provide (1) federal tax returns; (2) quarterly and/or yearly financial statements prepared according to generally accepted accounting practices; or (3) some other reliable and objective documentation that accurately reflects the Company's financial status.

## Filing Requirements

*Affidavit Requirement.* We direct the Company to support its responses with an affidavit or declaration under penalty of perjury, signed and dated by an authorized officer of the Company with personal knowledge of the representations provided in the Company's response. The affidavit or declaration must verify the truth and accuracy of the information therein, state

**APP 045**

that all of the information requested by this letter that is in the Company's possession, custody, control, or knowledge has been produced, and state that any and all documents provided in its responses are true and accurate copies of the original documents. In addition to such general affidavit or declaration of the authorized officer of the Company described above, if such officer (or any other affiant or declarant) is relying on the personal knowledge of any other individual rather than his or her own knowledge, and if multiple Company employees contribute to the response, the Company shall provide separate affidavits or declarations of each such individual with personal knowledge that identify clearly to which responses the affiant or declarant with such personal knowledge is attesting. All such declarations provided must comply with Section 1.16 of the Rules,[12] and be substantially in the form set forth therein. Failure to support your responses with a sworn affidavit could subject you to forfeiture.[13]

*Delivery Requirements.* The Company shall transmit its response via email to aaron.gershbock@fcc.gov, john.corbin@fcc.gov, and sarah.mcnally@fcc.gov. The electronic copy shall be produced in a format that allows the Commission to access and use it, together with instructions and all other materials necessary to use or interpret the data, including record layouts, data dictionaries, and a description of the data's source.

## Instructions

*Request for Confidential Treatment.* In addition to providing the requested information and documents, any request for confidentiality of certain information or documents must strictly comply with the requirements of 47 CFR § 0.459, including a statement of the reasons for withholding the materials from inspection. The request must include a schedule of the information or documents for which confidentiality is requested that states, individually as to each such item, the information required by section 0.459(b) of the Commission's rules including, but not limited to, identifying the specific information for which confidential treatment is sought; explaining the degree to which the information is commercial or financial, or contains a trade secret or is privileged; and explaining how disclosure of the information could result in substantial competitive harm.[14] Accordingly, a "blanket" request for confidentiality or a casual request, including simply stamping pages "confidential," will not be considered a proper request for confidentiality, and those materials will not be treated as confidential.[15]

*Claims of Privilege.* If the Company withholds any information or documents under claim of privilege, it shall submit, together with any claim of privilege, a schedule of the items withheld that states, individually as to each such item: the numbered Inquiry to which each item responds and the type, title, specific subject matter and date of the item; the names, addresses, positions, and organizations of all authors and recipients of the item; and the specific grounds for claiming that the item is privileged.

*Format of Responses.* The response must be organized in the same manner as the

---

[12] 47 CFR § 1.16.

[13] *SBC Commc'ns, Inc.*, 17 FCC Rcd at 7600, para. 28 (2002) (imposing $100,000 penalty for failing to submit a sworn written response).

[14] *See* 47 CFR § 0.459(b).

[15] *See* 47 CFR § 0.459(c).

questions asked, i.e., the response to Inquiry 1 should be labeled as responsive to Inquiry 1.

*Method of Producing Documents.* The Company shall submit each requested document in its entirety, even if only a portion of that document is responsive to an inquiry made herein, including all appendices, tables, or other attachments, and all other documents referred to in the document or attachments. The Company shall not edit, cut, expunge, or otherwise take any action to modify any document submitted in response to this LOI. In addition to any document the Company submits in response to any inquiry, the Company shall also submit all written materials necessary to understand any document responsive to these inquiries.

*Identification of Documents.* The Company shall identify all documents provided in response to these inquiries in accordance with this paragraph. The Company shall include a reference label on each document that identifies each document in sequential and consecutive numerical order and "Bates" stamp all documents (e.g., Company 01-000001, where "Company" is the responding entity, "01" signifying that the document is response to Question 1 of this LOI, and "000001" indicating that the document is the first page in a consecutively numbered range potentially reaching one hundred thousand). Elements such as these should be separated by dashes, as indicated. For each document submitted in response to this LOI, the Company shall provide an index indicating: the title of the document; the date of the document; the custodian from whose files the document was retrieved; the author and recipient of the document; and the corresponding reference label number assigned to the document. If any document is not dated, the Company shall state the date on which it was prepared. If any document does not identify its authors or recipients, state, if known, the names of the authors or recipients.

*Documents Already Provided.* If a document responsive to any inquiry made herein has already been provided to the Enforcement Bureau during this or any other investigation, identify each such document, when and how it was produced to the Bureau, and specify the Bates-number range for the document.

*Documents No Longer Available.* If a document responsive to any Inquiry made herein existed but is no longer available, or if the Company is unable for any reason to produce a document responsive to any Inquiry, identify each such document by author, recipient, date, title, and specific subject matter, and explain fully why the document is no longer available or why the Company is otherwise unable to produce it.

*Retention of Original Documents.* With respect only to documents responsive to the specific Inquiries made herein and any other documents relevant to those Inquiries, the Company is directed to retain the originals of those documents for [twelve months/twenty-four/sixty months] from the date of this letter unless (a) the Company is directed or informed by the Enforcement Bureau in writing to retain such documents for some shorter or longer period of time, or (b) the Enforcement Bureau or the Commission releases an item on the subject of this investigation, including, but not limited to, a Notice of Apparent Liability for Forfeiture or an order disposing of the issues in the investigation, in which case, the Company must retain all such documents until the matter has been finally concluded by payment of any monetary penalty, satisfaction of all conditions, expiration of all possible appeals, conclusion of any enforcement action brought by the United States Department of Justice, or execution and implementation of a final settlement with the Commission or the Enforcement Bureau.

### *Production of Electronic Records.*

1. General:
   a. Records existing as Electronically Stored Information (ESI) shall be produced in non-proprietary electronic form and shall include text data and image data held:
      i.   In your record retention systems; and/or
      ii.  By your technology, data, or other service provider(s).

   b. Records that do not exist as ESI may be produced as copies of paper or other original format and may be converted to image or text data and provided as ESI, unless originals are required.

2. Text Data
   a. Text data relating to transactions shall be produced within a data file:
      i.   Using a delimited ASCII text data format; or
      ii.  Using software that can export to a commonly readable, non-proprietary file format without loss of data.
   b. Text data files relating to transactions shall include field descriptions.

3. Image Data
   a. Image data shall be produced in graphic data files in a commonly readable, non-proprietary format with the highest image quality maintained.
   b. Image data of items associated with transactions shall be:
      i.   Produced in individual graphic data files with any associated endorsements; and
      ii.  Linked to corresponding text data by a unique identifier.

4. Encryption/Authentication
   a. ESI may be transmitted through an encrypted file. Decryption keys and/or passwords shall be provided separately at the time the data are produced. *Please do not encrypt individual file contents if the main file is encrypted.*
   b. Authentication, such as hash coding, may be set by agreement.
   c. Affidavits or certificates of authenticity may be included as part of the electronic production.

*Continuing Nature of Inquiries.* The specific Inquiries made herein are continuing in nature. The Company is required to produce in the future any and all documents and information that are responsive to the Inquiries made herein but not initially produced at the time, date, and place specified herein. In this regard, the Company must supplement its responses (a) if the Company learns that, in some material respect, the documents and information initially disclosed were incomplete or incorrect or (b) if additional responsive documents or information are acquired by or become known to the Company after the initial production. The requirement to update the record will continue for [twelve months/twenty-four months/sixty months] from the date of this letter unless (a) the Company is directed or informed by the Enforcement Bureau in writing that the Company's obligation to update the record will continue for some shorter or longer period of time, or (b) the Enforcement Bureau or the Commission releases an item on the subject of this investigation, including, but not limited to, a Notice of Apparent Liability for

**APP 048**

Forfeiture or an order disposing of the issues in the investigation, in which case the obligation to update the record will continue until the matter has been finally concluded by payment of any such monetary penalty, satisfaction of all conditions, expiration of all possible appeals, conclusion of any enforcement action brought by the United States Department of Justice, or execution and implementation of a final settlement with the Commission or the Enforcement Bureau.

*Construction.* The terms "any" and "all," "and" and "or," and "each" and "every" shall be construed inclusively to bring within the scope of the requests for information and documents all information and documents that might otherwise arguably be construed as outside the scope of the requests. Likewise, the singular of any word or defined term shall include the plural and the plural of any such word or defined term shall include the singular. The words "relating to" or "relate to" shall be construed to mean, whether directly or indirectly, in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, supporting, qualifying, confirming, contradicting, or stating.

## Definitions

For purposes of this LOI, the following definitions apply. The definitions in this section apply regardless of whether the first letter of the defined term appears in upper or lower case.

"Affordable Connectivity Program" refers to Affordable Connectivity Program, Title 47, Code of Federal Regulations, Part 54, Subpart R.

"Associated Companies" is the Company and any company identified in response to Inquiries 29, 30, 31, or 32. Each singular company from the Associated Companies is an "Associated Company."

"Communication" means any transmission or exchange of information between two or more persons, orally or in writing, and includes, without limitation, any conversation, contact or discussion, whether face-to-face or by means of telephone, telegraph, telex, electronic mail, electronic or other media, whether by chance or design.

"The Company" means (a) SI Wireless, LLC, irrespective of the names under which it has done business; (b) all of its predecessors, subsidiaries, affiliates, branches, divisions, groups, operations, units, parent organizations, plants, and any joint ventures of which it is a part – including, but not limited to, Integrated Business Networks, LLC; and (c) each of the present or former officers, directors, employees, agents, and representatives of SI Wireless, LLC.

"Covered Companies" include Huawei Technologies Company, ZTE Corporation, Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, Dahua Technology Company, AO Kaspersky Lab, China Mobile International USA Inc., China Telecom (Americas) Corp., Pacific Networks Corp. and its wholly-owned subsidiary ComNet (USA) LLC, and China Unicom (Americas) Operations Limited.

"Covered Equipment" shall mean any equipment provided by a Covered Company, the use of which is restricted by any statute, regulation, or other legal obligation. "Covered services" shall mean any services provided by a Covered Company, the use of or subscription to which is

**APP 049**

restricted by any statute, regulation, or other legal obligation. "Covered equipment and services" shall mean both covered equipment and covered services.

"Document" shall mean all written or graphic matter, however produced or reproduced onto any other tangible record, including, but not limited to, all writings or recordings, whether set down in handwriting, typewriting, printing, photostating, photographing, magnetic impulse, computer media, mechanical or electronic recording, or other form of data compilation; as well as all drafts and all versions of such documents, including electronic documents that have been deleted but are retrievable, in the possession, custody, or control of the Company (including all writings and records that have been transferred from the Company to its accountants, attorneys, or consultants). "Document" includes every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation. "Document" specifically includes, but is not limited to, statements of procedure and policy; records of email; telephone logs; routing slips; records or evidence of incoming and outgoing telephone calls; itineraries; activity reports; travel vouchers and accounting; bank records; accounting and bookkeeping records and materials; financial records and statements; external or internal correspondence; cables; telexes; teletypes; telegrams; telecopies; verbal or written communications; memoranda; letters; messages; reports; plans; summaries; briefing materials; audits; studies; notes; working papers; graphs; maps; charts; diagrams; agendas; minutes; transcripts, records, or summaries of any meeting, conversation, conference or communication; and all attachments to any of the items set forth in this paragraph.

"Identify," when used with reference to a person, shall mean to state his or her full legal name, job title (if any), current business address, business phone number, and e-mail address. If business address or telephone number are not available, state the person's home address and telephone number.

"Identify," when used with reference to a Document, shall mean to state the date, author, addressee, type of document (e.g., the types of document, as described above), a brief description of the subject matter, its present or last known location, and its custodian.

"Identify," when used with reference to an entity other than a person, shall mean to state its name, current or last known business address, current or last known business telephone number, and e-mail address.

"SIW" or "SI Wireless" or "Company" shall mean SI Wireless, LLC, and any predecessor-in-interest, affiliate, parent company, wholly or partially owned subsidiary, other affiliated company or business, and all owners, including but not limited to, partners or principals, and all directors, officers, employees, or agents, including consultants and any other persons working for or on behalf of the foregoing at any time during the period covered by this LOI. Although this LOI refers to SI Wireless to collectively include each person or entity listed in this definition, any responses must specifically detail and distinguish between the actions or responsibilities of each entity.

"Telecommunications" or "Telecommunications Service" includes, but is not limited to, each type of interstate telecommunications listed in Section 54.706 of the Rules. *See* 47 CFR § 54.706(a); *see also* 47 U.S.C. §§ 153(50), 153(53), 254(d).

**APP 050**

"USAC" shall mean the Universal Service Administrative Company.

"USF" shall mean the federal Universal Service Fund.

# EXHIBIT 3
# (Including selected attachments)

APP 052



**Steve Leckar**
sleckar@kalbianhagerty.com
888 17th Street, NW, Suite 1200
Washington, DC 20006

**KALBIAN HAGERTY** LLP
ATTORNEYS AND COUNSELORS AT LAW

(202) 223-5600 Telephone
(202) 223-6625 Facsimile

September 17, 2024

**By E-Mail and First Class Mail**

John A. Corbin, Esq.
Investigative Counsel, Fraud Division
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

Dan Daly, Esq.
Office of the Chief Financial Officer
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

*Re: SI Wireless, LLC*
*File No. EB-FD-24-00036576/SCRP0001013*

Dear Messrs. Corbin and Daly:

On behalf of SI Wireless, LLC ("SI"), we respond to the Enforcement Bureau's July 11th Letter of Inquiry ("LOI") and the Chief Financial Officer's July 11th Notice of Funding Hold ("Notice") concerning SI's participation in the Secure and Trusted Communications Networks Act's ("Act") Reimbursement Program ("SCRP").[1]

There are four takeaways, all flowing from a core point. SI historically had a customer base of about 30,000 people. It migrated most of them when it chose to participate in the SCRP. It maintained written agreements with several to protect its spectrum for licensing purposes while undertaking to rip, replace and restore full service afterwards. Its application disclosed this business plan, and the FCC approved it. Congressional funding shortfalls impacted SI's progress, which the Program Administrator's tardy processing and payment of invoices—akin to deficiencies identified in the recently-released Fourth Report to Congress—exacerbated. Currently SI is owed over $32.7 million for work completed, not billed and unable to be billed under program constraints. It is also owed $14.47 million for unpaid amounts billed.

First, the FCC asks whether SI had customers taking service when it applied for SCRP finding and has any now. As SI stated, during this period it consistently has had customers.

Second, neither the Act not Rules condition eligibility to be an advanced communications provider on any minimum customer metrics nor define when customers are to be counted—if at all. The target called for providers with less than two million customers to submit plans to remove and replace the proscribed equipment and restore broadband service promptly; for the

---

[1] A separate Box attachment answers the Bureau's requests. When disaggregated into subparts, the LOI approaches two thousand discrete demands. The sheer volume of data requested comprises about 83.0 Gigabytes of information—the equivalent of 83 sets of the ENCYCLOPEDIA BRITANNICA.

APP 053



FCC to review and approve meritorious plans; and for providers primed with federal funding to make good faith efforts to cleanse and restore their networks. SI has met its obligations.

In 2019, when it had 11,000 customers, SI filed papers with the FCC declaring the intent to participate in a rip-and-replace program. Its new management bought the firm in July 2020. A month later SI began ripping out Huawei equipment and continued doing so during 2021. Its plan was to cleave away, destroy, and then replace the discredited equipment and resume full service once installation and testing ended.

SI was still providing service to five customers in January 2022, when it applied for SCRP funding. The FCC, which had been publicly and privately urging SI and other providers to start early, approved SI's original plan and post-funding cut modification. The FCC never said that SI could not suspend service. And it blinks reality to think that SI's accepted plans could have worked without doing so. Congress evinced no desire to exclude from the SCRP a provider such as SI, which had committed resources, removed offending equipment, and was remediating with the FCC's blessings but had not completed reinstallation.

Third, the FCC's inquiry asks if SI's principal, Leslie Williams ("Williams") told the WASHINGTON POST and then told the FCC in May that SI lacks current customers. He did not.

Mr. Williams accurately told the POST that there were "dead zones" in SI's former market area where "[c]urrently customers are without service." That was true for places where SI cannot serve former customers because limited funding and the Administrator's tardiness have thwarted its progress. Mr. Williams was not quoted as saying that SI had no customers.

Eight days later, the FCC's Request for Information asked a different question, namely whether SI currently had paying customers. Mr. Williams truthfully responded that six customers receive service as an offset against amounts due for performing work for SI at an agreed-upon rate, and that 81 others take service through its Affiliate, Rural Connect, to whom SI wholesales service for offsets to sums owed Rural Connect for tower space. Nothing in the Act or Rules precludes such in-kind service arrangements.

Fourth, funding shortfalls and the Administrator's tardy and inconsistent processing and disbursements have damaged SI. It disposed of the covered equipment and waited for almost two years to be reimbursed. Afterwards it bought and installed most of the replacement equipment but has received less than 10% of what was approved for this purpose.



Before turning to the merits, we should address the equities. "'It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government.'"[2] SI had served its deeply rural market for over a decade without Universal Service Fund ("USF") or other federal assistance. It heeded the Program's siren call. It performed work for the Program by following its approved plan while being unable to earn revenues. Yet other firms, including USF-subsidized businesses, continued to earn a living during the Program. Being unpaid for work accomplished and then being thwarted from restoring service and generating revenues is a major financial stressor for SI, a small business that must meet its obligations and provide valuable service to customers. To this day, no FCC or Administration officer has made any site visits or audits, presented SI with specific allegations of dishonesty, or questioned its construction. This conundrum is akin to a trusted longtime customer pressuring a contractor to do a job and afterwards unilaterally reducing the price and then putting off the reimbursement.

A strong public interest also is implicated beyond the conventional understanding that the government should honor its contractual obligations. The current impasse leaves the poorly served communities in rural Tennessee and Kentucky that comprise SI's market to the whim of large-sized government-funded fiber providers who are immune from real competition. When SI is paid it will roll out with close to 100 sites and excellent high speed fixed wireless service for about a third of what many big providers charge in that market.

I.  The FCC and its staff issued numerous declarations that led SI to commit time, human capital and financial resources into the Program.

This letter first discusses SI's history as a broadband supplier and then explains how the FCC led it to participate in the Program. Afterwards SI reviews its experience in the Program by addressing its disclosures to the FCC and the enervating ways in which the Program Administrator has failed to review plans and invoices and to pay approved bills in a businesslike manner. Lastly SI will satisfy the government's questions about whether the firm has customers.

---

[2]  *Heckler v. Community Health Svcs of Crawford Cty., Inc.*, 467 U. S. 51, 61, n. 13 (1984) (cleaned up).



SI has long served a discrete largely rural broadband market with competitive prices. Like many providers, SI had installed Huawei equipment throughout its network, unaware of the threat that it posed.[3] Once that became a national issue, SI closely tracked proposals being deliberated in Congress and the FCC to fund removing covered equipment in the communications supply chain.[4] As far back as early 2018, SI was one of seven carriers whose cost estimates prompted the government to recognize that for those providers "the impact of a rip-and-replace requirement is large compared with similarly situated non-reporting carriers."[5] The following May, just after the new law's signing, SI submitted a statement of interest to participate in the SCRP.[6] In mid-July 2020, just after SI's then-owners had transitioned its customers, its current owners acquired the business. Next, between August 2020-April of 2021 it removed Huawei equipment in anticipation of the Program's establishment, as the FCC had confirmed would be forthcoming.[7] It was, in other words, almost a seamless process.

Although the LOI and Notice muse over whether SI has "normal business operations and cash flow," the SCRP never was or could have been destined to be normal business. Neither the relevant Committee Report,[8] floor debate,[9] statutory language,[10] nor Second Report and Order conditioned eligibility and funding on any participant's "normal" operation or cash flow. Certainly, the Act did not base program eligibility on any level of consistent, stable, regular, or reserve revenues. Indeed, the FCC understood that tear down first and replace afterwards could be a likely approach for some providers. It "recognize[d] the removal, replacement, and disposal of covered equipment <u>may</u> in the case of mobile wireless networks, entail setting up parallel

---

[3] "What is frustrating is that large telecom providers knew the dangers posed by the equipment from companies like Huawei and ZTE years ago because of warnings inside our government. But smaller providers didn't get the same heads-up by our government, and when confronted with rumors about untrusted equipment and the certainty of their bottom lines, they went with their bottom line." CONG. REC. H.10285-10286 (Dec. 16, 2019) (remarks of Cong. Doyle). *See also id.* at H.10286 ("This bill takes into account important concerns we have heard from small, rural providers that were previously unaware of possible security risks when selecting vendors and making purchasing decisions.") (remarks of Cong. Latta).

[4] The SCRP's genesis and administrative history has been well-explained in *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Second Report and Order at pp. 2-15, WC Docket No. 18-89, 35 FCC Rcd (Dec. 11, 2020) ("Second Order").

[5] *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, WC Docket No. 18-89, Report and Order, Further Notice of Proposed Rulemaking, and Order, 34 FCC Rcd 11423, ¶ 114 (2019).

[6] SI Supply Chain Filing (May 21, 2020).

[7] Ans. Req. 15 and supporting invoices.

[8] H.R. Rep. 116-352, "Secure and Trusted Communications Networks Act of 2019" (116th Cong., 1st Sess., Dec. 16, 2019).

[9] 165 CONG. REC. H.1022-10286 (Dec. 16, 2019).

[10] 47 U.S.C. § 1601 *et seq.*



network core and RAN components and then migrating existing customers to the new network."[11] Using "may" signified that there could be varied approved ways—SI's being one—to meet the common goal of removing and destroying covered equipment and replacing it.

As well, the FCC accepted that some providers might experience a loss in revenues from customer attrition. It did not suggest that loss would result in program disqualification. The sole "penalty" was that the Program would not reimburse providers' lost revenues.[12]

As applied here, a Rip and then Replace program is what SI proposed and the FCC approved in lieu of SI's setting up parallel networks. SI's network is in transition, for its network migration business model necessarily differs from a fully deployed network model. SI has done everything in its power, given programmatic resources, to minimize service disruptions and build out its network to provide full service, generate revenue, and restore cash flow.

A. The FCC's invitations required no specific level of customer service.

SI's January 2022 application to the Program followed studying the Second Report and Order, attending FCC webinars, and receiving its lawyer's confirmation from FCC staff that providers who removed and replaced covered equipment early would be reimbursed for their documented reasonable expenses. Nobody expressed concerns with any provider's suspending service while undertaking a Rip and then Replace. Rather, it was all about the equipment:

1. While avoiding Anti-Deficiency Act implications,[13] the FCC encouraged providers to begin renovating far in advance of congressional appropriations. Its December 2020 Second Report and Order "applauded" providers for "proactively taking steps to increase the security of their networks notwithstanding the uncertainty of Federal government assistance" and confirmed that "we will allow providers to obtain reimbursement for costs reasonably incurred prior to the creation and funding of the Reimbursement Program, for the removal, replacement, and disposal of covered equipment and services."[14] Mr. Williams studied that issuance.[15] And as previously stated, SI had begun removing Huawei materials since that past August.

---

[11] Second Report and Order, ¶ 134 (emphasis added).

[12] Id.

[13] 31 U.S.C. §§ 1341(a)(1)(A)-(B), 1342.

[14] Second Report and Order at ¶ 130.

[15] Ans. Req. 24. Mr. Williams has been a Certified Project Manager and in the telecommunications industry since 2004. Ans. Req. 49.



2. High-level FCC staff stressed that immediately ripping out suspect equipment would not jeopardize Program eligibility. Mr. Williams observed a September 2021 webinar where senior staff recognized that providers faced a "complex task" of "evaluating base station after base station, router after router to ensure that the American public is no longer vulnerable to untrusted network equipment and services," and stated that "this will not be simple: removing insecure equipment from existing networks after installation is challenging because historically these systems have been closed and deeply integrated with little opportunity to mix and match equipment from different vendors."[16]

3. Most crucially, the staff overseeing the September webinar realized that "in some cases this will mean starting over from scratch" and urged providers to "make no mistake—the time is now to remove this equipment from our networks ...."[17] Similarly, the senior staff confirmed that "We understand that many of these carriers are small carriers that may not have the resources to float paying all these expenses while they wait to be reimbursed."[18]

4. The sense of urgency imparted by the government also was driven home to SI via a more direct channel. Before the September Public webinar, SI had begun significant removal but was concerned with accelerating the pace and not recovering its associated expenses. It sought insight from a respected practitioner who represented other providers and thoroughly understood the SCRP process. In mid-September, its counsel wrote: "I just spoke to the FCC. As long as you have everything documented and can show that the equipment

---

[16] Public Notice, *FCC Announces a Webinar for the Secure and Trusted Communications Networks Reimbursement Program*, DA 21-1164 (Sept. 16, 2011); Ans. Request 24. A February 8, 2021, webinar on "Protecting Against National Security Threats to the Communications Supply Chain," was held under the Rural Wireless Association's auspices; we have FOIA'ed a transcript and believe it will reflect similarly encouraging statements.

[17] See https://youtu.be/9cFEeHgMYgo (webinar); https://www.fcc.gov/news-events/events/2021/09/secure-and-trusted-communications-networks-reimbursement-program-webinar ; Tr., p. 1 (remarks of Acting Special Counsel to Chairwoman Rosenworcel Trent Harkrader) (unofficial transcript) (Ans. Req. 24 ). The theme of exigency permeated the September 2021 webinar. *See id.* at pp. 5 ("you can also start going ahead now; there's no need to wait to compile vendor quotes, invoices and other documentation"), 15 (recognizing that lines of credit might have been obtained by "a program participant that has begun the remove replace and dispose process prior to applying for and receiving their funding allocation from the reimbursement program") (remarks of Acting Associate Bureau Chief Justin Faulb).

[18] *See id.* at p. 11 (Faulb).



has been rendered unusable and that no data is accessible (and that it is destroyed here and not overseas) then you should be good to go. The FCC is issuing guidance in the next few days to few weeks. They are not seeking to penalize anyone or make the process more cumbersome, but you need to keep really good records on the process."[19]  SI  began removing Huawei antennae.[20]

SI also reasonably relied on these public and private representations in committing to the Program. It believed that lost revenue would be recovered after a brief takedown. Nowhere during or after this period did the Commission instruct providers to maintain any level of continued service while reconfiguring their networks.

> B. <u>SI submitted a comprehensive bid and business plan that disclosed it would have very limited customer service until after it had both ripped and then replaced.</u>

During the fall and early winter of 2021, SI examined the market and then submitted a successful proposal for $181 million, which Congressional funding constraints later lowered to $71 million.[21]  SI's representations were accurate.

1. Its first application correctly disclosed that it had "[f]ewer than two million customers." The application form did not demand a customer count. SI also made clear that it hadn't ceased being an advanced communications provider: its determination to undertake ripping, replacing and then bringing back a full complement of revenue-paying customers was fundamental to its approved plan to remain in business as a broadband provider. Meanwhile it maintained a small discrete group of customers taking broadband service from it.

2. As SI has pointed out, the Commission recognized that some providers would lack continued service for the temporary time needed to Rip and then Replace. The operative date appears to be the point when a otherwise-qualified provider either determined to initiate the process or commenced doing so. No other interpretation makes sense given the Commission and staff's frequent declarations that providers could begin the process before the Program's formal adoption.

---

[19]  Email thread of September 1—13, 2021, between Eric Steinmann-Cari Bennet, Esq. (Ans. Req. 24). Ms. Bennet was counsel for the Competitive Carriers Association and the Rural Wireless Association.

[20]  Ans. Req. 15.

[21]  Whether requiring adherence to a standard catalog may have raised pricing and was a factor in causing appropriations to be cut back need not be addressed but it bears mention.



3. SI informed the FCC that it "ha[d] begun the de-installation of its equipment and expect[ed] to have the de-installation, destruction and recycling completed by the time it receives its first reimbursement from allocation."[22] SI also explained how it would tackle the problem by first yanking out and destroying the Huawei equipment in its network.

4. In addition, SI advised that its "Form 477 shows only a small group of subscribers as services were transitioned for most of our customers to other providers in late December 2019/early 2020 after it became apparent that the federal government would no longer support Huawei equipment and services and after Sprint terminated the Company's roaming [affiliation] due to its impending sale to T-Mobile."[23] As discussed below, to protect its spectrum licenses SI retained a few customers who were reported on its Form 477s as it went forward to Rip and then Replace.

None of this means that SI was any less a "provider of advanced communications services." By an analogy, a baseball pitcher sidelined by Tommy John surgery has not abandoned his occupation while being sidelined and recovering. He was a pitcher before the surgery, he remains so during rehabilitation and then after resuming pitching. As applied here, SI had always been a broadband service provider, it remained one while it radically modified its network infrastructure to meet the congressional intent, and it will remain so upon its return to active service.

5. One further note: SI advised the FCC that with _full_ funding it would "deploy and relaunch its network as it existed before 2020 (with essentially the same footprint included in the area launched)."[24] Otherwise it planned to "relaunch its network to provide quality internet-only fixed wireless services focusing initially on the smaller cities, towns,

---

[22] SI WIRELESS, LLC, FRN: 0019623834, COMPANY BACKGROUND AND THE PLAN, p.1 (Business Plan accompanying submission of Form 5640, SCRP Application Request for Funding Allocation (Jan. 19, 2022)). _See also_ Ans. Req. 25.

[23] _See id._

[24] _See id._ (emphasis added).



and rural areas within its existing coverage areas in Western Tennessee, Eastern Kentucky, and Southern Illinois."[25]

Had SI instead provided fitful and blocked service to customers while simultaneously ripping as well as replacing, it would have destroyed its business reputation irreparably. It also would have been unable to remove and destroy the offending equipment and rebuild efficiently, which it now has substantially accomplished.

To summarize, then, SI also reasonably trusted the FCC's 2022 approval of its application and accordingly incurred further expenses. However, unexpected intervening matters forestalled its ability to undertake its approved plan and recapture its customers and lost revenue.

    C. <u>As SI continued focusing on removal and destruction, greatly diminished funding and undue delays in the Program's administration required it to modify its business plan and operations.</u>

After SI submitted its initial application, the expected level of appropriations was slashed. SI then revised its business plan to offer Fixed Wireless Service over an internally-constructed network consisting of 427 sites—*if* full funding was given—and replace its former 204 site network. Otherwise, it calculated that it could only put up about 60 sites until the remaining funding was made available. In December 2022 SI submitted a modified business plan, which the Commission reviewed and approved. To date, SI has installed equipment on over 80 sites, this exceeding what was approved. It is optimizing the equipment to ensure it is transmitting at high levels of speed—even though the government hasn't paid for its work.

Returning back in time, SI affirmed that the new FCC-approved modified plan would "follow the original proposal which involved the Company first shutting down its existing network, temporarily transitioning customers to other networks, and then bringing up the replacement network, restoring former customers and ultimately adding new customers to the new network."[26]

        1. SI stated that "the decommissioning work is substantially accomplished and SIW has made substantial reimbursement requests so that it can pay costs associated with the decommissioning and destruction process. The delay in processing these invoices exceeds 5 months in some cases and has put SIW in peril with its vendors because it has not been able to make timely payments for the completed work and is beginning to lose

---

[25] *See id.* at p. 2.
[26] SI UPDATED/PHASE ONE PLAN TO DEAL WITH PARTIAL FUNDING, p.1 (Business Plan accompanying submission of Form 5640, SCRP Application Request for Funding Allocation).

APP 061



credibility with its vendors who will not continue to do the work needed to complete the project."[27]

2. SI again wrote that it had transitioned its customers to "offer[] them continuity of services …[and] cut nearly all of [its] revenue sources. Meanwhile, expenses associated with the network [during the replacement process] with much fewer customers are still being incurred."[28]

3. SI clarified that it had submitted a "plan revision which is going from mobility to fixed wireless (and then layering in mobility if, and when, additional funding and/or national carrier affiliation becomes available[)]" but in the interim "[g]iven the lack of full funding, the Company does not intend to locate on all the same sites in which it is decommissioning its equipment due to the need to have additional sites spaced appropriately to handle fixed wireless traffic and to eventually handle mobile traffic should additional funding be made available through congressional appropriation."[29]

SI also justifiably relied on the FCC's approval of its modified business plan, in addition to its first plan, while continuing to incur added substantial expenses.

> D. <u>SI, despite being affected by Program factors which the FCC has reported as being dysfunctional, has materially finished much of its approved construction but remains unpaid for work it did long ago.</u>

Since being approved, SI made steadfast progress, as we have discussed. Meanwhile the firm was affected by several of the deleterious factors listed in the FCC's Fourth Report to Congress, which identified the "(1) absence of full funding; (2) supply chain delays; (3) labor shortages; (4) weather-related challenges; and (5) extended review times in the processing of requests for reimbursement" as causing many providers to experience problems.[30] The impediments from the budget cuts need not be reprised. Suffice it to say that this unexpected

---

[27] *See id.*, p. 2.

[28] Updated Phase One Plan at p. 2.

[29] *See id.* at pp. 3, 4.

[30] Wireline Competition Bureau, *Secure and Trusted Communications Networks Reimbursement Program Fourth Report*, at p. 9, WC Docket No. 18-89 (July 1, 2024) ("Fourth Report"), https://docs.fcc.gov/public/attachments/DOC-403626A1.pdf. These issues weren't new. *See id.* at pp. 1-2 (discussing prior submissions to Congress).



twist caused appreciable delay because SI had to reconfigure and secure the FCC's approval of its modified business plan. That shut down all payments and submittals for many months.

Having found ways to address the budget constraints and other issues, SI's abiding problem lies in being buffeted by the Program administration. Securing payments from the Administrator has proved inexplicably inconsistent and tardy. Because it took nearly five months before SI's first modification was approved it was not paid its first tranche until about November of 2022. Meanwhile SI could not submit further invoices or modifications for the smallest of items. Those types of problems, as discussed below, have not improved.

It is not as if SI hadn't alerted the FCC to these issues: Mr. Williams and SI's regulatory counsel spoke with FCC personnel between the fall of 2022-early 2023, to alert them to what was happening (or not). SI sought time and again to persuade the Staff to, *inter alia*, examine the processing and payment delay or present questions that SI could address.[31]

Some representative examples of the continued delays in funding, processing and reimbursement follow:

1. There are currently 212 SI invoices that are over 120 days old, 163 over 240 days old, and 106 over 360 days old. These total $14.67 million with the longest now past 670 days.[32] Although these were in the pipeline when the freeze occurred SI has no way of knowing when they will be processed, let alone honored.

2. The total due under those invoices pales in comparison to what is due for work SI performed but cannot be submitted due to the Program's rules. An additional $32.1 million in invoices are tied up because the

---

[31] Mr. Williams, along with SI's counsel, Ms. Bennett, several times alerted the FCC staff and the Program Administrator of recurring issues with the Program's administration. *See, e.g.*, https://www.fcc.gov/ecfs/document/104132258923950/1 (Notice of April 14, 2023; "SI Wireless implores the FCC to pay invoices for this work that has been completed so that SI Wireless can pay its vendors who have lost patience with the Reimbursement Program and SI Wireless. Some of these vendors have been waiting over 223 days to get paid and are threatening legal action."); https://www.fcc.gov/ecfs/document/10406117307084/1 (Notice of April 6, 2023; "SI Wireless noted that the back and forth emails ... would be better handled in a telephone call or video conference with the ... Administrator" and "seeks the Commission's help in directing the Fund Administrator to bifurcate and approve invoices that are not part of its modification rather than sitting on them while its modification is vetted."). No one wrote back to dispute SI's statements.

[32] SI, *Open Invoices Awaiting Repayment* (Ex. 1). SI has awaited payment on two invoices that total $976,000 for 344 days. *See id.* at p.4.



Administrator won't approve a modification to allow more modifications to be submitted so that SI can invoice for what it has purchased. The Fund Administrator's policy has been that any unapproved modification will hold up a next-needed modification for additional equipment and until this year, any modification order held up the processing of invoices.

3. Currently a large modification is needed for remaining equipment needed to build a comparable network to the 204 sites. This modification is stalled because SI was asked to break its initial modification request into three parts for prompt processing. "Prompt" did not result: four months passed for that small portion to be approved. Unfortunately, the Program won't allow simultaneous processing of modifications and remaining segments are placed in a queue.

Another way of looking at SI's situation is to do it graphically:

| | | |
|---|---|---|
| Invoices Waiting for Reimbursement Approval | 270 | $14,470,541.66 |
| Average Length of Time Awaiting Reimbursement Approval | 299 | |
| # of Days Oldest Invoice Has Been Awaiting Reimbursement Approval | 694 | |
| # Of Modifications | 6 | |
| # Of Days Awaiting Modification Approval or Denial | 421 | $32,656,228.22 |
| Invoices Awaiting Reimbursement Over 365 Days | 121 | |
| Invoices Awaiting Reimbursement Over 180 Days | 195 | |
| Invoices Awaiting Reimbursement Over 90 Days | 227 | |
| # of Invoices in Submitted Status (hasn't even been looked at) | 145 | |
| # of Days Oldest Invoice Has Been Sitting in Submitted Status | 435 | $47,126,769.88 |

The Program represented a government-industry compact: federal funds to underwrite prompt removal and replacement of equipment that jeopardized the Nation's defense within a tight timeline in return for prompt payment of reasonable costs and a willingness to accept a temporary loss of subscribers and revenues. That this goal remains unmet was conveyed by Mr.



Williams and several other providers' executives to the WASHINGTON POST, which reported that small companies such as SI have been and are being shortchanged by the Program.[33]

II.   SI's customer base was sufficient at all relevant times.

SI also can readily respond to the FCC's questions of whether the firm has had customers, cash-paying or otherwise, while pursuing SI's Rip and then Replace process.

As previously explained, the FCC focused on getting the verboten Chinese equipment out, not on having any number of customers. SI responded to the FCC's entreaties. It retained a few customers to maintain the spectrum during the period that it projected as needed to dismantle and then rebuild its network. Given the exigencies, not even the most farsighted of providers could have anticipated that Program appropriations would be pruned and its administration lag so greatly as to thwart progress. In any event, any legitimate question of whether SI had and has maintained customers and was eligible for Program funding can be resolved by five distinct yet overlapping findings:

(i) Neither the Act nor the rules specify what point in time, if any, that a Program applicant must have customers. If there is a time it would be different for different carriers. A logical time for SI would be the point when this carrier, with a demonstrated history of customer service, took proactive steps signifying its desire to participate in the SCRP. SI had put forth such evidence as early as May of 2019, when its Form 477 reported nearly eleven thousand customers. Its actions afterwards were directed towards participating in the Program. In August 2020, a mere month after its former owners transitioned 3000 customers and its new owners took over, SI began removing covered equipment and continued to do so steadily.

(ii) A plausible case can be made that zero is a number and because it is under two million, a provider with no customers would be eligible for SCRP funding.

(iii) If customers are required as of the application's submittal, SI would qualify. By April 2021, it had been ripping out covered equipment and knew that the Second Report and Order was "applauding" providers who were proactively remediating with the FCC essentially assuring them of payment, provided the expenses were documented and reasonable. That month, SI entered into written agreements with five customers (it understood that one had two lines) to take service. Their presence was to maintain the spectrum while SI remade its network from top to bottom. Those agreements were in

---

[33] Eva Dou, "Small carriers fight to survive amid delayed Huawei rip-and-replace funds," THE WASHINGTON POST (May 2, 2024).



KALBIAN
HAGERTY LLP
ATTORNEYS AND COUNSELORS AT LAW

effect in January 2022, when SI's application and business plan advised the Commission of its program. The Commission approved that plan in July 2022.[34]

(iv) Nothing in the Act requires that customers generate cash flow or an exchange of services for equipment or access to towers, as has occurred here. Bartering is a form of payment because each party receives consideration for their counterpart's promise and the FCC has recognized such arrangements previously.[35]

(v) The Act also expressly provides that customers of providers' Affiliates are deemed to be customers of the applicant provider. SI's Affiliate, Rural Connect, had about 1256 customers in January 2022 and has about 387 currently.

Before responding to the government's questions about subscribers, however, one preliminary point should be noted. And that is the extent to which the Notice and the Enforcement Bureau's requests fail to appreciate the context of Mr. Williams's statements to the POST and his response to the RFI.

### A. The FCC's concerns that center on Mr. Williams' remarks to the media and his response to the prior RFI misinterpret his statements.

Mr. Williams has spoken privately to the Staff, as discussed previously [36] and commented publicly when asked to do so over concerns with the Program's funding and administration.[37] He received an RFI in May, shortly after the WASHINGTON POST had reported his disappointment with the Program's untimely processing and reimbursement—deficiencies recognized two months later in the FCC's Fourth Report. He told the truth to the newspaper. And when the FCC came calling, he did so again—in response to its asking about a different topic.

Mr. Williams' statement to the POST reporter that the network had been "down since 2022" and that "'[c]urrently, customers are without service'"[38] appears to have been misconstrued. SI's network had not been offering full service while it was Ripping and then

---

[34] E-Mail from FCC IT Service Desk-Leslie Williams (July 15, 2022) (Ans. Req. 25).

[35] See infra n. 60 (citing FCC precedent and federal appellate decisions reviewing FCC orders).

[36] See n. 31, supra and accompanying text.

[37] E.g., Carl Weinschenk, SI Wireless Criticizes Rip and Replace Program, TELECOMPETITOR (July 14, 2024) (https://www.telecompetitor.com/si-wireless-criticizes-rip-and-replace-program-administration/); Mike Dano, The Huawei 'rip and replace' program is a mess, argues SI Wireless, LIGHT READING (Oct. 18, 2023) (https://www.lightreading.com/security/the-huawei-rip-and-replace-program-is-a-mess-argues-si-wireless).

[38] Eva Dou, "Small carriers fight to survive amid delayed Huawei rip-and-replace funds," THE WASHINGTON POST (May 2, 2024).



Replacing but it was offering advanced communications service to some customers—in accordance with the FCC-approved plan. In addition, the POST juxtaposed his statement about customers lacking service next to his equally accurate observation that many of SI's former and anticipated customers were now experiencing "dead zones" in rural stretches. However, Mr. Williams neither said nor was quoted as saying that SI lacked any customers.

In response to the FCC's subsequent, different question of whether SI was "currently receiv[ing] revenue from providing advanced communications service to customers," Mr. Williams truthfully replied that "6 direct customers who perform work on this project are provided internet from our network and have agreed that we can offset amounts due them at the rate of $25 a month for this" and that there were 81 others who were customers of Rural Connect, which takes wholesale service from SI and allows SI tower space. Mr. Williams stated that both sets of customers are accounted for on an accrued basis, with payment deferred and offset later.[39]

The instant LOI and Notice followed two months later; in the interim SI's funding continued to languish. No funds were received save for a reimbursement of legal fees. About 172 invoices that have been held up pending an RFI concerning a civil project manager working on the project from the beginning that had nothing to do his invoice.

The current LOI's scope is, to say the least, granular. SI is unaware of any Program participant—reportedly some have lacked customers—being directed to provide, *inter alia*, minute details, going back years before its current owners purchased the firm in July 2020, seeking information about literally dozens of independent vendors, their employees, and their business relationships.[40] In the interests of comity and conserving resources SI has responded to

---

[39] Letter from Leslie Williams-FCC re: SC-CN0077090 Request for Information, p.4 (May 10, 2024) (Req. 38).

[40] For instance, Req. 32 wants SI to:

> "[p]rovide a chart for each company identified in response to Inquiry 31, including any additional companies you identify in response to Inquiry 33 (collectively, including the Company, the "Associated Companies," and each one singularly an "Associated Company"). Each chart must: show the internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility); specify the names of all owners (and percentage of ownership or membership interest); identify all directors or board members (including addresses and telephone numbers); identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity); and identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual."



the LOI and Notice in the hope that the staff will conclude promptly that SI has been candid, that there never has been anything nefarious afoot and that SI's funding should be immediately restored.

### B. Neither the Act nor the FCC rules require any particular number of customers as of the filing date of its application.

Putting aside for the moment SI's long customer relationship history, neither the Act nor the FCC rules quantify how many customers a provider needed to have nor establish any given date by which providers were expected to have customers, if they were required to have any customers.

For one thing, zero undeniably is a number.[41] And it is a number under the then-prevailing ceiling. Accordingly, zero customers would meet the basic definition of eligibility for this program. As an illustration, consider a provider just preparing its network for launch, a process that would take at least a year after acquiring offending equipment. Under the uncodified customer requirement, that company would be ineligible for funding; the Act confirms that Congress would never have wanted that equipment being put in to service. Requiring that provider to acquire and maintain an active customer base in those circumstances would make as scant sense as an administrative ukase requiring active customers while ripping an entire network for replacement.

What is necessary, and what is consistent with the FCC's exhortations to providers to move forward speedily with removal and renovation, is the presence of a genuine provider with a historical customer base and a *bona fide* plan, resources, and commitment to rip out covered equipment, remove and destroy it, and then install new equipment. There are many ways to do that, as the FCC publicly recognized. SI so qualifies and the demonstrated continuous timeline of its remediation, undertaken under FCC-encouraged and then approved protocols, proves that.

Moreover, any full-scale interruption of business such as SI's applications had disclosed would occur, which the FCC reviewed and approved, would result in a period of no or skeletal service to customers. Nor would it have been commercially practicable to offer some continued full service to a wide customer base during a Rip-and-Replace. That would have been a self-inflicted fatal wound: few if any customers would want to commence, continue, or resume business with a provider whose service was being interrupted incessantly.

---

[41] John Matson, *The Origin of Zero*, SCIENTIFIC AMERICAN (Aug. 21,2009) (quoting Robert Kaplan, THE NOTHING THAT IS: A NATURAL HISTORY OF ZERO (Oxford University Press, 2000) ("It isn't until then [the Fifth Century A.D.], and not even fully then, that zero gets full citizenship in the republic of numbers.") (cleaned up) (https://www.scientificamerican.com/article/history-of-zero/).

John A. Corbin, Esq. & Dan Daly, Esq.
September 17, 2024
Page 17 of 23


KALBIAN
HAGERTY LLP
ATTORNEYS AND COUNSELORS AT LAW

Based on public statements neither the Commission nor SI anticipated the lengthy reimbursement approval process for both finished work and for additional work to be performed. Those delays directly caused SI's down time to extend from months into as long as two years. But having encouraged applicants to extirpate equipment as soon as possible, the Commission should not revoke a company's eligibility for heeding Congress and the Commission's asking for immediate action.

### C. SI's customer base has declined but exists and will be restored once it goes operational.

SI's current owners bought the firm in mid-July 2020, just after the former owners had denuded the customer base by transitioning them elsewhere. SI's new management was heavily influenced by the FCC's urging providers to begin dismantling their covered equipment and chose to Rip, transition, and then Replace to stay in business.

### 1. SI had a longstanding subscriber base and has maintained some customers.

SI has been licensed by the FCC as a wireless telecommunications provider since at least 2011.[42] At its height SI's network was 204 sites. SI's customer base declined from nearly 30,000 to 6 between 2017 and 2022, as reflected by its Form 477's filed with the Commission and for 2020, another business record.[43]

| Date Filed | Certifying Official | # of Subscribers |
| --- | --- | --- |
| 31 Dec '17 | Mike Jaksich | 29,762 |
| 31 Dec '18 | Mike Jaksich | 20,452 |
| 30 Jun '19 | Mike Jaksich | 10,988 |
| 1 Jan.'20 | Leslie Williams | 3,602 |
| 30 Jun '21 | Leslie Williams | 6 |
| 30 Jun '22 | Leslie Williams | 6 |

When SI applied for SCRP funds in January of 2022 it accurately disclosed having "only a small group of subscribers" and stated that it has "begun the de-installation of its equipment and expect[ed] to have the de-installation, destruction and recycling completed by the time it

---

[42] Ans. Reqs. 1, 6. *See also* https://wireless2.fcc.gov/UlsApp/UlsSearch/results.jsp;JSESSIONID_ULSSEARCH=oihhTmvHN1E chJno0XwTy61-sQRf3udiHzrzwC15bhStvqfErpvK!-2133920878!732021324.

[43] The company appears not to have filed a Form 477 in 2020. However, Mr. Williams received documentation of its customer population in September 2021 before he acquired his first interest in the company. It and the other reports are included within SI's responses to the document requests.



receives its first reimbursement from allocation."[44] Its representation was accurate. That past April, SI had executed written agreements with two individuals and three firms to provide them a digital wireless link and equipment to access the internet and thereby maintain the spectrum during the renovation process.[45] SI made concurrent agreements with three firms, *viz.*, DTC Communications, Ken-Tenn Communications, LLC, and Rural Connect.[46] Later on, after being approved for the Program, it added customers on the network equipment that it has been testing and deploying, and continues to have them.

### 2. As an Affiliate of SI, Rural Connect and its customers are deemed SI's customers for purposes of SI's eligibility.

So far SI has spoken of direct customer relationships that it obtained prior to applying and whom it has maintained while ripping and then replacing. Rural Connect has been taking wholesale advanced internet service from SI. Those of Rural Connect's customers to whom it passes along this service also are customers of SI because their provider was an SI Affiliate, under the statutory definition of "customer." Nothing in the Act limits the broad reach of "Affiliates" to include their customers only to determine applicants' meeting the threshold customer ceiling for SCRP eligibility. These customers count for other purposes.

The Affiliate relationship stems from Mr. Williams' acquiring a 49% interest in Integrated Business Networks, LLC ("IBN"), which owns SI, on September 1, 2021.[47] He was at that time Rural Connect's Interim General Manager (there was no higher officer or non-officer in its structure) and a board member under an appointment made on October 16, 2021.[48] Rural Connect then had 1204 customers with a monthly revenue of $77,264, all of whom were broadband customers. That transaction occurred nearly five months before January 20, 2022, when SI's FCC Form 5640 application and associated documentation were filed with the Commission.

By virtue of these transactions, Rural Connect was an SI Affiliate and Rural Connect's customers counted as SI's customers. This conclusion flows from Section 3(b) of the Act, which makes eligible for SCRP a licensee that "provides advanced communications service to United

---

[44] Company Background and the Plan, p.1, (Ans. Req. 25). *See also* https://wireless2.fcc.gov/UlsApp/UlsSearch/results.jsp;JSESSIONID_ULSSEARCH=oihhTmvHN1EchJno0XwTy61-sQRf3udiHzrzwC15bhStvqfErpvK!-2133920878!732021324.

[45] Ans. Req. 21 (Garrett Honea, Linda McAlpin, DTC Communications, Ken-Tenn Communications, LLC, and Rural Connect).

[46] Ans. Req. 21.

[47] Ans. Req. 30.

[48] Ans. Req. 23. Mr. Williams' control of Rural Connect was increased on June 1, 2022, when he purchased 41% of the company. Ans. Req. 23.



States customers" (if they didn't exceed the then-two-million limit), meaning the provider's own "customers" <u>and</u> "customers of any affiliate (as defined in section 3 of the Communications Act of 1934, (47 U.S.C. 153)) of such provider."[49] In turn, 47 U.S.C. § 153(2) defines an "affiliate" as "a person that (directly or indirectly) owns or controls, is owned or controlled by, or is under common ownership or control with, another person," and "the term 'own' [to] mean[] to own an equity interest (or the equivalent thereof) of more than 10 percent."[50]

To be sure, neither the Act nor the SCRP Rules define what "control" means outside of a 10% equity ownership. However, guidance as to what otherwise constitutes sufficient "control" under which an entity must be deemed an "Affiliate" can be seen in the FCC Rules and from Rural Connect's organizational papers. As to the former, Section 1.2110 of the auction Rules define "control" for designated entity affiliate purposes as the power that "can arise through stock ownership; occupancy of director, officer or key employee positions, contractual or other business relations; or combinations of these and other factors," and describe a "key employee [a]s an employee who, because of his/her position in the concern, has a critical influence in or substantive control over the operations or management of the concern."[51]

The parameters of "control" are further illustrated by Article XI, Section 1 of Rural Connect's Operating Agreement. It provided that "[t]he day to day management and control of the Company, and its business and affairs, shall be conducted or exercised by, or under the direction and authority of, the Managers."[52] Article XI, Section 2 of that instrument vested the Board with authority to elect or appoint "Managers."[53] Back in January 2022, when SI applied for SCRP funding, Rural Connect had no appointed managers other than Mr. Williams, its Interim General Manager.

Thus understood, Rural Connect was SI's Affiliate. In January 2022 Mr. Williams owned over 10% of Rural Connect while also serving as a Board member and its Interim General

---

[49]  47 U.S.C. §§ 1603(b)(1) (eligibility), 1608(6)(A)-(B) (defining "customer").

[50]  47 U.S.C. § 157(2). A "person" includes "an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 157(39).

[51]  47 C.F.R. 1.2110(5)(ii)(B).

[52]  Ans. Req. 23.

[53]  *Id.*

**APP 071**



Manager.[54] In turn, Rural Connect's customers count as SI's customers for purposes of determining SI's SCRP eligibility.[55]

### 3. The FCC's alternating tests for "customers" are not entitled to deference.

Nor need customers be paying SI cash for taking service from it. To be sure, the Second Report and Order first suggested that being a "customer" of an Advanced Communications Provider (or an Affiliate) involves a buyer-seller, purchase-type relationship, stating that "could refer only to those customers purchasing advanced communications service or could refer to any customer of the provider or affiliate regardless of the service or product purchased,"[56] it ultimately decided to "choose to interpret customer narrowly, which in turn will increase the pool of eligibility for the program" and decided that the term "customer" would mean "those customers taking advanced communications service from the provider and its affiliates."[57] However one looks at it, a customer who "takes" advanced communications service need not be a paying one under the dictionary definition of a "purchase," which means "to obtain by paying money or its equivalent," or "to obtain by labor, danger, or sacrifice."[58]

SI's analysis is supported by the legislative history and the statute. Neither require nor suggest that customers taking service must pay providers cash nor preclude barter relations. An agency interpretation making a demand that was neither addressed by Congress nor required by the statute and that precludes recognized understandings is not entitled to deference. Absent contrary statutory language, courts presume that "'Congress intended to retain the substance of the common law.'"[59]

---

[54] Since June 2022 Mr. Williams also has owned a 41% interest in Rural Connect. Under the foregoing FCC rules, he held "control" over it although he spoke from a layperson's understanding when he responded to the FCC's RFI last May that he held a "non-controlling majority interest." Ans RFI, *supra* n. 38, at p. 4. Mr. Williams also is no longer the Interim General Manager. Ans. Req. 2.

[55] Req. 46 sought production of Rural Connect's customer data from 2021 to date. SI calculated that a full response would have required it to produce 300,000 documents, about to 3.15GB. SI elected to produce samples and invites the Bureau to particularize its request to something meaningful and manageable for everyone.

[56] Second Report and Order, ¶ 114.

[57] Second Report and Order, ¶ 114.

[58] WEBSTER'S NEW COLLEGIATE DICTIONARY 936 (1977 ed.).

[59] *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (quoting *Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010)); Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS at 318 (2012) ("A statute will be construed to alter the common law only when that disposition is clear.").



The common law recognized bartering as the equivalent of sales transactions.[60] The FCC likewise has long recognized that barter-type arrangements, such as SI made with some customers, can have economic significance.[61]

Because the Act does not require that "customers" of providers pay cash for service, any interpretation otherwise would be error. "'[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.'"[62] Although the Act isn't ambiguous any insistence on monetary payments where SI and others agreed to a different time-honored form of consideration would be arbitrary.

### III. The private and public interests favor a prompt disposition in SI's favor, as withholding and clawing back funding are not justified and would significantly harm customers in SI's service territory.

The public interest, to which SI alluded earlier, also calls for closing the investigation and lifting the funding freeze, as SI has committed no wrong. Insofar as SI's direct interests are

---

[60] *See, e.g. Oklahoma Natural Gas Co. v. FERC*, 906 F. 2d 708, 712-713 (D.C. Cir. 1990) ("the arrangement appears to be a form of barter whereby Williams supplies gas to PowerSmith in return for Ladd's delivery of gas downstream. * * * But ... to assert jurisdiction by calling it transportation at least superficially appears to place a premium on the form rather than the substance of the transaction."); *Helvering v. Syndicate Varieties*, 140 F.2d 344, 347 (D.C. Cir. 1944) ("In the common law, however, there is no different rule applicable to a contract of sale from that which is applicable to a contract of exchange.") (cleaned up); *United States v. Samakol*, 2023 WL 7308083, *3 (S.D. Ala. Nov.5, 2023) ("a sale, barter, or alternative payment of a debt are distinctions without a difference.").

[61] *RKO General, Inc. v. FCC*, 670 F. 2d 215, 226 & n.31 (D.C. Cir. 1981); *In the Matter of Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 36 FCC Rcd. 7702, 7717 & n. 91 (2021) (citing *Sonshine Family Television, Inc., Forfeiture Order*, 24 FCC Rcd 14830, 14834-35, ¶. 14 (2009) (recognizing barter arrangements in which a broadcaster effectively purchases programming in exchange for valuable consideration in the form of advertising time)), *rev'd in part on other grds*, 39 F.4th 817 (D.C. Cir. 2022); *In the Matter of Implementation of Section 621(A)(1) of the Cable Communications Policy Act of 1984, etc.*, 34 FCC Rcd. 6844, 6848-6854, *aff'd in part and rev'd in part, City of Eugene, Ore. v. FCC*, 998 F.3d 701 (6th Cir. 2021); *Fuqua Communications, Inc.*, Memorandum Opinion and Order, 30 FCC 2d 94, 97 (1971) (finding that consideration has been construed to involve many forms, including barter of goods or services and "trade-outs").

[62] *Amazon Services, Inc. v. United States Department of Agriculture*, 109 F.4th 573, 581-582 (D.C. Cir. 2024) (granting petition for review) (quoting *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024)). *See also Lake Region Healthcare Corporation v. Becerra*, 2024 WL 4019093, *4, --- F.4th ---- (D.C. Cir. 2024) (same; rejecting shortsighted agency interpretation of statutory scheme).



concerned, there are strong grounds for holding the government responsible for fulfilling its contractual obligations.[63]

And there is an equally strong argument to be made in favor of others whose interests stand to be served by requiring the FCC to honor its agreement with SI, *viz.*, the everyday consuming public in its marketplace. "In the post-pandemic era, broadband has become indispensable to every aspect of modern life. Every single day, Americans turn to their broadband connections for work, education, healthcare, commerce, and communication [and] access to broadband is not a luxury, but a necessity."[64] When SI is paid what it is owed and can complete its project and resume operations, consumers in the segments of Tennessee and Kentucky whom it served and benefited from competition will be able to reap those benefits once again. These include fair cost, innovation, and customer care. That will encourage similar behavior from other carriers. The Digital Divide is as much about these factors as speed of service.[65] The FCC's opening a proceeding examining T-Mobile's proposed acquisition of UScellular's wireless operations suggests that consumer interests such as SI has identified will bear serious consideration in a market analysis.[66]

### IV. Conclusion

SI has weathered a bevy of problems that no business reasonably could have expected. Notwithstanding these issues, which have been akin to engaging in a game of Whack-a-Mole, its approved plans to strip the covered equipment and then replace it will bear fruit soon. It has largely completed construction work on 80 sites and is configuring them, being mindful of budget constraints and vendor reluctance to reengage without payment. Likewise, technology marches on: SI is experiencing challenges obtaining last-generation equipment required by this program that was supposed to have ended long ago. There is simply no recovery from the harm SI has sustained by the incessant delays and artificial tasks that have been imposed on it.

---

[63] *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) ("[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."); *Security Federal Sav. Bank of Florida v. Director, Office of Thrift Supervision*, 747 F.Supp. 656, 660 (N. D. Fla. 1990) ("public interest is best served by requiring the government to honor its obligations. This promotes certainty in the market and encourages private individuals and business entities to invest in regulated institutions.").

[64] *Eighteenth Section 706 Report and Notice of Inquiry*, GN Docket No. 24-214 at 2, ¶ 2 (Sept. 6, 2024).

[65] *See* General Accounting Office, *Closing the Digital Divide for the Millions of Americans without Broadband* (Feb. 1, 2023) (https://www.gao.gov/blog/closing-digital-divide-millions-americans-without-broadband).

[66] *Federal Communications Commission Opens Docket for Proposed Transfer of Wireless Operations, Customers, and Certain Spectrum Licenses and Spectrum Leases of UScellular to T-Mobile*, GN Docket No. 24-286 (Sept. 11, 2024).



By separate correspondence we will ask the Wireline Competition Bureau to restore and prioritize the funding pipeline and approve paying the remaining reimbursable amounts in a manner that recognizes the funding's critical importance to SI's survival.

Mr. Williams' declaration, which attests to this letter's factual discussion and to the RFI answers, an exhibit showing SI's outstanding invoices, and a request for confidential treatment of certain proprietary and/or highly personal matters, are attached.

We would be pleased to confer at your earliest convenience.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
Sarah McNally, Esq.
Aaron Gershbock, Esq.
Meghan Ingrisano, Esq.
Mehrdad Barikbin, Esq.
Jae Seong
Trent Harkrader, Esq.
Loyaan Egal, Esq.
Mark Stephens
P. Michele Ellison, Esq.
Caressa D. Bennet, Esq.

## Declaration

Leslie Williams declares as follows:

1. I am Managing Member of SI Wireless, LLC ("SI").

2. I have read the foregoing letter of September 17, 2024, from counsel for SI to Messrs. John Corbin, Esq., and Dan Daly, Esq. I also helped prepare and have reviewed SI's responses to the Federal Communications Commission's Bureau of Enforcement's Requests for Information ("RFI"). In addition, I helped obtain and have reviewed the documents accompanying SI's answers to the RFI.

3. The facts set forth in the letter and the answers to the RFI are true and accurate, to the best of my knowledge, information, and belief.

I state under penalty of perjury that the foregoing is true and correct. Executed on September 17, 2024.

Leslie Williams

**EXHIBIT**

**1**

Open Invoices Awaiting Reimbursement

The dates contained herein are as of 082824

| Number | Invoice Number | SCRP Internal Status | Description of Invoice | Invoice Date | Created | Vendor | Amount | Days |
|---|---|---|---|---|---|---|---|---|
| SCIN0001279 | KN002 | Under Initial Review | Project Management | 2022-10-15 | 2022-10-19 10.52 08 | Ken Nickerson | $19,462.50 | -679 |
| SCIN0001456 | 2022-0904 | Under Initial Review | Replacement work | 2022-10-26 | 2022-10-28 16:03 27 | Minghelli, LLC | $96,386.38 | -670 |
| SCIN0001457 | 2022-0905 | Under Initial Review | Replacement Work | 2022-10-26 | 2022-10-28 16:10 50 | Minghelli, LLC | $77,410.53 | -670 |
| SCIN0003022 | KN003 | Under Initial Review | Project Management | 2022-11-12 | 2022-12-20 10:36 09 | Ken Nickerson | $38,925.00 | -617 |
| SCIN0003050 | 20221201 | Under Initial Review | Project Management | 2022-12-18 | 2023-01-04 16 23 11 | Amy McFarling | $27,000.00 | -602 |
| SCIN0003147 | 1017 | Ready for Secondary Review | Site Work | 2023-01-12 | 2023-01-19 20:09:45 | Sikut Inc | $11,838.16 | -587 |
| SCIN0003148 | 1018 | Under Initial Review | Site Related Work | 2023-01-12 | 2023-01-19 20:31:45 | Sikut Inc | $245,208.44 | -587 |
| SCIN0003155 | MT-008 | Under Initial Review | Site Plan | 2023-01-09 | 2023-01-19 21 49:19 | Mlawn Services | $1,700.00 | -587 |
| SCIN0003973 | 20230101 | Under Initial Review | Project Management Services | 2023-01-17 | 2023-03-06 10 24 30 | Amy McFarling | $27,000.00 | -541 |
| SCIN0003980 | KN005 | Under Initial Review | Project Management | 2023-02-07 | 2023-03-06 13 28:28 | Ken Nickerson | $43,713.56 | -541 |
| SCIN0005328 | 20230201 | Under Initial Review | Project Management | 2023-02-15 | 2023-05-23 18:06 56 | Amy McFarling | $27,000.00 | -463 |
| SCIN0005329 | 20230301 | Under Initial Review | Project Management | 2023-03-14 | 2023-05-23 18 12 57 | Amy McFarling | $27,000.00 | -463 |
| SCIN0005330 | GB002 | Under Initial Review | Project Management | 2023-03-01 | 2023-05-23 16 18 47 | Greg Belknap | $21,229.88 | -463 |
| SCIN0005331 | GB003 | Under Secondary Review | Project Management | 2023-04-01 | 2023-05-23 18 23 32 | Greg Belknap | $21,719.98 | -463 |
| SCIN0005332 | GB004 | Under Initial Review | Project Management | 2023-05-01 | 2023-05-23 18:28 00 | Greg Belknap | $21,912.20 | -463 |
| SCIN0005445 | PN001 | Under Initial Review | Contract Services | 2022-11-19 | 2023-05-28 13:40 49 | Paula Nowell | $7,500.00 | -458 |
| SCIN0005446 | PN002 | Under Initial Review | Contract services | 2022-12-19 | 2023-05-28 13:44 08 | Paula Nowell | $7,500.00 | -458 |
| SCIN0005447 | PN003 | Under Initial Review | Contract Services | 2023-02-15 | 2023-05-28 13:47 28 | Paula Nowell | $7,500.00 | -458 |
| SCIN0005448 | PN004 | Under Initial Review | Contract Services | 2023-03-15 | 2023-05-28 13:49 46 | Paula Nowell | $7,500.00 | -458 |
| SCIN0005449 | PN005 | Under Initial Review | Contract Services | 2023-04-15 | 2023-05-28 13 52:13 | Paula Nowell | $7,500.00 | -458 |
| SCIN0005458 | TB3 | Under Initial Review | Project Management | 2023-04-15 | 2023-05-30 16:34 56 | Troy Bruce | $40,415.92 | -456 |
| SCIN0005459 | TB4 | Under Initial Review | Project Management | 2023-05-12 | 2023-05-30 16 38.02 | Troy Bruce | $40,745.79 | -456 |
| SCIN0005461 | JSKT04 | Ready for Secondary Review | Construction Management | 2022-12-21 | 2023-05-30 17 02 00 | Jeff Sikut | $24,457.00 | -456 |
| SCIN0005463 | JSKT06 | Under Initial Review | Construction Management | 2023-03-07 | 2023-05-30 17.08 57 | Jeff Sikut | $26,332.41 | -456 |
| SCIN0005464 | JSKT07 | Under Initial Review | Construction Management | 2023-04-07 | 2023-05-30 17 12.30 | Jeff Sikut | $27,197.65 | -456 |
| SCIN0005465 | JSKT08 | Under Initial Review | Construction Management | 2023-05-07 | 2023-05-30 17:15 07 | Jeff Sikut | $25,646.25 | -456 |
| 5CIN0005467 | CR005 | Ready for Secondary Review | Construction Management | 2023-02-07 | 2023-05-30 20.11 45 | Chuck Robarts | $25,297.75 | -456 |
| SCIN0005469 | cr007 | Under Initial Review | construction management | 2023-04-07 | 2023-05-30 20 17 03 | Chuck Robarts | $25,135.50 | -456 |
| SCIN0005470 | cr008 | Under Initial Review | construction management | 2023-05-07 | 2023-05-30 20.19 21 | Chuck Robarts | $24,796.25 | -456 |
| SCIN0005471 | kn006 | Under Initial Review | project management | 2023-03-07 | 2023-05-30 21:21.09 | Ken Nickerson | $41,137.38 | -456 |
| SCIN0005472 | kn007 | Under Initial Review | project management | 2023-04-07 | 2023-05-30 21:24:27 | Ken Nickerson | $40,945.45 | -456 |
| SCIN0005473 | KN008 | Under Initial Review | project management | 2023-05-07 | 2023-05-30 21:27:53 | Ken Nickerson | $41,585.30 | -456 |
| SCIN0005528 | 2301 | Under Initial Review | SITE SERVICES | 2023-06-04 | 2023-06-05 16 50.47 | Fisher Telecommunications | $101,500.00 | -450 |
| SCIN0005530 | PN006 | Under Initial Review | Coordination | 2023-05-15 | 2023-06-05 17 22:16 | Paula Nowell | $7,598.05 | -450 |
| SCIN0005531 | 20230401 | Under Initial Review | PROJECT MANAGEMENT | 2023-04-14 | 2023-06-05 20 03:11 | Amy McFarling | $27,000.00 | -450 |
| SCIN0005532 | 20230501 | Under Initial Review | PROJECT MANAGEMENT | 2023-05-14 | 2023-06-05 20 05:31 | Amy McFarling | $27,000.00 | -450 |
| SCIN0005580 | MT-013 | Under Initial Review | SITE SERVICES | 2023-06-05 | 2023-06-05 21 59 08 | Mlawn Services | $1,323.24 | -449 |
| SCIN0005563 | MT-015 | Under Initial Review | SITE SERVICES | 2023-06-05 | 2023-06-05 22 14.10 | Mlawn Services | $14,045.40 | -449 |

**APP 077**

| SCIN0008784 | MT-019 | Submitted | SITE INSPECTION | 2023-08-05 | 2023-08-21 13:27:24 Mitawn Services | $51,600.00 | -373 |
|---|---|---|---|---|---|---|---|
| SCIN0008787 | MT-020 | Submitted | TOWER TERMS | 2023-08-05 | 2023-08-21 13:31:23 Mitawn Services | $4,444.38 | -373 |
| SCIN0008790 | 2023-0805-1 | Ready for Secondary Review | TOWER TERMS | 2023-08-05 | 2023-08-21 13:39:20 Minghelli, LLC | $17,777.52 | -373 |
| SCIN0008793 | 2023-0804-2 | Submitted | SITE ACO | 2023-08-04 | 2023-08-21 13:52:33 Minghelli, LLC | $16,450.00 | -373 |
| SCIN0008794 | 20230814-1 | Under Initial Review | FENCE COMPOUND | 2023-08-14 | 2023-08-21 13:58:47 Clear 9 | $12,501.60 | -373 |
| SCIN0008795 | MT-025 | Submitted | CONST DRAWINGS | 2023-08-14 | 2023-08-21 14:11:43 Mitawn Services | $14,728.68 | -373 |
| SCIN0008796 | MT-026 | Under Initial Review | CONST DRAWINGS | 2023-08-14 | 2023-08-21 14:15:52 Mitawn Services | $3,682.17 | -373 |
| SCIN0008798 | MT-022 | Submitted | SITE WORK | 2023-08-07 | 2023-08-21 14:21:46 Mitawn Services | $7,803.00 | -373 |
| SCIN0008801 | MT-021 | Submitted | SITE WORK | 2023-08-05 | 2023-08-21 14:30:28 Mitawn Services | $43,250.00 | -373 |
| SCIN0008806 | MT-023 | Submitted | SITE WORK | 2023-08-10 | 2023-08-21 15:12:06 Mitawn Services | $21,625.00 | -373 |
| SCIN0008814 | 20230701 | Submitted | project management | 2023-07-14 | 2023-08-21 18:14:49 Amy McFarling | $27,000.00 | -373 |
| SCIN0008815 | 20230801 | Submitted | project management | 2023-08-14 | 2023-08-21 18:17:06 Amy McFarling | $27,000.00 | -373 |
| SCIN0008816 | MT-027 | Submitted | SITE SURVEY | 2023-08-17 | 2023-08-21 18:32:55 Mitawn Services | $103,780.00 | -373 |
| SCIN0008817 | MT-028 | Submitted | SITE SURVEY | 2023-08-17 | 2023-08-21 18:40:11 Mitawn Services | $51,890.00 | -373 |
| SCIN0008818 | KN011 | Submitted | PROJECT MANAGEMENT | 2023-08-15 | 2023-08-21 18:44:11 Ken Nickerson | $41,177.09 | -373 |
| SCIN0008819 | JSKT10 | Submitted | PROJECT MANAGEMENT | 2023-08-07 | 2023-08-21 18:48:42 Jeff Sikut | $25,940.25 | -373 |
| SCIN0008860 | 30-23 | Submitted | NTP | 2023-08-21 | 2023-08-22 19:04:44 NTCH West Tenn | $12,950.00 | -372 |
| SCIN0008896 | MT-018 | Submitted | COLO | 2023-08-04 | 2023-08-23 19:31:33 Mitawn Services | $82,250.00 | -371 |
| SCIN0008898 | MT-029 | Submitted | UTILITY COORDINATION | 2023-08-22 | 2023-08-23 19:41:18 Mitawn Services | $17,965.08 | -371 |
| SCIN0009104 | 1315 | Under Initial Review | Drone | 2023-08-25 | 2023-08-30 00:14:58 Marachute Mechanics | $70,000.00 | -364 |
| SCIN0009105 | MT-024 | Submitted | CONST DRAWINGS | 2023-08-14 | 2023-08-30 00:18:12 Mitawn Services | $25,775.19 | -364 |
| SCIN0009106 | 20230826-1 | Submitted | FOUNDATION | 2023-08-26 | 2023-08-30 00:23:20 Clear 9 | $374,196.81 | -364 |
| SCIN0009107 | 1022 | Submitted | FOUNDATION | 2023-08-26 | 2023-08-30 00:28:46 Sikut Inc | $374,196.81 | -364 |
| SCIN0009108 | 2023-0826 | Under Initial Review | foundation | 2023-08-26 | 2023-08-30 00:32:09 Minghelli, LLC | $93,549.20 | -364 |
| SCIN0009109 | 1023 | Under Initial Review | BUILDOUT | 2023-08-26 | 2023-08-30 00:38:04 Sikut Inc | $117,664.00 | -364 |
| SCIN0009110 | 20230826-2 | Under Initial Review | BUILD OUT | 2023-08-26 | 2023-08-30 00:42:33 Clear 9 | $117,664.00 | -364 |
| SCIN0009111 | 20230827-1 | Under Initial Review | RELOCATION | 2023-08-27 | 2023-08-30 00:49:55 Clear 9 | $131,667.16 | -364 |
| SCIN0009112 | 2023-0828 | Under Initial Review | RELOCATION | 2023-08-28 | 2023-08-30 00:58:18 Minghelli, LLC | $155,245.61 | -364 |
| SCIN0009113 | 1024 | Under Initial Review | RELOCATION | 2023-08-29 | 2023-08-30 01:05:06 Sikut Inc | $131,667.16 | -364 |
| SCIN0009114 | 1025 | Submitted | RELOCATION | 2023-08-29 | 2023-08-30 01:08:09 Sikut Inc | $7,720.00 | -364 |
| SCIN0009115 | 1026 | Under Secondary Review | RELOCATION | 2023-08-29 | 2023-08-30 01:09:45 Sikut Inc | $7,720.00 | -364 |
| SCIN0009116 | 20230829-1 | Under Initial Review | INSTALLATION | 2023-08-29 | 2023-08-30 01:15:48 Clear 9 | $113,400.00 | -364 |
| SCIN0009117 | 2023-0829 | Submitted | INSTALLATION | 2023-08-29 | 2023-08-30 01:21:11 Minghelli, LLC | $37,600.00 | -364 |
| SCIN0009140 | 1317 | Submitted | drone | 2023-08-25 | 2023-08-30 14:10:39 Marachute Mechanics | $10,000.00 | -364 |
| SCIN0009523 | 1027 | Under Initial Review | INSTALL CABLE | 2023-08-30 | 2023-09-08 13:45:26 Sikut Inc | $18,900.00 | -355 |
| SCIN0009526 | 1029 | Under Initial Review | INSTALL CABLE | 2023-08-30 | 2023-09-08 13:55:20 Sikut Inc | $115,350.00 | -355 |
| SCIN0009527 | 1030 | Under Initial Review | 200A SERVICE | 2023-08-30 | 2023-09-08 14:02:46 Sikut Inc | $18,900.00 | -355 |
| SCIN0009528 | 1031 | Submitted | PAD INSTALL | 2023-08-31 | 2023-09-08 14:12:24 Sikut Inc | $237,339.70 | -355 |
| SCIN0009529 | 1032 | Submitted | PAD INSTALL | 2023-08-31 | 2023-09-08 14:14:55 Sikut Inc | $17,903.97 | -355 |
| SCIN0009534 | 1034 | Submitted | TRENCHING AND CABLING | 2023-09-05 | 2023-09-08 14:38:49 Sikut Inc | $33,500.00 | -355 |
| SCIN0009545 | 1035 | Submitted | TRENCHING AND CABLING | 2023-09-05 | 2023-09-08 14:55:48 Sikut Inc | $11,550.00 | -355 |
| SCIN0009547 | 1036 | Under Initial Review | TRENCHING AND CABLING | 2023-09-05 | 2023-09-08 15:01:12 Sikut Inc | $100,500.00 | -355 |

**APP 078**

| Invoice | Ref | Status | Type | Date 1 | Date 2 | Vendor | Amount | Days |
|---|---|---|---|---|---|---|---|---|
| SCIN0010521 | MT-032 | Submitted | SITE PLAN | 2023-09-13 | 2023-10-03 18:31:42 | Mitawn Services | $3,400.00 | -330 |
| SCIN0011931 | 20231013-1 | Submitted | RIP & REPLACE | 2023-10-13 | 2023-11-08 14:18:23 | Clear 9 | $76,939.36 | -294 |
| SCIN0011933 | 2023-1013-1 | Submitted | RIP & REPLACE | 2023-10-13 | 2023-11-08 14:23:10 | Minghelli, LLC | $52,602.24 | -294 |
| SCIN0011935 | DS016 | Under Initial Review | PROJECT MANAGEMENT | 2023-10-15 | 2023-11-08 14:32:56 | Dave Sikut | $19,462.50 | -294 |
| SCIN0011956 | JSKT12 | Submitted | CONSTRUCTION MANAGEMENT | 2023-10-15 | 2023-11-08 15:43:30 | Jeff Skut | $26,604.34 | -294 |
| SCIN0011960 | CK-08 | Submitted | PROJECT MANAGEMENT | 2023-10-22 | 2023-11-08 15:48:08 | Charley Karnes | $38,925.00 | -294 |
| SCIN0012995 | SC002 | Under Final Review | PROJECT MANAGEMENT | 2023-10-15 | 2023-12-01 00:24:57 | SOCRATICA CONSULTING | $12,285.00 | -271 |
| SCIN0012996 | SC003 | Under Final Review | PROJECT MANAGEMENT | 2023-11-15 | 2023-12-01 00:26:39 | SOCRATICA CONSULTING | $10,290.00 | -271 |
| SCIN0012998 | CK-10 | Submitted | PROJECT MANAGEMENT | 2023-11-22 | 2023-12-01 00:32:57 | Charley Karnes | $38,925.00 | -271 |
| SCIN0012999 | 20231001 | Submitted | PROJECT MANAGEMENT | 2023-10-14 | 2023-12-01 00:35:17 | Amy McFarling | $27,000.00 | -271 |
| SCIN0013125 | 20231101 | Submitted | PROJECT MANAGEMENT | 2023-11-14 | 2023-12-05 12:06:53 | Amy McFarling | $27,000.00 | -267 |
| SCIN0013589 | DS017 | Submitted | PROJECT MANAGEMENT | 2023-11-15 | 2023-12-15 14:27:07 | Dave Sikut | $19,462.50 | -257 |
| SCIN0014912 | 135 Revised | Under Initial Review | EQUIPMENT | 2023-01-01 | 2024-01-17 01:10:27 | Sparqworx | $694,490.00 | -224 |
| SCIN0014913 | #INV18600 | Under Initial Review | EQUIPMENT | 2023-12-18 | 2024-01-17 01:14:48 | GreyWolves | $662,500.00 | -224 |
| SCIN0014920 | 261 | Under Final Review | PROJECT MANAGEMENT | 2023-11-03 | 2024-01-17 01:45:12 | MLC Strategies | $8,617.00 | -224 |
| SCIN0014985 | 20231201 | Submitted | PROJECT MANAGEMENT | 2023-12-14 | 2024-01-18 11:29:07 | Amy McFarling | $27,000.00 | -223 |
| SCIN0014986 | CK-11 | Submitted | PROJECT MANAGEMENT | 2023-12-22 | 2024-01-18 11:31:15 | Charley Karnes | $38,925.00 | -223 |
| SCIN0014998 | 20240101 | Submitted | PROJECT MANAGEMENT | 2024-01-14 | 2024-01-18 11:34:54 | Amy McFarling | $27,000.00 | -223 |
| SCIN0015269 | SC201 | Under Final Review | PROJECT MANAGEMENT | 2024-01-15 | 2024-01-23 01:19:21 | SOCRATICA CONSULTING | $7,910.00 | -218 |
| SCIN0016778 | 4718 | Under Initial Review | Paris Site | 2024-01-23 | 2024-02-15 14:36:22 | Flat Wireless | $172,296.55 | -195 |
| SCIN0016780 | 4707 | Under Initial Review | McKenzie Site | 2024-01-10 | 2024-02-15 14:43:41 | Flat Wireless | $124,753.76 | -195 |
| SCIN0016794 | 4712 | Under Initial Review | Martin Site | 2024-01-16 | 2024-02-15 14:51:04 | Flat Wireless | $123,762.50 | -195 |
| SCIN0016787 | 4725 | Under Initial Review | OakGrove Site | 2024-01-31 | 2024-02-15 14:57:09 | Flat Wireless | $120,024.65 | -195 |
| SCIN0017029 | SC202 | Under Final Review | PROJECT MANAGEMENT | 2024-02-15 | 2024-02-21 13:41:20 | SOCRATICA CONSULTING | $6,055.00 | -189 |
| SCIN0017029 | CK-12 | Submitted | PROJECT MANAGEMENT | 2024-01-06 | 2024-02-21 13:43:26 | Charley Karnes | $38,925.00 | -189 |
| SCIN0017047 | 20240201 | Submitted | PROJECT MANAGEMENT | 2024-02-14 | 2024-02-22 14:42:48 | Amy McFarling | $27,000.00 | -188 |
| SCIN0017375 | 20240215-1 | Under Initial Review | SITE WORK | 2024-02-15 | 2024-03-02 10:32:20 | Clear 9 | $73,353.89 | -179 |
| SCIN0017376 | 20240215-2 | Under Initial Review | SITE WORK | 2024-02-15 | 2024-03-02 10:38:28 | Clear 9 | $143,976.83 | -179 |
| SCIN0017377 | 1045 | Under Initial Review | SITE WORK | 2024-02-14 | 2024-03-02 10:45:32 | Sikut Inc | $19,193.36 | -179 |
| SCIN0017380 | GWD008 | Under Final Review | PROJECT MANAGEMENT | 2024-02-15 | 2024-03-02 10:54:24 | Good Works Digital | $27,007.50 | -179 |

**APP 079**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SCIN0021702 | 022 | Under Initial Review | CPA SERVICES | 2023-03-01 | 2024-04-24 02.29.51 | Diemer CPA | $6,305.10 | -126 |
| SCIN0021703 | 024 | Under Initial Review | CPA SERVICES | 2023-04-01 | 2024-04-24 02 31 22 | Diemer CPA | $6,305.10 | -126 |
| SCIN0021704 | 026 | Under Initial Review | CPA SERVICES | 2023-05-01 | 2024-04-24 02.32 56 | Diemer CPA | $6,305.10 | -126 |
| SCIN0021705 | 028 | Under Initial Review | CPA SERVICES | 2023-06-01 | 2024-04-24 02 34 44 | Diemer CPA | $6,305.10 | -126 |
| SCIN0021706 | 030 | Under Initial Review | CPA SERVICES | 2023-07-01 | 2024-04-24 02 36 26 | Diemer CPA | $6,305.10 | -126 |
| SCIN0021707 | 032 | Under Initial Review | CPA SERVICES | 2023-08-01 | 2024-04-24 02 38 05 | Diemer CPA | $6,305.10 | -126 |
| SCIN0021708 | 034 | Under Initial Review | CPA SERVICES | 2023-11-01 | 2024-04-24 02 39.57 | Diemer CPA | $6,305.10 | -126 |
| SCIN0022939 | GWD010 | Under Final Review | PROJECT MANAGEMENT | 2024-04-15 | 2024-05-09 01:03.13 | Good Works Digital | $29,786.25 | -111 |
| SCIN0022940 | CK-03-2024 | Submitted | PROJECT MANAGEMENT | 2024-03-24 | 2024-05-09 01:05 17 | Charley Karnes | $38,925.00 | -111 |
| SCIN0022941 | CK-04-2024 | Submitted | PROJECT MANAGEMENT | 2024-04-24 | 2024-05-09 01.06.34 | Charley Karnes | $38,925.00 | -111 |
| SCIN0022942 | PC11 | Submitted | CONSTRUCTION MANAGEMENT | 2024-03-23 | 2024-05-09 01.08:46 | Philip Comer | $23,808.00 | -111 |
| SCIN0022943 | PC12 | Submitted | CONSTRUCTION MANAGEMENT | 2024-04-23 | 2024-05-09 01:10:24 | Philip Comer | $23,808.00 | -111 |
| SCIN0023303 | BB009 | Ready for Secondary Review | PROJECT MANAGEMENT | 2023-03-15 | 2024-05-15 01:47:41 | Barnett Browning | $11,797.50 | -105 |
| SCIN0023304 | BB010 | Ready for Secondary Review | PROJECT MANAGEMENT | 2024-04-15 | 2024-05-15 01 49 38 | Barnett Browning | $5,460.00 | -105 |
| SCIN0023305 | SC203 | Under Final Review | PROJECT MANAGEMENT | 2024-03-15 | 2024-05-15 01 52 03 | SOCRATICA CONSULTING | 37,140.00 | -105 |
| SCIN0023306 | SC204 | Under Final Review | PROJECT MANAGEMENT | 2024-04-15 | 2024-05-15 01 53 41 | SOCRATICA CONSULTING | $6,055.00 | -105 |
| SCIN0023307 | 20240401 | Submitted | PROJECT MANAGEMENT | 2024-04-14 | 2024-05-15 01:55:59 | Amy McFarling | $27,000.00 | -105 |
| SCIN0025616 | 4917601 | Under Final Review | Legal | 2024-05-17 | 2024-06-12 12 26 29 | Womble | $3,728.60 | -77 |
| SCIN0025619 | #NL2022 | Under Initial Review | PROJECT MANAGEMENT | 2024-04-16 | 2024-06-12 12:47:12 | Natalie Lopiccolo | $81,265.25 | -77 |
| SCIN0025620 | #NL2023 | Under Initial Review | PROJECT MANAGEMENT | 2024-04-25 | 2024-06-12 12 50 01 | Natalie Lopiccolo | $108,712.50 | -77 |
| SCIN0025621 | #NL2024-1 | Under Initial Review | PROJECT MANAGEMENT | 2024-04-25 | 2024-06-12 12 53:32 | Natalie Lopiccolo | $28,117.50 | -77 |
| SCIN0025622 | #NL2024-4 | Ready for Secondary Review | PROJECT MANAGEMENT | 2024-05-01 | 2024-06-12 12.55 27 | Natalie Lopiccolo | $16,380.00 | -77 |
| SCIN0026000 | JHC1 | Submitted | CONSTRUCTION MANAGEMENT | 2023-12-01 | 2024-06-14 18 23 36 | JHC Construction | $17,856.00 | -75 |
| SCIN0026002 | JHC2 | Submitted | CONSTRUCTION MANAGEMENT | 2023-01-01 | 2024-06-14 18.26.06 | JHC Construction | $17,856.00 | -75 |
| SCIN0026003 | JHC3 | Submitted | CONSTRUCTION MANAGEMENT | 2023-02-01 | 2024-06-14 18 27 28 | JHC Construction | $17,856.00 | -75 |
| SCIN0026004 | JHC4 | Submitted | CONSTRUCTION MANAGEMENT | 2023-03-01 | 2024-06-14 18:28:52 | JHC Construction | $17,856.00 | -75 |
| SCIN0026005 | JHC5 | Submitted | CONSTRUCTION MANAGEMENT | 2023-04-01 | 2024-06-14 18:30.02 | JHC Construction | $17,856.00 | -75 |
| SCIN0026006 | JHC6 | Submitted | CONSTRUCTION MANAGEMENT | 2023-05-01 | 2024-06-14 18 33 31 | JHC Construction | $17,856.00 | -75 |

**APP 080**

| SCIN0026247 | 20240613-6 | Submitted | SITE WORK | 2024-06-13 | 2024-06-20 10:30:02 Clear 9 | | $86,694.64 | -69 |
| SCIN0026248 | 20240613-7 | Submitted | SITE WORK | 2024-06-13 | 2024-06-20 10:39:48 Clear 9 | | $92,071.68 | -69 |
| SCIN0026249 | 20240613-8 | Submitted | SITE WORK | 2024-06-13 | 2024-06-20 10:48:15 Clear 9 | | $102,071.68 | -69 |
| SCIN0026250 | CR018 | Submitted | CONSTRUCTION MANAGEMENT | 2024-03-15 | 2024-06-20 10:56:22 | Chuck Robarts | $25,209.25 | -69 |
| SCIN0026251 | CR019 | Submitted | CONSTRUCTION MANAGEMENT | 2024-04-15 | 2024-06-20 11:06:10 | Chuck Robarts | $25,076.50 | -69 |
| SCIN0026252 | CR020 | Submitted | CONSTRUCTION MANAGEMENT | 2024-05-15 | 2024-06-20 11:10:47 | Chuck Robarts | $6,232.25 | -69 |
| SCIN0026253 | CR021 | Submitted | CONSTRUCTION MANAGEMENT | 2024-06-15 | 2024-06-20 11:13:32 | Chuck Robarts | $24,678.25 | -69 |

| Number of Invoices | | Dollars per category |
|---|---|---|
| 217 | Open Invoices > 60 days | $12,415,340.45 |
| 104 | Under Initial Review | $7,441,457.84 |
| 62 | Withdrawn | $25,357,924.29 |
| 9 | Completed Denied | $1,469,253.10 |
| 192 | Completed Granted | $24,488,794.39 |
| 0 | Needs More Information | $0.00 |
| 145 | Submitted | $6,890,842.06 |
| 0 | Pending Payment | $0.00 |
| 7 | Ready for Secondary Review | $113,007.93 |
| 0 | Ready for Final Review | $0.00 |
| 2 | Under Secondary Review | $29,439.98 |
| 521 | Total Invoices Submitted | $65,790,729.59 |
| 258 | Active Invoices | |
| | Average Time To Payment | -147.7222982 |

**APP 081**

# Selected Attachments from Exhibit 3

Response to Inquiry 15

Equipment Produced or Provided

Prepared On: 8/15/2024

15. For each calendar year, identify all equipment or services produced or provided by the Covered Companies to the Company that has been in place or use at any time by the Company since January 1, 2019, including but not limited to any equipment or service(s) obtained at auction, as a regular purchase, as a gift, or as a loan, including equipment or services stored or housed on towers the Company can no longer access.

a. For all equipment or services identified in response to this Inquiry, please include the following:

i. the date the equipment or service was deployed;

ii. the date the equipment or service was removed (if removed); and

iii. whether the equipment or service is still in use as of the date of this Letter of Inquiry.

b. For any equipment or service removed that was part of its initial application to the Reimbursement Program, describe what the Company did with the equipment or services after removal. If any equipment or service was not disposed of in a manner in compliance with normal procedures under the SCRP, specify the alternate procedure used, the reason for the alternate procedure, and what happened with the relevant covered equipment or covered services.

Response:

15. The following table includes a list of all equipment or services produced or provided by the Covered Companies to the Company since January 1, 2019:

JC

**APP 083**
SIWIRELESS 15-000001

| Equipment/Services Produced by Covered Companies | Quantity in SI Wireless' Possession each Year | | | | | | Deployment Dates | Removal Dates |
|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | | |
| Huawei Battery Cabinets with Batteries | 210 | 210 | 210 | 150 | 150 | 150 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei BTS Cabinets | 210 | 210 | 210 | 124 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei BBU Shelves (inside BTS cabinets) | 210 | 210 | 210 | 124 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei RRUs | 561 | 561 | 561 | 37 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei Sector Antennas | 1 | 1 | 1 | 1 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 11/9/2022 |
| Huawei GPS Antennas | 213 | 213 | 213 | 213 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei Power and Fiber Cables | 544 | 544 | 544 | 544 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 11/9/2022 |
| Huawei Transceivers | 1128 | 1128 | 1128 | 1128 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei BSC/PDSN Cabinets | 2 | 2 | 2 | 2 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei HLR Cabinets | 1 | 1 | 1 | 1 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei BSC/Positioning Cabinets | 1 | 1 | 1 | 1 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei AAA Servers | 1 | 1 | 1 | 1 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei M2000 Cabinets | 2 | 2 | 2 | 2 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei CSOFTX3000 | 1 | 1 | 1 | 1 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei UMG Cabinets | 2 | 2 | 2 | 2 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei HSS Cabinets | 1 | 1 | 1 | 1 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei USN/UGW Cabinets | 1 | 1 | 1 | 1 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |
| Huawei Crosswave Hot Spots | 110 | 110 | 110 | 110 | 0 | 0 | From 2010 - 3/27/2014 | From 2020 - 2/19/2022 |

a.

   i. To the best of our knowledge, all the equipment listed in the above table was deployed on sites between January 2010 – March 2014. The deployments took place by the former employees/owners of SI Wireless, LLC, and they have provided us with their former deployment tracking sheet which includes various completion dates of site work deliverables. The tracking sheet includes "Construction Start" dates and "Site On-Air" dates for each site. These dates range from January 2010 – March 2014, so we have concluded that all the equipment would have been deployed during this time frame. The former employees of SI Wireless have also provided us their previous inventory list and site folders which include close out documents after the sites were deployed. The deployment tracking sheet, inventory list, and site folders with close out documents have been included as support.

      a. (File/folder names: SI Wireless Deployment Tracker-R 1 3.xlsx; SIW Network Inventory and Purchase Docs (1); SI Wireless Site Construction Records)

   ii. To the best of our knowledge, all the equipment listed above was removed from sites between 2020 – November 9, 2022. The decommissioning work for each site was performed in multiple phases/days beginning in 2020 and finishing by November 9, 2022 for the entire network. When performing the decommissioning work, the Huawei communications equipment was removed first as it was the highest priority. Thus, the Huawei BTS Cabinets, Battery Cabinets, RRUs, GPS antennas, and core equipment were removed by February 19, 2022. Then, any remaining equipment was removed from all sites by November 9, 2022 to complete the entire decommissioning of the network. An excel sheet has been provided to further specify the dates the removal work was performed on each site to the extent that exact dates can

JC

APP 084
SIWIRELESS 15-000002

be provided (File name: Inquiry 15 - Removal Dates.xlsx). Where there is not an exact date, the removal work was performed during the time frame of 2020 – November 9, 2022. It has also been further verified that all covered equipment has been removed from every SI Wireless site. As support, we have provided folders documenting that all the equipment was installed on every site, and documenting that all the equipment was removed from every site.

    a. (File/Folder names: Inquiry 15 – Removal Dates.xlsx; Decommission Support; SIW Files (1); SIW Leases; Site Leases; SIW Site Info Sheets)

iii. None of the equipment listed above is in use as of the date of this Letter of Inquiry, except that some of the inert battery cabinets with all electronics removed, which we previously inquired about reusing, have been retained. SI Wireless was previously given approval by the FCC to reuse some of the Huawei battery cabinets for future charity projects instead of destroying them since they are just empty metal cabinets and don't contain any communications capabilities. The email from Justin Faulb from the FCC is included to verify that SI Wireless was given approval to reuse these cabinets.

    a. (File name: Gmail - FW_ Batteries.pdf)

b. Upon removal of all equipment from the sites, the Company then stored it at warehouse locations and laydown yards for further inventorying, photographing, and storage while awaiting shipment to be destroyed/recycled. Once inventoried and documented, the equipment was loaded into semi-trailers and eventually shipped to a Teltech Group facility in Farmers Branch, TX for processing, destruction, and recycling. To the best of our knowledge, Teltech Group documented, inventoried, and recycled/destroyed all the equipment in accordance with SCRP guidelines. We have included inventory spreadsheets and photos of all equipment sent to Teltech Group, and the corresponding reports and certificates of destruction they provided.

    a. (Folder names: SIW Equipment Inventory Photos - Before Recycling; SIW Recycling CODs and Reports)

It should be noted that the Teltech inventory reports include some naming schemes that are different than the inventory naming schemes used in the Company's spreadsheets. So, when comparing the Company's equipment inventory sheets with the inventory sheets that Teltech created, it can be difficult to tie the two together.

JC

APP 086

Response to Inquiry 24
SCRP Requirements
Prepared On: 7/23/2024
Document assembled from Approved Participation Letter

24.    Provide a detailed description of how the Company met the requirements to participate in the
       SCRP at the time the Company applied to participate in the SCRP.

SI Wireless met the requirements to participate in the SCRP when we applied by having fewer than 2 million customers while also having covered Huawei equipment. We put all the required Information into the application and on July 15th, 2022, the FCC approved our application.

The Company is a provider of advanced communication services. It had long provided service of greater than 200 KB per second, having done so for as many as 30,000 subscribers, far less than the then-statutory ceiling, for over 13 years prior to suspending its full network operations to participate in this program.

As our counsel's accompanying letter of September 17th, which is incorporated by refence, discusses, we had begun a rip and then replace program by the time we applied, having relied on the FCC and its staff's public assurances to the provider community and the staff's assurance to our counsel that it was acceptable to move forward with rip and replace. Our business plan disclosed that we had suspended most service except for a small group of customers. (One of those customers was Rural Connect, which was and remains an Affiliate and was taking and remains taking wholesale service from SI). We made clear that we intended to rip and destroy and then replace SI's covered equipment. In this respect, we respectfully state that it seems axiomatic that when a company rips and then replaces its network that the only reasonable time to expect that company to serve customers is before and after that process. What is being ripped and replaced is the equipment needed to provide service to the customers.

Our position is further supported by the FCC's statements. For instance, Section 130 of the Second Report and Order, which we had read before applying, stated: "We applaud these providers for proactively taking steps to increase the security of their networks notwithstanding the uncertainty of Federal government assistance. As such, we will allow providers to obtain reimbursement for costs reasonably incurred prior to the creation and funding of the Reimbursement Program, for the removal, replacement, and disposal of covered equipment and services." And the Second Report and Order essentially recognized in Section 134 that some carriers might be able to keep their networks up during the removal and remediation and earn revenue from doing so. That statement recognized that there were, alternative ways to move forward. Moreover, the common name of the program ("Rip and Replace"), indicated that providers could do what we have done: i.e., rip and then replace.

This sentiment was further validated by the Secure and Trusted Communications Networks Reimbursement Program Webinar (September 27, 2021), which SI's principal, Leslie Williams, attended. There, ranking staff recognized, among other things, that "This will not be simple, removing insecure equipment from existing networks after installation is challenging because historically these systems have been closed and deeply integrated with little opportunity to mix and match equipment from

LW

SIWIRELESS 24-000001
APP-087

different vendors in some cases this will mean starting over from scratch." That is what we intended to do, what we disclosed, and what the FCC approved.

Moreover, even if SI had had no customers, which it did not, zero is a number under 2 million and accordingly zero customers also would have met the basic definition of eligibility for this program. Congress, in not requiring any number other than under 2 million, may have considered the situation of a hypothetical provider lacking any customers and just preparing their network for launch, a process that would take at least a year after acquiring the offending equipment. Congress would not have wanted any installed covered equipment being put in to render service.

The details of SI's customers are provided in this response to questions 21 and 22.

Supporting Documents:

- SECOND REPORT AND ORDER 2nd RO FCC-20-176A1.pd
- Carri Destruction Call w FCC.pdf
- SI WIRELESS SCRP APPROVAL.pdf
- Secure and Trusted Communications Networks Reimbursement Program Webinar.mp4

LW

SIWIRELESS**APP-088**24-000002

Response to Inquiry 25
Business Plan
Prepared On: July 28, 2024

25. Provide a detailed explanation of the Company's business plan when it initially applied and was accepted to participate in the SCRP and the Company's subsequent modifications to this plan, including any role Rural Connect or other vendors or business partners may have in the plan. Explain the need for the plan and all aspects thereof, including but not limited to:

    a. The number of towers from which covered equipment will be removed (or ripped);

    b. The number of existing towers where new equipment will be placed after the covered equipment is removed (or replaced);

    c. The reason for any discrepancies between the numbers listed in a and b, above;

    d. The number of new towers the Company will obtain, rent, or construct that do not contain covered equipment but where new equipment will be placed;

    e. Any additional planned towers not specified above;

    f. If any existing, new, or planned tower or underlying land is owned by any person with an ownership interest in the Company (including its parent corporations or subsidiaries) or any of its vendors or business partners, specify the name of the tower owner or owner of the underlying land;

    g. The justification for each tower modification or new tower construction;

    h. The justification for any increase or decrease in the total number of towers;

    i. Insofar as not already explained, the explanation, as to each requested modification, of the Company's decision to modify its coverage area.

At the time of SI Wireless' application to the SCRP program, our business plan was to provide and continue to grow our advance communication services to the rural communities of Western Tennessee and Kentucky. At that time, we were in discussions directly or indirectly with at least two national carriers and an emerging national carrier to continue our previously provided service as a rural roaming affiliate as we had done throughout our history. We had Covered equipment installed on two hundred four (204) sites with two (2) cores operating on primary PCS Spectrum supplemented by spectrum from the affiliated carrier and our plan was to redeploy our comparable network on the same spectrum in the same areas which comprised all or part of 44 counties in Tennessee, 5 counties in Kentucky, and 1 county in Illinois. The affiliated national carrier would pay us a set amount for each site used and allow us to use these same sites for our own customers at the same time. The national carrier fees were the primary revenue generator SI Wireless had had throughout its existence. The business plan was to re-engage and do the same thing we did before but with a different national Carrier partner as Sprint our former partner was being merged into T-Mobile. All of this original plan was consistent with our prior operation.

Our plan to Rip out the Covered Equipment and accomplish redeployment within the programs stated one year performance period required us to quickly line up our vendors and get commitments from vendors and suppliers who could perform or could become able to perform within that period as well as meet the price guidelines from the catalog. We started this portion of the program in advance of getting formal approval pursuant to the FCC Encouragement and advice of Counsel.

When it became known that the program was going to be short funded, the two national carriers indicated they would wait to see where we ended up on funding and pretty much broke off negotiations due to the short funding and the third emerging carrier began to establish a pattern of being hot and cold on working with us which continues to be their position through to the present time. Thus, we had to entirely rework our existing business plan to account for partial funding and the resulting lack of a committed national carrier affiliation. It was at that time that we revised our business plan and shifted our focus from a full Mobility Network to a first phase Fixed Wireless deployment that could be ramped up to a full mobile and affiliated deployment on full funding and National carrier affiliation that might follow. This change was approved by the FCC under this program[1]. This new business plan we believed could sustain our company financially until the full funding was approved and we could finish building out a comparable network.

We incorporated working with WISPS that were being put out of business to provide a home for their customers to migrate to and to use their towers in lieu of the large tower company towers that we had previously been deployed on prior to the "Rip" portion of this program. The large tower companies were either litigating or threatening to do so against us and we had no avenue to reach a settlement with them. We have made use of towers from the WISPS, and we have built 22 sites so far with three more in development to come to the 100 sites we hope to relaunch with. We also have made use of two existing water tanks in this design and one of the large tower companies has relented and we are able to locate on their sites at a rate comparable to our overall lease rate. We have also incorporated several of the displaced people as vendors from some of the WISPS into different rolls supporting our build out as they have extensive experience with fixed wireless and the customers we intend to serve and the towers and means of backhaul we intend to serve them with. Another leg of our modified business plan was to make use of the different blocks of spectrum we have which are all much narrower bands than the major carriers uses but we have sought and have been successful in getting carrier aggregation to work on 4G on the same equipment specified in our original proposal to allow us to provide competitive speed with fiber deployments and significant capacity.

We had to put in a modification request to communicate these changes and to ask for assistance in carrying it out. Approval of this revised / modified plan was crucial in order that we would be sustainable in the event the program was not fully funded but also could be adapted to a return to our original plan if the rest of the funds were approved. It would have made sense for us to be able to have a discussion with the FCC and/or their contractor and then put in a plan that was understood and agreed at that time but there was no way to do this. In lieu of this much preferred conversation, we put in a modification request in accordance with the program guidelines and unfortunately much of it was completely misunderstood and outright denied without anyone undertaking to understand the whole circumstances behind the Request for Modification. This lack of understanding and communication resulted in multiple revisions to the modification, multiple

**APP 090**
SIWIRELESS 25-000002

back and forth clarification conversations, and a 5 month no payment delay. As we are a small business we have been at the mercy of this program and its lack of funding and as such our business plan has had to be modified and adjusted in order for us to build a comparable network to the one that we "ripped" as a result of our participation in this program.

The answers to the following subpart bulleted inquiries will provide additional insight into the structure of our network and our plan to rebuild what once was a viable advanced communication network before this program:

a.  The number of towers from which covered equipment will be removed (or ripped);

We have already accomplished this on all 204 sites we formerly operated on. At the time we formally applied to the SCRP program we had largely completed the "rip" portion of removing the equipment and have since completed the destruction of same. This early start was pursuant to FCC directive[2] and advice of counsel[3]. We accomplished this with the help of our vendors deferring most of their earnings until we were reimbursed.

b.  The number of existing towers where new equipment will be placed after the covered equipment is removed (or replaced);

Please see our response to Inquiry 12 and our multiple responses to Requests for Information as related on numerous previous occasions. SI Wireless had to terminate pretty much all or none of its leases on large tower company sites (this is described in further detail in several other responses in this inquiry as well as in the aforementioned RFIs). The Tower companies took exception to this and either commenced or threatened litigation. Since that time one tower company has basically relented and is allowing relocation (after complete decommissioning). About 5 of the 23 towers that we were able to relocate on already have the replacement equipment on them as part of the 98-site initial phase we are intending to launch with. That would make the answer to your question approximately 17 yet to deploy (could be increased by other companies relenting but we do not see this as a likely scenario). These future numbers are dependent on SIW getting the promised funding or payment of the allocated funding. Of these 98 initial sites we have built to date 23 sites greenfield from the ground up and anticipate that in a total network deployment with full funding we will build approximately 72 greenfield sites consistent with the number approved in our original approved plan.

c.  The reason for any discrepancies between the numbers listed in a and b, above;

As mentioned previously, the lack of full funding for the program and even more so lack of payment of funding for the reimbursements due us to allow us to get the job done in deploying at least the most sites we can deploy at this time. This should be understandable given we have received less than 15% of the awarded funds for this program and out of that have completed the entire decommission and destruction of our former network. The larger issue of why 427 sites to replace 204 is a matter of what it takes to provide a quality product given the evolution of communication services and what resources we have to do so. The tower count would decrease with taller towers and with lower band spectrum and with more spectrum depth allowing greater throughput and capacity. We don't have all these but rather we have access to 15 MHz of PCS spectrum, 20-49 MHz

**APP 091**

SIWIRELESS 25-000003

of EBS spectrum and wide swaths of CBRS spectrum. We have to design to provide a Fixed Wireless Access (FWA) product with this while we wait for full funding to come. If it doesn't or it comes at a time after the major carriers have built their own networks, 427 is the number of sites that will allow us to have a reasonably comparable network to operate providing quality competitive service to those customers we served with a quality wireless product previously.

d.  The number of new towers the Company will obtain, rent, or construct that do not contain covered equipment but where new equipment will be placed;

Unclear what is meant by new towers. If "New sites" means greenfield sites that we have built from the ground up in areas where there is a dearth of sites and service for both internet and cellular for the residents in those locations, then we have 23 constructed at the present time with two or three additional slated for our commercial re-launch. If "New sites" means simply sites we were not located on previously then eventually deployment of new sites to our network will be 427 less perhaps 30-40 sites where we will go back on sites previously decommissioned because of the large tower companies have not relented in their hostility to our exercise of the termination rights in our lease.

e.  Any additional planned towers not specified above;

Based on the success of our product relaunch and/or receiving payment and funding we have over 200 WISP towers we can locate on to expand our network. A WISP is a fixed wireless internet service provider offering high speed broadband delivered wirelessly to end user locations. WISP service is used by consumers and businesses as an alternative to wired internet connections. We anticipate that the total raw land newly constructed sites on full deployment will be close to the 72 such sites approved in our original application.

f.  If any existing, new, or planned tower or underlying land is owned by any person with an ownership interest in the Company (including its parent corporations or subsidiaries) or any of its vendors or business partners, specify the name of the tower owner or owner of the underlying land;

The majority of land underlying the newly constructed towers has been purchased by NTCH West Tenn Inc. which is related to NTCH Inc, in which Eric Steinmann has an indirect interest as disclosed in this and other proceedings. The arrangement calls for this company to receive no rent at current from the company and they have not done so but they have funded all these ground purchases._

g.  The justification for each tower modification or new tower construction;

This is duplicative of information given to your fund administrator on several occasions most recently in response to RFI KN003 included herein[4].

---

[4] Please refer to the Cover Letter Response to Request for Information – if all the supporting schedules are needed, we can provide them at your request – "Cover Letter - SC-CN0055200 - Kenny Nickerson - KN003 – 20240401.pdf"

**APP 092**

SIWIRELESS 25-000004

h. The justification for any increase or decrease in the total number of towers;
As stated previously, the increase in the number of towers needed to create a comparable network as SI Wireless needed to change from a Mobility Network to a Fixed Wireless network has been addressed above. The decrease in towers that we will relaunch with is due to funding reductions and flaws in the SCRP Program Administration, as discussed in our counsel's accompanying letter of September 17th. In fact the launch of those sites which will occur will entitle us to reimbursement of over 100 million dollars. As of this time we have been paid less than a fourth of that and less than 15% of the funds awarded us. The eventual increase of funding on full payment is what our RF design tool and RF engineers provide to us to have sites that will serve a reasonably comparable geographic area and subscriber base and some of the factors that weigh on this include height, spectrum depth and Spectrum quality as explained previously.

i. Insofar as not already explained, the explanation, as to each requested modification, of the Company's decision to modify its coverage area.
Even though this has been explained multiple times in the Modification process as well as in several RFIs, we will once again explain SI Wireless' decision or need to modify its coverage area. The coverage area we previously served in Madison County was provided almost wholly by heavily collocated Large tower company (Primarily American Tower) structurally failing sites. We had to pursuant to our lease provisions terminate all or none of the American Tower sites we were collocated on before the Rip portion of this program. The reason we had to terminate these leases was in addition to being a requirement of the provisions of the lease was it made no business sense to continue paying rent on unused towers for now over 2.5 year and 60 percent unused towers for another who know how long until the program is fully funded because even though this is clearly a necessary expense of the program, we have been denied any reimbursement from your fund administrator. These leases being terminated, we would have had to do raw land builds for new towers throughout Madison County to replace these sites. However, Madison County has zoning and permitting requirements that would not allow this to happen within the one year performance period let alone three times that. Therefore in order to create our comparable network, we looked to adjoining Haywood County who had a new Ford electric truck plant going in, a huge influx of people many working and staying in trailer parks who need the service we could provide and a county government that agreed to approve all 14 raw land sites we needed to serve that county in one proceeding. We explained this modification of coverage in our initial modification request and to this date have not got a clear answer in response and have been left with no choice but to move forward in building these sites and providing not new but expanded coverage in one county we served before and reduced coverage in another we served before. This we feel was a reasonable choice leading to deployment of a reasonable comparable network.

In conclusion, our current business plan remains as it was at the time of the first submitted modification. We want to restore a good wireless network service at 30-45 dollars per month to approximately the same population we were servicing previously that is currently paying 59-89 a month and provide the area needed infrastructure for a wireless future and a competitive present that do not exist. This should make us sustainable, and we will get this done. We will adapt our

**APP 093**
SIWIRELESS 25-000005

business plan on a granular basis as needed to survive the oppression and non-payment of this program.

Supporting Documents Provided:
- Carri Destruction Call w FCC.pdf
- Cover Letter - SC-CN0055200 - Kenny Nickerson - KN003 - 20240401.pdf
- SC-MOD-AR0001250 modification approval.pdf
- SECOND REPORT AND ORDER 2nd RO FCC-20-176A1 Applaud Carriers.pdf
- SI Wireless Confidential PLAN Jan 2022.pdf
- SI Wireless Plan Confidential 030623.pdf
- SI WIRELESS SCRP APPROVAL.pdf

**Background of SI Wireless, LLC ("SIW") acquisition by IBN – Bill Howard and Leslie Williams successor**

Prior to July 29,2020 SIW was owned by 5 members: Egyptian Communication Services, Inc. an Illinois corporation, James T Coyle Legacy Trust, an Illinois trust, Technology Group LLC, an Illinois Limited Liability Company, Shawnee Communications, an Illinois corporation, and Crosslink Wireless Inc., a Illinois corporation. (See "Membership Interest Purchase Agreement - SI Wireless.pdf")

In about 2013 SIW was buying spectrum from Sprint and deploying their network which comprised part of Sprints network and NTCH West Tenn Inc. was operating already in that market on towers they had constructed and serving customers at under $30 monthly with no strings attached for unlimited cellular phone service since 2004. The two companies entered into a coopetition agreement where NTCH West Tenn inc. leased tower space and leased spectrum to SIW that greatly accelerated their network deployment, and the two companies worked well together through the years and that is where the relationship started between the group of small companies that Leslie Williams and Bill Howard worked with and SIW.

SIW operated through those years and built a base of local customers with its my mobile nation brand, MVNO nationwide customers with its Twigby brand, and also provided 204 sites to Sprints network in an arrangement where Sprint paid them monthly for the sites. Instead at a later date it became clear that Sprint was being bought itself by T mobile and that the government was not going to allow the transaction minus a promise to have no ZTE or Huawei equipment. At this time customer counts are reflected as provided. ["Member Base Report thru 010120.xlsx "provided by predecessor ownership CFO].

SIW had to that point been providing strategic roaming coverage throughout Central and Western Tennessee for Sprint, and in fact was pushed by Sprint to initially use Huawei equipment when its network was deployed in 2013 (Huawei invoices provided by predecessor ownership CFO).

Jason Narrell, former CFO stated that neither Sprint nor T-Mobile was allowed to discuss the roaming agreement with SIW during their pending merger because they were restricted by the FCC and DOJ. But Sprint then allowed SIW's agreement to expire in January of 2020 and that caused a large loss of revenue for SIW virtually

overnight. SIW had anticipated this, was aware that T mobile and in fact Verizon and Dish needed their coverage area and had commenced planning to participate in the SCRP program to make their network acceptable to those carriers to enter into an agreement with them. SIW also had made arrangements previously to transition and or terminate with ample notice their customers so these customers would not be affected, and they gave notice to Tower companies that they would terminate their leases as they could not afford to carry these leases during the rip and replace period with the loss of Revenue and opted to terminate leases rip the equipment and then release and rebuild.

Among the leases of these over 200 terminated tower leases [See SIW provided "TowerCo Vendors Financial Summary 7-27-20.xlsx") was American Tower, Crown, Vertical Bridge, a few other tower lessors and NTCH West Tenn, Inc, On November 19, 2019, SIW sent twelve (12) lease termination letters to its various tower lessors. With the exception of NTCH West Tenn Inc the tower companies all took a combative stance and in general threatened litigation.

We can speculate that the threatened litigation, the country environment fighting the Covid 19 virus, and resulting workforce and supply chain issues unnerved the owners of SIW at that time and caused them to reach out and inquire about doing first something cooperative with NTCH West Tenn then offering to sell to Bill Howard who had expressed interest leading the SCRP effort and managing the company during this period. A transaction that came to pass in July of 2020.

Prior to this transaction, under its previous ownership, SIW, through its predecessor CEO, Michael Beehn submitted the request for information response #NSSC0001269 on 5/26/2020 (See "Supply Chain Filing.pdf") to the FCC which subsequently led to the Secure and Trusted Networks Communication Act (and ultimately "SCRP").

Glenn Ishihara of NTCH West Tenn Inc., led discussions with SIW as NTCH West Tenn was owed a substantial amount for its tower leases and its parent, also managed by Mr Ishihara, was owed for its spectrum lease. During these discussions it was disclosed that SIW had hired a reorganization consultant, and the company was considering filing bankruptcy. Mr. Ishihara who was on a reduced work schedule due to family issues passed on making any long term involvement in SIW but told Mr. Narrell he would discuss with some younger entrepreneurs who worked with his company the opportunity of saving SIW and help them with getting the transaction closed since retaining SIW as a spectrum lessee and retaining some potential of some of SIW amounts due getting repaid in any partial amount was of interest to NTCH West Tenn Inc.

After discussing the transaction with Bill Howard, a former colleague of Mr. Ishihara who had worked previously in Tennessee, Bill Howard engaged counsel (Don Evans of Fletcher Heald Hildreth). Bill also formed Integrated Business Networks, LLC with which to acquire the membership interests of SIW. SIW transacted for a relatively small

**APP 096**
SIWIRELESS 30-000002

amount of cash and large assumption of liabilities of $6,458,416.43, as the book net equity on 7/24/2020 provided by the former owners was negative ($2,582,997.73) [SIW Wireless, LLC FS 072420.xlsx provided by predecessor CFO]. Mr. Howard recruited a board and officers from among his former colleagues including appointing himself, William Howard, Director, President, Leslie Williams, Director and Treasurer, and Carolyn Cobbs, Director and Secretary. An application for transfer of control was filed by Mr. Howard and granted by the commission.

The only records that Mr. Howard carried forward were those provided by previous owners that were in certain due diligence files. Extensive network statistics and subscriber records were not turned over at that time and these were not particularly relevant to the plan ahead for this company.

Bill Howard by way of background has worked in wireless since April 2001. He has designed networks in over 10 different markets and been part of deploying over 400 cell sites. He also has a background in physically deploying antennas and radios, and microwave backhaul links and had experience operating his own WISP operation in Vermont during this time period.

**Summary of Integrated Business Networks, LLC acquisition of former member interests of SI Wireless, LLC**

Sellers:     Egyptian Communication Services, Inc., an Illinois corporation, James T Coyle Legacy Trust, an Illinois trust, Technology Group LLC, an Illinois Limited Liability Company, Shawnee Communications, an Illinois corporation, and Crosslink Wireless Inc., a Illinois corporation

[This did not include Hamilton County Communications, inc. or Wabash Independent Networks, Inc. as they were no longer members. Believe this occurred on or around 4/16/2020]

Buyer:      Integrated Business Networks, LLC, controlled by William Howard (Sole Member).

Chronological history of the FCC filings with highlighted dates below:

https://wireless2.fcc.gov/UlsApp/ApplicationSearch/apolAdminHistory.jsp?applID=12173 946

6/18/2018          Second Amended and Restated Operating Agreement.

**APP 097**
SIWIRELESS 30-000003

Members signing are Egyptian Communication Services, Inc., Hamilton County Communications, Inc., Wabash Independent networks, Inc., James T Coyle Legacy Trust, Technology Group LLC, Shawnee Communications, inc. and Crosslink Wireless, Inc.

At that time Section 6.1(b) Management of Company affairs pg 14 sets for seven (7) natural persons as the managers. The first is the CEO/President, then **the other six are appointed by each of the members**

6/20/2018     First Amendment to Second Amended and Restated Limited Liability Company Operating Agreement. Amendment restated Section 6.10 Advisory Committee, reducing it from three persons who are not Managers, Members or Officers down to one.

Signed by Egyptian Communication Services, Inc.; Hamilton County Communications, Inc; Wabash Independent Networks, Inc.; James T Coyle Legacy Trust; Technology Group LLC; Shawnee Communications, Inc.; and Crosslink Wireless, inc.

7/19/2019     Second Amendment to Second Amended and Restated Limited Liability Company Operating Agreement

1. Section 1.1 Covered Person
2. Section 5.2 Member Voting to 80% for major decision such as amendment to the Articles, Agreement or Management Agreement, Capital Calls, compensation to Managers, dissolution of the company, management salaries, approval of internal transactions (to be voted on by the disinterested Members.
3. Section 6.9(a) Amendment. Managers holding a majority may establish a temporary committee and invest such committees with such powers as it sees fit each such committee and designees and appointees shall hold the office of a "manager". Sections 6.9(b) and (c) intentionally left blank
4. Section 12.1 authorized the issuance of additional units to raise capital.

Signed by Egyptian Communication Services, Inc, , Hamilton County Communications, inc., Wabash Independent Networks, Inc., , James T Coyle Legacy Trust, Technology Group LLC, Shawnee Communications, Inc., and Crosslink Wireless, inc.

| | |
|---|---|
| 4/16/2020 | Hamilton and Wabash sold their interests back to SIW. A $925,000 disbursement to both on "SIW GL 010120 to 072420 083120" this information was provided by former SIW staff. |
| 6/26/2020 | Application for Transfer of Control of SI Wireless LLC filed by then CFO Jason Narrell. |
| 6/27/2020 | Application was offline because the former owners had not paid a regulatory fee (was less than $3,000) |
| 7/1/2020 | IBN Initial Operating Agreement |
| 7/7/2020 | Transfer of Control application amended. https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?appIID=12173946&printable |
| 7/20/2020 | Application consented |
| 7/29/2020 | IBN (FRN 0029712932) submits to the FCC its NT (required notification) of the consummation of the transaction for a transfer of control of SIW to IBN controlled by Willam Howard. https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?appIID=12210847 |
| 7/30/2020 | FCC accepts the 7/29/2020 filing |
| 9/1/2021 | William Howard enters into a two-phase agreement, the first being a sale of 49% to Leslie Williams, with 50% being deferred until the FCC consents to the transfer of control to Leslie |
| 08/2/2022 | TC (Transfer of Control) of Integrated Business Networks, LLC filed, from William Howard 1601 Assembly St, Columbia SC to Leslie Williams (FRN 0027860121), 5417 28th St, Lubbock TX 79407. |
| 5/4/23 | Action taken / FCC consent of TC |

**APP 099**
SIWIRELESS 30-000005

SIW history prior to transfer of control to IBN

FRN: <u>0019623834</u>

Cores: 0028390268

Approximate SI Wireless Subscribers 1/1/2019

### Mobile Nation

1/1/2019 15,000

1/1/2020 3,602

### Twigby (STX) - MVNO

1/1/2019 14,000

1/1/2020 22,000

Total Subscribers 1/1/2019: 29,000

Total Subscribers 1/1/2020: 25,602

### SI Wireless, LLC Prior to IBN Acquisition

Brand names: Mobile Nation, Twigby

1418 Kensington Square Court Building D

Murfreesboro, TN 37130

Officers:

Michael Beehn, CEO

Jason Narrell, CFO

Mike Jaksich, CTO

Rhonda Barnhart VP Administration

Matt Owens, VP Marketing

*STX Group, LLC. with assumed name of Twigby wholly owned subsidiary of SIW was formed 2/1/2019*

FRN: 0028390268

1418 Kensington Square Court Building D

Murfreesboro, TN 37130

Illinois State Filings: https://apps.ilsos.gov/businessentitysearch/businessentitysearch


Registered Agent:

Tracy Nugent

306 W Church St

Champaign, IL 61820-3500

Initial Managers:

David Marlett, 7036 Kingsmill Court, Springfield IL 62711

J. Michael Grisham 120 W. Lane Street, Equality, IL 62934

Kim Harber 21688 Double Arch Road, Staunton, IL 62088

Matthew Bollinger 1010 W Broadway Steeleville, IL 62288

Additional manager listed in filings:

SIW Wireless, LLC 3/16/2020

Michael Grisham signed as Manager 2021

Jason Narrell signed as CFO 2022, 2023


Supporting Documents:

- Member Base Report thru 010120
- Membership Interest Purchase Agreement - SI Wireless
- SIW Supply Chain Filing 5-21-2020
- TowerCo Vendors Financial Summary v4 7-27-20

Response to Inquiry 31
Associated Companies Part 1
Prepared On: September 4, 2024

**Question:**
Describe the business relationships between and among the Company and any of its parents, subsidiaries, members, and associates.[10] Your description must identify all functions or services each person or entity performs and the entity for whom it performs such functions or services (e.g., an intermediate holding company that performs no functions, holds or manages assets such as leases office space, is a contracting party, performs responsible organization functions for affiliates, oversees finances such as keeping accounts, is the named entity on bank accounts, performs billing and collection, provides management functions, etc.). The Company's response must specifically state whether the Company or any of its owners or management (including managers, members, officers, or directors) have at any time had any relationship with these persons or entities. For any identified relationship, provide the following information:

  a. Explain the nature of and relevant dates associated with the relationship.

  b. Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity.

  c. A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity.

  d. A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity.

  e. A description of any shared financial assets and obligations including banking and credit accounts, and tax filings.

[10] This list includes, but may not be limited to: Leslie Williams; Eric Steinmann; Linda George; Amy McFarling; Chuck Roberts; Dave Sikut; Dogan Koslu; Greg Belknap; Jacquie Cossey; Jason Holliday; Jeffrey Sikut; Joseph
Clark; John Hehman; Kenneth Nickerson; Paula Nowell; Phillip Comer; Ray Harvey; Thomas Karnes; Tom Sams; Troy Bruce; Integrated Business Networks, LLC; Clear 9 Communications, LLC; ESIRF LLC; Flat Wireless LLC; Minghelli LLC; NTCH-West Tenn Inc.; NTCH-NM, LLC; PTA-FLA Inc.; Rural Connect LLC; Z Best Logistics, LLC; Sikut, Inc.; Business Solutions, LLC; Hardrock Enterpreises, LLC; MiTawn Services; Koslu LLC;
Sparqworx; MLC Strategies, LLC; Fisher Telecommunications; Tower Engineering Solutions, LLC; Barrett Browning, LLC; Partner Engineering & Science, Inc.; Marahute Mechanics; Solano Communications, LLC; World Tower; Socratica Consulting, LLC; Good Works Digital, LLC; Greywolves; Flat Wireless.

Prepared By: LW/PC

SIWIRELESS 31-000001
APP-102

**Response** – SI objects on grounds of undue burdensomeness and unintelligibility. You've asked about the Company and any members of what the FCC has arbitrarily deemed to be associates – that is, the Request footnoted forty-eight (48) companies and individuals and then demanded that SI to provide what frankly are mind-boggling specifics concerning each—we conservatively estimate about thirty-eight (38) categories. That is approximately 1,824 demands in but one umbrella request.

As these responses will demonstrate, as with many small businesses, SI Wireless depended upon companies and individuals with whom we have had relationships previously. Also, in almost every instance the FCC asked about an independent vendor, and frequently sought their proprietary or non-public information. That stated, we have made a good-faith effort to answer this Request as well as Inquiries 32 and 33. We have prepared an Excel Spreadsheet that, to the best of our ability, is based on information we possessed, know of, or is readily available to us. Using the spreadsheet is the most readily digestible format to present this mass of information.

Supporting Documents:
- Question 31-33 Grid.xlsx
- Question 31-33 Grid.pdf (provided in a formatted version in case it needs to be printed.
- Rural Connect Vendor List.xlsx
- CHEERS Trust_Fully Executed
- Various Quotes as referenced in the supporting spreadsheet
- Various Contracts as referenced in the supporting spreadsheet

Prepared By: LW/PC

APP 104

of our agency based environment... ... ... ...Any
omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting
contained herein

| Question | Response | Leslie Williams | Eric Steinmann | Linda George | Amy McFarling | Chuck Robarts | Dave Sikut | Dogan Koslu |
|---|---|---|---|---|---|---|---|---|
| 31 | a - Explain the nature of and relevant dates associated with the relationship. | Leslie became a director and board member (Treasurer) of SIW since July 2020.<br><br>President SI Wireless since 2021; Signer of Bank Accounts for SI Wireless; Provides Management Functions for SI Wireless General Manager then President of of Rural Connect since October 2021<br><br>Acquired Interest in IBN in September 2021 | Overall Project Management of Build to Suit activities for SI Wireless.<br><br>Overall Project manager from the inception of work for the SCRP for SI Wireless since 2020. Also provides Professional advice on the Project | > General Manager since 2004 and President and board member since 2011 of NTCH West Tenn Inc., who supplies towers and some other services for this project. | Entered into Agreement with SI Wireless in September of 2022 to help with Project Management for the SCRP Program | Entered into Agreement with SI Wireless in August of 2022 to provide Construction Management services for the SCRP Program | > Entered into Agreement with SI Wireless November 2021 to provide Project Management services for the SCRP Program. | Entered into Agreement with SI Wireless in September of 2022 to help with Project Management for the SCRP Program |
| 31 | b - Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a director or indirect ownership interest in the Company, and any other affiliated person or entity. | > 99% Owner of IBN (Parent Company of SIW)<br>> 41% Owner of Rural Connect<br>> 21% Owner of PTA-FLA | None | None | None | None | None | None |
| 31 | c - A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity. | When working in market, Leslie stays in the FEMA Trailers for Lodging. | When working in market, Eric stays in the FEMA Trailers for Lodging. | None | None | When working in market, this vendor used the FEMA Trailers for Lodging. | None | None |
| 31 | d - A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity. | Contract<br>>"SI WIRELESS Letter agreement Les Deffered compensation.pdf"<br><br>>"Si Wireless_Leslie Williams Owner Draw Agreement.pdf"<br><br>>"Membership Interest Transfer Agreement_FE_Leslie49.pdf" | Contract:<br>> "FE Service Agreement SIW and Eric Steinmann - Executed.pdf" | None | Contracts:<br>> "FE SIW and Amy McFarling contractor agreement.pdf"<br>> "FE SIW and Amy McFarling first contract amendment.pdf" | Contract:<br>> "FE Service Agreement SIW and Chuck Robarts FINAL rev 1.pdf" | Contracts:<br>> "FE Service Agreement: SIW and Dave Sikut.pdf"<br>> "Dave Sikut v SI Wireless First Amendment to Contrctor Agmt .pdf" | Contracts:<br>> "FE Service Agreement SIW and Dogan Koslu rev 1 (clean).docx.pdf"<br>> "Service Agreement SIW and Dogan Koslu Amendment 1.pdf" |
| 31 | e - A description of any shared financial assets and obligations including banking and credit accounts, and tax filings. | None | None | None | None | None | None | None |

APP 105

## Question 31 - 33 Grid

The answers contained herein are being provided to the best
of our ability based on information readily available to us. Any
omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting
contained herein

| Question | Response | Leslie Williams | Eric Steinmann | Linda George | Amy McFarling | Chuck Roberts | Dave Sikut | Dogan Kodu |
|---|---|---|---|---|---|---|---|---|
| 32 | 32 - Provide a chart for each company identified in response to inquiry 31 | | | | | | | |
| 32 | internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 32 | the names of all owners (and percentage of ownership or membership interest) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 32 | identify all directors or board members (including addresses and telephone numbers) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |

APP 106

of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Leslie Williams | Eric Steinmann | Linda George | Amy McFarling | Chuck Roberts | Dave Sikut | Dogan Koshu |
|---|---|---|---|---|---|---|---|---|
| 32 | Identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 32 | Identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| | each Associated Company, answer the | | | | | | | |
| 3 | a - The headquarters and/or business address of each company | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | b1 - State of Incorporation | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | b2 - States authorized to do business | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | b3 - Fictitious Names /dba | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | c - Identify the persons responsible for incorporating or otherwise creating each company and the relationship of such persons to the companies they incorporated or otherwise created (e.g., ownership interest, member, board member, officer, etc.). | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | d - Explain the nature of and relevant dates associated with the relationship. If the relationship comprises a transaction or series of transactions, identify the transactions and the dates or date range of such transactions | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | e1 - From 2019 to the present, state whether any of the Associated Companies filed consolidated Federal tax returns and, if so, identify which companies did so | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| | e2 - In the last four years before the date of this LOI, identify each company that files Federal tax returns (other than consolidated returns) in its own name | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| | e3 - In the last four years before the date of this LOI, identify each company that has not filed a Federal file tax return in its own name (other than those identified above as part of a consolidated return). For any company that has not filed a Federal tax return, identify the reason for non-filing (e.g., the | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |

## Question 31 - 33 Grid

The answers contained herein are being provided to the best
of our ability based on information readily available to us. Any
omission of Information has been inadvertent.
See Footnotes for descriptions and explanation of formatting
contained herein

| Question | Response | Leslie Williams | Eric Steinmann | Linda George | Amy McFarling | Chuck Roberts | Dave Silut | Dogan Koslu |
|---|---|---|---|---|---|---|---|---|
| 33 | f - Describe all physical or virtual facilities and assets that are shared by one or more of the Associated Companies. Include the address of an such faciliy, phone # or shared resources | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | g - Describe any shared financial assets and obligations, including banking and credit accounts | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | h  List and describe all contracts or other business arrangements between or among the Associated Companies | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |

Footnotes:

(a)  We are not Privy to the information requested of this entity
to accordingly answer this question regarding this entity - this is
not information within our corporate records - with the
exception of where we have provided information - it is
unintelligible as you are asking information that is not readily
available to SI Wireless without extensive research - for the items
where we do not have this information, cells have been shaded
light grey

(b) REFER TO OUR RESPONSE IN 31A

(*) This identifies a positive response only for those companies
we know this information for

APP 108

of our ability based on information readily available to us. Any omission of information has been inadvertent.

See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Greg Belknap | Jacquie Cossey | Jason Holliday | Jeffrey Sikut | Joseph Clark | John Hehman | Kenneth Nickerson | Paula Nowell |
|---|---|---|---|---|---|---|---|---|---|
| 31 | a - Explain the nature of and relevant dates associated with the relationship. | Entered into Agreement with SI Wireless in January of 2023 to provide a review of the safety situation and compliance at the company and its locations | She was engaged to provide consulting services related to assisting with determining price effective wired backhaul for the project in October of 2022. She ceased working on this in February of 2023 pursuant to the quote(s) listed in 31 (d). | Entered into Agreement with SI Wireless in August of 2022 to provide Project Management services for the SCRP Program. Directed his company, JHC Construction, to begin providing Construction services to associated companies (Minghelli, Clear 9, and Sikut Inc). | Entered into Agreement with SI Wireless in August of 2022 to provide Construction Management services for the SCRP Program | > Entered into Agreement with SI Wireless in November of 2021 to provide Project Management and Construction Management services for the SCRP Program | > Entered into Agreement with SI Wireless in August of 2022 to provide Construction Management services for the SCRP Program<br>· "FE Service Agreement SIW and John Hehman FINAL.pdf" | Entered into Agreement with SI Wireless in September of 2022 to provide Project Management services for the SCRP Program | Entered into Agreement with SI Wireless in October of 2022 to help with local coordination and communications for site acquisition and construction services including area wide communications and relations with third parties for the SCRP Program |
| 31 | b - Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity. | None | None | None | None | None | None | None | None |
| | c - A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity. | When working in market, this vendor formerly used the FEMA Trailers for Lodging. | None | When working in market, Jason has used the FEMA Trailers for Lodging. | When working in market, Jeff formerly used the FEMA Trailers for Lodging. | When working in market, Joe has used the FEMA Trailers for Lodging. | None | When working in market, Kenny was allowed to park his own trailer in the Laydown yard for lodging. | None |
| 31 | d - A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity. | Contract:<br>> "SIW and Greg Belknap contractor agreement FE.pdf" | Quote:<br>> "Jacquie Cossey - Quote-0000001.pdf" | Contract:<br>> "FE Service Agreement SIW and Jay Holliday.pdf" | Contract:<br>> "FE Service Agreement SIW and Jeff Sikut.pdf" | Contracts:<br>> "FE Service Agreement SIW and Joe Clark FINAL.pdf"<br>> "FE Service Agreement SIW and Joe Clark Amendment.pdf"<br>> "Service Agreement SIW and Joe Clark Second Amendment.pdf" | Contract:<br>< "FE Service Agreement SIW and John Hehman FINAL.pdf" | Contract:<br>> "FE Service Agreement SIW and Kenny Nickerson.docx.pdf" | Contract:<br>> "FE Contractor_Agreement-Paula_Nowell.pdf" |
| 31 | e - A description of any shared financial assets and obligations including banking and credit accounts, and tax filings. | None | None | None | None | None | None | None | None |

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Greg Belknap | Jacquie Cooney | Jason Holliday | Jeffrey Sikar | Joseph Clark | John Maltman | Kenneth Nickerson | Paula Nowell |
|---|---|---|---|---|---|---|---|---|---|
| 31 | Provide a chart for each company identified in response to Inquiry 31 | | | | | | | | |
| 32 | internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 32 | the names of all owners (and percentage of ownership or membership interest) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 32 | identify all directors or board members (including addresses and telephone numbers) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein.

| Question | Response | Greg Belknap | Jacquie Cossey | Jason Holliday | Jeffrey Sikut | Joseph Clark | John Hehman | Kenneth Nickerson | Paula Nowell |
|---|---|---|---|---|---|---|---|---|---|
| 32 | Identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 32 | Identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| | each Associated Company, answer the | | | | | | | | |
| 33 | a - The headquarters and/or business address of each company | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | b1 - State of Incorporation | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | b2 - States authorized to do business | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | b3 - Fictitious Names /dba | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | c - Identify the persons responsible for incorporating or otherwise creating each company and the relationship of such persons to the companies they incorporated or otherwise created (e.g., ownership interest, member, board member, officer, etc.). | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | d - Explain the nature of and relevant dates associated with the relationship. If the relationship comprises a transaction or series of transactions, identify the transactions and the dates or date range of such transactions | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | e1 - From 2019 to the present, state whether any of the Associated Companies filed consolidated Federal tax returns and, if so, identify which companies did so | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| | e2 - In the last four years before the date of this LOI, identify each company that files Federal tax returns (other than consolidated returns) in its own name | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| | e3 - In the last four years before the date of this LOI, identify each company that has not filed a Federal file tax return in its own name (other than those identified above as part of a consolidated return). For any company that has not filed a Federal tax | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |

# Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.

See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Greg Belknap | Jacquie Cosey | Jason Holliday | Jeffrey Silurt | Joseph Clark | John Hahman | Kenneth Nickerson | Paula Nowell |
|---|---|---|---|---|---|---|---|---|---|
| 33 | f - Describe all physical or virtual facilities and assets that are shared by one or more of the Associated Companies. Include the address of an such facily, phone # or shared resources | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | g - Describe any shared financial assets and obligations, including banking and credit accounts | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |
| 33 | h - List and describe all contracts or other business arrangements between or among the Associated Companies | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual |

Footnotes:

(a) We are not Privy to the information requested of this entity to accordingly answer this question regarding this entity - this is not information within our corporate records - with the exception of where we have provided information - it is unintelligible as you are asking information that is not readily available to SI Wireless without extensive research - for the items where we do not have this information, cells have been shaded light grey

(b) REFER TO OUR RESPONSE IN 31A

(c) This identifies a positive response only for those companies we know this information for

| Question | Response | Phillip Comer | Ray Harvey | Thomas Karnes | Tom Sams | Flat Wireless LLC | Troy Bruce | Integrated Business Networks, LLC | Clear 9 Communications, LLC |
|---|---|---|---|---|---|---|---|---|---|
| 31 | a - Explain the nature of and relevant dates associated with the relationship. | Entered into Agreement with SI Wireless in May of 2023 to help with Construction Management for the SCRP Program | Entered into Agreement with SI Wireless in August of 2022 to help with Construction Management for the SCRP Program | Entered into Agreement with SI Wireless in September of 2022 to help with Project Management for the SCRP Program | Entered into Agreement with SI Wireless in October of 2022 to provide Construction Management services for the SCRP Program | > This company was engaged to provide various site work services, as well and Project Management and Construction Management services for the SCRP Program in August of 2022 pursuant to the quote(s) listed in 31 (d). | > Entered into Agreement with SI Wireless in August of 2022 to provide Project Management services for the SCRP Program | This is the parent Company of SI Wireless since July of 2020. IBN owns 100% of SI Wireless. | Working relationship between Clear 9 and SI Wireless was an oral agreement prior to the quote being provided at time of commencement of work removing the equipment – in 2020 this company was engaged to perform decom and replacement services and to do so in accordance with the program directives. Clear 9 agreed to get paid when The Company got paid. In 2022 when SI Wireless was accepted into the SCRP at that time Clear 9 provided the quote(s) referenced in 31(d) and has provided subsequent quotes as needed. |
| 31 | b - Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity. | None | None | None | None | None | None | None | None |
| 31 | c - A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity. | None | None | None | When working in market, Tom has used the FEMA Trailers for Lodging. | Various personnel from this company have been allowed to use the FEMA trailers for lodging at times. | When working in market, Troy has used the FEMA Trailers for Lodging. | Company shares management addresses and other facilities with SI Wireless | Much of the construction, staging, FEMA trailers moved in for lodging, Warehousing, Storage, Construction Trailers are located at 1378 N Cavalier, Alamo, TN and 170 Gardner Grove, Cedar Grove, TN. Several of SIW Vendors and Managers use the FEMA Trailers, warehouse, laydown yard, and roll off construction debris and recycling containers in a shared manner. Also, several amongst this group have an email address ending in ClearTalk.net which we imagine causes them to share a virtual server. |
| 31 | d - A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity. | Contract: > "Service Agreement SIW and Phillip Comer fully executed.pdf" | Contract: > "FE Service Agreement SIW and Ray Harvey FINAL.pdf" | Contracts: > "FE Service Agreement SIW and Charley Karnes FINAL.pdf" > "Service Agreement SIW and Charley Karnes fully executed.pdf" | Contracts: > "FE Service Agreement SIW and Tom Sams FINAL.pdf" > "Service Agreement SIW and Tom Sams Amendment 1.pdf" | Quotes: > "FLT001 - Flat Wireless - Quote for SI Wireless.pdf" > "FLT002 - Flat Wireless - Quote.pdf"  Overall business arrangement is that companies will do work for SI Wireless as specified by the SCRP for the average rates in the program for which they will receive an advanced partial payment for services but will not receive full payment until the Company is reimbursed by the SCRP fund administrator. SI Wireless utilized multiple construction companies to mitigate risk. | Contract: > "FE Service Agreement SIW and Troy Bruce FINAL rev 1.pdf" | Parent Company of SI Wireless | Quotes: > "CLR9001 - Quote.pdf" > "Clear 9 - Quote - SI-002.pdf" > "Clear 9 - Quote - SI-004.pdf"  Overall business arrangement is that companies will do work for SI Wireless as specified by the SCRP for the average rates in the program for which they will receive an advance partial payment for services but will not receive full payment until the Company is reimbursed by the SCRP fund administrator. SI Wireless utilized multiple construction companies to mitigate risk. |
| 31 | e - A description of any shared financial assets and obligations including banking and credit accounts, and tax filings. | None | None | None | None | None | None | IBN filed a consolidated tax return with SI Wireless | None |

APP 112

# Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Phillip Comer | Ray Harvey | Thomas Karnes | Tom Sams | Flat Wireless LLC | Troy Bruce | Integrated Business Networks, LLC | Clear 9 Communications, LLC |
|---|---|---|---|---|---|---|---|---|---|
| | **32 - Provide a chart for each company identified in response to inquiry 31** | | | | | | | | |
| 32 | internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | > President: Kevin Beierschmitt<br>> Believed to have 40+ employees<br>> See Footnote (a) | N/A Individual | > Leslie Williams - President and Secretary - Provides overall management of the business<br>> 1 employee | Member - Eric Steinmann (Overall Responsibility of the Organization)<br>5 employees performing the following functions:<br>Decommissioning Work<br>Construction<br>Construction Management |
| 32 | the names of all owners (and percentage of ownership or membership interest) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | > Leslie Williams owns 99%<br>> Bill Howard owns 1% | 100% beneficially owned by The CHEERS Trust<br>100% Nominally owned by Eric Steinmann |
| 32 | identify all directors or board members (including addresses and telephone numbers) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | None | None |

APP 113

APP 114.

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Phillip Comer | Ray Harvey | Thomas Karnes | Tom Sams | Flat Wireless LLC | Troy Bruce | Integrated Business Networks, LLC | Clear 9 Communications, LLC |
|---|---|---|---|---|---|---|---|---|---|
| 32 | Identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity) | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | Manager - Leslie Williams | Manager - Eric Steinmann  Subcontractors JHC Construction Hornsby Electric Sikut Inc (Electrical) Ramm Fencing Flat Wireless BT Redimix ANTHEM Anchor Bolts Southeastern Reinforcing Southern Concrete  > Trustee of CHEERS Trust - Joe Sofio |
| 32 | Identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | Leslie Williams - President of SI Wireless and PTA FLA; Managing member of Rural Connect | Lutti Heidlebaugh performs office accounting and check payment to many of the other companies and some of the individuals from time to time.  This company also uses the tax preparation services of Joe Sofio who provides these services to several of the other companies |

each Associated Company, answer the

| Question | Response | Phillip Comer | Ray Harvey | Thomas Karnes | Tom Sams | Flat Wireless LLC | Troy Bruce | Integrated Business Networks, LLC | Clear 9 Communications, LLC |
|---|---|---|---|---|---|---|---|---|---|
| 33 | a - The headquarters and/or business address of each company | N/A Individual | N/A Individual | N/A Individual | N/A Individual | 10210 Frankford Ave, Suite 110 Lubbock, TX 79424 | N/A Individual | 1601 Assembly St # 8826 Columbia, SC 29202 | PO Box 1976 Wrightwood, CA 92397 |
| 33 | b1 - State of Incorporation | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | Delaware | Delaware |
| 33 | b2 - States authorized to do business | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | Delaware | Delaware; Tennessee |
| 33 | b3 - Fictitious Names /dba | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | None | None |
| 33 | c - Identify the persons responsible for incorporating or otherwise creating each company and the relationship of such persons to the companies they incorporated or otherwise created (e.g., ownership interest, member, board member, officer, etc.). | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | Bill Howard, Owner | Eric Steinmann - Nominal not beneficial owner |
| 33 | d - Explain the nature of and relevant dates associated with the relationship. If the relationship comprises a transaction or series of transactions, identify the transactions and the dates or date range of such transactions | N/A Individual | N/A Individual | N/A Individual | N/A Individual | RF design, optimization, and monitoring of the network implementation. Construction Services  See footnote (b) | N/A Individual | See footnote (b) | To do a substantial portion of the Decom and Reinstallation construction work on this project.  See footnote (b) |
| 33 | e1 - From 2019 to the present, state whether any of the Associated Companies filed consolidated Federal tax returns and, if so, identify which companies did so | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | IBN files a consolidated tax return with SI Wireless since 2020. IBN owned SI Wireless starting in 2020 | None |
| 33 | e2 - In the last four years before the date of this LOI, identify each company that files Federal tax returns (other than consolidated returns) in its own name | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | Consolidated | |
| 33 | e3 - In the last four years before the date of this LOI, identify each company that has not filed a Federal file tax return in its own name (other than those identified above as part of a consolidated return). For any company that has not filed a Federal tax | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | Consolidated | The tax return was filed on an individual's Schedule C |

## Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.

See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Phillip Comer | Ray Harvey | Thomas Karnes | Tom Sams | Flat Wireless LLC | Troy Bruce | Integrated Business Networks, LLC | Clear 9 Communications, LLC |
|---|---|---|---|---|---|---|---|---|---|
| 33 | f - Describe all physical or virtual facilities and assets that are shared by one or more of the Associated Companies. Include the address of an such facily, phone # or shared resources | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | None / Parent Company | See answer in 31c |
| 33 | g - Describe any shared financial assets and obligations, including banking and credit accounts | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | None | None |
| 33 | h - List and describe all contracts or other business arrangements between or among the Associated Companies | N/A Individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) | N/A Individual | None | Payroll Services Provided by Sikut Inc. |

Footnotes:

(a) We are not Privy to the information requested of this entity to accordingly answer this question regarding this entity - this is not information within our corporate records - with the exception of where we have provided information - it is unintelligible as you are asking information that is not readily available to SI Wireless without extensive research - for the items where we do not have this information, cells have been shaded light grey

(b) REFER TO OUR RESPONSE IN 31A

(x) This identifies a positive response only for those companies we know this information for

| Question | Response | ESIRF LLC | Minghelli LLC | NTCH-West Tenn Inc. | NTCH-NM, LLC | PTA-FLA Inc. | Rural Connect LLC | Z Best Logistics, LLC |
|---|---|---|---|---|---|---|---|---|
| 31 | a - Explain the nature of and relevant dates associated with the relationship. | This company was engaged to provide RF and Microwave design services for the SCRP Program in August of 2022 pursuant to the quote(s) listed in 31 (d). | Working relationship between Minghelli and SI Wireless was an oral agreement prior to the quote being provided at time of commencement of work removing the equipment – in 2020 this company was engaged to perform decom and replacement services and to do so in accordance with the program directives. Minghelli agreed to get paid when The Company got paid. In 2022 when SI Wireless was accepted into the SCRP at that time Minghelli provided the quote(s) referenced in 31(d) and has provided subsequent quotes as needed. | This company was engaged to provide equipment for tower work, logistics and material management services, new build tower materials, and other various site work services for the SCRP Program prior to September of 2022 pursuant to the quote(s) listed in 31 (d). The working relationship prior to the quote provided was an oral agreement and NTCH West Tenn provided equipment (Cranes and Forklifts) as well as Storage facilities to SI Wireless for use for the SCRP decommissioning activities. This company also facilitates the purchase of the real estate for new build towers in a manner that does not cost SI Wireless currently as the SCRP makes no provission for such expenses. | This company was engaged to provide new build tower materials, perform solar site set ups, and perform relocation work in August of 2022 pursuant to the quote(s) listed in 31 (d). | This company is owned 21% by Leslie Williams who effectively owns 99% of SI Wireless. Leslie Williams has been an officer of this company since 2006 and is currently the President. | Leslie became interim manager of Rural Connect in October of 2021 and he became a 41% owner in June of 2022. He is also President of this company. This company is a customer of SIW since 2015. Rural Connect also provides communication site rental to the Company. | > This company was engaged to provide construction services to the company since November of 2021 pursuant to the quote(s) listed in 31 (d). |
| 31 | b - Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity. | None | None | None | None | None | None | None |
| 31 | c - A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity. | None | Much of the construction, staging, FEMA trailers moved in for lodging, Warehousing, Storage, Construction Trailers are located at 1378 N Cavalier, Alamo, TN and 170 Gardner Grove, Cedar Grove, TN. Several of SIW Vendors and Managers use the FEMA Trailers, warehouse, laydown yard, and roll off construction debris and recycling containers in a shared manner.
Also, several amongst this group have an email address ending in ClearTalk.net which we imagine causes them to share a virtual server. | None | None | None | Much of the construction, staging, FEMA trailers moved in for lodging, Warehousing, Storage, Construction Trailers are located at 1378 N Cavalier, Alamo, TN and 170 Gardner Grove, Cedar Grove, TN. Several of SIW Vendors and Managers use the FEMA Trailers, warehouse, laydown yard, and roll off construction debris and recycling containers in a shared manner.
Also, several amongst this group have an email address ending in ClearTalk.net which we imagine causes them to share a virtual server. This company also shares some offices and office functions with the Project and Construction management for this project. | None |
| 31 | d - A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity. | Quotes:
> "ESIRF001 - 20220831_ESIRF Quote to SI Wireless.pdf"
> "ESIRF002 - 20221001_ESIRF Quote to SI Wireless.pdf"
> "ESIRF002 - 20221001_ESIRF Quote to SI Wireless_Revised.pdf"
> "ESIRF003 - 20231201_ESIRF Quote to SI Wireless.pdf" | Quotes:
> "MING001 - 20221001_Minghelli - Quote to SI Wireless.pdf"
> "Minghelli - Quote - MING002 - 5.1.22.pdf"
> "Minghelli - Quote - MING003 - 6.7.22.pdf"
> "Minghelli - Quote - MING004 - 10.1.22.pdf"
> "Minghelli - Quote - MING005 - 10.1.23.pdf"
> "Minghelli - Quote - MING006 - 11.1.23.pdf"

Overall business arrangement is that companies will do work for SI Wireless as specified by the SCRP for the average rates iin the program for which they will receive an advance partial payment for services but will not receive full payment until the Company is reimbursed by the SCRP fund administrator. SI Wireless utilized multiple construction companies to mitigate risk. | Quotes:
> "NTCHWT001 - 20221001_NTCH West Tenn - Quote to SI Wireless (updated).pdf"
> "NTCHWT002 - 20221207_NTCH West Tenn - Quote to SI Wireless.pdf"
> "NTCHWT003 - NTCH West Tenn - Quote.pdf"
> "NTCHWT004 - NTCH West Tenn - Quote.pdf"
> "NTCHWT005 - 20230701_NTCH West Tenn - Quote to SI Wireless.pdf"
> "NTCHWT006 - 20231201_NTCH West Tenn - Quote to SI Wireless.pdf" | Quote:
> "NTCHNM001 - 20220831_NTCH NM - Quote to SI Wireless" | N/A | As both companies are small companies and Leslie Williams has ownership/management control in both companies many of the arrangements have not been formalized into actual documents that can be provided. Many of these arrangements have been previously described to the FCC in meetings and responses in this LOI including an arrangement for shared tower space and an arrangement for use of SIW redeployed network and a contract for 1900 MHz range extending services from April 2021 and contracts for basic phone services in commencing in 2015. | Quotes:
> "ZBST001 - Z Best Logistics - Quote 083122 - SI Wireless.pdf"
> "ZBST002 - Z Best Logistics - Quote 080123 - SI Wireless.pdf" |
| 31 | e - A description of any shared financial assets and obligations including banking and credit accounts, and tax filings. | None | None | None | None | None | None | None |

# Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | ESIRF LLC | Minghelli LLC | NTCH-West Tenn Inc. | NTCH-NM, LLC | PTA-FLA Inc. | Rural Connect LLC | Z Best Logistics, LLC |
|---|---|---|---|---|---|---|---|---|
| 32 - Provide a chart for each company identified in response to Inquiry 31 | | | | | | | | |
| 32 | Internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility) | Member - Eric Steinmann (Overall Responsibility of the Organization) 3 employees performing the following functions: RF Engineering &Modeling Microwave design Equipment Purchase Consultation | Member - Jess Minghelli 7 employees performing the following functions: Decommissioning Work Construction Construction Management US Post Office Construction and Leasing | > President - Glenn Ishihara > Secretary - Josh Austin > CFO - Linda George > No employees at this time | Managing Member - Eric Steinmann > 2 employees performing Cell Site Construction; Property Acquisition; and Leasing | > President - Leslie Williams > Secretary - Eric Steinmann PTA-FLA currently has furloughed employees and contractors because it has completed removing and decommissioned its network comprised of covered equipment and was then denied reimbursement for all that . The reason given is because PTA was not directly serving customers with a consequentially non existent network when they applied for this program. That determination is under appeal and PTA-FLA can not resume operations or replacement of its network until that appeal is resolved and it is reimbursed for amounts due it. | Leslie Williams - Managing Member & President >7 Employees performing the following functions: -Office Administrator -Front Office Assistant -Tower Climber -Tech Support Supervisor -Field Tech/Technical Support -Maintenance -Mechanic | See Footnote (a) |
| 32 | the names of all owners (and percentage of ownership or membership interest) | 100% beneficially owned by The CHEERS Trust 100% Nominally owned by Eric Steinmann | 50% Ally Finance; 25% Arie Bos; 25% Jess Minghelli | 100% owned by NTCH, Inc. | 100% owned by Eric Steinmann | NTCH, Inc. - 58.588% Eric Steinmann - 19.032% Heinz Steinmann - 0.500% Daniel B. Steinmann - 0.025% Dogan Koslu - 0.615% Tao Ma - 0.060% Mark Ted Freeman - 0.005% John Rogers - 0.030% Kim Bourne - 0.010% Lee Scarborough III - 0.040% Ty-Teyona Oree - 0.005% Diana Rivera - 0.015% Alma Rodriguez - 0.015% Tatiana Laurent - 0.025% Samantha Olson 0.010% Sara Sanchez - 0.005% Joanna Burnside - 0.015% Jeffery Thomas - 0.005% Leslie Williams - 21.00% | Linda George - 10.00% Eva Miller - 0.06% Charley Karnes - 5.84% Dave Sherrod - 0.44% Philip Comer - 1.46% Christina Raab - 1.17% Floyd Rogers - 1.46% Justin Tefft - 0.28% Kevin Harmon - 1.17% Tyler Mansfield - 1.17% Heinz H. Steinmann - 16.14% Vincent J. Mancuso - 4.48% Randy Zachary - 0.15% David Steinmann - 0.22% Daniel Steinmann - 0.20% Jordan Steinmann - 0.20% Taylor Steinmann - 0.20% Kayla Steinmann - 0.10% Eric Steinmann Jr. - 0.10% John Steinmann - 1.21% Larry Postaer 9.53% Heinz Steinmann, Jr. - 2.42% Larry Christensen - 0.23% Luth Hedlebaugh - 0.03% George Keene - 0.28% Thomas E. Bozzo - 0.03% Don Likeness - 0.25% Lance Steinmann - 0.28% Leslie Williams - 41.00% | See Footnote (a) |
| 32 | identify all directors or board members (including addresses and telephone numbers) | None | None | Glenn Ishihara; 8850 W Desert Inn Rd. #107 Las Vegas, 89117; 949-300-0050 | None | Leslie Williams; 2417 20th St. Lubbock, TX 79407; 806-444-1375 Eric Steinmann; 10108 Leisure Lane. Jacksonville, Fl 32256; 803-363-6363 | Mike Kitto/Sunset Records Management, LLC; 1378 N Cavalier Dr. Alamo, TN 38001 731-668-3042 | See Footnote (a) |

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | ESIRF LLC | Minghelli LLC | NTCH-West Tenn Inc. | NTCH-NM, LLC | PTA-FLA Inc. | Rural Connect LLC | Z Best Logistics, LLC |
|---|---|---|---|---|---|---|---|---|
| 32 | Identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity) | Manager - Scott Ahern<br><br>> Trustee of CHEERS Trust - Joe Sofio | Manager - Jess Minghelli<br><br>Subcontractors<br>JHC Construction<br>Hornsby Electric<br>Sikut Inc (Electrical)<br>Ramm Fencing<br>Flat Wireless<br>BT Redimix<br>Anthem Anchor Bolts<br>Southeastern Reinforcing<br>Southern Concrete | Manager - Linda George<br><br>Subcontractors<br>TES<br>World Tower<br>Various Tower Vendors | Manager - Eric Steinmann | Manager Les Williams<br><br>No Contractors at Present | Manager Les Williams<br>Manager (interim) - Mike Kitto/Sunset Records Management, LLC<br><br>Subcontractors<br>See Supporting Document -"Rural Connect Vendor List.xls" | See Footnote (a) |
| 32 | Identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual | Lutti Heidlebaugh performs office accounting and check payment to many of the other companies and some of the individuals from time to time.<br><br>This company also uses the tax preparation services of Joe Sofio who provides these services to several of the other companies | Lutti Heidlebaugh performs office accounting and check payment to many of the other companies and some of the individuals from time to time.<br><br>This company also uses the tax preparation services of Joe Sofio who provides these services to several of the other companies | None | Lutti Heidlebaugh performs office accounting and check payment to many of the other companies and some of the individuals from time to time.<br><br>This company also uses the tax preparation services of Joe Sofio who provides these services to several of the other companies | Leslie Williams common owner/manager | Leslie Williams common owner/manager | See Footnote (a) |

each Associated Company, answer the

| Question | Response | ESIRF LLC | Minghelli LLC | NTCH-West Tenn Inc. | NTCH-NM, LLC | PTA-FLA Inc. | Rural Connect LLC | Z Best Logistics, LLC |
|---|---|---|---|---|---|---|---|---|
| 33 | a - The headquarters and/or business address of each company | PO Box 1976<br>Wrightwood, CA 92397 | PO Box 1976<br>Wrightwood, CA 92397 | 3354 Huntertown Rd<br>Versailles, KY 40383 | PO Box 1976<br>Wrightwood, CA 92397 | PO Box 8839<br>Columbia, SC 29202 | 1378 N. Cavalier Dr.<br>Alamo, TN 38001 | 3471 Shepard Rd.<br>Aubrey, Texas 76227 |
| 33 | b1 - State of Incorporation | Delaware | Mississippi | Tennessee | New Mexico | Florida | Tennessee | See Footnote (a) |
| 33 | b2 - States authorized to do business | Delaware | Mississippi; Tennessee | Tennessee | New Mexico; Texas | Florida; South Carolina | Tennessee | See Footnote (a) |
| 33 | b3 - Fictitious Names /dba | None | None | None | None | None | None | See Footnote (a) |
| 33 | c - Identify the persons responsible for incorporating or otherwise creating each company and the relationship of such persons to the companies they incorporated or otherwise created (e.g., ownership interest, member, board member, officer, etc.). | Eric Steinmann - Nominal not beneficial owner | Jess Minghelli - Owner | NTCH, Inc - Owner | Josh Austin - no current relationship | Peter T Akemann - no current relationship | Unknown - Believed to be Matthew Abernathy | See Footnote (a) |
| 33 | d - Explain the nature of and relevant dates associated with the relationship. If the relationship comprises a transaction or series of transactions, identify the transactions and the dates or date range of such transactions | Handle the design of all network radio elements including disparate base stations, backhaul, zoning presentations and support.<br><br>See footnote (b) | Accomplish work needed on this build not done by the other two major contractors.<br><br>See footnote (b) | Handle overall logistics, material management, storage space, and support with crane and forklift services during decommissioning. Has purchased land when needed to build additional towers when Colocation options were not available or feasible.<br><br>See footnote (b) | A vendor for towers, installation materials, and solar site engineering and supplies.<br><br>See footnote (b) | See footnote (b) | See footnote (b) | To move the decommissioned equipment through destruction and recycling in accordance with FCC guidance, and to acquire and manage the delivery and staging of materials for the network reconstruction.<br><br>See footnote (b) |
| 33 | e1 - From 2019 to the present, state whether any of the Associated Companies filed consolidated Federal tax returns and, if so, identify which companies did so | None | None | None | None | None | None | See Footnote (a) |
| 33 | e2 - In the last four years before the date of this LOI, identify each company that files Federal tax returns (other than consolidated returns) in its own name | | x | x | | x | x | See Footnote (a) |
| 33 | e3 - In the last four years before the date of this LOI, identify each company that has not filed a Federal file tax return in its own name (other than those identified above as part of a consolidated return). For any company that has not filed a Federal tax | The tax return was filed on an individual's Schedule C | | | The tax return was filed on an individual's Schedule C | | | See Footnote (a) |

## Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | ESRF LLC | Minghelli LLC | NTCH-West Tenn Inc. | NTCH-NM, LLC | PTA-FLA Inc. | Rural Connect LLC | Z Best Logistics, LLC |
|---|---|---|---|---|---|---|---|---|
| 33 | f - Describe all physical or virtual facilities and assets that are shared by one or more of the Associated Companies. Include the address of an such facily, phone # or shared resources | See answer in 31c | See answer in 31c | See answer in 31c | See answer in 31c | See answer in 31c | See answer in 31c | See Footnote (a) |
| 33 | g - Describe any shared financial assets and obligations, including banking and credit accounts | None | None | None | None | None | None | See Footnote (a) |
| 33 | h - List and describe all contracts or other business arrangements between or among the Associated Companies | None | Payroll Services Provided by Sikut Inc. | Arrangement between NTCH West Tenn and Rural Connect to use facilities provided to both Rural Connect and SI Wireless | None | None | Arrangement between NTCH West Tenn and Rural Connect to use facilities provided to both Rural Connect and SI Wireless. | See Footnote (a) |

**Footnotes:**

(a) We are not Privy to the information requested of this entity to accordingly answer this question regarding this entity - This is not information within our corporate records - with the exception of where we have provided information - it is unintelligible as you are asking information that is not readily available to SI Wireless without extensive research - for the items where we do not have this information, cells have been shaded light grey

(b) REFER TO OUR RESPONSE IN 31A

(x) This identifies a positive response only for those companies we know this information for

of our ability based on information readily available to us. Any omission of information has been inadvertent.

See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Sikut, Inc. | Business Solutions, LLC | Hardrock Enterprises, LLC | MiTawn Services | Koslu LLC | Sparqworx | MLC Strategies, LLC | Fisher Telecommunications |
|---|---|---|---|---|---|---|---|---|---|
| 31 | a - Explain the nature of and relevant dates associated with the relationship. | Working relationship between Sikut, Inc and SI Wireless was an oral agreement prior to the quote being provided at time of commencement of work removing the equipment – in 2020 this company was engaged to perform decom and replacement services and to do so in accordance with the program directives. Sikut Inc agreed to get paid when The Company got paid. In 2022 when SI Wireless was accepted into the SCRP at that time Sikut Inc provided the quote(s) referenced in 31(d) and has provided subsequent quotes as needed. This company also provides electrical services to SIW as it is a licensed electrical contractor. | > Entered into Agreement with SI Wireless in August of 2022 to help with Construction Management for the SCRP Program. They ceased working on this project in October of 2022. Managing Member Vince Hall was a former employee at SI Wireless | > Entered into Agreement with SI Wireless in August of 2022 to help with Construction Management for the SCRP Program. They ceased working on this project in July of 2023. Managing Member Mike Jaksich was a former employee / CTO at SI Wireless | This company was engaged to perform and direct all due diligence and permitting services for raw land sites, and all leasing activities on all sites for the SCRP Program since October of 2022 pursuant to the quote(s) listed in 31 (d). | This company was engaged to develop software and firmware platforms for the core network since November of 2022 pursuant to the quote(s) listed in 31 (d). | This company was engaged to be a provider for all replacment RAN equipment and certain installation and core network equipment and materials since May of 2022 pursuant to the quote(s) listed in 31 (d). | Provider of Consulting Services of Former FCC commissioner Mignon Clyburn needed to facilitate payments to SIW under the SCRP Program since February of 2023 | This company was engaged to perform site acquisition services for new build sites since August of 2022 |
| 31 | b - Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity. | None | None | None | None | None | None | None | None |
| 31 | c - A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity. | Much of the construction, staging, FEMA trailers moved in for lodging, Warehousing, Storage, Construction Trailers are located at 1378 N Cavalier, Alamo, TN and 170 Gardner Grove, Cedar Grove, TN. Several of SIW Vendors and Managers use the FEMA Trailers, warehouse, laydown yard, and roll off construction debris and recycling containers in a shared manner. Also, several amongst this group have an email address ending in ClearTalk.net which we imagine causes them to share a virtual server. | None | None | Much of the construction, staging, FEMA trailers moved in for lodging, Warehousing, Storage, Construction Trailers are located at 1378 N Cavalier, Alamo, TN and 170 Gardner Grove, Cedar Grove, TN. Several of SIW Vendors and Managers use the FEMA Trailers, warehouse, laydown yard, and roll off construction debris and recycling containers in a shared manner. Also, several amongst this group have an email address ending in ClearTalk.net which we imagine causes them to share a virtual server. | None | Various person from this company have used the FEMA for lodging | None | None |
| 31 | d - A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity. | Quotes:<br>> "SKT001 - Sikut, Inc.pdf"<br>> "SKT002 - Sikut, Inc.pdf"<br>> "SKT003 - Sikut, Inc.pdf"<br>> "SKT004 - Sikut, Inc.pdf"<br>> "SKT005 - Sikut, Inc.pdf"<br><br>Overall business arrangement is that companies will do work for SI Wireless as specified by the SCRP for the average rates in the program for which they will receive an advance partial payment for services but will not receive full payment until the Company is reimbursed by the SCRP fund administrator. SI Wireless utilized multiple companies to mitigate risk. | Contract:<br>> "FE Service Agreement SIW and Vince Hall (Business Solutions LLC).pdf" | Contract:<br>> "FE Service Agreement SIW and Hardrock Enterprises.pdf" | Quotes:<br>> "Mitawn Inc - Quote - MS001 - 1.1.23.pdf"<br>> "MiTawn Quote MT-002_REVISED.pdf" | Quotes:<br>> "Koslu LLC - Quote - 2211.pdf"<br>> "Koslu LLC - Quote - 2023-001.pdf"<br>> "Koslu LLC - Quote - 2023-002.pdf"<br>> "Quote 2023-006_SI Wireless Koslu LLC 20230828.pdf"<br>> "Quote 2023-007_SI Wireless Koslu LLC 20230828.pdf" | Quotes:<br>> "Sparqworx, LLC Quote 20220519-001.pdf"<br>> "SPARQWORX QUOTE - 20220807-002.pdf"<br>> "Sparqworx - Quote - 20221212-001 Rev.pdf"<br>> "Sparqworx - Quote - 1002.pdf"<br>> "Sparqworx - Quote - 1003.pdf"<br>> "Sparqworx - Quote - 20230511-001 S.11.23.pdf"<br>> "Sparqworx,LLC Quote_SI Wireless_20230718-001.pdf"<br>> "Sparqworx,LLC Quote_SI Wireless_20230719-001.pdf"<br>> "Sparqworx,LLC Quote_SI Wireless_20231009-600_Qng 23 Sites-Corrected.pdf"<br>> "20231101_Sparqworx Quote.pdf" | Contract/Supplemental Detail:<br>> "FE Engagement Letter - MLC Strategies, LLC.pdf"<br>> "MLC Strategies Invoice 252 Supplemental Details.pdf"<br>> "MLC Strategies Invoice 261 Supplemental Details.pdf" | Contract/Quote:<br>< "FE Service Agreement SIW and Fisher Telecom (executable version) final rev 1.pdf"<br>> "Fisher - Quote - 2201.pdf" |
| 31 | e - A description of any shared financial assets and obligations including banking and credit accounts, and tax filings. | None | None | None | None | None | None | None | None |

APP 121

# Question 31 - 33 Grid

The answers contained herein are being provided to the best
of our ability based on information readily available to us. Any
omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting
contained herein

| Question | Response | Sikut, Inc. | Business Solutions, LLC | Hardrock Enterprises, LLC | MITown Services | Koslu LLC | Sparqworx | MLC Strategies, LLC | Fisher Telecommunications |
|---|---|---|---|---|---|---|---|---|---|
| 32 - Provide a chart for each company identified in response to Inquiry 31 | | | | | | | | | |
| 32 | internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility) | Dave Sikut - Vice President & Foreman<br>Adila Aguilar - President, Consultant<br>Linda George - Chief Financial Officer<br>Lutti Heidlebaugh - Secretary<br>(4) employees - Construction Work and Construction Management | See Footnote (a) | See Footnote (a) | > President - Mike Feigenbaum<br>> Vice President - Jorge Valdez<br><br>>4 employees performing the following:<br>Administration<br>Site Acquisition<br>Site Due Diligence<br>Environmental Clearance<br>Tribal Clearance<br>FAA Clearance<br>Permitting and Zoning<br>Lease Negotiations<br>Site Engineering | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 32 | the names of all owners (and percentage of ownership or membership interest) | [illegible list of names and percentages] | See Footnote (a) | See Footnote (a) | Michael Feigenbaum - 33%<br>Tanya Cintron - 9%<br>Pamela Evans - 2%<br>Jorge Valdez - 10%<br>Victor Gillespie - 7%<br>Paula Nowell - 6%<br>The CHEERS Trust - beneficial 33%<br>(Eric Steinmann - nominal 33%) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 32 | identify all directors or board members (including addresses and telephone numbers) | Adilia Aguilar, Chairman/President<br>121 Vista Pl. Venice, CA 90291<br>310-613-0261<br><br>Dave Sikut, Vice President<br>125 Providence Dr, Medina, TN 38355<br>803-479-9427<br><br>Lutti Heidlebaugh, Secretary<br>PO Box 1198, Wrightwood, CA 92397 | See Footnote (a) | See Footnote (a) | Mike Feigenbaum - President; 467 S 1st Avenue Yuma, AZ 85364; 303 748-2714<br><br>Jorge Valdez - VP; 37 E 2nd St., Ste 1 PMB 452 Calexico, CA 92231; 011 52 686 211 11 50 | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein.

| Question | Response | Sikut, Inc. | Business Solutions, LLC | Hardrock Enterprises, LLC | MiTawn Services | Koslu LLC | Sparqworx | MLC Strategies, LLC | Fisher Telecommunications |
|---|---|---|---|---|---|---|---|---|---|
| 32 | Identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity) | Manager - Adina Aguiar<br><br>Subcontractors<br>Bolding Trucking LLC<br>BT Redi -Mix Inc. (SEMO)<br>Century Equipment Company<br>Clark Crane LLC<br>Davis Brother Tree Service, Inc.<br>First Kutz, LLC<br>Heritage Fence, Inc.<br>JHC Construction, LLC<br>Ramm Fencing, LLC<br>SDT Contractors, Inc.<br>Southeastern Reinforcing Inc<br>Star Concrete Pumping Co.<br>Tower Engineering Solutions, LLC<br>United Rental | See Footnote (a) | See Footnote (a) | Manager Mike Feigenbaum<br><br>Subcontractors<br>Partner Engineering Services<br>Various soil engineers<br>Various Surveyors<br>Fisher Telecommunications<br>Construction Materials Lab<br>Congruex | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 32 | Identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual | Dave Sikut provides electrical work for Minghelli, Clear 9, and Rural Connect. He also provides Construction Management services to SI Wireless.<br><br>Lutti Heidlebaugh performs office accounting and check payment to many of the other companies and some of the individuals from time to time. | See Footnote (a) | See Footnote (a) | Lutti Heidlebaugh performs office accounting and check payment to many of the other companies and some of the individuals from time to time.<br><br>This company also uses the tax preparation services of Joe Sofio who provides these services to several of the other companies | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |

each Associated Company, answer the

| Question | Response | Sikut, Inc. | Business Solutions, LLC | Hardrock Enterprises, LLC | MiTawn Services | Koslu LLC | Sparqworx | MLC Strategies, LLC | Fisher Telecommunications |
|---|---|---|---|---|---|---|---|---|---|
| 33 | a - The headquarters and/or business address of each company | 170 Gardner Rd<br>Cedar Grove, TN 38321 | 1000 Canby Trace Dr.<br>Thompson's Station, TN 37179 | 12582 N. Hardrock Circle<br>Hayward, WI 54843 | 467 S 1st Avenue<br>Yuma, AZ 85354 | 224 Redlands St<br>Playa Del Rey, CA 90293 | PO Box 580<br>Abernathy, TX 79311 | 350 G Street SW N505<br>Washington, DC 20024 | PO Box 560<br>Wrightwood, CA 92397 |
| 33 | b1 - State of Incorporation | Illinois | See Footnote (a) | See Footnote (a) | Missouri | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 33 | b2 - States authorized to do business | Illinois; Tennessee | See Footnote (a) | See Footnote (a) | Missouri; Tennessee | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 33 | b3 - Fictitious Names /dba | None | See Footnote (a) | See Footnote (a) | None | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 33 | c - Identify the persons responsible for incorporating or otherwise creating each company and the relationship of such persons to the companies they incorporated or otherwise created (e.g., ownership interest, member, board member, officer, etc.). | Eric Steinmann - No Current Relationship | See Footnote (a) | See Footnote (a) | Eric Steinmann -Nominal not beneficial Owner | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 33 | d - Explain the nature of and relevant dates associated with the relationship. If the relationship comprises a transaction or series of transactions, identify the transactions and the dates or date range of such transactions | Has done and will do a substantial portion of the decommissioning work, the rebuilding work and to do all the electrical work and pull electrical permits for the whole project.<br><br>See footnote (b) | To get the advantage of experience with the sites being replaced; Vinces company was contracted to handle the logistics for the crews doing decom work in the Eastern part of the network.<br><br>See footnote (b) | To provide a back up to Eric Steinmann for overall project management. To interface with equipment and tower vendors and to oversee the backhaul procurement on the project.<br><br>See footnote (b) | Site acquisition, development, construction readiness, and landlord negotiations related to co-location sites.<br><br>See footnote (b) | Engaged to write billing and customer management special feature software and to help integrate with the new core components.<br><br>See footnote (b) | This is a reseller we buy our equipment through that provides added knowledge, contacts and follow through from someone who is abreast of the different offerings from different suppliers and knows our operations from experience.<br><br>See footnote (b) | See footnote (b) | Performs site acquisition services.<br><br>See footnote (b) |
| 33 | e1 - From 2019 to the present, state whether any of the Associated Companies filed consolidated Federal tax returns and, if so, identify which companies did so | None | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 33 | e2 - In the last four years before the date of this LOI, identify each company that files Federal tax returns (other than consolidated returns) in its own name | x | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 33 | e3 - In the last four years before the date of this LOI, identify each company that has not filed a Federal file tax return in its own name (other than those identified above as part of a consolidated return). For any company that has not filed a Federal tax | | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |

APP 122

# Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Sikur, Inc. | Business Solutions, LLC | Hardrock Enterprises, LLC | MITown Services | Kozlu LLC | Sparqworx | MLC Strategies, LLC | Fisher Telecommunications |
|---|---|---|---|---|---|---|---|---|---|
| 33 | f - Describe all physical or virtual facilities and assets that are shared by one or more of the Associated Companies. Include the address of an such facily, phone # or shared resources | See answer in 31c | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 33 | g - Describe any shared financial assets and obligations, including banking and credit accounts | None | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |
| 33 | h - List and describe all contracts or other business arrangements between or among the Associated Companies | Provides Payroll Services to Clear 9 and Minghelli which is then reconciled and reimbursed bi-annually. | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) |

Footnotes:

(a) We are not Privy to the information requested of this entity to accordingly answer this question regarding this entity - this is not information within our corporate records - with the exception of where we have provided information - it is unintelligible as you are asking information that is not readily available to SI Wireless without extensive research - for the items where we do not have this information, cells have been shaded light grey

(b) REFER TO OUR RESPONSE IN 31A

(x) This identifies a positive response only for those companies we know this information for

of our ability based on information readily available to us. Any
omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting
contained herein

| Question | Response | Tower Engineering Solutions, LLC | Barrett Browning, LLC | Partner Engineering & Science, Inc. | Marahute Mechanics | Solano Communications, LLC | World Tower | Socratica Consulting, LLC | Good Works Digital, LLC |
|---|---|---|---|---|---|---|---|---|---|
| 31 | a - Explain the nature of and relevant dates associated with the relationship. | This company was engaged to perform tower and mount engineering services fo the SCRP Program since March of 2023 pursuant to the quote(s) listed in 31 (d). | Entered into Agreement with SI Wireless in June of 2023 to help with Project Management Billing and RFI Responses as related to the SCRP Program | This company was engaged to perform Environmental Review and compliance consultant services related to New build sites since October of 2022 pursuant to the quote(s) listed in 31 (d). | This company was engaged to perform drone services for the SCRP Program since August of 2022 pursuant to the quote(s) listed in 31 (d). | This company was engaged to provide billing consultant services to the SCRP Program since November of 2022 pursuant to the quote(s) listed in 31 (d). | This company was engaged to provide Towers to the Company for new Build sites since February of 2023 pursuant to the quote(s) listed in 31 (d). | Entered into Agreement with SI Wireless in August of 2023 to help with Project Management as related to the status and tracking of documentation within the Company File Program of work performed by Vendors for the SCRP Program. | Entered into Agreement with SI Wireless in June of 2023 to help with Project Management of Billing and RFI Responses as related to the SCRP Program. |
| 31 | b - Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity. | None | None | None | None | None | None | None | None |
| 31 | c - A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity. | None | None | None | Uses shared FEMA Trailers when working in market. | None | None | None | None |
| 31 | d - A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity. | Quote: > "TES - Quote - 230518 - 3.5.23.pdf" | Contracts: > "FE Service Agreement SIW and Barrett Browning LLC (Shawn Capistrano).pdf" > "Service Agreement SIW and Barrett Browning LLC (Shawn Capistrano) 2nd Amendment.pdf" | Quotes: > "Partner - Quote - 22-389269 - 10.13.22.pdf" > "Partner - Quote - 23-398140 - 2.14.23.pdf" | Quotes: > "MM001 - Marahute Mechanics - Quote.pdf" > "MM002 - Marahute Mechanics - Quote.pdf" | Quote: > "Solano Communications SCRP_SI Wireless_Reimbursement;PM_Esti mate 1233.pdf" | Quotes: > "World Tower - Quote - 23-0054 - 2.28.23.pdf" > "World Tower - Quote - 23-0055 - 2.13.23.pdf" > "World Tower - Quote - 23-0065 - 2.28.23.pdf" > "World Tower - Quote - 23-0066 - 2.28.23.pdf" > "World Tower - Quote - 23-0067 - 2.28.23.pdf" > "World Tower - Quote - 23-0159 - 5.24.23.pdf" | Quote: > "Service Agreement SIW and Socratica Consulting LLC (Rebecka Nelson).pdf" | Contracts: > "Service Agreement SIW and Good Works Digital LLC (Pamala Capistrano).pdf" > "Service Agreement SIW and Good Works Digital LLC (Pamala Capistrano) Amendment 1.pdf" > "Service Agreement SIW and Good Works Digital LLC (Pamala Capistrano) 2nd Amendment.pdf" |
| 31 | e - A description of any shared financial assets and obligations including banking and credit accounts, and tax filings. | None | None | None | None | None | None | None | None |

APP 124

# Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Tower Engineering Solutions, LLC | Barrett Browning, LLC | Partner Engineering & Science, Inc. | Marshuts Mechanics | Solano Communications, LLC | World Tower | Socratica Consulting, LLC | Good Works Digital, LLC |
|---|---|---|---|---|---|---|---|---|---|
| **32 - Provide a chart for each company identified in response to Inquiry 31** | | | | | | | | | |
| 32 | internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility) | See Footnote (a) | Single Member LLC | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | Single Member LLC |
| 32 | the names of all owners (and percentage of ownership or membership interest) | See Footnote (a) | Shawn Capistrano 100% | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | Scott Capistrano 50% Pamala Capistrano 50% |
| 32 | identify all directors or board members (including addresses and telephone numbers) | See Footnote (a) | Shawn Capistrano 2030 W Baseline Rd #182-1329 Phoenix, AZ 85041 626-643-0437 | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | Scott Capistrano 661-753-7903 Pamala Capistrano 928-985-0207 4722 Budsage Ct Prescott, AZ 86301 |

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein.

| Question | Response | Tower Engineering Solutions, LLC | Barrett Browning, LLC | Partner Engineering & Science, Inc. | Marahune Mechanics | Solano Communications, LLC | World Tower | Socratica Consulting, LLC | Good Works Digital, LLC |
|---|---|---|---|---|---|---|---|---|---|
| 32 | Identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity) | See Footnote (a) | None | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | N/A |
| 32 | Identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual | See Footnote (a) | None | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | None |

each Associated Company, answer the

| Question | Response | Tower Engineering Solutions, LLC | Barrett Browning, LLC | Partner Engineering & Science, Inc. | Marahune Mechanics | Solano Communications, LLC | World Tower | Socratica Consulting, LLC | Good Works Digital, LLC |
|---|---|---|---|---|---|---|---|---|---|
| 33 | a - The headquarters and/or business address of each company | 1320 Greenway Dr, Ste. 600 Irving, TX 75038 | 2030 W Baseline Rd #182-1329 Phoenix, AZ 85041 | P.O. Box 207428 Dallas, TX 75320-7428 | 16360 Teton St Victorville, CA 92395 | 833 SW Lemans Ln, #213 Lee's Summit, MO 64082 | 1213 Compressor Drive PO Box 508 Mayfield KY 42066-0031 | 6611 South Willowridge Lane Rogers, AR 72758 | 4722 Budsage Ct Prescott, AZ 86301 |
| 33 | b1 - State of incorporation | See Footnote (a) | Wyoming | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | Wyoming 2021 - [Originally California 2017] |
| 33 | b2 - States authorized to do business | See Footnote (a) | N/A | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | N/A |
| 33 | b3 - Fictitious Names /dba | See Footnote (a) | None | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | None |
| 33 | c - Identify the persons responsible for incorporating or otherwise creating each company and the relationship of such persons to the companies they incorporated or otherwise created (e.g., ownership interest, member, board member, officer, etc.) | See Footnote (a) | Shawn Capistrano - Single Member LLC | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | Sott Capistrano - Single Member LLC |
| 33 | d - Explain the nature of and relevant dates associated with the relationship. If the relationship comprises a transaction or series of transactions, identify the transactions and the dates or date range of such transactions | See footnote (b) | Contracted to provide help with the billing and RFI Responses for the SCRP Program. See footnote (b) | EPA, NEPA and phase 1 reports. See footnote (b) | Tower mapping, RF mapping and other drone service. See footnote (b) | See footnote (b) | See footnote (b) | Contracted to provide help with the billing and organization of documentation of work performed for the SCRP Program. See footnote (b) | Contracted June 2023 to provide help with the billing and RFI Responses for the SCRP Program. See footnote (b) |
| 33 | e1 - From 2019 to the present, state whether any of the Associated Companies filed consolidated Federal tax returns and, if so, identify which companies did so | See Footnote (a) | N/A | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | N/A |
| 33 | e2 - In the last four years before the date of this LOI, identify each company that files Federal tax returns (other than consolidated returns) in its own name | See Footnote (a) | | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | |
| 33 | e3 - In the last four years before the date of this LOI, identify each company that has not filed a Federal file tax return in its own name (other than those identified above as part of a consolidated return). For any company that has not filed a Federal tax | See Footnote (a) | The tax return was filed on an individual's Schedule C | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | The tax return was filed on an individual's Schedule C |

## Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.

See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Tower Engineering Solutions, LLC | Barrett Browning, LLC | Partner Engineering & Science, Inc. | Marahuta Mechanics | Solano Communications, LLC | World Tower | Socretica Consulting, LLC | Good Works Digital, LLC |
|---|---|---|---|---|---|---|---|---|---|
| 33 | f - Describe all physical or virtual facilities and assets that are shared by one or more of the Associated Companies. Include the address of an such facily, phone # or shared resources | See Footnote (a) | None | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | None |
| 33 | g - Describe any shared financial assets and obligations, including banking and credit accounts | See Footnote (a) | None | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | None |
| 33 | h - List and describe all contracts or other business arrangements between or among the Associated Companies | See Footnote (a) | None | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | See Footnote (a) | None |

Footnotes:

(a) We are not Privy to the information requested of this entity to accordingly answer this question regarding this entity - this is not information within our corporate records - with the exception of where we have provided information - it is unintelligible as you are asking information that is not readily available to SI Wireless without extensive research - for the items where we do not have this information, cells have been shaded light grey

(b) REFER TO OUR RESPONSE IN 32A

(x) This identifies a positive response only for those companies we know this information for

of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein.

| Question | Response | Greywolves | SI Wireless, LLC | Diemer CPA, LLC | Womble Bond Dickinson LLP | David Selzer | Inet South, LLC | Jack Cathey | JHC Construction, LLC | Natalie Lopiccolo |
|---|---|---|---|---|---|---|---|---|---|---|
| 31 | a - Explain the nature of and relevant dates associated with the relationship. | This company was engaged to provide various Core network equipment since November of 2023 pursuant to the quote(s) listed in 31 (d). | Self/"The Company" | This company was engaged to perform audit, business consulting, and project management services for the SCRP Program since November of 2021. | This firm was hired as SI Wireless' legal counsel for matters relating to the SCRP Program since November of 2021 | He was engaged to perform spectrum leasing/purchasing negotiations for the SCRP Project in July of 2024 pursuant to the quote(s) listed in 31 (d). | Entered into Agreement with SI Wireless in December of 2023 to help with Project Management for the SCRP Program | Entered into Agreement with SI Wireless in May of 2024 to help with Project Management backhaul services for the SCRP Program | This company was engaged to perform Construction Management services for the SCRP Program in October of 2023 pursuant to the quote(s) listed in 31 (d). However due to the number of sites simultaneously being worked on it was determined that JHC would perform construction work as a subcontractor under several of the contractors and provide Construction Management Services directly to SI Wireless. | Entered into Agreement with SI Wireless in November of 2021 to help with Project Management for the SCRP Program |
| 31 | b - Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity. | None | Self/"The Company" | None | None | None | None | None | None | None |
| 31 | c - A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity | None | Self/"The Company" | None | None | None | None | None | Various personnel from this company use shared lodging and FEMA trls and park their vehicles at the laydown yards. | None |
| 31 | d - A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity. | Quotes:<br>> "Greywolves_SI Wireless QUO16102_REVISED.pdf"<br>> "Greywolves_SI Wireless QUO16103_Revised.pdf"<br>> "Greywolves_SI Wireless QUO16104.pdf" | Oral agreements with Rural Connect, Ken Tenn, and DTC? | Contracts:<br>> "Engagement Letter - Diemer CPA LLC - 1.7 - SI Wireless.pdf"<br>> "Diemer - Amendment 001 - Engagement Letter - SI Wireless - signed 090122.pdf" | Contract:<br>> "Womble Signed Engagement Letter.pdf" | Quote:<br>> "David Selzer- Quote - DSelz-01 - 7.1.24.pdf" | Contract:<br>> "FE Service Agreement SIW and Inet South LLC.pdf" | Contract:<br>> "FINAL Service Agreement SIW and Jack Cathey 2024-0_240627_133833.pdf" | Quote:<br>> "JHC - Quote - JHCI24165 2.pdf" | Contract:<br>> "FE Service Agreement SIW and Natalie Lopiccolo.pdf" |
| 31 | e - A description of any shared financial assets and obligations including banking and credit accounts, and tax filings. | None | Self/"The Company" | None | None | None | None | None | None | None |

APP 129

## Question 31 - 33 Grid

The answers contained herein are being provided to the best
of our ability based on information readily available to us. Any
omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting
contained herein

| Question | Response | Greywolves | SI Wireless, LLC | Diemer CPA, LLC | Womble Bond Dickinson LLP | David Salzer | Inet South, LLC | Jack Carthey | JHC Construction, LLC | Natalie Lopiccolo |
|---|---|---|---|---|---|---|---|---|---|---|
| 32 - Provide a chart for each company identified in response to Inquiry 31 | | | | | | | | | | |
| 32 | internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility) | See Footnote (a) | > Leslie Williams President and Managing Member - Provides overall management of the business | See Footnote (a) | See Footnote (a) | N/A individual | See Footnote (a) | N/A individual | See Footnote (a) | N/A individual |
| 32 | the names of all owners (and percentage of ownership or membership interest) | See Footnote (a) | 100% Owned by Integrated Business Networks, LLC | See Footnote (a) | See Footnote (a) | N/A individual | See Footnote (a) | N/A individual | See Footnote (a) | N/A individual |
| 32 | identify all directors or board members (including addresses and telephone numbers) | See Footnote (a) | Self/"The Company" | See Footnote (a) | See Footnote (a) | N/A individual | See Footnote (a) | N/A individual | See Footnote (a) | N/A individual |

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein.

| Question | Response | Greywolves | SI Wireless, LLC | Diemer CPA, LLC | Womble Bond Dickinson LLP | David Sebar | Inet South, LLC | Jack Cathey | JHC Construction, LLC | Natalie Lopiccolo |
|---|---|---|---|---|---|---|---|---|---|---|
| 32 | Identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity) | See Footnote (a) | Self/"The Company" | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |
| 32 | Identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual | See Footnote (a) | Self/"The Company" | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |

each Associated Company, answer the

| Question | Response | Greywolves | SI Wireless, LLC | Diemer CPA, LLC | Womble Bond Dickinson LLP | David Sebar | Inet South, LLC | Jack Cathey | JHC Construction, LLC | Natalie Lopiccolo |
|---|---|---|---|---|---|---|---|---|---|---|
| 33 | a - The headquarters and/or business address of each company | 3211 Internet Blvd. Suite 300 Frisco TX 75034 | Self/"The Company" - Not an associated company | 1546 N. Orleans St. #601 Chicago, IL 60610 | 2001 K Street, NW Suite 400 South Washington, D.C. 20006 | N/A Individual | 196 CR 325 Corinth, TN 38834 | N/A Individual | 18501 Collier Ave, Suite A-100 Lake Elsinore, CA 92530 | N/A Individual |
| 33 | b1 - State of Incorporation | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |
| 33 | b2 - States authorized to do business | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |
| 33 | b3 - Fictitious Names /dba | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |
| 33 | c - Identify the persons responsible for incorporating or otherwise creating each company and the relationship of such persons to the companies they incorporated or otherwise created (e.g., ownership interest, member, board member, officer, etc.). | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |
| 33 | d - Explain the nature of and relevant dates associated with the relationship. If the relationship comprises a transaction or series of transactions, identify the transactions and the dates or date range of such transactions | See footnote (b) | Self/"The Company" - Not an associated company | See footnote (b) | See footnote (b) | N/A Individual | See footnote (b) | N/A Individual | See footnote (b) | N/A Individual |
| 33 | e1 - From 2019 to the present, state whether any of the Associated Companies filed consolidated Federal tax returns and, if so, identify which companies did so | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |
| 33 | e2 - In the last four years before the date of this LOI, identify each company that files Federal tax returns (other than consolidated returns) in its own name | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |
| 33 | e3 - In the last four years before the date of this LOI, identify each company that has not filed a Federal file tax return in its own name (other than those identified above as part of a consolidated return). For any company that has not filed a Federal tax | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |

# Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.

See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Greywolves | SI Wireless, LLC | Diemer CPA, LLC | Womble Bond Dickinson LLP | David Setzer | Inet South, LLC | Jack Cathey | JHC Construction, LLC | Natalie Lopiccolo |
|---|---|---|---|---|---|---|---|---|---|---|
| 33 | f - Describe all physical or virtual facilities and assets that are shared by one or more of the Associated Companies. Include the address of an such facily, phone # or shared resources | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |
| 33 | g - Describe any shared financial assets and obligations, including banking and credit accounts | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |
| 33 | h - List and describe all contracts or other business arrangements between or among the Associated Companies | See Footnote (a) | Self/"The Company" - Not an associated company | See Footnote (a) | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual | See Footnote (a) | N/A Individual |

**Footnotes:**

(a) We are not Privy to the information requested of this entity to accordingly answer this question regarding this entity - this is not information within our corporate records - with the exception of where we have provided information - it is unintelligible as you are asking information that is not readily available to SI Wireless without extensive research - for the items where we do not have this information, cells have been shaded light grey

(b) REFER TO OUR RESPONSE IN 31A

(a) This identifies a positive response only for those companies we know this information for

APP. 132

| Question | Response | Robin Wood | Chris Young | Eric Daversa | Connect 5G, Inc |
|---|---|---|---|---|---|
| 31 | a - Explain the nature of and relevant dates associated with the relationship. | Entered into Agreement with SI Wireless in December of 2023 to help with Project Management for the SCRP Program | Entered into Agreement with SI Wireless in January of 2024 to help with Project Management for the SCRP Program | Entered into Agreement with SI Wireless in August of 2023 to help with Project Management for the SCRP Program | Entered into Agreement with SI Wireless in June 2024 to provide HSS Subscriber services for the SCRP Program pursuant to the quote(s) provided in 31 (d) |
| 31 | b - Identify any shared or common owners, officers, directors, members, managers, trustees, employees, consultants, contractors, or other shared position with the Company, any person holding a direct or indirect ownership interest in the Company, and any other affiliated person or entity. | None | None | None | None |
| 31 | c - A description of any physical or virtual facilities (e.g., office space, phone numbers, or servers) that the Company shares with any other affiliated person or entity. | None | None | FEMA | Various personnel |
| 31 | d - A list and description of any contracts or other business arrangements between the Company and any of any other affiliated person or entity. | Contract: > "FE Service Agreement SIW and Robin Wood.pdf" | Contract: > "FE Service Agreement SIW and Chris Young.pdf" | Contract: > "FE_Service_Agreement_SIW and Eric DaVersa.pdf" | Quote: > "SI Wireless, Connect 5G Opus-M Quotation for FWA LTE HSS and Core, Quotation 1324 July 23 2024 Rev C.pdf" |
| 31 | e - A description of any shared financial assets and obligations including banking and credit accounts, and tax filings. | None | None | None | None |

APP 133

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.
See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Robin Wood | Chris Young | Eric Devarse | Connect 5G, Inc |
|---|---|---|---|---|---|
| 32 - Provide a chart for each company identified in response to Inquiry 31 | | | | | |
| 32 | internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility) | N/A individual | N/A individual | N/A individual | See Footnote (a) |
| 32 | the names of all owners (and percentage of ownership or membership interest) | N/A individual | N/A individual | N/A individual | See Footnote (a) |
| 32 | identify all directors or board members (including addresses and telephone numbers) | N/A individual | N/A individual | N/A individual | See Footnote (a) |

APP 134

| Question | Response | Robin Wood | Chris Young | Eric Daversa | Connect 5G, Inc |
|---|---|---|---|---|---|
| 32 | Identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity) | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |
| 32 | Identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |

**each Associated Company, answer the**

| Question | Response | Robin Wood | Chris Young | Eric Daversa | Connect 5G, Inc |
|---|---|---|---|---|---|
| 33 | a - The headquarters and/or business address of each company | N/A Individual | N/A Individual | N/A Individual | 11625 Custer Rd Ste 110 PMB 338 Frisco, TX 75035 |
| 33 | b1 - State of Incorporation | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |
| 33 | b2 - States authorized to do business | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |
| 33 | b3 - Fictitious Names /dba | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |
| 33 | c - Identify the persons responsible for incorporating or otherwise creating each company and the relationship of such persons to the companies they incorporated or otherwise created (e.g., ownership interest, member, board member, officer, etc.). | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |
| 33 | d - Explain the nature of and relevant dates associated with the relationship. If the relationship comprises a transaction or series of transactions, identify the transactions and the dates or date range of such transactions | N/A Individual | N/A Individual | N/A Individual | See footnote (b) |
| 33 | e1 - From 2019 to the present, state whether any of the Associated Companies filed consolidated Federal tax returns and, if so, identify which companies did so | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |
| | e2 - In the last four years before the date of this LOI, identify each company that files Federal tax returns (other than consolidated returns) in its own name | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |
| | e3 - In the last four years before the date of this LOI, identify each company that has not filed a Federal file tax return in its own name (other than those identified above as part of a consolidated return). For any company that has not filed a Federal tax return, identify the reasons for non-filing (e.g., the company was incorporated within the current tax filing year). | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |

## Question 31 - 33 Grid

The answers contained herein are being provided to the best of our ability based on information readily available to us. Any omission of information has been inadvertent.

See Footnotes for descriptions and explanation of formatting contained herein

| Question | Response | Robin Wood | Chris Young | Eric Daversa | Connect SG, Inc |
|---|---|---|---|---|---|
| 33 | f - Describe all physical or virtual facilities and assets that are shared by one or more of the Associated Companies. Include the address of an such facily, phone # or shared resources | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |
| 33 | g - Describe any shared financial assets and obligations, including banking and credit accounts | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |
| 33 | h - List and describe all contracts or other business arrangements between or among the Associated Companies | N/A Individual | N/A Individual | N/A Individual | See Footnote (a) |

Footnotes:

(a) We are not Privy to the information requested of this entity to accordingly answer this question regarding this entity - this is not information within our corporate records - with the exception of where we have provided information - it is unintelligible as you are asking information that is not readily available to SI Wireless without extensive research - for the items where we do not have this information, cells have been shaded light grey

(b) REFER TO OUR RESPONSE IN 31A

(c) This identifies a positive response only for those companies we know this information for

32.   Provide a chart for each company identified in response to Inquiry 31, including any additional companies you identify in response to Inquiry 33 (collectively, including the Company, the "Associated Companies," and each one singularly an "Associated Company"). Each chart must: show the internal employment structure (number of employees and relative functions, including identifying all officers and showing their respective areas of responsibility); specify the names of all owners (and percentage of ownership or membership interest); identify all directors or board members (including addresses and telephone numbers); identify any trustees, managers, sub-contractors and independent contractors (including the functions such contractors perform for the entity); and identify all common (i.e., performs functions for more than one Associated Company) board members, officers, managers, and employees, or other shared position, and identify the titles, functions, and relationships of each such individual.

SI objects on the grounds of undue burdensomeness, irrelevancy and unintelligibility, as well as to the demand that SI create charts, other than any in its possession and control. For the thirty-three (33) companies, almost all being independent vendors, you have posed twenty (20) subparts, including a demand that we identify such minutiae as each employee's functions, and numerous other demands that SI lacks knowledge of. It has nonetheless sought to respond to these six hundred and sixty (660) demands via the Excel Spreadsheet provided in response to Inquiry 31. As the information for this question pertains to the same individuals and companies, it was more efficient to provide the information in a single spreadsheet.

Please see the Excel Spreadsheet provided in response to Inquiry 31 ("Question 31-33 Grid.xlsx"). As the information for this question pertains to the same individuals and companies, it was more efficient to provide the information in a single spreadsheet for Questions 31, 32, and 33.

Prepared By: LW

38.    Provide copies of all Documents that serve as the basis for or otherwise support the responses to all the Inquiries above, to the extent not already provided.

Except as set forth below, documents have been provided with the questions that they pertain to:

- Enclosed with this response is the INDEX of files included with this response including the Bates Stamp for each file and it's corresponding original file name:
  - SIWireless- SCRP LOI Response- INDEX.xlsx

- Enclosed are five representative samples of sites that are either completed or nearing completion within our comparable network. Once again, we strongly encourage you to visit our market and see firsthand that the funds we have received, or will receive, through our participation in the SCRP are indeed being used as outlined in the program's guidelines.
  - COTTAGE GROVE_SITE PICS.pdf
  - DAN_SITE PICS.pdf
  - HARLAN SITE PICS.pdf
  - JIMJACK SITE PICS.pdf
  - McKENZIE_SITE PICS.pdf

- Customer RFI Response May 2024.pdf

Prepared By:

**SI Wireless, LLC**
1601 ASSEMBLY ST
# 8826
COLUMBIA, SC, 29202
FRN: 0019623834

10 May 2024

Re: SC-CN0077090 Request for Information

RFI Restated here:

*To Whom It May Concern:*

*Please provide the information requested below by May 24, 2024.  If you have questions or wish to reply to this email, please log into this application, select the correspondence, and reply directly.*

*1.  Does SI Wireless currently provide advanced communications service to any customer(s)?*

> *a) If so, please identify the advanced communications service(s) that customers currently purchase from SI Wireless and state whether SI Wireless provides those services over its own network or, instead, resells the service(s) of another provider.  If SI Wireless provides advanced communications service through a resale agreement, please indicate which company(ies) SI Wireless contracts with to purchase or provide resale services and the date(s) SI Wireless entered into those contracts.   As per the Program FAQs, SI Wireless should support its response through any of the following types of currently dated documentation:  information from a company website describing services provided to customers; a catalog of services provided to customers; or financial reports demonstrating number of customers and/or broadband services provided.*

> *b)  For each customer of advanced communications service, describe the relationship, if any, between each customer and Leslie Williams or SI Wireless, including but not limited to whether they are owners, affiliates, or employees of SI Wireless or any companies affiliated with SI Wireless.*

*2.  Does SI Wireless currently receive any revenue from providing advanced communications service(s) to customers?*

> *a.  If so, please provide documentation, such as financial reports and copies of SI Wireless's bills to customers, to demonstrate the provision of advanced communications service to those customers and receipt of revenue from them for the past two (2) months.*

> *b.  If not, please provide the last date on which SI Wireless received any revenue resulting from its provision of advanced communication services and provide any supporting documentation, including receipts, bank statements, etc. in support.*

*3.  For each of the six customers to which SI Wireless previously indicated it provided advanced communication service as of the application date in January 2022, please state whether and when SI*

*Wireless stopped providing advanced communications service to each customer since the time of the application date. If it did, specify the date and substance of the notice it provided to each customer and provide a copy of each such notice.*

*4. Has there been any time period since January 18, 2022 during which SI Wireless did not provide advanced communications service to any individual customer or all customers? If so, please identify the beginning and end dates for any such time period.*

*5. Apart from the modifications made by SI Wireless to move to a fixed wireless service offering, has SI Wireless made any change in its service offerings or business operations, including but not limited to modifying its network coverage, since May of 2023? If so, describe the changes.*

---

**Response:**

**Question 1:** *Does SI Wireless currently provide advanced communications service to any customer(s)?*

***Yes***

> *a) If so, please identify the advanced communications service(s) that customers currently purchase from SI Wireless and state whether SI Wireless provides those services over its own network or, instead, resells the service(s) of another provider. If SI Wireless provides advanced communications service through a resale agreement, please indicate which company(ies) SI Wireless contracts with to purchase or provide resale services and the date(s) SI Wireless entered into those contracts. As per the Program FAQs, SI Wireless should support its response through any of the following types of currently dated documentation: information from a company website describing services provided to customers; a catalog of services provided to customers; or financial reports demonstrating number of customers and/or broadband services provided.*

> *b) For each customer of advanced communications service, describe the relationship, if any, between each customer and Leslie Williams or SI Wireless, including but not limited to whether they are owners, affiliates, or employees of SI Wireless or any companies affiliated with SI Wireless.*

**Response 1a: Answers**

SI Wireless currently provides cost-effective, high-speed, switched, broadband services that enables users to originate and receive high-quality voice, data, graphics, and video using wireless technology.

SI wireless provides these services over its own network. It does not resale any services of another provider.

The SI Wireless website is currently in development. Screenshots of the website are provided below.

**APP 139**

SIWIRELESS 38-000008







**APP 140**

SIWIRELESS 38-000009

**Response 1b:**

Leslie Williams has a non-controlling minority ownership interest in Rural Connect. For all other SI Wireless customers, Leslie has none of the described relationships.

**Question 2:** *2. Does SI Wireless currently receive any revenue from providing advanced communications service(s) to customers?*

*Yes. SI Wireless receives revenue from providing advanced communication services but it is minimal as we have not launched commercially yet.*

　　a. *If so, please provide documentation, such as financial reports and copies of SI Wireless's bills to customers, to demonstrate the provision of advanced communications service to those customers and receipt of revenue from them for the past two (2) months.*

*See P&L*
*4820.01 reflects accrual for 81 customers*
*4820.02 reflects accrual for 6 customers*

*The Sales Revenue recognized is not paid currently on a cash basis. 6 direct customers who perform work on this project are provided internet from our network and have agreed that we can offset amounts due them at the rate of $25 a month for this. 81 customers of a WISP, that we rent tower space from, are on our network for service but the Wisp bills them. We recognize the revenue as an offset monthly of $25 (Our $30 rate less a $5 billing allowance) to amounts due the Wisp for rent on their towers. This is an insignificant aspect of what we are doing but provides valuable customer experience information to us. We are ripping and replacing not replacing then ripping, consequently we do not have normal operations or cash flow or bills during this process and this cannot be expected until we complete launching what we deem a commercially launchable interim footprint that is ready to meet customer expectations for the entire area.*

　　b. *If not, please provide the last date on which SI Wireless received any revenue resulting from its provision of advanced communication services and provide any supporting documentation, including receipts, bank statements, etc. in support.*

*Response 2b: not applicable*

**Question 3:** *3. For each of the six customers to which SI Wireless previously indicated it provided advanced communication service as of the application date in January 2022, please state whether and when SI Wireless stopped providing advanced communications service to each customer since the time of the application date. If it did, specify the date and substance of the notice it provided to each customer and provide a copy of each such notice.*

**Response 3:**

For each of the six customers SI Wireless has provided continuous, uninterrupted services to these customers.

**Question 4:**  *4.  Has there been any time period since January 18, 2022 during which SI Wireless did not provide advanced communications service to any individual customer or all customers?  If so, please identify the beginning and end dates for any such time period.*

**Response 4:**

SI Wireless has provided continuous, uninterrupted advanced telecommunications services to customers since January 2022 the inception of this program.

**Question 5:**  *5.  Apart from the modifications made by SI Wireless to move to a fixed wireless service offering, has SI Wireless made any change in its service offerings or business operations, including but not limited to modifying its network coverage, since May of 2023?  If so, describe the changes.*

**Response 5:**

*NO outside of the approved and pending modifications.*

Thank you,

Leslie Williams
President, SI Wireless

49.     Provide all employment, salary, and/or other payment contracts between the Company and
        Leslie Williams, including all Documents showing communications related to the development of
        the contracts or employment offer, approval of the contracts, or setting the salary set for forth
        in any contract.

Please see the attached supporting documentation for Leslie Williams:

- SI WIRELESS Letter agreement Les Deferred compensation
- Membership Interest Transfer Agreement_FE_Leslie49
- PMI Certfication

Aside from being President of SI Wireless, Leslie is also a Certified Project Management Professional
with 20 years of industry experience. It should also be noted here that the SCRP Final Cost Catalog
Updated 12.17.21 shows the average salary for a Project Manager is $38,925 a month which is more
than Leslie's current salary.

5.7.3 Project Management (per person per month)

Low $ 25,950.00 High $ 51,900.00 Average $ 38,925.00

Prepared By:  LW

49.     Provide all employment, salary, and/or other payment contracts between the Company and
        Leslie Williams, including all Documents showing communications related to the development of
        the contracts or employment offer, approval of the contracts, or setting the salary set for forth
        in any contract.


Please see the attached supporting documentation for Leslie Williams:

- SI WIRELESS Letter agreement Les Deferred compensation
- Membership Interest Transfer Agreement_FE_Leslie49
- PMI Certfication


Aside from being President of SI Wireless, Leslie is also a Certified Project Management Professional
with 20 years of industry experience. It should also be noted here that the SCRP Final Cost Catalog
Updated 12.17.21 shows the average salary for a Project Manager is $38,925 a month which is more
than Leslie's current salary.

5.7.3 Project Management (per person per month)

Low $ 25,950.00 High $ 51,900.00 Average $ 38,925.00

Prepared By:  LW

# EXHIBIT 4

APP 145

Steve Leckar
sleckar@kalbianhagerty.com
888 17th Street, NW, Suite 1200
Washington, DC 20006



**KALBIAN
HAGERTY** LLP
ATTORNEYS AND COUNSELLORS AT LAW

(202) 223-5600 Telephone
(202) 223-6625 Facsimile

September 25, 2024

**By E-Mail and First Class Mail**

John A. Corbin, Esq.
Investigative Counsel, Fraud Division
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

Dan Daly, Esq.
Office of the Chief Financial Officer
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

*Re: SI Wireless, LLC*
*File No. EB-FD-24-00036576/SCRP0001013*

Dear Messrs. Corbin and Daly:

On behalf of SI Wireless, LLC ("SI"), please permit us to make a brief supplement to our September 17th response to the Enforcement Bureau's July 11th Letter of Inquiry and the Chief Financial Officer's July 11th Notice of Funding Hold.

On page 5 of our response, we wrote that when SI began participating in the SCRP, "[n]obody expressed concerns with any provider's suspending service while undertaking a Rip and then Replace. Rather, it was all about the equipment[.]" Last weekend, in reading the FCC's January 10, 2023, REPORT TO CONGRESS, this discussion of the application process struck a chord:

> To complete an application, each applicant was required to submit: (1) estimates of costs that would be reasonably incurred to permanently remove, replace, and dispose of covered communications equipment or services in its network; (2) detailed information on the covered communications equipment or services to be removed, replaced, and disposed of; (3) a certification that as of the date the applications were submitted, the applicant had developed a plan and timeline for the removal, replacement and disposal of all covered communications equipment and services in its networks; (4) a timeline for the removal, replacement, and disposal of covered communications equipment and services; and (5) certifications that it will comply with Reimbursement Program rules. (at page 4).

This reference corroborates SI's theory that for established broadband providers who were actively removing and replacing covered equipment the FCC's focus was on cleansing the networks, not on maintaining any level of customer service.

www.kalbianhagerty.com

APP 146

John A. Corbin, Esq. & Dan Daly, Esq.
September 25, 2024
Page 2 of 2



KALBIAN
HAGERTY LLP
ATTORNEYS AND COUNSELORS AT LAW

Separately, after discussing its burgeoning accounts receivables, SI pointed to the fitful administration of its requests for payment and the inordinate amounts of time that have been consumed merely in seeking to get paid for its dismantling and destroying the Huawei equipment and replacing it. These have prevented its restoration of full and far less expensive wireless service within its rural marketplace. We would appreciate any consideration the Bureau and CFO could give towards reviewing this matter on an expedited basis.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
   Sarah McNally, Esq.
   Aaron Gershbock, Esq.
   Meghan Ingrisano, Esq.
   Caressa D. Bennet, Esq.

APP 147

# EXHIBIT 5

**APP 148**



**Steve Leckar**
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

# KALBIAN HAGERTY LLP

ATTORNEYS AND COUNSELORS AT LAW

888 17th Street, NW, Suite 1200
Washington, DC 20006

November 7, 2024

**By E-Mail and First-Class Mail**

John A. Corbin, Esq.
Investigative Counsel, Fraud Division
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

Dan Daly, Esq.
Office of the Chief Financial Officer
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

*Re: SI Wireless, LLC*
*File No. EB-FD-24-00036576*

Dear Messrs. Corbin and Daly:

Thank you for your prompt response of October 30th to our request on behalf of SI Wireless, LLC ("SI") for a status conference.

While awaiting a date and time, we wanted to call to your attention some further matters.

SI has undertaken the work required to dismantle and destroy the covered equipment. It replaced these products with compliant materials on 88 sites. It is working to optimize the network, aiming to bring these sites online and serve customers, and is currently serving on some initial sites. However, it cannot complete the process due to insufficient funding.

In essence, the funding freeze, which was *de facto* since March and became *de jure* on July 11th, is jeopardizing a minority-headed company's existence. SI has massive obligations due to contractors and vendors—incurred in unambiguous reliance on the FCC's public and private urging that advanced communications providers proceed forthwith to jettison Huawei and ZTE materials from their networks. SI has submitted documentation establishing that right after its former owners sold the business, its new owners began that massive undertaking and continued it in a near-seamless process. And it provided evidence that all along it has maintained a trimmed-down level of customer service although neither the statute nor the regulations demanded any customer base, provided the statutory limit wasn't exceeded. Nothing stated by SI to the WASHINGTON POST and the Wireline Competition Bureau, which contacted SI in the POST article's aftermath, was untruthful or detracted from that core reality.

The freeze's direct impact on SI is grave and well-documented. Currently, SI's receivables, as submitted to the government and Program Administrator, comprise a universe of 270 pending invoices, some now over two years old, exceed $14.67 million. A copy of the latest

**APP 149**



table of those invoices, which delineates the individual vendors and the services/equipment they supplied is attached as Exhibit A. To be blunt, these are real people whom SI wishes to pay for their work and will pay promptly once the freeze is lifted and funding restored.[1]

As well, our September 17th letter informed you that over $32 million in billing was (and remains) tied up because the Program Administrator has proved unable to process modifications in a timely manner sufficient to allow other invoices to be submitted.

The FCC's choking off SI's funding has other direct impacts on the company. Curtailing funds prevents the company from bringing in network optimizing contractors and thwarts its ability to bring all 88 sites online. As well, absent funding, SI's ability to procure provisioning and billing software packages is stultified.

No responsible business could operate by treating its customers in such a cavalier manner. It is no less lamentable when the federal government commissions services and demands new equipment only to stiff-arm a regulated entity that has done its bidding and seeks to remain in business.

Notably the aforesaid considerations don't even account for the time value of money, the earnings that SI would have received from its system being on air in a timely fashion had the system worked as the organic statute contemplated. It was, after all, Congress' intent and design that successful Secure and Trusted Communications Network Act applicants' destruction and renovation process should take a year, albeit with provisions for individual extensions of time if proven necessary. 47 U.S.C. § 1603(d)(6)(A)-(C). SI has been seeking to get its modifications and invoices paid in a timely manner for far beyond that period, only to meet repeated artificial roadblocks.

This unhealthy situation is not news to the FCC: SI's September 17th letter explained that its principal and regulatory counsel had alerted the staff beginning in the fall of 2022 that the Administrator wasn't processing submissions in anything close to an orderly way. SI provided references to pertinent documents lodged in the FCC's files reflecting SI's efforts to persuade senior agency officials that something was amiss in the Program's administration. As well, SI referred the FCC to two of about a dozen articles in the trade press where the firm had called attention to shortfalls of the sort later identified in the FCC's Fourth Report to Congress.

One further point. Our response emphasized the significant public interest in fostering innovative competition within SI's primarily rural geographic market, many of whose residents participate in the so-called Affordable Connectivity program. SI is prepared to deliver broadband technology at highly competitive pricing—$30 per month for self-installation and $45 per month for company installation. Currently, providers like Aeneas and Starlink dominate the market,

---

[1] SI would gladly present the FCC with a pay-out plan and timetable, including certifications.



with Aeneas's monthly pricing being twice as much ($59.95 to 89.95) and Starlink's four times as much ($120). Samples of those offerings are included as Group Exhibit B.[2]

Given these factors' confluence, our question remains: how does ongoing indecision from the agency align with the legislative goal of timely replacing providers' systems and supporting vibrant, competitive markets?

If brought up to date so that SI can pay its contractors, that would promptly achieve the 39% allocated so far and which is represented by already-completed work. This would allow the stakeholders to await any congressional reauthorization while enabling SI to provide essential services and foster competition in a third of the area it previously served. This support would give my clients a crucial opportunity to sustain their business by rather than face the risk of closure from, of all things, having participated in the Secure and Trusted Communications Network Reimbursement Program.

We'd like to confer next week to try to nail down any residual concerns and seek to fashion an expedited way for SI to be brought current. If need be, the FCC and Administrator are welcome to send designees into the market and meet with SI, as Congress has empowered and requested the agency to carry out and as SI has invited it to do.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
    Sarah McNally, Esq.
    Aaron Gershbock, Esq.
    Caressa D. Bennet, Esq.

---

[2] Several of the remaining providers that offer relatively low-cost service also differ from SI's business model in that they require fixed-term contracts.

# EXHIBIT 6

APP 152



**Steve Leckar**
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

# KALBIAN HAGERTY LLP
ATTORNEYS AND COUNSELORS AT LAW

888 17th Street, NW, Suite 1200
Washington, DC 20006

November 19, 2024

**By E-Mail and First-Class Mail**
John A. Corbin, Esq.
Sarah McNally, Esq.
Aaron Gershbock, Esq.
Fraud Division
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

> Re: SI Wireless, LLC
> File No. EB-FD-24-00036576

Dear Dan, Sarah, and Aaron:

After our discussion on Wednesday and SI Wireless, LLC's ("SI"), principal's subsequent acceptance of your request for an interview, something became evident. SI's status reports submitted to the FCC and Program Administrator reaffirms that the firm relied on the FCC's urging to remove, dispose, and replace covered equipment promptly, accurately disclosed its business' configuration and plans, only to be severely impacted by the government's undue reliance on a private contractor's lack of self-oversight. The FCC's <u>Fourth Report to Congress</u> confirms that SI is not the only firm so affected and that the undue delay has frustrated Congress' intent that the broadband industry be revamped speedily.

## A. Background

Our September 17th letter stated that high-level FCC staff proved unresponsive to verbal entreaties from SI and its regulatory counsel about the Program Administrator's delay. (p. 31). An extract from SI's January 8, 2024, report well-describes the systemic backlog:

> This situation has led to extraordinarily long wait times for invoice approval, with one invoice taking nearly a year to get approved. The specific invoice in question underwent a 352-day approval process, during which 319 days were spent waiting for the fund administrator to issue 7 Requests for Information (RFIs). The crux of the matter was fixed fee billing, a method explicitly deemed acceptable for professional engineering services according to the FAQ, yet the fund administrator refused to acknowledge it as such. This refusal resulted in an increase of almost $300 to the invoice when converted to Time and Materials (T&M). (1/8/24, p.2).

**APP 153**



### B. Selected topics appearing recurrently in status reports

SI's reports reflect the increasing well-justified frustration of a small business that set out in earnest and confronted programmatic dysfunctions while fruitlessly pointing out to the FCC ways to improve the system. The upshot of these deficiencies is that the administrator's procedures are needlessly requiring the government to pay more for reimbursable services than was originally sought by participants.

The full reports are attached; Mr. Williams will be pleased to discuss them in his interview.

1. <u>SI accurately disclosed its business plan</u>.

In response to Enforcement's questions, SI explained that its business plan submitted with its Form 5640 application disclosed that it had shifted from a full-mobility network affiliated national carrier roaming partner to a scaled-down fixed wireless initial deployment. SI's earliest Status Report, submitted in the fall of 2022, confirmed as much and advised that it had fully decommissioned 143 of 204 sites, and was then decommissioning and disposing of covered equipment.[1] SI was forthright about its plan: "Our company has chosen to no[t] hot cut but rather to move subs, take down and redeploy the network. We are a small business without extensive funding and its essential that we be able to complete this job in a short time frame as all our incoming cash flow has been turned off for this process and to date none brought in from reimbursements. We are living on vendor goodwill from past deployments we have done but that will not last forever."[2]

SI also explained its plan to offer services through Rural Connect, which it accurately described as a "wholly owned sister company that operates as a wireless Internet service provider ("WISP"), and has been in operation for 12+ years who serves within but not all the Company's footprint."[3]

---

[1] Oct. 13, 2022 Report at p.2.

[2] *Id.* at p.4. A few months later, SI wrote that "[u]nlike some of the other applicants, SIW has been able to migrate its customer base to another network while the equipment is being replaced rather than build a new network and then migrate customers to it. SIW has been able to proceed at a much quicker pace as a result, but is now stuck because it has not been reimbursed for its efforts thus far." Jan. 11, 2023 Report at p.2.

[3] Oct. 13, 2022 Report at p.2.



2. <u>SI offered respectful, experience-based suggestions to improve the program administration, both at the agency level and the Program Administrator's office.</u>

From the outset, SI's hands-on experience prompted t ito make programmatic suggestions to the FCC and the Administrator. For instance, it recommended that "the FCC chairperson … pen a letter to local governments, tower companies and landlords asking for their consideration[,] including in expediting or eliminating planning and zoning hurdles to further these programs['] efforts and explaining that it is in furtherance of a national agenda of importance."[4]

To assist the Program Administrator, SI early on suggested that "there should be an expedited approval process of a new plan and new cost estimate made to implement a new plan based on the partial funding allocation."[5] A few months later, it explained that "[o]ne of the biggest challenges is the uncertainty of what costs will be reimbursed. Due to the inability to discuss with staff responsible for reviewing invoices, the only way for SIW to gain certainty before incurring significant expenses is to submit cost modifications in the Portal, and then wait months for a response, which typically consist of a large number of questions, thereby extending the process even further. If reviewing staff were authorized to discuss submissions in advance, SIW could accelerate the process of engaging vendors to continue work on removal, replacement, and disposal of covered equipment."[6]

---

[4]  Oct. 13, 2022 Report at p.2.

[5]  *Id.* at p.4.

[6]  Jan. 11, 2023 Report at p.2. *See also* April 12, 2023 Report at p.2 ("submitting a modification completely stops all invoice processing... throwing away needed time to complete this project. A modification for work to be done after disposal takes place prevents invoice processing for payments to cover the disposal. When we took on this project, my fear was that contractors and equipment vendors would cause a huge delay for us but it turns out it is the fund administrator that has paused all progress. I am truly scared we will not be able to get this project completed on time because of the way this program is being handled."); July 11, 2023 Report at p.2 ("Eliminate those processes in place right now that seem to create more waste then prevent it. Without a doubt you should be able to submit for reimbursement a cost that comes in under the category amount without a modification. You should also be able to submit an invoice across a couple categories if the vendor bills you that way or offers you a bundled often lower cost. And for sure the invoicing activities should not be shut down or affected at all by submitting modifications that are required on this program."); Jan. 8, 2024 Report at p.2 ("SI Wireless once again finds itself in a prolonged waiting period for the fund administrator to approve its modification, submitted on November 17th, 2023. As a consequence, all invoice processing has been halted since that date, given that any modification results in the suspension of all invoice processing. To put this into perspective, a total of 209 days and counting have been spent waiting for the fund administrator to approve SI Wireless Modifications, keeping in mind that the initial timeframe for this program is 365 days. Please note this modification delay is separate from the invoice processing delays that have invoices waiting over a year for approval. The issue of waiting for the fund administrator's approval is not a new challenge for SI Wireless.").



Those recommendations went nowhere. Nor did SI's "suggest[ion] that at a minimum there be a 'shot clock' of 30 days for each invoice submitted for reimbursement. If there are any issues with the invoice, an RFI should be issued so that expectations can be set and problems understood."[7] And SI got no further with its observation that "[a] non[-]portal means of communication is essential. We are getting repeat and serial RFI's that we respond to over again, mainly through the portal but the message is not getting through. The vendors affected by these are not getting paid while others are; many vendors don't understand this and that can ruin the teamwork on a construction project."[8]

The FCC and Program Administrator also turned a deaf ear to SI's requests, offered as early as January of 2023, that "SIW also would welcome the opportunity to walk staff through the network decommissioning and equipment destruction process and share evidence of the amount of work that SIW has completed thus far. SIW strongly believes such a meeting will go a long way to educating staff about these processes, allow for questions to be addressed and will help streamline the review process in a manner that will allow the funds to be disbursed in a more reasonable time frame so that work doesn't have to come to a complete halt."[9]

3. SI reported how continued delay in processing its invoices was prompting vendor attrition and thwarting its timetable and progress.

By early 2023, SI stated that it had "removed and destroyed all the Huawei equipment in its network" but was impeded by, not just the lack of funding but the "staff's refusal to discuss whether certain equipment and services will be reimbursed."[10]

Further, in what was to become a recurring issue, SI wrote about how it was being delayed by a pattern of bureaucratic red tape. It also advised early in 2023 that "[t]o date, SIW has spent over $12 million on removal of equipment, but has been reimbursed less than $375,000. Many invoices have been sitting in the system for over 130 days with no action. This delay in reimbursement has severely impeded the ability of SIW to continue the process. SIW's vendors need to be paid in a timely manner. The delay has caused its vendors to stop work, in turn, impeding SIW from completing the work."[11]

---

[7] Jan. 11, 2023 Report at p.2.

[8] July 11, 2023 Report at p.2.

[9] Jan. 11, 2023 Report at p.2. *See also* July 11, 2023 Report at p.2 ("Some continuity of who is doing the reviews combined with some channels for communication above is needed especially for companies like ours that have started earlier than others and are going about this in a different order ([*i.e.*]) ripping then replacing instead of a simultaneous process). We have invited those reviewing our project to the market to gain an understanding of each other['s] needs to get through this together in the easiest manner[;] please consider this."

[10] Jan. 11, 2023 Report at p.2.

[11] *Id.*



Things took a turn for the worse, such that by mid-summer of 2023, SI wrote that "[t]he big picture is that with 39% funding and a one[-]year clock ticking away there is a near certainty that participants will not end up with a comparable network. There is also no incentive for waste or unreasonable payments. The risk of fraud and abuse is to participants who started down this path and committed to this program in good faith who are at risk of running out of time and funds by delays in reimbursements causing them to miss the time[]table to receive funding which is only a fraction of the funds required to begin with."[12]

In the fall of 2023, SI called yet another conundrum to everyone's attention. SI declared that "[i]t seems the invoice approval format has changed as well. SI Wireless has come to this conclusion given that monthly management invoices, with the exact same format that [was] previously getting approved, are now receiving RFIs compared to previous months' invoices that did not receive RFIs. Since the last status update, SI Wireless has also noticed a change in Fixed Fee Billing approvals. SI Wireless has engineering contractors who bill on a fixed fee basis, which per the FCC's FAQs is permitted as long as the services are '[s]pecific engineering professional services that result in work products or deliverables (e.g., system design, vendor selection, technical bid support and subcontractor retention and management)…[f]or professional services billed as fixed fee, the Participant must submit a copy of the vendor invoice and quote that provides a cost and activity 'build-up' to support the expense. Fixed fee invoices must specify the time period covered by the invoice, a description of the services rendered, and the amount due." SI Wireless's engineering contractors' deliverables fall within the permitted activities in the FAQs. However, SI Wireless has received numerous RFIs from the Fund Administrator concerning such fixed fee invoices which is causing inordinate delay of receiving funds [and thus] hindering SI Wireless from completing its work. The end result is countless hours of administrative work that are driving up the costs of the program unnecessarily. Until the last week, SI Wireless has made numerous attempts to discuss its concerns with the Fund Administrator to reach a solution but has received extremely delayed responses from the Fund Administrator in trying to schedule meetings.)"[13]

---

[12] July 11, 2023 Report at p.2.

[13] October 5, 2023 Report at p.2. *See also* Jan. 11, 2024 Report at p.4 ("Furthermore, the lack of a limit on the amount of time the Fund Administrator can sit on an invoice should be unacceptable. SI's position is that the Fund Administrator be directed to correct each of its unacceptable actions and administer the program timely and efficiently to ensure its success and that of participant vendors. There is a pressing need to question who is ensuring that the Fund Administrator is not creating waste, fraud, and abuse. SI Wireless currently has open invoices submitted in 2022, 446 days ago, still sitting in under initial review, which should be deemed unacceptable.")



4. <u>SI also duly reported how the delay was affecting its purchasing decisions.</u>

Bureaucratic red tape and delay also led to slippages in obtaining technology, as represented by SI's report in the fall of 2023 that "SI Wireless has had difficulty purchasing the needed 4G equipment for its network replacement due to cash flow issues that have stemmed from excessive delays in processing invoices. As each day passes, the 4G equipment that SI Wireless needs to purchase becomes harder to obtain because the equipment vendor is producing more 5G equipment and less if any 4G LTE equipment. The delays associated with the Fund Administrator's processing of invoices and the overall funding short fall of the program is causing concern that by the time SI Wireless gets its invoices approved and paid the equipment might not be available and it will be back to the drawing board to get new equipment approved and then get in line to get funding to place an order then actually have the equipment scheduled and delivered. There is a very clear problem with specifying 4G equipment and then not fully funding the program and/or allowing the 4G equipment to be purchased now when it is available."[14] Our September 17th letter also discussed this issue.

**Conclusion and request for prompt corrective action**

We trust that the Bureau can appreciate that inefficiencies and frustration mushroom when small businesses are shunted aside by a regulatory body willing to turn a blind eye towards requests for rational solutions, such as having a dedicated staff person available to review roadblocks and to inspect the property to address any genuine issues. One doesn't need a new agency or roving commission to recognize that—in theory the Office of Management and Budget and the FCC's Chief Operating Officer and Performance Improvement Officer are empowered under the GPRA Modernization Act of 2010, 31 U.S.C. §§ 1115, 1123-1124, to address curative steps when there's evidence that an agency program's process has ossified.

This inquiry should be framed not as an enforcement issue but as one for the Chief Financial Officer's long-overdue scrutiny, and so I am copying Mr. Daly, the Chief Managing Director's designee in this matter. We hope to get any residual issues resolved promptly at the Enforcement level and to create an expedited way for SI to be brought current.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
Dan Daly, Esq.
Caressa D. Bennet, Esq.

---

[14] October 5, 2023 Report at p.4.

**APP 158**

# Status 10.11.22

# SCRP Status Update

FCC Form 5640

OMB Control No. 3060-1270

File No.  SC-SU0001025

## Applicant Information

Applicant FRN  0019623834

Applicant Name SI Wireless, LLC

Applicant Email leslie.williams@siwirelessllc.c

Applicant Phone 8064441375

Applicant Address PO Box 8826

Applicant City   Columbia

Applicant State   SC

Applicant ZIP Code 29202

## Contact Information

 Is the contact the same as the contact listed on the Application Request for Funding Allocation? If not, please list below.

Contact Name Leslie Williams

Contact Email leslie.williams@siwirelessllc.cc

Contact Phone 8064441375

Contact Address  PO Box 8826

Contact City   Columbia

Contact State   SC

Contact ZIP Code  29202

*Indicate which deadline you are meeting with this filing.

2022-10-13

## Explanation of Effort and Availability of Commercial Equipment

*Provide an explanation of efforts undertaken, and challenges encountered, in permanently removing, replacing, and disposing of covered communications equipment or service.

SI wireless operated a full mobility network as a national carrier affiliated roaming partner comprising 204 sites, a main and a remote switching center. SI proposed to replace that network basically like for like and reaffiliate with a national carrier however absent full funding this cannot be accomplished at this time. Accordingly, and as stated in its application, SI is pivoting to a fixed wireless initial deployment (only a partial deployment can be achieved at this time), focusing initially in smaller cities, towns and rural areas within the SIW footprint. This will be done through Rural Connect, wholly owned sister company that operates as a wireless Internet service provider ("WISP"), and has been in operation for 12+ years who serves within but not all the Company's footprint.

The Company is in the process of decommissioning and disposing of all covered equipment in its network as a phase 1 based on current funding. If, and/or when, the remaining funds are allocated, the Company will, if they can reaffiliate with a national carrier, adapt this network to a full mobility voice and data network for traditional cellular customers and fixed wireless customers as were served on our previous network using covered technology.

Currently 143 of 204 sites are fully decommissioned, all type one covered equipment has been removed from sites and switches and destroyed in accordance with guidance received. One site has been reinstalled with replacement equipment.

Major challenges include:
1) Invoices submitted have received RFIs, in which we have responded, but they have not been responded to by the FCC.
2) Timing on zoning/planning. We believe it would be helpful if the FCC chairperson were to pen a letter to local governments, tower companies and landlords asking for their consideration including in expediting or eliminating planning and zoning hurdles to further these programs efforts and explaining that it is in furtherance of a national agenda of importance.
3) Cost estimate modifications require going over the 20k alloted line items in the application, which inhibits the ability to make new cost modifications based on the new plan for the partial funding.

*Explain whether you are finding commercially available equipment in the marketplace. If not, then explain efforts taken to obtain replacement equipment.

We have commenced deployment of Tarana equipment for fixed wireless on one site. We are expecting the next shipment of replacement equipment to arrive within two weeks or 8 weeks after initial order. The single site completed has been done with equipment we have received on an expedited basis so we could field test and verify our RF models. If the delivery is as promised and if we can continue to be supplied on this time schedule, we foresee being able to meet the one-year time period to deploy the sites we have scheduled for the first phase of our redeployment based on the partial funding received.

* If there is additional information relevant to the preceding questions or that you believe the Commission should be aware of, please include the information below.

We need an open discussion setting the ground rules promptly so we can adjust to the expectations of those approving invoices which to us differ from what has been communicated to us prior to submitting invoices. Because of delays at various stages of this effort we are now entering the second quarter so to speak of work and continuing to ask the players to play without payment.

Additionally, we believe it would be helpful if the FCC chairperson were to pen a letter to local governments, tower companies and landlords asking for their consideration including in expediting or eliminating planning and zoning hurdles to further these programs efforts and explaining that it in furtherance of a national agenda of importance. In addition, there should be an expedited approval process of a new plan and new cost estimate made to implement a new plan based on the partial funding allocation. Our company has chosen to now hot cut but rather to move subs, take down and redeploy the network. We are a small business without extensive funding and its essential that we be able to complete this job in a short time frame as all our incoming cash flow has been turned off for this process and to date none brought in from reimbursements. We are living on vendor goodwill from past deployments we have done but that will not last forever.

**APP 163**

## Program Compliance

*Indicate whether recipient has fully complied with (or is in the process of complying with) all requirements of the Reimbursement Program.

☑ Yes ☐ No

*Indicate whether recipient has permanently removed from its communications network, replaced, and disposed of (or is in the process of permanently removing, replacing, and disposing of) all covered communications equipment or services that were in the recipient's network  as of the date of submission of the recipient's application requesting funding.

☑ Yes ☐ No

If you have not yet completed the removal, replacement, and/or disposal process, what estimated percentage of the removal, replacement, and/or disposal process have you completed?

70

*Indicate whether recipient has fully complied with (or is in the process of complying with) the timeline submitted by the recipient. If not, provide explanation for deviation.

☐ Yes ☑ No

*The filer has indicated no to a question in this section, please provide additional information.

We are currently in the process of decommissioning the sites. Given we only received partial funding, a revised plan and timeline has been uploaded. We started submitting invoices to the portal for reimbursement over a month ago and still have not received any inclination if these are approved or will be paid soon. We have received multiple RFIs on some items and we have responded with our questions asking for further clarification, but it has been silent from the FCC side. We believe we are submitting everything necessary with each invoice in order to get these reimbursed, but with no communication or status updates from your end on where these stand we have no way of knowing if everything is being submitted correctly or if we will eventually receive further RFIs. We have multiple vendors who have been working in accordance with this project for several months now and with no responses from your end on where these reimbursement requests stand we are becoming very concerned at the lack of communication that is needed in order to help us plan for the several months ahead. We have noticed that only 1 participant in this program has been paid so far, and we are trying to get answers where our reimbursement claims stand seeing that we have submitted invoices around the same time that company started submitting claims. It would make this process much more efficient for both of us if we could be provided the appropriate contact personnel for each aspect of this program (cost modifications, RFI requests, reimbursement claim status updates, etc.) so we can stay in communication with the correct people throughout the project. It would be especially helpful to us and you if the person sending the RFIs could include their contact info so we can communicate quickly to understand exactly what they need from us.

## Certifications

* By checking the box and providing the electronic signature where indicated below, the Certifying Official on behalf of the filer certifies under penalty of perjury that:

☑ (1) The Certifying Official is authorized to submit this status report on behalf of the above-named filer and, based on information known to me or provided to me by employees responsible for the information being submitted, the information set forth in this status report has been examined and is true, accurate, and complete, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. The Certifying Official acknowledges that any false, fictitious, or fraudulent information or statement, or the omission of any material fact on this status report or on any other document submitted by the filer may subject the filer and the undersigned to punishment by fine or forfeiture under the Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or can lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812). (2) The filer is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that the filer will maintain detailed records, including receipts, of all costs eligible for reimbursement actually incurred for a period of 10 years; and will file all required documentation for its expenses. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.

## Certifier Information

Certifier Signature      Leslie Williams

Certifier Phone    8064441375

Certifier Name    Leslie Williams

Certifier Email    leslie.williams@siwirelessllc.cc

Certifier Title    President

Date Signed    2022-10-11

**APP 166**

# Status 1.11.23

# SCRP Status Update

FCC Form 5640

OMB Control No. 3060-1270

File No.  SC-SU0001440

## Applicant Information

Applicant FRN  0019623834

Applicant Name  SI Wireless, LLC

Applicant Email  leslie.williams@siwirelessllc.c

Applicant Phone  8064441375

Applicant Address  PO Box 8826

Applicant City  Columbia

Applicant State  SC

Applicant ZIP Code  29202

## Contact Information

[✓] Is the contact the same as the contact listed on the Application Request for Funding Allocation? If not, please list below.

Contact Name  Leslie Williams

Contact Email  leslie.williams@siwirelessllc.cc

Contact Phone  8064441375

Contact Address  PO Box 8826

Contact City  Columbia

Contact State  SC

Contact ZIP Code  29202

*Indicate which deadline you are meeting with this filing.

2023-01-11

**APP 168**

## Explanation of Effort and Availability of Commercial Equipment

*Provide an explanation of efforts undertaken, and challenges encountered, in permanently removing, replacing, and disposing of covered communications equipment or service.

SI Wireless ("SIW") has removed and destroyed all the Huawei equipment in its network.
The two major challenges in moving forward with replacing the network are (1) the lack of funding and (2) staff's refusal to discuss whether certain equipment and services will be reimbursed.
To date, SIW has spent over $12 million on removal of equipment, but has been reimbursed less than $375,000. Many invoices have been sitting in the system for over 130 days with no action. This delay in reimbursement has severely impeded the ability of SIW to continue the process. SIW's vendors need to be paid in a timely manner. The delay has caused its vendors to stop work, in turn, impeding SIW from completing the work.
 One of the biggest challenges is the uncertainty of what costs will be reimbursed. Due to the inability to discuss with staff responsible for reviewing invoices, the only way for SIW to gain certainty before incurring significant expenses is to submit cost modifications in the Portal, and then wait months for a response, which typically consist of a large number of questions, thereby extending the process even further. If reviewing staff were authorized to discuss submissions in advance, SIW could accelerate the process of engaging vendors to continue work on removal, replacement, and disposal of covered equipment.
SIW has had discussions with vendors to deploy new equipment, but is unable to enter into contracts without assurances that the funding will materialize. Unlike some of the other applicants, SIW has been able to migrate its customer base to another network while the equipment is being replaced rather than build a new network and then migrate customers to it. SIW has been able to proceed at a much quicker pace as a result, but is now stuck because it has not been reimbursed for its efforts thus far. SIW suggests that at a minimum there be a "shot clock" of 30 days for each invoice submitted for reimbursement. If there are any issues with the invoice, an RFI should be issued so that expectations can be set and problems understood. SIW also would welcome the opportunity to walk staff through the network decommissioning and equipment destruction process and share evidence of the amount of work that SIW has completed thus far. SIW strongly believes such a meeting will go a long way to educating staff about these processes, allow for questions to be addressed and will help streamline the review process in a manner that will allow the funds to be disbursed in a more reasonable time frame so that work doesn't have to come to a complete halt.

*Explain whether you are finding commercially available equipment in the marketplace. If not, then explain efforts taken to obtain replacement equipment.

While certain replacement equipment is commercially available, there is a lack of certain equipment that best suits SIW's needs. We have currently tested Tarana equipment and found it will do part but not all the job for us. This Equipment is backordered at least 4 months and certain parts like Harding connectors needed to deploy it are backordered longer. We are looking to do most of our deployment with Samsung equipment but are waiting for our in market test platform to be completed and have already experienced problems ranging from power supply availability to short shipments of mounting brackets. We have been able to overcome these on the small test scale but its imperative that we get our large order in now and its equally imperative that we be on the same page with the FCC when we do this and as described above there is not a way to discuss and resolve our interim plan with them right now in order to do this

* If there is additional information relevant to the preceding questions or that you believe the Commission should be aware of, please include the information below.

As discussed above, it is important that SIW be able to engage in a real-time dialogue with those responsible for reviewing its invoices and reports and cost modification requests. It would be helpful for the Commission to assign a single point of contact responsible for discussions with SIW.

## ProgramCompliance

*Indicate whether recipient has fully complied with (or is in the process of complying with) all requirements of the Reimbursement Program.

☑ Yes ☐ No

*Indicate whether recipient has permanently removed from its communications network, replaced, and disposed of (or is in the process of permanently removing, replacing, and disposing of) all covered communications equipment or services that were in the recipient's network as of the date of submission of the recipient's application requesting funding.

☑ Yes ☐ No

If you have not yet completed the removal, replacement, and/or disposal process, what estimated percentage of the removal, replacement, and/or disposal process have you completed?

*Indicate whether recipient has fully complied with (or is in the process of complying with) the timeline submitted by the recipient. If not, provide explanation for deviation.

☐ Yes ☑ No

*The filer has indicated no to a question in this section, please provide additional information.

As discussed above, it is important that SIW be able to engage in a real-time dialogue with those responsible for reviewing its invoices and reports and cost modification requests.  It would be helpful for the Commission to assign a single point of contact responsible for discussions with SIW.

## Certifications

* By checking the box and providing the electronic signature where indicated below, the Certifying Official on behalf of the filer certifies under penalty of perjury that:

☑ (1) The Certifying Official is authorized to submit this status report on behalf of the above-named filer and, based on information known to me or provided to me by employees responsible for the information being submitted, the information set forth in this status report has been examined and is true, accurate, and complete, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. The Certifying Official acknowledges that any false, fictitious, or fraudulent information or statement, or the omission of any material fact on this status report or on any other document submitted by the filer may subject the filer and the undersigned to punishment by fine or forfeiture under the Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or can lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812). (2) The filer is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that the filer will maintain detailed records, including receipts, of all costs eligible for reimbursement actually incurred for a period of 10 years; and will file all required documentation for its expenses. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.

## Certifier Information

| | | | |
|---|---|---|---|
| Certifier Signature | Leslie Williams | Certifier Phone | 8064441375 |
| Certifier Name | Leslie Williams | Certifier Email | leslie.williams@siwirelessllc.cc |
| Certifier Title | President | | |
| Date Signed | 2023-01-11 | | |

# Status 4.12.23

APP 175

# SCRP Status Update

FCC Form 5640

OMB Control No. 3060-1270

File No. SC-SU0001694

## Applicant Information

Applicant FRN 0019623834

Applicant Name SI Wireless, LLC

Applicant Email leslie.williams@siwirelessllc.c

Applicant Phone 8064441375

Applicant Address PO Box 8826

Applicant City Columbia

Applicant State SC

Applicant ZIP Code 29202

## Contact Information

☑ Is the contact the same as the contact listed on the Application Request for Funding Allocation? If not, please list below.

Contact Name Leslie Williams

Contact Email leslie.williams@siwirelessllc.c(

Contact Phone 8064441375

Contact Address PO Box 8826

Contact City Columbia

Contact State SC

Contact ZIP Code 29202

*Indicate which deadline you are meeting with this filing.

2023-04-11

## Explanation of Effort and Availability of Commercial Equipment
*Provide an explanation of efforts undertaken, and challenges encountered, in permanently removing, replacing, and disposing of covered communications equipment or service.

We have been waiting for payment on almost 16 million in funding with invoices aging beyond 220 days. As a matter of fact, 74 invoices totaling more than 11 million dollars have been aging BEYOND 160 days. I can't understand how we are supposed to finish any project in a year time frame when we can't even get paid by the fund administrator in a timely manner. Aside from that, submitting a modification completely stops all invoice processing... throwing away needed time to complete this project. A modification for work to be done after disposal takes place prevents invoice processing for payments to cover the disposal. When we took on this project, my fear was that contractors and equipment vendors would cause a huge delay for us but it turns out it is the fund administrator that has paused all progress. I am truly scared we will not be able to get this project completed on time because of the way this program is being handled.

*Explain whether you are finding commercially available equipment in the marketplace. If not, then explain efforts taken to obtain replacement equipment.

Lead time for some equipment is sitting at 4-6 months which makes it even worse that we can't get paid by the fund administrator on time.

* If there is additional information relevant to the preceding questions or that you believe the Commission should be aware of, please include the information below.

Right now, about 46 of the 126 applicants have submitted invoices with 80% of the payments being approved going to three companies, Given we have invoices aging at 221 days with less than half of the participants submitting invoices, I shutter to think what is going to happen when all applicants are submitting invoices in July. Now is the time to fix this process!!!

**APP 179**

## Program Compliance

*Indicate whether recipient has fully complied with (or is in the process of complying with) all requirements of the Reimbursement Program.

☑ Yes ☐ No

*Indicate whether recipient has permanently removed from its communications network, replaced, and disposed of (or is in the process of permanently removing, replacing, and disposing of) all covered communications equipment or services that were in the recipient's network as of the date of submission of the recipient's application requesting funding.

☑ Yes ☐ No

If you have not yet completed the removal, replacement, and/or disposal process, what estimated percentage of the removal, replacement, and/or disposal process have you completed?


*Indicate whether recipient has fully complied with (or is in the process of complying with) the timeline submitted by the recipient. If not, provide explanation for deviation.

☑ Yes ☐ No

*The filer has indicated no to a question in this section, please provide additional information.

## Certifications

*By checking the box and providing the electronic signature where indicated below, the Certifying Official on behalf of the filer certifies under penalty of perjury that:

☑ (1) The Certifying Official is authorized to submit this status report on behalf of the above-named filer and, based on information known to me or provided to me by employees responsible for the information being submitted, the information set forth in this status report has been examined and is true, accurate, and complete, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. The Certifying Official acknowledges that any false, fictitious, or fraudulent information or statement, or the omission of any material fact on this status report or on any other document submitted by the filer may subject the filer and the undersigned to punishment by fine or forfeiture under the Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or can lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812). (2) The filer is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that the filer will maintain detailed records, including receipts, of all costs eligible for reimbursement actually incurred for a period of 10 years; and will file all required documentation for its expenses. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.

## Certifier Information

Certifier Signature    Leslie Williams

Certifier Phone   8064441375

Certifier Name   Leslie Williams

Certifier Email   leslie.williams@siwirelessllc.cc

Certifier Title   President

Date Signed   2023-04-12

# Status 7.11.23

# SCRP Status Update

FCC Form 5640

OMB Control No. 3060-1270

File No.  SC-SU0001888

## Applicant Information

Applicant FRN  0019623834

Applicant Name  SI Wireless, LLC

Applicant Email  leslie.williams@siwirelessllc.c

Applicant Phone  8064441375

Applicant Address  PO Box 8826

Applicant City  Columbia

Applicant State  SC

Applicant ZIP Code  29202

## Contact Information

☑ Is the contact the same as the contact listed on the Application Request for Funding Allocation? If not, please list below.

Contact Name  Leslie Williams

Contact Email  leslie.williams@siwirelessllc.c

Contact Phone  8064441375

Contact Address  PO Box 8826

Contact City  Columbia

Contact State  SC

Contact ZIP Code  29202

*Indicate which deadline you are meeting with this filing.

2023-07-10

**APP 184**

## Explanation of Effort and Availability of Commercial Equipment

*Provide an explanation of efforts undertaken, and challenges encountered, in permanently removing, replacing, and disposing of covered communications equipment or service.

We are 8 months into the one year deployment period for this program. We have been reimbursed 11.2 of 71.6 million allocated to us while we have invoiced 16 million. Our modification to show what we were doing with 39% funding vs 100% stayed in review for 155 days during which all of our invoices went unpaid. This of course caused us to suspend much of the work during this period but our one year time frame was not suspended. So we are now in between a rock and a hard place of having to submit modifications in order to submit billings in order to be reimbursed in order to complete the work that all needs to be complete in 4 months from now and step one, the modification, might take longer then all of the time we have left. Hopefully we can suggest some things to improve this situation for ourselves and for others.

A non portal means of communication is essential. We are getting repeat and serial RFI's that we respond to over again, mainly through the portal but the message is not getting through. The vendors affected by these are not getting paid while others are; many vendors don't understand this and that can ruin the teamwork on a construction project.

Some continuity of who is doing the reviews combined with some channels for communication above is needed especially for companies like ours that have started earlier than others and are going about this in a different order (ie ripping then replacing instead of a simultaneous process). We have invited those reviewing our project to the market to gain an understanding of each others needs to get through this together in the easiest manner please consider this.

Eliminate those processes in place right now that seem to create more waste then prevent it. Without a doubt you should be able to submit for reimbursement a cost that comes in under the category amount without a modification . You should also be able to submit an invoice across a couple categories if the vendor bills you that way or offers you a bundled often lower cost. And for sure the invoicing activities should not be shut down or affected at all by submitting modifications that are required on this program.

The big picture is that with 39% funding and a one year clock ticking away there is a near certainty that participants will not end up with a comparable network. There is also no incentive for waste or unreasonable payments. The risk of fraud and abuse is to participants who started down this path and committed to this program in good faith who are at risk of running out of time and funds by delays in reimbursements causing them to miss the time table to receive funding which is only a fraction of the funds required to begin with.

*Explain whether you are finding commercially available equipment in the marketplace. If not, then explain efforts taken to obtain replacement equipment.

Lead time for some equipment is still sitting at 4-6 months which makes it challenging to complete this project in the one year time frame.

* If there is additional information relevant to the preceding questions or that you believe the Commission should be aware of, please include the information below.

## ProgramCompliance

*Indicate whether recipient has fully complied with (or is in the process of complying with) all requirements of the Reimbursement Program.

☑ Yes ☐ No

*Indicate whether recipient has permanently removed from its communications network all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipients application request for funding.

☑ Yes ☐ No

If recipient has not yet completed the removal process, what estimated percentage of the removal process have you completed?

*Indicate whether recipient has replaced all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☐ Yes ☑ No

If recipient has not yet completed the replacement process, what estimated percentage of the replacement process have you completed?

2

*Indicate whether recipient has disposed of all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☑ Yes ☐ No

If recipient has not yet completed the disposal process, what estimated percentage of the disposal process have you completed?

*Indicate whether recipient has fully complied with (or is in the process of complying with) the timeline submitted by the recipient. If not, provide explanation for deviation.

☑ Yes ☐ No

**APP 188**

\*The filer has indicated no to a question in this section, please provide additional information.

## Certifications

*By checking the box and providing the electronic signature where indicated below, the Certifying Official on behalf of the filer certifies under penalty of perjury that:

☑ (1) The Certifying Official is authorized to submit this status report on behalf of the above-named filer and, based on information known to me or provided to me by employees responsible for the information being submitted, the information set forth in this status report has been examined and is true, accurate, and complete, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. The Certifying Official acknowledges that any false, fictitious, or fraudulent information or statement, or the omission of any material fact on this status report or on any other document submitted by the filer may subject the filer and the undersigned to punishment by fine or forfeiture under the Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or can lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812). (2) The filer is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that the filer will maintain detailed records, including receipts, of all costs eligible for reimbursement actually incurred for a period of 10 years; and will file all required documentation for its expenses. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.

## Certifier Information

| | | | |
|---|---|---|---|
| Certifier Signature | Leslie Williams | Certifier Phone | 8064441375 |
| Certifier Name | Leslie Williams | Certifier Email | leslie.williams@siwirelessllc.cc |
| Certifier Title | President | | |
| Date Signed | 2023-07-11 | | |

# Status 10.5.23

APP 191

# SCRP Status Update

FCC Form 5640

OMB Control No. 3060-1270

File No.  SC-SU0002156

## Applicant Information

Applicant FRN  0019623834

Applicant Name  SI Wireless, LLC

Applicant Email  leslie.williams@siwirelessllc.c

Applicant Phone  8064441375

Applicant Address  PO Box 8826

Applicant City  Columbia

Applicant State  SC

Applicant ZIP Code  29202

## Contact Information

☑ Is the contact the same as the contact listed on the Application Request for Funding Allocation? If not, please list below.

Contact Name  Leslie Williams

Contact Email  leslie.williams@siwirelessllc.c

Contact Phone  8064441375

Contact Address  PO Box 8826

Contact City  Columbia

Contact State  SC

Contact ZIP Code  29202

*Indicate which deadline you are meeting with this filing.

2023-10-08

**APP 192**

## Explanation of Effort and Availability of Commercial Equipment

*Provide an explanation of efforts undertaken, and challenges encountered, in permanently removing, replacing, and disposing of covered communications equipment or service.

SI Wireless has experienced incredible delay in getting its network replaced mainly due to a lack of funding and funding approval. Since the last status update was submitted in July 2023, SI Wireless has received 31 payments amounting to less than 2% of our billings to date and received 136 Requests for Information (RFI) from the Fund Administrator. SI Wireless is still waiting to be reimbursed on invoice(s) originally submitted into the portal on October 17, 2022, which means as of this status update, this invoice is over 350 days old. This is an example of one of many invoices that are aging over 300 days. Invoices that have been approved have taken, on average, 170 days to be processed.We have six invoices in the portal that are in "Under Initial Review" status that have aged over 250 days.

The below example shows the invoice cycle for one invoice originally submitted on 10/17/2022:

10/17/2022 invoice submitted
11/15/2022 received first RFI from EY (29 days waiting on Fund Administrator)
11/15/2022 responded to first RFI
05/19/2023 received second RFI from EY (185 days waiting on Fund Administrator)
05/19/2023 responded to second RFI
06/01/2023 received third RFI (13 days waiting on Fund Administrator)
06/07/2023 responded to third RFI
07/12/2023 received fourth RFI (35 days waiting on Fund Administrator)
07/20/2023 responded to fourth RFI
07/31/2023 received fifth RFI (11 days waiting on Fund Administrator)
08/06/2023 responded to fifth RFI
08/10/2023 received sixth RFI (4 days waiting on Fund Administrator)
08/23/2023 responded to sixth RFI
09/06/2023 received seventh RFI (14 days waiting on Fund Administrator)
09/06/2023 responded to seventh RFI (28+ days still waiting on Fund Administrator)
Currently this invoice is still under review, with a total of 319 days of Fund Administrator processing.

It seems the invoice approval format has changed as well. SI Wireless has come to this conclusion given that monthly management invoices, with the exact same format that were previously getting approved, are now receiving RFIs compared to previous months' invoices that did not receive RFIs. Since the last status update, SI Wireless has also noticed a change in Fixed Fee Billing approvals. SI Wireless has engineering contractors who bill on a fixed fee basis, which per the FCC's FAQs is permitted as long as the services are "[s]pecific engineering professional services that result in work products or deliverables (e.g., system design, vendor selection, technical bid support and subcontractor retention and management)...[f]or professional services billed as fixed fee, the Participant must submit a copy of the vendor invoice and quote that provides a cost and activity 'build-up' to support the expense. Fixed fee invoices must specify the time period covered by the invoice, a description of the services rendered, and the amount due." SI Wireless's engineering contractors' deliverables fall within the described permitted activities in the FAQs. However, SI Wireless has received numerous RFIs from the Fund Administrator concerning such fixed fee invoices which is causing inordinate delay of receiving funds hindering SI Wireless from completing its work.

The end result is countless hours of administrative work that are driving up the costs of the program unnecessarily. Until the last week, SI Wireless has made numerous attempts to discuss its concerns with the Fund Administrator to reach a solution but has received extremely delayed responses from the Fund Administrator in trying to

**APP 193**

*Explain whether you are finding commercially available equipment in the marketplace. If not, then explain efforts taken to obtain replacement equipment.

Lead time for some equipment is still sitting at 4-6 months. It becomes especially challenging when you combine this with lengthy delays getting funding from the Fund Administrator,

SI Wireless has had difficulty purchasing the needed 4G equipment for its network replacement due to cash flow issues that have stemmed from excessive delays in processing invoices. As each day passes, the 4G equipment that SI Wireless needs to purchase becomes harder to obtain because the equipment vendor is producing more 5G equipment and less if any 4G LTE equipment. The delays associated with the Fund Administrator's processing of invoices and the overall funding short fall of the program is causing concern that by the time SI Wireless gets its invoices approved and paid the equipment might not be available and it will be back to the drawing board to get new equipment approved and then get in line to get funding to place an order then actually have the equipment scheduled and delivered. There is a very clear problem with specifying 4G equipment and then not fully funding the program and/or allowing the 4G equipment to be purchased now when it is available.

The concept of having SI Wireless rebuild its network with 40 cents on the dollar is not feasible to start but coupling that with the lack of timely payments we have experienced means we are spending all our time dealing with that issue and not with the needed deployment. Please understand that with the funding shortfall there is in essence a 60% holdback in this program when 10% is normal and allow the reimbursements and payments to flow to in our case at least redeploy to a sustainable level. Given its current limited ability to access the funds approved for allocation, coupled with the excessive invoice processing delays, SI Wireless is behind on its one-year timeline and will be seeking an extension to complete the process.

**APP 195**

## Program Compliance

*Indicate whether recipient has fully complied with (or is in the process of complying with) all requirements of the Reimbursement Program.

☑ Yes ☐ No

*Indicate whether recipient has permanently removed from its communications network all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipients application request for funding.

☑ Yes ☐ No

If recipient has not yet completed the removal process, what estimated percentage of the removal process have you completed?

*Indicate whether recipient has replaced all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☐ Yes ☑ No

If recipient has not yet completed the replacement process, what estimated percentage of the replacement process have you completed?

7

*Indicate whether recipient has disposed of all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☑ Yes ☐ No

If recipient has not yet completed the disposal process, what estimated percentage of the disposal process have you completed?

*Indicate whether recipient has fully complied with (or is in the process of complying with) the timeline submitted by the recipient. If not, provide explanation for deviation.

☐ Yes ☑ No

APP 196

*The filer has indicated no to a question in this section, please provide additional information.

## Certifications

*By checking the box and providing the electronic signature where indicated below, the Certifying Official on behalf of the filer certifies under penalty of perjury that:

☑ (1) The Certifying Official is authorized to submit this status report on behalf of the above-named filer and, based on information known to me or provided to me by employees responsible for the information being submitted, the information set forth in this status report has been examined and is true, accurate, and complete, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. The Certifying Official acknowledges that any false, fictitious, or fraudulent information or statement, or the omission of any material fact on this status report or on any other document submitted by the filer may subject the filer and the undersigned to punishment by fine or forfeiture under the Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or can lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812). (2) The filer is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that the filer will maintain detailed records, including receipts, of all costs eligible for reimbursement actually incurred for a period of 10 years; and will file all required documentation for its expenses. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.

## Certifier Information

Certifier
Signature        LESLIE WILLIAMS                    Certifier Phone  8064441375

Certifier Name  LESLIE WILLIAMS                     Certifier Email  leslie.williams@siwirelessllc.cc

Certifier Title  PRESIDENT

Date Signed      2023-10-08

# Status 1.8.24

APP 199

# SCRP Status Update

FCC Form 5640

OMB Control No. 3060-1270

File No. SC-SU0002362

## Applicant Information

Applicant FRN  0019623834

Applicant Name SI Wireless, LLC

Applicant Email leslie.williams@siwirelessllc.c

Applicant Phone 8064441375

Applicant Address PO Box 8826

Applicant City  Columbia

Applicant State  SC

Applicant ZIP Code 29202

## Contact Information

[✓] Is the contact the same as the contact listed on the Application Request for Funding Allocation? If not, please list below.

Contact Name Leslie Williams

Contact Email leslie.williams@siwirelessllc.c(

Contact Phone 8064441375

Contact Address  PO Box 8826

Contact City  Columbia

Contact State  SC

Contact ZIP Code  29202

*Indicate which deadline you are meeting with this filing.

2024-01-06

**APP 200**

## Explanation of Effort and Availability of Commercial Equipment
*Provide an explanation of efforts undertaken, and challenges encountered, in permanently removing, replacing, and disposing of covered communications equipment or service.

SI Wireless once again finds itself in a prolonged waiting period for the fund administrator to approve its modification, submitted on November 17th, 2023. As a consequence, all invoice processing has been halted since that date, given that any modification results in the suspension of all invoice processing. To put this into perspective, a total of 209 days and counting have been spent waiting for the fund administrator to approve SI Wireless Modifications, keeping in mind that the initial timeframe for this program is 365 days. Please note this modification delay is separate from the invoice processing delays that have invoices waiting over a year for approval. The issue of waiting for the fund administrator's approval is not a new challenge for SI Wireless. Currently, there are over 200 invoices awaiting approval, and even more disconcerting is the fact that over 100 invoices are in queue, still in a submitted status, meaning they have not been looked at by the fund administrator yet (the oldest one is 188 days old). These invoices are lingering, awaiting attention. This situation has led to extraordinarily long wait times for invoice approval, with one invoice taking nearly a year to get approved. The specific invoice in question underwent a 352-day approval process, during which 319 days were spent waiting for the fund administrator to issue 7 Requests for Information (RFIs). The crux of the matter was fixed fee billing, a method explicitly deemed acceptable for professional engineering services according to the FAQ, yet the fund administrator refused to acknowledge it as such. This refusal resulted in an increase of almost $300 to the invoice when converted to Time and Materials (T&M). Moreover, the extensive back-and-forth during the RFIs, each billed at $175+ per hour, not only incurred substantial costs but also consumed countless hours. In the pursuit of preventing waste, fraud, and abuse, Ernst & Young inadvertently escalated spending for this invoice by a substantial amount for SI Wireless with their RFIs and associated work. This calculation does not even account for the number of hours billed by Ernst & Young to "process" the invoice and submit RFIs. Adding to the frustration, multiple invoices received identical RFIs more than once, indicating a lack of consistency in the approval process and posing a significant challenge to operational efficiency. In their report to Congress on January 5th, the FCC indicated that the fund administrator received a total of 12,983 reimbursement claims. The question arises: How many of these invoices experienced a significant increase due to unnecessary back-and-forth discussions? The reimbursement structure for Ernst & Young's services as the fund administrator remains unclear, but it appears that the current practices may inadvertently generate additional work, leading to unnecessary delays and potentially inflated billables for the benefit of Ernst & Young, the Fund Administrator. The frequency with which these issues are occurring suggests that this is not an isolated incident but rather a recurring pattern. The delay in reimbursement is not only impeding the timely completion of the project but is also creating an environment where waiting for an entire year to have an invoice reimbursed is deemed acceptable. This mindset and program approach of delay is unsustainable and seriously jeopardizes successful achievement of program goals as well as the viability of program participants. The Fund Administrator's actions, which lead to an inflation of work for one invoice by a significant amount, should be unacceptable. Waiting 319 days for the Fund Administrator to produce 7 questions (RFIs) on an invoice should be unacceptable. The fact that these challenges are pervasive across most of our invoices, not just one, should be unacceptable. The waste the Fund Administrator is generating on nearly every invoice we submit should be unacceptable.

**APP 201**

*Explain whether you are finding commercially available equipment in the marketplace. If not, then explain efforts taken to obtain replacement equipment.

Lead time for some equipment is still sitting at 4-6 months. It becomes especially challenging when you combine this with lengthy delays getting funding from the Fund Administrator,

* If there is additional information relevant to the preceding questions or that you believe the Commission should be aware of, please include the information below.

Furthermore, the lack of a limit on the amount of time the Fund Administrator can sit on an invoice should be unacceptable. SI's position is that the Fund Administrator be directed to correct each of its unacceptable actions and administer the program timely and efficiently to ensure its success and that of participant vendors. There is a pressing need to question who is ensuring that the Fund Administrator is not creating waste, fraud, and abuse. SI Wireless currently has open invoices submitted in 2022, 446 days ago, still sitting in under initial review, which should be deemed unacceptable. The Fund Administrator's failure to approve invoices in a timely manner may force SI Wireless into bankruptcy and to cease operations. As this outcome likewise should be deemed unacceptable, it is in the best interest of program success to correct and improve the Fund Administrator's performance as soon as possible. While acknowledging that funding shortages and supply chain issues are challenges, the predominant blame for the program's poor performance lies with the Fund Administrator.

## ProgramCompliance

*Indicate whether recipient has fully complied with (or is in the process of complying with) all requirementsof theReimbursementProgram.

☑ Yes ☐ No

*Indicate whether recipient has permanently removed from its communications network all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipients application request for funding.

☑ Yes ☐ No

If recipient has not yet completed the removal process, what estimated percentage of the removal process have you completed?

*Indicate whether recipient has replaced all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☐ Yes ☑ No

If recipient has not yet completed the replacement process, what estimated percentage of the replacement process have you completed?

10

*Indicate whether recipient has disposed of all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☑ Yes ☐ No

If recipient has not yet completed the disposal process, what estimated percentage of the disposal process have you completed?

*Indicate whether recipient has fully complied with (or is in the process of complying with) the timeline submitted by the recipient. If not, provide explanation for deviation.

☐ Yes ☑ No

**APP 204**

*The filer has indicated no to a question in this section, please provide additional information.

## Certifications

* By checking the box and providing the electronic signature where indicated below, the Certifying Official on behalf of the filer certifies under penalty of perjury that:

☑ (1) The Certifying Official is authorized to submit this status report on behalf of the above-named filer and, based on information known to me or provided to me by employees responsible for the information being submitted, the information set forth in this status report has been examined and is true, accurate, and complete, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. The Certifying Official acknowledges that any false, fictitious, or fraudulent information or statement, or the omission of any material fact on this status report or on any other document submitted by the filer may subject the filer and the undersigned to punishment by fine or forfeiture under the Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or can lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812). (2) The filer is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that the filer will maintain detailed records, including receipts, of all costs eligible for reimbursement actually incurred for a period of 10 years; and will file all required documentation for its expenses. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.

## Certifier Information

| | | | |
|---|---|---|---|
| Certifier Signature | LESLIE WILLIAMS | Certifier Phone | 8064441375 |
| Certifier Name | LESLIE WILLIAMS | Certifier Email | leslie.williams@siwirelessllc.cc |
| Certifier Title | PRESIDENT | | |
| Date Signed | 2024-01-08 | | |

# Status 7.8.24

APP 207

Status Update Submitted 07/08/24

According to the FCC website, "The Supply Chain Reimbursement Program (SCRP) is a $1.9 billion program created by the FCC at the direction of Congress to reimburse providers of advanced communications services with ten million or fewer customers for reasonable expenses incurred in the removal, replacement, and disposal of communications equipment and services produced or provided by Huawei Technologies Company (Huawei) or ZTE Corporation (ZTE)." SI Wireless participated in this program with the understanding that dismantling their fully functional 204-site network serving rural communities in Western Tennessee and Kentucky to protect national security would be followed by timely reimbursements for the replacement network as per the program guidelines. While SI Wireless has fulfilled its part by removing this potential national security threat, the administrative execution of the program has been lacking.

SI Wireless engaged in the SCRP Program, aiming to complete it within the mandated 12-month timeframe, expecting timely reimbursements and reasonable responsiveness. However, they faced significant delays and inefficiencies that have threatened their business and livelihoods. Reimbursements for incurred expenses have not been timely, significantly increasing costs and administrative burdens. For instance, SI Wireless is awaiting approval for reimbursement of over 258 invoices totaling nearly $15 million, with an average invoice age of 189 days. Some invoices have been pending approval for over 628 days, while 145 invoices are still in "Submitted" status without an initial review, the oldest pending for over a year. Since the end of April, the FCC has reimbursed less than $6,000 of the outstanding $15 million, which is unacceptable. SI Wireless has had to take out loans to cover expenses, accruing non-reimbursable interest due to the delay in reimbursements.

SI Wireless has completed the decommissioning and destruction of the old network and is about 80% complete on redeploying over 80 replacement sites, including 22 new build towers. The delays in invoice processing and cost modification approvals have caused multiple program extensions. SI Wireless has been waiting over 356 days for FCC approval of cost modifications including the currently pending modification submitted on April 25th. The delay in approval of this modification is preventing the submission of additional invoices totaling over $30 million for work completed last year. The inefficiencies and delays in the program administration have significantly impacted the network rebuild, public service, and company sustainability.

The Fund Administrator (Ernst and Young) appears to have a conflicting interest, with no incentive to quickly process invoices as they are paid hourly. This results in excessive back-and-forth over minor discrepancies, serial RFIs, and extensive delays in reimbursement. Participants with ongoing government-supplemented cash flow are less impacted by these delays, while SI Wireless, operating on a rip-and-replace basis without ongoing revenue, is significantly affected. The program's reimbursement process should reflect the participants' methods of accomplishment and not be based on incorrect assumptions.

Furthermore, the program's mandate to use older LTE technologies instead of newer 5G or upcoming 6G technologies is counterproductive, causing the US to fall behind in the technology race. Participants should be promptly reimbursed for reasonably incurred expenses, and the remaining 61% of projected expenses should be addressed. The FCC has 10 years to audit payments, and the current shortfall in timely reimbursements is making it extremely challenging for participants like SI Wireless to replace their networks.

SI Wireless is also burdened by continuous administrative demands and false statements from the program administrators. The company is repeatedly asked to certify payments and provide affidavits, a demand seemingly not placed on other participants. The focus should be on restoring service to customers rather than on unnecessary inquiries. SI Wireless aims to complete the job and receive reimbursement in accordance with program guidelines. However, the current administration of the program is not meeting these expectations, necessitating a change.

**APP 208**

**Action Items Requested:**

1. Hold the Fund Administrator accountable for reimbursing reasonable expenses incurred as part of this program.
2. Approve our Cost Modification to continue submitting for reimbursement of reasonably incurred expenses.
3. Accelerate reimbursement of the allocated amount, given it is less than half the funding needed, and future funding is uncertain.
4. Understand our business and treat our circumstances appropriately, considering the extended performance period.
5. Remove the LTE-only policy given the extended performance period and state of technology.
6. Require that government-funded fiber builds allow access to all potential users, including competitors, at the same price.
7. End the practice of serial requests for information that drag out the process.
8. Ensure that those receiving government funds in rural America provide access to competitors at equal prices.
9. Provide guidelines for timely item approval, with responses subject to specific shot clocks.
10. Focus on completing what can be achieved with short funding rather than attacking participants.
11. Fund the remaining 60% of the program to continue network buildout and provide affordable internet to underserved rural communities.
12. End retaliatory actions and work together to fix structural issues in the program administration.

In conclusion, SI Wireless remains committed to providing high-quality, low-cost internet to rural communities despite the inefficiencies and inequalities in the program administration. They continue to build out a comparable network in areas neglected by large telecom monopolies and the US government, even though loans have been necessary to fund progress. The focus should be on restoring service to customers, especially those affected by the cancellation of the Affordable Connectivity Program (ACP), which offered a subsidy for affordable internet. SI Wireless's $30 flat fee unlimited high-speed wireless internet product is critical for these communities. Lastly, it has not gone unnoticed that we received an In-depth Data Validation and Request for Information unrelated to any invoice following the publication of our last candid interview about our participation in this program.

# EXHIBIT 7



# KALBIAN HAGERTY LLP

ATTORNEYS AND COUNSELORS AT LAW

**Steve Leckar**
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

888 17th Street, NW, Suite 1200
Washington, DC 20006

December 13, 2024

**By E-Mail and First-Class Mail**
John A. Corbin, Esq.
Sarah McNally, Esq.
Aaron Gershbock, Esq.
Fraud Division
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

> *Re: SI Wireless, LLC*
> *File No. EB-FD-24-00036576*

Dear Dan, Sarah, and Aaron:

Each of you posed numerous questions of Leslie Williams, SI Wireless, LLC's ("SI"), principal, over the November 26th five-hour interview. Subsequently, we received your email of December 5th which we will address after discussing this matter's current posture.

### A. SI's overview: it committed no wrong.

First, at the interview's outset you stated that the Enforcement probe could continue or ripen into an investigation. Or the staff and your managers might determine to close the matter and we might not hear further from Enforcement, which would return everything to the Chief Financial Officer. Rather than respond, I chose to await the interview's conclusion. It is time to share our perspective.

SI's reimbursements and modifications and an already desultory payment processing have been halted for nine months. This has dramatically impacted a company that cannot activate its large rural network and serve customers and thereby generate cash flow. The FCC's continued delay has financially devastated SI's reasonable commercial expectations.

Moreover, a case could be made that SI, whose primary market is a 44-county swath of rural Tennessee, finds itself involuntarily fitting within the scenario described in FCC Chair's recent correspondence with Congressional appropriations committee chairs. In importuning Congress to fully fund the Secure and Trusted Communications Program, which has run over 300% of its intended performance period, she stated, among other things, that:

**APP 211**



Because so many of the Reimbursement Program participants serve rural and remote areas of the country, any shut down of network facilities could remove the only provider available. Moreover, the inability of any participant to fully remove, replace, and dispose of equipment and services contemplated under the law raises serious national security concerns.[1]

As you know, SI was a wireless operator for thirteen years before applying to the SCRP program. Long before Enforcement made its presence, the arcane reimbursement methodologies, inordinate delay, and dismissive attitude that the Program Administrator, the FCC's chosen handmaiden, demonstrated towards SI were at best trying and at worst vexing. As matters presently stand, SI now has answered several thousand questions (including subparts) posed by Enforcement that enquired about every nook and cranny of SI's business.

At bottom, the Enforcement probe seems fixated on whether SI had customers when it applied for SCRP funding. We have responded that SI entered program relying on the FCC's alluring published and widely circulated representations that the government wanted providers quickly replacing covered equipment, for which it promised they'd be paid once the SCRP was authorized, and appropriations were funded. It is undeniable that the FCC never once demanded any level of customers and that SI's FCC-approved business plan disclosed that it had stripped away almost all customers to run the most limited of service while it denuded and then rebuilt its network. In undertaking that process, which anyone would have understood contemplated the barest of service, if any, SI relied on the public words of Mr. Harkrader and other senior staff: Les Williams both heard and acted on their exhortation, as we wrote you and as he reaffirmed in the interview. Meanwhile, out of an abundance of caution, SI had provided identified equipment for license-save purposes to several identified persons to access the spectrum, along with Rural Connect, which also took service from it.

Now the staff has posed further granular of demands, thereby causing even more time to drag by. We will address these requests one further time to prove that SI has acted properly. But we must give fair notice. Nothing in the authorizing legislation or rules requires SCRP recipients to be providing any level of service when applying to participate in the program. And no legal basis allows the FCC to ignore, much less disclaim, legitimate reliance interests reflected by the circumstances presented here. If Enforcement contends otherwise, then please advise us where its conception is so enshrined in the law or regulations. We then will ask the Commission whether it is fair and just as a legal matter to throttle a small business that relied on the agency's written and oral promises, only to be subjected to a Javert-like probe launched immediately after SI responded truthfully to the press's questions about the SCRP's dysfunctions.

Otherwise, we hope that SI's answers will persuade Enforcement that the probe should end; that you communicate to the CFO that the freeze should be lifted forthwith; and direct the Program Administrator to pay SI promptly all undisputed invoices, some now outstanding over

---

[1] Letter from Hon. Jessica Rosenworcel-Hon. Steny Hoyer, *et al* at p.3 (Nov. 26, 2024).

**APP 212**



KALBIAN
HAGERTY LLP
ATTORNEYS AND COUNSELORS AT LAW

two 2 years, as well as those invoices it has been unable to submit due to modification requirements during this period and before; and reimburse SI's legal expenses incurred incident to the Enforcement/CFO investigation.

### B. Response

SI's response to the ten questions is as follows.

1. Documents showing network usage by the five identified customers (six lines), e.g. documents showing volume of calls, capacity utilized, total storage utilized, graphs showing usage volumes for each customer or each of the towers providing service, tower ping data, etc.

   Response: SI doesn't have this data, it was not necessary to capture it when these customers were set up. It disclosed and the FCC and Program Administrator knew full well that it would be stripping out the covered equipment and destroying it and then rebuilding its network. And its business plan was approved. A reasonable observer would understand that it would be highly inefficient to devote the time and funds to procure such equipment and then record the data: SI's full energies were devoted to stripping, then replacing, then restoring service as quickly as possible. It had no incentive to allow the new network to lie fallow.

2. Along the same vein as #1, documents showing SI Wireless network usage by the persons/contractors staying in the trailer parks.

   Response: SI doesn't have this data, what it has is the status of whether the tower equipment was up or down. All its plans are unlimited and the workers are people helping it on this project and providing important feedback. Usage is not required by SI. Those making use of these connections can be asked, if this information is needed beyond what has been provided. See (SI Wireless Network Usage.pdf)

   It also is important to point out that SI needs to be reimbursed to set up and implement the functionality that captures data usage.

3. Identify all "specialized equipment" referenced by Mr. Williams that was used by SI Wireless to maintain its license.

   Response: See Exhibit A (SIWIRELESS 21-000025.pdf)

4. All executed tower lease agreements between Rural Connect and SI Wireless. As well as information regarding who negotiated on behalf of each party and who drafted the contract(s).

**APP 213**



Response: There are no executed tower lease agreements between these two parties. But as you know, each are controlled by Leslie Williams, who also owns SI. Nonetheless, in the interests of moving this process along, sample photographs of equipment that SI installed on identified RC sites, which were taken for archival purposes, are supplied.

5.  The missing signature page for the Eric DaVersa Contractor Agreement. See (SIWIRELESS 26-000277)

Response: Your copy is identical to SI's. It was signed by the contractor but not by Mr. Williams. No billings were submitted for this contractor's services and a fully executed contract would be remitted before that occurred.

6.  Documents showing Charley Karnes obtained his 5.84% ownership in Rural Connect after September 21, 2022.

Response: See (RC Employee Membership Interest Pool 2-15-23.pdf). Correspondence sent when he received his initial interest is included and confirms Mr. Williams's letter's representations.

7.  Information explaining the "freight recovered" line item found in the Mimosa Networks, Inc. invoice. (SIWIRELESS 16-000009)

Response: SI has inquired of Mimosa Networks but to no avail. Mimosa Networks, a product of U.S.-based Airspan, was acquired around the time of the purchase by India-based Reliance and the number on the invoice now goes to a voicemail. It has proven impossible to get anyone to answer it and email correspondence.

  a.  https://hub.radisys.com/press-release/radisys-acquires-mimosa-to-accelerate-availability-of-broadband-access-for-advancing-societies#:~:text=June%2019%2C%202024,(NYSE%20American:%20MIMO).
  b.  https://www.telecompetitor.com/fixed-wireless-vendor-mimosa-has-a-new-owner/

In any event, SI bought products from Mimosa for testing purposes for radio and backhaul networks. Bear in mind that none of the corresponding invoices for those acquisitiosn

**APP 214**



were submitted for reimbursement, let alone the $500 one you asked about.[2] Mimosa is not a current product of SI's network redeployment.

8. Documents showing the $200,000 Owner's Draw Contract (SIWIRELESS 26-000338) was withdrawn by SI Wireless; along with the date of withdrawal and any reasons for the action.

Response: The $200,000 agreement was never submitted as an invoice. It was submitted in a Cost Modification in December 2022 and then removed in March 2023. This removal was part of similar removals of valid expenses required to get SI's modification approved after five months of no invoice processing and no reimbursement payments had elapsed. There was a discussion with Ernst & Young at the time that this expense could and should be submitted differently, which is what SI did. In the FCC portal, when one removes a cost, it does not give a confirmation. Instead, it removes the cost from the modification. Only invoices give confirmation of the withdrawal.

9. The line item invoices associated with the drafting of the $200,000 Owner's Draw Contract (SIWIRELESS 26-000338) and the $250,000 Annual Salary Contract (SIWIRELESS 26-000336).

Response: There were no invoices associated with the $200,000 owner draw because, as Mr. Williams stated, it was withdrawn. The only invoice submitted for Leslie Williams' compensation is attached. (SIInternal Labor_#IL-07-07-2023-0019623834_103023.pdf)

10. The names of any individuals present when the $200,000 Owner's Draw Contract (SIWIRELESS 26-000338) and the $250,000 Annual Salary Contract (SIWIRELESS 26-000336) were executed.

Response: There were no individuals present or required when these were executed, other than Mr. Williams, the firms' common principal. His compensation, incidentally, is below the average identified in the Cost Catalog for individuals with a comparable skill set.

C. Conclusion and request for prompt corrective action

We hope that Mr. Williams' responses, supplemented by this letter and the supporting documentation, convinces the Bureau that SI has satisfied any conceivable legal and factual issues. The Bureau should inform the Chief Financial Officer of that, so that SI is promptly paid

---

[2] We trust you will appreciate why SI, which is owed $14 million on processed invoices alone, is nonplussed by the staff's focusing on a $500 rebate for a product that SI never asked the government to underwrite.

**APP 215**



the undisputed sums due.  It is unfair in the extreme to starve this company financially any longer by unsupported surmise and conjecture.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
    Dan Daly, Esq.

# EXHIBIT 8



## KALBIAN HAGERTY LLP
### ATTORNEYS AND COUNSELORS AT LAW

**Steve Leckar**
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

888 17th Street, NW, Suite 1200
Washington, DC 20006

December 20, 2024

**By E-Mail and First-Class Mail**
John A. Corbin, Esq.
Sarah McNally, Esq.
Aaron Gershbock, Esq.
Fraud Division
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

> Re: *SI Wireless, LLC*
> File No. EB-FD-24-00036576

Dear John, Sarah, and Aaron:

This responds to John's email sent yesterday morning.

Question #2: Can you please provide the identity and contact information for the persons/entities represented in SIW's response as "making use of these connections" or point us to where in SIW's document production that information can be found.

Answer: Vendors and contractors made use of service at the workstations at SI's trailers in Alamo, TN and Cedar Grove, TN, to access their email, cell phones and text messages. Those are necessary aspects of Twenty-First Century work. For those on this project making use of SI internet services the list includes the following, many of whom were let go due to SI's financial situation.

Eric Daversa 858 245 6702, Ken Nickerson 505 870 6241, Charles Robarts 386 288 6666, JHC/Jason Holliday 760 713 0552, Justin Cook 760 596 2833, Victor Gillespie 760 996 2831, Troy Bruce 760 646 6878, Jeff Sikut 985 960 2676, Mike Feigenbaum 303 748 2714, Eric Steinmann 803 363 6363, Flat Wireless Project manager Roy Fuhr 913 216 6624, Construction manager Leonard (Beau) Crawford 405 712 4271, Tom Sams 970 234 9996, and Chris Elkin 864 484 1313.

Question #6: SIW provided the document "RC Employee Membership Interest Pool 2-15-23.pdf", which references a "signature page of the attached agreement that you are receiving with this agreement". Can you please provide the referenced signature page related to this letter for Charley Karnes.

**APP 218**



Answer: It is attached.

Question #9: EB believes SIW may have misinterpreted this request. EB is asking for SIW to provide any billings and/or invoices generated by the contract drafter that were provided to SIW for the work performed in drafting the $200,000 Owner's Draw and the $250,000 Annual Salary Contracts.

Answer: Mr. Williams, as SI's principal and sole executive, was the signer on both sides and created these agreements. He used as a guide various form that he obtained and then sought to create instruments that, using his layperson's language, reflected his intent to memorialize the value of his services. There are no billings or invoices or amounts submitted for reimbursement associated with drafting either contract.

Lastly, although you didn't ask this, we think it is important to understand that Mr. Williams never intended to work for free on this complex project. He has worked and continues to work week in and week out: he's SI's principal interface with government officials and the public in its large rural market. Frequently a 16-hour workday has proved the norm for him. And there have been plenty of times he's worked in the wee hour of the morning undertaking administrative matters, which a trip to the FCC Portal would confirm. SI received a single $233,000.00 reimbursement for his services under the salary agreement that was submitted and nothing for his substantial expenses over the several years he's led the company on this project. We would venture that the billing for his work pales in comparison to the sums that the agency has been and is reimbursing for other Chief Executive Officers' compensation and in a comparatively timely manner, to boot.

Sincerely,

Stephen C. Leckar

encl
cc: Leslie Williams
    Dan Daly, Esq.

**APP 219**

**TRANSFEREE MEMBER**

By: _____

Name: <u>Charley Karnes</u>

Membership Interest in Rural Connect, LLC:<u>2.14%</u>

5

**APP 220**

# EXHIBIT 9



**Steve Leckar**
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

## KALBIAN HAGERTY LLP
### ATTORNEYS AND COUNSELORS AT LAW

888 17th Street, NW, Suite 1200
Washington, DC 20006

December 23, 2024

**By E-Mail and First-Class Mail**
John A. Corbin, Esq.
Sarah McNally, Esq.
Aaron Gershbock, Esq.
Fraud Division
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

> *Re: SI Wireless, LLC*
> *File No. EB-FD-24-00036576*

Dear John, Sarah, and Aaron:

On Friday morning, John emailed to ask the following question.

"For Question #6, EB originally asked for 'Documents showing Charley Karnes obtained his 5.84% ownership in Rural Connect after September 21, 2022.' Your letters provide documentation showing Mr. Karnes obtained a 2.14% ownership interest in Rural Connect on December 19, 2022. Please provide documentation showing when Mr. Karnes obtained the remaining 3.7% of his ownership interest in Rural Connect."

The answer flows from Eric Steinmann's divestment of his interest in Rural Connect ("RC") in December 2022. You may recall that SI's response to RFI 2 stated that on June 21, 2022, Mr. Williams purchased his interest in RC from Ally Finance Corp. on settlement of a bankruptcy action, "[f]ollowing which there were other changes to the ownership and management of this company. Including [*sic*] Eric Steinmann transferred his share of ownership through Ally Finance to the employees of Rural Connect." (SIWIRELESS 02-000004).

That transfer followed the Program Administrator asserting to Messrs. Williams and Steinmann that a contractor (recall that Mr. Steinmann is the Project Manager overseeing SI's decommissioning and replacement activities) could not have an ownership interest in any company involved in the project. Our December 13th letter, as supplemented by our December 20th letter and the accompanying documentation, explained that Mr. Karnes initially received a 2.14% interest in RC on or about December 19, 2022. (Letter of Dec. 13, 2024, at p.4, Q#6 & accompanying RC Employee Membership Interest Pool 2-15-23.pdf); Letter of Dec. 20, 2024, at pp. 1-12 & accompanying signature page.)

**APP 222**



**KALBIAN HAGERTY** LLP
ATTORNEYS AND COUNSELORS AT LAW

    As further reflected by the enclosed Membership Interest Transfer Agreement, most of the twelve employees accepted the transfer, which was for a stated consideration of $1.00 per share.  However, four (Kristian Jackson, Brittney Sanchez, Connie Emison, and Justin Puckett) did not return signed forms.  Because the RC informational tax return had to be filed, Charles Karnes agreed to hold the percentages allocated to these four employees, which totals another 3.56%.  He still holds the additional 3.56% transferred to him.  A copy of the membership interest ledger is attached; a "X" appears by the names and corresponding interests of those employees who accepted the interests.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
    Dan Daly, Esq.

**APP 223**

# EXHIBIT 10

APP 224



**Steve Leckar**
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

# KALBIAN HAGERTY LLP

ATTORNEYS AND COUNSELORS AT LAW

888 17th Street, NW, Suite 1200
Washington, DC 20006

December 23, 2024

**By E-Mail and First-Class Mail**
Dan Daly, Esq.
Office of the Chief Financial Officer
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

> *Re: SI Wireless, LLC*
> *File No. EB-FD-24-00036576*

Dear Mr. Daly:

I want to address with the Chief Financial Officer our deep concern with the freeze order, which was taken in March but not disclosed to SI Wireless, LLC ("SI") until mid-July. We ask the CFO to release the hold, which is unjustifiable. When we raised this issue with the Enforcement Bureau ("EB"), they told us they are independent of the CFO and that we should contact you. We are doing that directly, trusting that you will perform an independent review of this letter and our prior correspondence with the Enforcement Bureau, each of which has been copied to you.

If the CFO cannot or will not take this curative action, please direct us to the responsible FCC official who has that authority.

A. <u>Background</u>

SI Wireless still finds itself trying to get reimbursed for funds spent ripping and replacing the Huawei equipment that had supported its network since 2010. date it has been reimbursed $24,475,356.45, has invoices waiting to be reimbursed in the amount of almost $15,000,000— the oldest unpaid invoice was submitted for reimbursement on October 19, 2022. It also has more than $37,000,000 in reimbursable expenses that it cannot submit as invoices because it must await related modifications being processed one at a time, which has taken up to five months to accomplish. The most recent such modification has been pending since April 25, 2024. Of course, even if SI could submit a statement, the funding hold has made it impossible to obtain any reimbursement.



In the past, when months elapsed without reimbursements, SI spoke truthfully about its experience in this program and the FCC appears to have taken exception to that. The government and the Program Administrator's acts and omissions have a dramatic impact on SI. SI is not a USF-supported company. The process of ripping and then replacing its network has left it without cash flow during most of the SCRP program whereas other program participants who've been replacing and then ripping and are USF-supported have been covering their expenses—and likely earning profits while this program has been extended.

B. <u>There is cogent evidence that the FCC has retaliated against SI</u>.

After an article in the WASHINGTON POST about SI Wireless' experience appeared in May 2024, well over into what was touted as a one-year program, SI Wireless was no longer just being starved of reimbursements; it became a target. In July 2024, SI received a Notice of Hold, which referenced the POST article and claimed that there are questions pertaining to whether "SI Wireless is in fact a provider of advanced communications service to customers and therefore eligible to participate in the SCRP." This occurred two years after its application was reviewed and its business plan twice approved and on the heels of SI Wireless being quoted in a national publication of record.

The meager number of reimbursements now have been frozen while SI has incurred massive funds and energy answering over 2400 questions (including subparts) posed by the government. These questions supposedly pertain to why the company lacked paying customers at the time it applied for the program on a network that the FCC had clearly asked to be ripped long before then and then did so. Since then, the review has morphed into questions on why SI has paid cost catalog amounts, which is mystifying inasmuch as the FCC instructed providers to use that reference to determine pricing.[1]

Despite this seemingly impenetrable bureaucratic fen there are undeniable material facts pointing inexorably to the conclusion that the CFO's continued tolerance of the status quo is unsupportable—which is not to concede that it ever was justifiable:

1. Prior to the Secure and Trusted Communications Act of 2019 ("Act") SI Wireless had an operational Huawei network serving members of our communities in Rural Tennessee since 2011.

---

[1] It is fair to compare SI Wireless' plight with the Program Administrator's good fortunes. At no point was Ernst & Young's Fund Administration looked at, even after hundreds of its employees systematically cheated on CPA ethics exams and misleading the subsequent investigation. It was fined $100,000,000 while serving as the Fund Administrator for this program. *See* "Ernst & Young to Pay $100 Million Fine After Auditors Cheated on Ethics Exams," NEW YORK TIMES (June 28, 2022) (available at https://www.nytimes.com/2022/06/28/business/ernst-young-sec-cheating.html). At no point was its business before the FCC impacted. Yet somehow, SI, while following the rules given out by the FCC for this program, has been starved financially and shunted aside.

**APP 226**



2. SI Wireless' customer base peaked at about 30,000 subscribers, far under the Act's two million customers ceiling.

3. SI is a small provider, acting in good faith to comply with FCC directives.

4. In December 2020 the FCC's Second Report and Order sent to Congress stated: "Some providers have already started the process to remove and replace problematic equipment from Huawei and ZTE from their networks. We applaud these providers for proactively taking steps to increase the security of their networks notwithstanding the uncertainty of federal government assistance. As such, we will allow providers to obtain reimbursement for costs reasonably incurred prior to the creation and funding of the Reimbursement Program for the removal, replacement, and disposal of covered equipment and services." SI was aware of this announcement being promulgated: it was widely circulated among internet service provider and the market was abuzz over it.

5. SI's principal, Leslie Williams, also listened attentively to remarks delivered by Trent Harkrader, Chief of the Wireline Competition Bureau, in a September 28, 2021, SCRP Webinar that: "This will not be simple. Removing insecure equipment from existing networks after installation is challenging because historically, they have been closed and deeply integrated with little opportunity to mix and match equipment from different vendors. In some cases, it means starting over from scratch.... make no mistake the time is now to remove this equipment from our network." (He was joined by another high-ranking staff member, Justin Faulb, who echoed his comments.)

6. SI Wireless began that massive undertaking in 2021 and continued it in a near-seamless process. And it has provided the Enforcement Bureau and you evidence that all along it maintained a trimmed-down level of customer service although neither the statute nor the regulations demanded any customer base, provided the statutory limit wasn't exceeded.

7. No one has pointed to SI having submitted any improper forms or asking the government to underwrite any unauthorized expenses that the firm incurred.

Now, SI has ripped out the banned equipment on over two hundred sites and has new equipment. It replaced these products with compliant materials on 88 sites.[2] It is working to optimize the network, aiming to bring these sites online and serve customers, and is currently

---

[2] These sites represent about 25-30% of the coverage SI Wireless had prior to becoming a participant in this program.



serving on some initial sites. However, it cannot complete the process due to insufficient funding. As a result, the funding freeze is jeopardizing a minority-headed company's existence. It has massive obligations due to contractors and vendors—incurred in unambiguous reliance on the FCC's public and private urging that advanced communications providers proceed forthwith to jettison Huawei and ZTE materials from their networks.

### C. Other dysfunctional effects of the unjustified freeze

No responsible business could operate by treating its customers in such a cavalier manner. It is no less lamentable when the federal government commissions services and demands new equipment only to stiff-arm a regulated entity that did its bidding and seeks to remain in business.

Notably the aforesaid considerations don't even account for the time value of money, the earnings that SI would have received from its system being on air in a timely fashion had the system worked as the organic statute contemplated. It was, after all, Congress' intent and design that successful SCRP applicants' destruction and renovation process should take a year, albeit with provisions for individual extensions of time if proven necessary. 47 U.S.C. § 1603(d)(6)(A)-(C). SI Wireless has been seeking to get its modifications and invoices paid in a timely manner for far beyond that period, only to meet repeated artificial roadblocks.

This unhealthy situation is not news to the FCC: SI's September 17th letter explained to you and the EB that SI's principal and regulatory counsel, Caressa Bennet, Esq., had alerted the staff beginning in the fall of 2022 that the Administrator wasn't processing submissions in anything close to an orderly way. SI provided references to pertinent documents lodged in the FCC's files reflecting efforts to persuade senior agency officials that something was amiss in the Program's administration. As well, SI referred the FCC to two of about a dozen articles in the trade press where the firm had called attention to shortfalls of the sort later identified in the FCC's Fourth Report to Congress.

One further point. Our response emphasized the significant public interest in fostering innovative competition within SI's primarily rural geographic market, many of whose residents participate in the so-called Affordable Connectivity program. SI is prepared to deliver broadband technology at highly competitive pricing—$30 per month for self-installation and $45 per month for company installation. Currently, providers like Aeneas and Starlink dominate the market, with Aeneas's monthly pricing being twice as much ($59.95 to 89.95) and Starlink's four times as much ($120).[3]

---

[3] Several of the remaining providers that offer relatively low-cost service also differ from SI's business model in that they require fixed-term contracts.



Given these factors' confluence, our question remains: how does ongoing indecision from the agency align with the legislative goal of timely replacing providers' systems and supporting vibrant, competitive markets?

D. Conclusion

If brought up to date so that SI can pay its contractors, that would promptly achieve the 39% allocated so far and which is represented by completed work. This would allow the firm to provide essential services and foster competition in a third of the area it previously served. This support would give it a crucial opportunity to sustain its business rather than face the risk of closure from, of all things, having participated in the Program.

We ask that you respond to this letter promptly.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
    Trent Harkrader, Esq.
    John Corbin, Esq.
    Sarah McNally, Esq.
    Aaron Gershbock, Esq.

**APP 229**



July 11, 2025

***VIA E-MAIL ATTACHMENT***
Leslie Williams
SI Wireless, LLC
P.O. Box 8826
Columbia, SC 29202
leslie.williams@siwirelessllc.com

Steve Leckar
Kalbian Hagerty LLP
888 17th Street NW, Suite 1200
Washington, DC 20006
sleckar@kalbianhagerty.com

**Re: Notice of Funding Hold: Secure & Trusted Communications Networks
Reimbursement Program**       SCRP Number: SCRP0001013      FRN: 0019623834

Mr. Williams:

By this letter, we are informing you that the Federal Communications Commission (FCC or Commission) will at this time continue the funding hold placed on SI Wireless LLC (SI Wireless) on July 11, 2024 that applies to all disbursements from the Secure and Trusted Communications Networks Reimbursement Program (SCRP or Reimbursement Program), as administered by the Commission, the Wireline Competition Bureau (Bureau), and the Fund Administrator.[1] Based on the totality of the circumstances, including our review of SI Wireless's Sept. 17, 2024 response to the Funding Hold Letter and additional credible information obtained since the letter, we have determined that withholding disbursements continues to be warranted due to serious questions about SI Wireless's eligibility to participate in the Reimbursement Program as a provider of advanced communications services, and accordingly whether disbursing funds would violate the statute and rules governing the Reimbursement Program.

The Reimbursement Program was established to provide reimbursement to providers of advanced communications service with fewer than 10 million customers for reasonable costs incurred in removing, replacing, and disposing of Huawei and ZTE communications equipment and services. In making these reimbursements, however, Congress directed the Commission to take "all necessary steps" to avoid waste, fraud, and abuse in order to ensure that the Reimbursement Program funds are used only for authorized purposes and in accord with

---

[1] Letter from Jae Seong, Chief Financial Officer, Federal Communications Commission, to Leslie Williams, President, SI Wireless, LLC (July 11, 2024) (Funding Hold Letter).

1

**APP 231**

Program requirements.[2] The Commission takes this ongoing obligation seriously and recognizes the importance of protecting the integrity of the Reimbursement Program, particularly in light of the limited funds available. This includes ensuring that only entities that are eligible to participate in the Reimbursement Program receive reimbursements.

In May 2024, we became aware that the president of SI Wireless, Leslie Williams, reportedly stated that the SI Wireless network had been shut down since 2022, which raised questions of whether SI Wireless provides advanced communications service and whether SI Wireless made misrepresentations to the Commission regarding its eligibility during its participation in the Reimbursement Program.[3] On May 10, 2024, the Bureau sent the company Requests For Information (RFI) regarding the operation of SI Wireless's network and its provision of advanced communications service to customers. On May 24, 2024, SI Wireless submitted its RFI responses (Responses) to the Bureau.

SI Wireless's responses to those RFIs failed to demonstrate that SI Wireless currently provides advanced communications service to customers, as required by section 1.50004(a) of the Reimbursement Program's rules. The Responses indicated that: (1) SI Wireless "does not have normal business operations or cash flow"; (2) SI Wireless's revenue from providing advanced communications services to customers "is minimal as [SI Wireless] has not launched commercially yet," and that it does "not have normal operations or cash flows during this process and this cannot be expected until [SI Wireless] complete[s] launching what [it] deem[s] a commercially launchable interim footprint that is ready to meet customer expectations for the entire area"; and (3) SI Wireless's reference to direct customers indicates that the customers only "perform work on this project," which raises the question of whether they are in fact customers at all.[4]

Because these responses did not alleviate the Commission's concerns, it issued the Funding Hold Letter to SI Wireless. In response, SI Wireless asserted generally that it had five customers at the time of the application to the Reimbursement Program[5] and there was no requirement that these customers pay SI Wireless for the provision of advanced communications services.[6]

SI Wireless represented that at the time of its application to the Reimbursement Program it "had executed written agreements with two individuals and three firms to provide them" with advanced communications service.[7] The Commission contacted these purported customers to

---

[2] 47 U.S.C. § 1603(e)(1) ("The Commission shall take all necessary steps to avoid waste, fraud, and abuse with respect to the Program."); 47 CFR § 1.50004(p) ("The Commission delegates authority to the Wireline Competition Bureau, to adopt the necessary policies and procedures relating to allocations, draw downs, payments, obligations, and expenditures of money from the Reimbursement Program to protect against waste, fraud, and abuse . . . .").

[3] Eva Dou, *Funding shortfall for new tech endangers rural cell service, FCC says*, Wash. Post, May 2, 2024, https://www.washingtonpost.com/technology/2024/05/02/huawei-rip-remove-order-threatens-service/

[4] SI Wireless May 24, 2024 RFI Response at 4. *But see* SI Wireless's FCC Form 5640 (answering "Yes" to the question asking "Is the applicant a Commercial Broadband Provider?") (May 25, 2022).

[5] Letter from Steven Leckar to John A. Corbin, Esq. and Dan Daly, Esq., at 1-2, 13-14, 16-18 (Sept. 17, 2024) (SI Wireless Response to Funding Hold/LOI).

[6] *Id.* at 14.

[7] *Id.* at 13-14, 17.

2

**APP 232**

determine whether they were using advanced communications services from SI Wireless at the time of SI Wireless's application to the Reimbursement Program on January 20, 2022.[8] None of these five purported customers confirmed taking any service from SI Wireless at the time of its application to the Reimbursement Program.[9] SI Wireless's claim that even if it had no paying customers, it is plausible for the Commission to assume that "zero is a number" and that SI Wireless is still an advanced communications provider even if it has no customers is not persuasive.[10] The Secure and Trusted Communications Networks Act of 2019 (Secure Networks Act) directs the Commission to make reimbursements to "providers of advanced communications service to replace covered equipment or services,"[11] which contemplates an active provider serving customers.[12]

In order to meet the criteria under the Secure Networks Act to participate in the Reimbursement Program, SI Wireless must be a provider of advanced communications service[13] to United States customers.[14] The certification language contained in each SCRP recipient's request for a funding allocation to participate in the Reimbursement Program makes clear that this is an ongoing requirement and includes an attestation to this effect. In connection with each of SI Wireless's requests for funding allocation, an SI Wireless officer certified[15] under penalty of perjury, and in relevant part, that:

> The Applicant is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and

[8] Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, WC Docket No. 18-89, Report and Order, 35 FCC Rcd 14284, 14333 (2020) (*Second Report and Order*) ("A provider seeking to participate in the Reimbursement Program must have [ten] million or fewer customers, as of the date its application is filed.").

[9] See *Second Report and Order*, 35 FCC Rcd at 14333, para. 114 ("We interpret 'customers of such provider' . . . to mean customers taking advanced communications service from the provider . . . .").

[10] SI Wireless Response to Funding Hold/LOI at 13.

[11] 47 U.S.C. § 1603(a).

[12] See *Second Report and Order*, 35 FCC Rcd at 14333, para. 114; Protecting Against National Security Threats to Communications Supply Chain Through FCC Programs, WC Docket No. 18-89, Third Report and Order, 36 FCC Rcd 11958, 11989-11991, paras. 75-84 (2021) (defining provider of advanced communications services with customers).

[13] See 47 CFR 1.50004(a) (The term "advanced communications service" means high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology with connection speeds of at least 200 kbps in either direction.)

[14] See 47 U.S.C. § 1603(a); 47 CFR § 1.50004(a). The Secure and Trusted Communications Networks Act of 2019 limited eligibility in the Reimbursement Program to "providers of advanced communications service." 47 U.S.C. § 1603(a). In the *Second Report and Order*, the Commission clarified that "[e]ligibility to participate in the Reimbursement Program is limited to 'providers of advanced communication service.'" *Second Report and Order*, 35 FCC Rcd at 14332, para. 110; *id.* at 14284, paras. 114-15 ("To identify customers of advanced communications service, providers must count those customers purchasing a service that includes a broadband connection with a speed of at least 200 kbps in one direction").

[15] President Leslie Williams signed this certification when he submitted SI Wireless's final application to the Reimbursement Program on January 20, 2022.

3

orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.[16]

The Commission is statutorily required to limit eligibility in the Reimbursement Program to providers of advanced communications service.[17] SI Wireless's responses to the RFI questions, the Funding Hold Letter, and the information supplied by those purported to have been customers of SI Wireless at the time of its application provide a basis to reasonably believe, based on the totality of the circumstances, that all or part of further Reimbursement Program payments to SI Wireless would violate the statute and rules governing the program.

In its response to the Funding Hold Letter, SI Wireless also argues that the FCC imposed no requirement that a participant in the Reimbursement Program maintain normal business operations or cash flow during the course of its participation in the Reimbursement Program.[18] However, each submission from SI Wireless to the Reimbursement Program includes a certification that it has complied with all Reimbursement Program rules, including the requirement that participants be providers of advanced communications services. The FCC had knowledge that SI Wireless had begun the process of shutting down certain portions of its network when SI Wireless applied to the Reimbursement Program but had no reason to believe SI Wireless would cease operations completely.

After the investigation made to date, it remains unclear whether SI Wireless has ongoing network operations or whether it has been a provider of advanced communications service at any point during its participation in the Reimbursement Program. The Commission cannot deviate from the Secure Networks Act's requirement that an applicant must be a provider of advanced communications service to customers in order to be eligible for the Reimbursement Program. Moreover, the Commission cannot authorize payments to be made in violation of Reimbursement Program rules. As a result, we will continue to investigate and review the following:

1) Whether SI Wireless is in fact a provider of advanced communications service to customers and therefore eligible to participate in the SCRP (and/or was such a provider at the time of its application); and
2) Whether SI Wireless has made misrepresentations or otherwise lacked candor in its dealings with the Commission with respect to its eligibility and otherwise over the course of its participation in the SCRP.

The Commission will continue to hold any and all payments to SI Wireless until it can assess the available facts and further consider what appropriate action should be taken consistent with the Commission's obligation to protect its programs from waste, fraud, and abuse. Please be advised that in addition to this hold, the Commission may seek to recover other amounts that

---

[16] Wireline Competition Bureau Announces Best Practices for Equipment Disposal and Revises FCC Form 5640 Certifications for the Secure and Trusted Communications Networks Reimbursement Program, WC Docket No. 18-89, Public Notice, 36 FCC Rcd 14061, 14083, Appx. B: Revised Certifications for FCC Form 5640: SCRP Application Request for Funding Allocation, Section 1.50004(c) (Part C) (Certification 2).

[17] 47 U.S.C. § 1603(a); 47 CFR § 1.50004(a); *Second Report and Order*, 35 FCC Rcd at 14332, para. 110.

[18] SI Wireless Response to Funding Hold/LOI at 7-12.

APP 234

are determined to have been disbursed to SI Wireless from the Reimbursement Program in violation of statutory requirements or Commission rules.

SI Wireless is permitted to demonstrate why payments from the Reimbursement Program should not be held, in whole or in part. Among the factors we may take into account are the nature and scope of the issues, the amount of money potentially involved, the ability to repay the funds if found to be improperly paid, and the effect a hold would have on customers. SI Wireless has until 30 days from the date of the letter to respond to this notice with any information that it believes the Commission should consider. If SI Wireless does not respond to this notice, then any requested reimbursements may be permanently denied.

If you have any questions, please contact Dan Daly, who can be reached at 202-418-1832, or at Daniel.Daly@fcc.gov.

Sincerely,

*Timothy Siekierka*

Timothy Siekierka for Jae Seong
Chief Financial Officer
Federal Communications Commission

cc:     Joseph Calascione, Chief, Wireline Competition Bureau, FCC
        Patrick Webre, Acting Chief, Enforcement Bureau, FCC
        Mark Stephens, Managing Director, FCC
        Adam Candeub, General Counsel, FCC

5

**APP 235**



Steve Leckar
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

# KALBIAN
# HAGERTY LLP
ATTORNEYS AND COUNSELORS AT LAW

888 17th Street, NW, Suite 1200
Washington, DC 20006

July 21, 2025

**By E-Mail and First-Class Mail**
Dan Daly, Esq.
Office of the Chief Financial Officer
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

*Re: SI Wireless, LLC*
*File No. EB-FD-24-00036576*

Dear Mr. Daly:

On behalf of SI Wireless, LLC, I am responding to Mr. Siekierka's letter of July 11th extending the Federal Communications Commission's ("FCC") hold on disbursements from the Secure and Trusted Communications Networks Reimbursement Program. The Court of Appeals' briefing order issued on July 2nd, nine days before the CFO unilaterally continued a funding hold that had been in effect for a year.

Mr. Siekierka's letter demands a response thirty days later, or by Sunday, August 10th, which would roll over to Monday August 12th. As you doubtless know, SI's Reply to the FCC's Opposition to SI's petition for a writ of mandamus will be due in the Circuit Court of Appeals on August 18th. I have a scheduled one-week vacation out of town beginning immediately afterwards.

Although the Notice of Continued Funding Hold concerns some common issues with the appellate matter, it raises other discrete and fact-intensive questions. I would prefer to focus on these two matters *seriatim*, while remaining attentive to several other matters for which I am responsible in the Court of Appeals and other courts.

In these circumstances, I ask that you grant SI an extension of time to respond to the CFO's letter, to and including September 5th. This brief continuance, which continues the status quo, will not prejudice the FCC in any way.

Separately, the Siekierka letter demands that SI inform the CFO of "the nature and scope of the issues, the amount of money potentially involved, the ability to repay the funds if found to be improperly paid, and the effect a hold would have on customers." However, the letter nowhere cites or refer us to where the FCC's rules and/or internal guidelines set forth these



criteria are referenced. Could you identify the sources, so that we may evaluate the FCC's guidelines and precedent as we prepare SI's response?

Lastly, the Siekierka correspondence asserts that "[t]he Commission contacted … purported [SI] customers to determine whether they were using advanced communications services from SI Wireless at the time of SI Wireless's application to the Reimbursement Program on January 20, 2022" and that the named customers claim they were not. SI denies this allegation and asks that it be provided with copies of documentation supporting the FCC's claim so that we may appropriately reply.

Should you have any questions, please contact me.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
Mark Stephens, Managing Director, FCC
Joseph Calascione, Chief, Wireline Competition Bureau, FCC
Patrick Webre, Esq., Acting Chief, Enforcement Bureau, FCC
Adam Candeub, Esq., General Counsel, FCC

APP 238

 

**[EXTERNAL]: RE: Notice of Continued Funding Hold: Secure & Trusted Communications Networks Reimbursement Program**

**From** Steve Leckar <sleckar@kalbianhagerty.com>

**Date** Mon 6/1/2026 10:14 AM

**To** Steve Leckar <sleckar@kalbianhagerty.com>

**From:** Daniel Daly <Daniel.Daly@fcc.gov>
**Sent:** Tuesday, July 29, 2025 11:48 AM
**To:** Steve Leckar <sleckar@kalbianhagerty.com>
**Cc:** Adam Candeub <Adam.Candeub@fcc.gov>; Joseph Calascione <Joseph.Calascione@fcc.gov>; Mark Stephens <Mark.Stephens@fcc.gov>; Patrick Webre <Patrick.Webre@fcc.gov>
**Subject:** RE: [EXTERNAL]: RE: Notice of Continued Funding Hold: Secure & Trusted Communications Networks Reimbursement Program

Mr. Leckar,

Per your request, OMD agrees to grant SI Wireless, LLC an extension to respond until September 11, 2025. Regarding your question about why the letter asks SI Wireless to inform the Commission of the nature of the issues, amount of money involved, etc., the factors are part of what the Commission may consider in deciding whether to with withhold payments, per Section 5 of the Funding Hold Directive, https://www.fcc.gov/sites/default/files/fcc-directive-1038-2.pdf. Regarding your request for documentation concerning interviews with alleged customers, the Enforcement Bureau does not release information regarding an ongoing investigation.

Dan Daly
Deputy Managing Director
Office of the Managing Director
Federal Communications Commission
202-418-1832



**From:** Steve Leckar <sleckar@kalbianhagerty.com>
**Sent:** Monday, July 21, 2025 1:35 PM
**To:** Daniel Daly <Daniel.Daly@fcc.gov>
**Cc:** Adam Candeub <Adam.Candeub@fcc.gov>; Joseph Calascione <Joseph.Calascione@fcc.gov>; Mark Stephens <Mark.Stephens@fcc.gov>; Patrick Webre <Patrick.Webre@fcc.gov>
**Subject:** [EXTERNAL]: RE: Notice of Continued Funding Hold: Secure & Trusted Communications Networks Reimbursement Program

Some people who received this message don't often get email from sleckar@kalbianhagerty.com. Learn why this is important

CAUTION: This email originated from outside of the Federal Communications Commission. Do not click on links or open attachments unless you recognize the sender and trust the content to be safe. If you suspect this is a phishing attempt, please use the 'Report Message' feature in Microsoft Outlook or forward the email to the NSOC.

Stephen C. Leckar
Kalbian Hagerty LLP
888-17th Street, N.W.
Suite 1200
Washington, D.C. 20006
Direct: 202 419 3286
Fax: 202 223 6625
Cell: 703 217 2273

**From:** Timothy Siekierka <Timothy.Siekierka@fcc.gov>
**Sent:** Friday, July 11, 2025 2:06 PM
**To:** leslie.williams@siwirelessllc.com; Steve Leckar <sleckar@kalbianhagerty.com>
**Cc:** Adam Candeub <Adam.Candeub@fcc.gov>; Joseph Calascione <Joseph.Calascione@fcc.gov>; Mark Stephens <Mark.Stephens@fcc.gov>; Patrick Webre <Patrick.Webre@fcc.gov>; Jodie Griffin <Jodie.Griffin@fcc.gov>; Daniel Daly <Daniel.Daly@fcc.gov>; Jae Seong <Jae.Seong@fcc.gov>; Brian Cruikshank <Brian.Cruikshank@fcc.gov>; Ty Covey <Ty.Covey@fcc.gov>
**Subject:** Notice of Continued Funding Hold: Secure & Trusted Communications Networks Reimbursement Program

To Mr. Williams,

By the attached letter, we are informing you that the Federal Communications Commission (Commission) is continuing its hold on disbursements from the Secure and Trusted Communications Networks Reimbursement Program, as administered by the Commission, the Wireline Competition Bureau, and the Fund Administrator, to your company, SI Wireless, LLC (SI Wireless).

If you have any questions, please contact Dan Daly, who can be reached at 202-418-1832, or at Daniel.Daly@fcc.gov.

Tim Siekierka (Acting)
*for Jae Seong*
Chief Financial Officer
Office of Managing Director
Federal Communications Commission

**APP 241**

# SI Wireless, LLC

P.O. Box 8826
Columbia, SC 29202

August 15, 2025

**VIA EMAIL**
Jae Seong, Chief Financial Officer
Federal Communications Commission
45 L Street, N.E.
Washington, D.C. 20554

Re: **SI Wireless, LLC**
**SCRP Number SCRP0001013; FRN 0019623834**
**Response to Notice of Funding Hold: Secure and Trusted Communications**
**Networks Reimbursement Program**

Dear Mr. Seong:

On behalf of SI Wireless, LLC ("SI Wireless"), this letter responds to the Federal Communications Commission's ("FCC" or "Commission") July 11, 2025, letter ("July 2025 Letter") notifying the company that the Commission will continue the funding hold placed on disbursements to SI Wireless under the Secure and Trusted Communications Network Reimbursement Program ("SCRP" or "Reimbursement Program"). As detailed below, SI Wireless was – and remains – fully eligible for reimbursement under the Secure Network Act enacting the Reimbursement Program, it has demonstrated full compliance at every step with that statute, and as encouraged by the FCC, the company has acted swiftly to remove telecommunications equipment deemed dangerous and a threat to national security. Despite this, the Commission has failed to carry out its many obligations under the Secure Network Act including to reimburse SI Wireless even though on numerous occasions the FCC assured service providers like SI Wireless that they would not be penalized for moving quickly as we did to execute Congress's vision to ensure the integrity of the nation's telecommunications infrastructure.

Continued withholding of SCRP funds is unwarranted and contrary to the law as SI Wireless was found eligible and has complied with all requirements mandated by Congress in order to be reimbursed under the Reimbursement Program. The FCC's delay in disbursing funds for invoices submitted by SI Wireless has caused ongoing damage to the company and to its customers and the public it serves. This damage is existential to our company and can only be partially remedied by action within a matter of weeks to reimburse us amounts due as a start. Further delay daily causes the equipment we have purchased to become more obsolete, continues to allow other providers at greater price points to become more entrenched, and erodes our ability financially to compete or even to continue in business. When this freeze is promptly lifted, we will need your agency to provide additional time, flexibility and consideration for SI Wireless to replace its network due to the undue delay and cessation in processing our company's invoices for reimbursement. The boat we built to carry us to project completion has foundered, and righting it so we can get underway again will be every bit as difficult as the metaphor suggests. Among other reasons for prompt action is the lasting harm caused to a

**APP 243**

population of citizens with limited means and the necessity to maintain the public's faith that they can rely on the government's representations and assurances that they will be reimbursed for taking actions asked of them to protect national security.

## Background – SI Wireless's Network and Provision of Advanced Communications Service

As an initial matter, it is important to note that SI Wireless is not a "phantom" network provider seeking to take advantage of any government programs at taxpayer expense. Rather, SI Wireless is a company in the business of providing advanced wireless communication services, mobile telephony, and wireless internet service to primarily rural customers that generally lack service from the national carriers. SI Wireless constructed from its own private funds a network that was comprised of 204 sites, and it had a customer base of approximately 30,000 customers in 2017[1] SI Wireless provided service most often on an unlimited basis and at fixed monthly rates of approximately $33 per month which has been reduced to below $30 at present.

SI Wireless has served customers on a network that it purchased, constructed, and operated and the company provided customer service through customer care centers and stores that it leased or purchased and constructed. The company also provided and will continue to provide ongoing operational jobs to people in the rural communities it serves as well. SI Wireless offers customers in rural areas better coverage than other carriers, a nationwide plan, and at better prices than the national carriers. The company, prior to this program, enhanced the service of a national carrier through an affiliation arrangement (Sprint) by sharing its network with their customers. Without SI Wireless, Sprint's customers would not have had coverage in much of SI Wireless's rural service area and this remains the case presently for customers of the T mobile network that has absorbed Sprint. The revenue for SI Wireless's operations had come both from Sprint for network access, and direct payments from SI Wireless's own customers. SI Wireless did not and does not receive any USF support. Customers pay for SI Wireless's service because the company offers essential wireless services at affordable price points in rural areas that are otherwise unserved.

In late 2018 it was reported that T-Mobile and Sprint's parent companies had agreed to merge and were seeking approval from various departments of the U.S. government.[2] It was also reported that these national carriers had agreed to remove Huawei equipment (used by SI Wireless) from all their worldwide networks in order to gain approval for this merger.[3] Although no government entity thought to help ensure companies such as ours would not be adversely affected our company would have been fine absent the Huawei condition T-Mobile also had an acute lack of network facilities in SI Wireless's service area and could have benefited substantially from continuing the network-sharing arrangement. Instead, per the agreement, this

---

[1] https://www.lightreading.com/mobile-core/rural-carrier-mobilenation-apparently-shutting-down-in-january (last visited Aug. 13, 2025)

[2] https://www.reuters.com/article/world/exclusive-t-mobile-sprint-see-huawei-shun-clinching-us-deal-sources-idUSKBN1OD2IA/#:~:text=WASHINGTON%2FNEW%20YORK%20(Reuters),shut%20out%20the%20Chinese%20company. (last viewed Aug. 13, 2025).

[3] *Id.*

was scuttled, and Sprint cancelled the agreement premerger as promised and T-Mobile/Sprint customers could not use SI Wireless's Huawei-based network. As a result, our customers lost their national service areas and were left with unmarketable and unacceptable service as a result. As a company focused on providing the best service at a reduced price, we were left with only one viable decision and that was to facilitate moving ours customers to another network then quickly replacing our Huawei equipment to provide an acceptable service experience while also serving roaming or network sharing customers from T mobile or another emerging national carrier in the same way we had previously. This is the plan SI Wireless submitted for your agency's review, received formal approval for, and executed to the extent possible under the circumstances we have encountered.

In no way did SI lack candor with the FCC in our application. As we informed the FCC last September, we had 6 active lines that were on new non-covered network equipment. These subscribers had been reported on form 477 and the application asked us to report our subscribers reported on form 477[4]. To suggest that we were lacking candor in this regard [5]is to imply (if not to accuse us) not only that we believed customers were required for purposes of this program, but also that we sought to avoid complying with what we understood to be the law. Nothing in our record or in the history of our participation in this program supports such a view. To the contrary, we were among the very few carriers to heed the FCC's call to remove and replace our network when we did—even knowing it meant starting over from scratch, as our twice-approved plans disclosed. It was no secret that we were dismantling and starting over with the expectation of receiving timely payments and gaining back our customer base and more once we were finished.[6] We possessed all competence necessary to serve any number of customers, for any duration, and in any manner—had we been informed by our attorneys, through my attendance at FCC program briefings, or through our team's multiple reviews of the program rules, that such customers were required while ripping and replacing our network. We reported those customers or subscribers (your agency uses these two terms seemingly interchangeably) because we were instructed to do so and for no other purposes and certainly not with any lack of candor. Hence the latest freeze order attached hereto[7] is based on an inaccurate premise. We have also obtained and attach sworn declarations[8] from customers and the technician who installed and serviced them that substantiate our position that when SI applied it had customers taking service. Albeit not our intent to put these 6 lines forward as such they clearly indicate compliance with even the customer/subscriber requirement of unknown origin that your agency alleges[9].

---

[4] 2nd Report and Order § 56 at 28

[5] FCC Notice of Funding Hold – July 11, 2024 at 3

[6] https://www.fcc.gov/news-events/events/2021/09/secure-and-trusted-communications-networks-reimbursement-program-webinar (last visited Aug. 13, 2025).

[7] FCC Notice of Funding Hold Renewal Letter – July 11, 2025 at 2-3

[8] *See* Exhibit A – Sworn Customer Declarations

[9] *Id.*, Declarations of R. Wood, T. Karnes, K. Krueger, L. McAlpin, and M. Houston. These declarations directly contradict the Commission's contention that no customers took service from SI Wireless at the time of its application to the Reimbursement Program. See July 2025 Letter at

It is also important to understand that, unlike other carriers, SI Wireless does not receive any universal service fund ("USF") support for operating in rural areas. There might be a misunderstanding regarding this as shown in your agency's question 19 in the Letter of Inquiry date July 11, 2024 [10] wherein the FCC asked us to provide to the FCC information regarding the amount of these funds that we do not receive from once again the FCC. This leads us to wonder if your agency might be thinking that we actually were getting these funds and therefore were being unduly impatient and ungrateful as the assumption was that we were in fact being well compensated throughout this project with USF operating funds as many of the other carriers were. To be clear, *no such support is available* to help this company weather the replacement project period and we are in fact from the inception being put out of business because of the FCCs delays in this project. Indeed, once it became clear that Replacement Program funds would only be sufficient to cover approximately 39% of reimbursement requests, other rural carriers, primarily those receiving USF support, elected not to "rip and replace" covered requirement like SI Wireless did. Rather, those carriers embarked on the opposite strategy, i.e., "replace then rip", to ensure that they could continue to receive USF support to fund their operations until such time as they could be assured that full SCRP payments would be available to fully capitalize their covered equipment replacement projects. This may also be why your agency believes it is possible to have ongoing normal customers when one is ripping and replacing their network. It is not. Only if replacing then ripping can normal customers be retained and that is not how your agency refers to the program[11] nor is it consistent with your agency's call to remove networks before the inception of the program[12] even if it means starting over from scratch[13]. Those carriers like us who answered your agency's call when made to remove Huawei equipment[14] had no secure network to serve normal customers at the time applications were submitted. Yet it is SI Wireless who responded and is now affected most by the delay in making reimbursements in general and is the only participant subjected to this freeze. Your agency is required by statute to give weight to the needs of participants in equitably disbursing funds [15] and that statutory obligation at this point demands that this freeze be ended and that funds be immediately distributed to us to restore our network, which was dismantled as

---

2-3. See Exhibit A, Decl. of R. Wood at 4-5; Decl. of L. McAlpin at 3-4. These contradict the statement that no customers informed your agency of having taken service.

[10] FCC Letter of Inquiry, dated July 11, 2024 at 5

[11] As early as 2022, the FCC refers to the SCRP Program as "Rip and Replace" in their Commission Documents section of their website - See https://www.fcc.gov/document/rosenworcel-notifies-congress-demand-rip-and-replace-program (last visited Aug. 13, 2025).

[12] 2nd Report and Order at 58 *"We will not penalize these providers for taking decisive, proactive steps to secure their networks before the reimbursement program is created and funded."*

[13] *See* n.6, *supra.*

[14] 1st Report and Order at 46

[15] *See* Section I.B. & n.7, *infra.*

a requirement of this Program – this is the only way our small company will survive. Our need is assuredly the greatest at this point of any participant.

SI Wireless embarked on its network replacement program spurred on by the FCC's call to take immediate action "now" to remove covered equipment from their networks.[16] In the name of national security, the Commission represented to and assured carriers that they would be reimbursed and not be penalized for following Congress and the FCC's directives.[17] It was acknowledged that for some this would involve starting over from scratch[18] and our company, through its lawyers, actually confirmed with your agency at the time and was told that we were "good to go", but to maintain thorough records *not of customers* but of disposal of equipment.[19] Those representations and assurances have not been fulfilled for SI Wireless. The entire time we have been in this program we have been starved for the reimbursements needed to get the job done in a progressive way leading to what now seems to be our impending business failure. As of this writing, we have invoices that are up to 769 days old that are still in Submitted status. Of that time, the freeze has been in place for only 397 days; therefore, for the preceding 372 days, your agency had not even reviewed or looked at these. In your recent Spending Report, the agency claims that initiating reimbursement for invoices from January to March 2024 took an average of 11.34 days[20]. For SI Wireless, however, invoices submitted during that period took an average of 129.03 days to have the reimbursement claim initiated—and this was all before the funding freeze. The bulk of the 13% of funds reimbursed to date have been for network removal, only a bit over $11,000,000 or less than 7% percent of the funds to replace this network per costs approved by your agency have been reimbursed to SI wireless in a period that exceeds the statutory performance period by over 300% and counting. The Commission's extreme delays and extraordinarily onerous, burdensome, and languishing inquiry into SI Wireless's replacement plans have caused ever-increasing, irreparable damage, while our company's dire needs remain not considered in either the action taken by your agency or the time with which you fail to take action. SI Wireless is in severe financial distress and urgently requires the FCC to fulfil its obligations under the Secure Network Act to safeguard the nation's telecommunications network, and to ensure that SI Wireless has funding to replace its now removed network immediately in consideration of its immediate needs.

## I. Discussion

### A. The Secure Network Act Requirements

As the Commission is aware, the Secure Network Act states that the FCC "shall establish a reimbursement program" to provide funds to service providers for "permanently removing,"

---

[16] *See* Section I.B. & n.31, *infra.*

[17] *See* Section I.B. & n.30, *infra.*

[18] *See* n.6, *supra.*

[19] *See* Exhibit B – email re: FCC call on equipment destruction – Carri Bennett

[20] 6th Report and Order at 12

"replacing," and "disposing of" "covered communications equipment or services."[21] The Secure Networks Act also states that the FCC "shall make reasonable efforts to ensure that reimbursement funds are distributed equitably among all applicants...according to the needs of the applicants...."[22] In order to ensure that program participants are fairly treated under the Replacement Program and that funds are quickly distributed to participants, the statute imposes several duties on the Commission, including, among others, the duty to "mitigate the administrative burdens and costs associated with the application process";[23] provide an opportunity for applicants to cure application deficiencies;[24] and to conduct audits, reviews and field investigations,[25] Furthermore, given the national security concerns caused by Huawei and ZTE equipment, Congress included a rule of construction authorizing reimbursement "before the provider incurs the cost of the permanent removal, replacement, and disposal" of the Huawei and ZTE equipment.[26] The Secure Networks Act also established a mandatory one-year deadline for "the permanent removal, replacement, and disposal of any covered communications equipment or services ... after the date on which the Commission distributes reimbursement funds to the recipient."[27]

### B. The FCC's *2020 Supply Chain Order* and Assurances to Service Providers of Reimbursement.

In response to Congress's mandate to remove dangerous telecommunications equipment from the national telecommunications network to protect national security, the FCC adopted the *2020 Supply Chain Order* implementing the Reimbursement Program.[28] The Commission actively encouraged service providers to remove dangerous equipment from their networks and assured them that they would be reimbursed for proactively removing Huawei and ZTE equipment from their networks to protect national security. Specifically, the Commission applauded providers for proactively taking steps to increase the security of their networks even though the Reimbursement Program had not yet been established, encouraged them to take steps to remove and dispose of covered equipment, and assured them that they would not be penalized for taking decisive, proactive steps to secure their networks before the reimbursement program was created and funded.[29] The FCC stated that it would allow providers to obtain reimbursement

---

[21] 47 U.S.C. §§ 1603(a) and (c)(1).

[22] 47 U.S.C. § 1603(d)(5)(A).

[23] 47 U.S.C. § 1603(d)(2)(C).

[24] 47 U.S.C. § 1603(d)(3)(B).

[25] 47 U.S.C. § 1603(e)(3).

[26] 47 U.S.C. § 1603(h).

[27] 47 U.S.C. § 1603(d)(6)(A) ("shall be completed not later than one year").

[28] *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Second Report and Order, 35 FCC Rcd 14284 (2020) ("*2020 Supply Chain Order*").

[29] *2020 Supply Chain Order, supra note 26,* ¶ *130, at 57*

for costs reasonably incurred prior to the creation of funding of the Reimbursement Program, and SI Wireless removed and disposed of covered equipment that met the timing requirements set forth in the *2020 Supply Chain Order*, and in reliance on the FCC's representations in that order.[30]

The FCC produced a webinar on September 27, 2021, confirming that providers who acted in good faith to begin the removal and replacement process prior to the reimbursement application window would not be penalized and could still qualify for funding.[31] FCC staff emphasized that reimbursement eligibility could include expenses incurred before the program formally launched, so long as the provider met the other statutory criteria. During that webinar, Trent Harkrader, Chief of the Wireline Competition Bureau, stated that removing insecure equipment from existing networks after installation was challenging. In some cases, it would mean starting over from scratch, and emphasized that "the time is now to remove this equipment from our network." Then-Acting Associate Chief of the FCC's Wireline Competition Bureau, Justin Faulb, stated that reimbursement would be provided for expenses incurred to remove and replace equipment even though the service provider had not actually paid for the replacement equipment because the FCC recognized that small companies lacked the resources to float such expenses while waiting to be reimbursed. This reinforced that providers like SI Wireless, who acted promptly to secure their networks based on the Commission's urging, were intended to receive reimbursement and advance payments under the Reimbursement Program.

C. **SI Wireless has Complied with the Requirements in the Secure Networks Act and the FCC's Rules, and Must be Reimbursed.**

1. **SI Wireless Currently Provides Advanced Communications Service to Customers.**

In the July 2025 Letter[32], the FCC made several allegations questioning SI Wireless's eligibility for SCRP reimbursements, all of which are meritless. First, the letter states that SI Wireless's responses to the Wireless Competition Bureau's ("Bureau") May 10, 2024, Requests for Information "failed to demonstrate that SI Wireless currently provides advanced communications service to customers, as required by section 1.50004(a) of the Reimbursement Program's rules.[33] That rule, which tracks the eligibility requirements in section 1603(b) of the Secure Networks Act,[34] only requires a provider, such as SI Wireless, to have 10 million or fewer customers, and to certify that it has developed a plan and a timeline for the removal, replacement, and disposal of covered equipment. SI Wireless met those requirements. It has less than 10 million customers, and it has developed a plan and timeline to remove, replace, and dispose of its Huawei network.

---

[30] *2020 Supply Chain Order, supra note 26, ¶ 108, at 48*

[31] *See n.6, supra*

[32] FCC Notice of Funding Hold Renewal Letter – July 11, 2025

[33] *Id.* at 2.

[34] 47 U.S.C. § 1603(b).

The network replacement project required SI Wireless to transition most of its customers to an affiliate,[35] and to notify other customers that the company would no longer be able to provide them with the services they had become accustomed to receiving[36]. Also as mentioned above, SI Wireless was nonetheless able to continue to provide advanced communications service to a few customers growing to many customers once the network removal and replacement project commenced on equipment installed for this purpose. [37]

### 2. SI Wireless Had Ongoing Operations During the Relevant Time Period, and the FCC Knew This Fact.

Second, the letter states that it was "unclear whether SI Wireless has ongoing network operations or whether it has been a provider of advanced communications service at any point during its participation in the Reimbursement Program." Nowhere in the statute is "ongoing network operations" a requirement for SCRP eligibility — a point the Commission has understood, as evidenced by the fact that it has not conducted the "random field investigations to ensure that recipients of reimbursements under the Program are performing the work such recipients are required to perform under the commitments made in the applications."[38] SI Wireless has explained its plan and progress at every opportunity in its applications, modifications, and status reports[39], and has invited the Commission to visit on multiple occasions to observe the work and better understand the company's needs, as the statute charges the Commission to do.[40] Had those duties been carried out, the record would reflect facts inconsistent with the statement in the July 2025 Letter.

---

[35] Section 1603(b)(1) states that Reimbursement Program participants are those that have 10 million or fewer customers. 47 U.S.C. § 1603(b)(1). That section does not require participants to have current, active customers. To the extent that there is such a requirement, and SI Wireless does not concede that it does, SI Wireless does in fact have active advanced communications services customers. Moreover, the advanced communications services customers of its affiliates, which customers your agency has been informed of, are also considered to be SI Wireless's customers. Section 1608(b) defines "customers" for purposes of the Secure Network Act as "(A) the customers of such provider; and (B) the customers of any affiliate…of such provider." 47 U.S.C. § 1608(b). *See also 2020 Supply Chain Order* ¶ 114 ("Given the overall intent of the program to assist with the removal of equipment and services posing a national security risk and the language in the House Report, we choose to interpret customer narrowly, which in turn will *increase the pool of eligibility for the program.* Accordingly, we interpret 'customers of such provider' and 'customers of any affiliate' to mean *those customers taking advanced communications service from the provider and its affiliates.*") (emphasis added).

[36] *See* n.1, *supra*

[37] *See* Section II.C.2, n.20, & FCC Notice of Funding Hold – July 11, 2024, *infra*.

[38] 2nd Report and Order at 76

[39] *See* Exhibit C and Exhibit D

[40] *2020 Supply Chain Order, supra note 26, ¶ 109, at 48*

SI Wireless has been licensed by the FCC as a wireless telecommunications provider since 2011. SI Wireless is a critical provider of high-quality, affordable services and equipment to what was—and is intended to again be—a sizable rural customer base. Over 191,000 people in our service area formerly relied on the FCC's Affordable Connectivity Program (cite) for a $30 monthly discount on fiber service that otherwise cost $59 to $89 per month. We now offer unlimited service at $30 per month, effectively replacing this COVID-19–era subsidy program, which has since ended. No additional subsidy is required, no billions in construction funding are necessary, and the FCC has long pursued the very outcome that SI Wireless is already delivering. We also provide the benefits of competition—lower prices and higher-quality service—which your agency frequently espouses, to those in our rural areas who are not yet our customers.

Before committing to this program, as announced by our president in November of 2019, and before moving all customers off our network in January 2020[41]. SI Wireless operated a network of 204 sites providing advanced communication services to more than 30,000 customers. After the FCC announced the SCRP program and asked providers to remove insecure network equipment, SI Wireless continues to implement their approved network replacement plan which included transitioning customers to an affiliate, notifying customers that could not be transitioned that SI Wireless would not be able to continue providing them with service, and providing ongoing advanced communications—initially to a limited number of customers and eventually to hundreds—during the network replacement period.

The statute and FCC rules do not expressly require continuous service—let alone "normal" service levels—as a condition of participation in the Reimbursement Program. The Commission strongly urged service providers to remove covered equipment[42] from their networks, which SI Wireless did. The removal of that equipment necessarily reduced the level of service and coverage the company could provide compared to its network before removing Huawei equipment. SI Wireless relied on the FCC's assurances that funding would be forthcoming to replace compromised network equipment so that service could be restored. In taking these steps, SI Wireless temporarily forewent a significant portion of its revenue, with the period of reduced service reasonably expected to last approximately two years from the date of the application for removal of covered equipment. Had the FCC fulfilled its statutory obligations with respect to the company, this dispute could have been avoided.

As discussed above, the FCC's Chief of the Wireline Competition Bureau, emphasized that "the time is now to remove this equipment from our network." It is important to note that section 1603(d)(6)(A) of the Secure Networks Act requires completion of the permanent removal, replacement, and disposal of any covered communications equipment or services within one year.[43] The FCC has disbursed to SI Wireless only $24,475,356.45 of the $181,087,825.81 approved to remove, replace, and dispose of Huawei equipment and only slightly over 11 million or less than 7% of the approximate $181 million awarded has been for actually rebuilding this network. In spite of this we have already deployed equipment on over 100 sites, or about half of the 204 sites we set out to replace—a remarkable accomplishment in the face of being paid less than 7% of the funds in total and nothing for over the last year. SI

---

[41] *Supra note 34*

[42] See 2020 Supply Chain Order, ¶ 130

[43] 47 U.S.C. § 1603(d)(6)(A) ("shall be completed not later than one year").

Wireless was a financially sound company with minimal debt when it undertook the dismantling of its Huawei network and temporarily forewent revenue. Prompt completion of the network replacement, however, was essential. This was made clear in the SCRP application plan and the modification to deal with the Program's short funding submitted to and approved by the Commission[44].

### 3. SI Wireless Clearly Provided Advanced Communications Service to Customers Pursuant to the Act and the FCC has Cited Authority for its position which does not in any way support its position.

Third, the FCC incorrectly contends that "[i]n order to meet the criteria under the Secure Networks Act to participate in the Reimbursement Program, SI Wireless must be a provider of advanced communications service to United States customers."[45] The Commission reads a "currently providing" requirement into the statute and the rule that does not exist. Neither requires the ongoing provision of advanced communications service, which makes sense. It is near impossible if not completely impossible for a small, rural service provider that does not receive any USF support to both comply with the requirement to remove covered equipment from its network, while at the same time construct a brand-new network before funds have been disbursed under the Reimbursement Program. Furthermore, it is unlikely that Congress intended to exclude from the program a company that was in the process of deploying covered, high-risk equipment but had not yet acquired its customer base—a result that would flow from reading a nonexistent 'currently providing' requirement into the rule. The citations provided in the Second and Third Report and Order do not support this conclusion, nor do they offer any justification for adding provisions that do not appear in the statute. Below is the paragraph of the 2020 Supply Chain Order ¶ 114 that you cite to:

> *114. We read the phrase "customers of such provider" and "customers of any affiliate" as having more than one possible interpretation. The language could refer only to those customers purchasing advanced communications service or could refer to any customer of the provider or affiliate regardless of the service or product purchased. The accompanying House Report states "[s]ection 4 requires the FCC . . . to reimburse providers of advanced communications service with 2 million or fewer subscribers."[346] This language suggests an intention to focus on the subscribers of the provider that purchase advanced communications service in determining eligibility. The House Report also states the Reimbursement Program is established "to assist small communications providers with the costs of removing prohibited equipment and services from their networks."[347] By limiting the meaning of "customer" to those purchasing advanced communications service, potentially a large company with a small number of advanced communications service customers could qualify for the Reimbursement Program. Given the overall intent of the program to assist with the removal of equipment and services posing a national security risk and the language in the House Report, we choose to*

---

[44] *Supra note 37*

[45] July 2025 Letter at 3 & n.14 (citing and discussing 47 U.S.C. § 1603(a); 47 C.F.R. § 1.50004(a)).

*interpret customer narrowly, which in turn will increase the pool of eligibility for the program. Accordingly, we interpret "customers of such provider" and "customers of any affiliate" to mean those customers taking advanced communications service from the provider and its affiliates. A provider seeking to participate in the Reimbursement Program must have two million or fewer customers, as of the date its application is filed.*[348]

*Footnote 348 reads "If the provider's number of customers increases above two million after its application is filed, they will not lose their eligibility to participate in the Reimbursement Program by virtue of the customer increase."*

If this is the authority you cite—and assuming that no one without your agency's interpretive expertise could make sense of it—you are relying on a discussion that:

a) Starts by admitting that there is more than one possible interpretation of what you cite as a basis for effectively denying our company's eligibility.

b) starts by describing <u>customers 'purchasing'</u>, then discusses that the House's intention suggests focus on <u>Subscribers purchasing</u> but concludes that the terms at issue refer to <u>customers 'taking'</u> (underlines added) and not just that taking service from the provider and its affiliates. While 'purchasing' might suggest a paying customer, taking' in no way suggests paying to be a requirement especially when contrasted to purchasing in the same sentence. There is no question SI Wireless had customers "taking" service at the time their application was filed and beyond[46].

c) adds a timing requirement —'as of the date its application is filed'—which is nowhere in the statute. The Act states:
> (b) ELIGIBILITY.—The Commission may not make a reimbursement under the Program to a provider of advanced communications service unless the provider—
>> (1) has 10,000,000 or fewer customers; and
>> (2) makes all of the certifications required by subsection (d)(4).
>> (basically requiring a plan)

If anything, the Act required a "less than" number but certainly did not require a "more than" number at the time of making or receiving a reimbursement. For SI Wireless the first reimbursement was in late 2022[47] at a time that equipment had already been purchased and deployed. At this time paying customers were both taking service and purchasing service provided on that equipment. In addition, reading in a nonexistent "time of application filing" requirement makes even less sense when you understand the FCCs direction to rip out the networks that served customers well before the application date. To repeat you can't serve customers on a network that has been dismantled.

---

[46] *See* Exhibit A

[47] First SCRP Reimbursement was received and posted into the SI Wireless bank account on November 23, 2022

d) The cite contains references to Congressional intent but in no way here or otherwise is it explained how requiring customers at any time between "rip and replace" or more appropriately "rip and replace and make ready" serves any intent stated or that could be stated. Please tell what important goal of national security or equity or potential fraud or waste or anything is served by having to have customers during the time the network is ripped. It is totally in opposition to the goal of replacing these networks where they were not serving customers at the time of the application but would and could be used to do so. Congress did not say when, Congress did not say paying, and Congress did not say a more than number just a less than number.

e) The cited provision claims your agency's intention is to "increase the pool of eligibility for the program" — yet it is used here to narrow eligibility, excluding not only SI Wireless but also any other provider that did not have customers taking service at the time of application. This exclusion would apply whether a provider had already dismantled its network, was in the process of launching service, or used covered equipment for intermittent operations such as special events. All of these scenarios present the same national security risks if covered equipment is not replaced, which was the clear intent of Congress to address.

f) clearly states we interpret "customers of such provider" and "customers of any affiliate" to mean those customers taking advanced communications service from the provider and its affiliates yet you state the opposite in refusing to count the customers of the affiliates of SI Wireless that existed taking and purchasing normal service throughout this entire program and for which your agency has been provided detailed records;

g) and finally this cite declares that "If the provider's number of customers increases above two million after its application is filed, they will not lose their eligibility to participate in the Reimbursement Program by virtue of the customer increase"
    i. Despite Congress' clear instruction to your agency that it not make reimbursement to a provider that exceeds a certain number of subscribers —a fact seemingly ignored based on this addition;
    ii. Congress did not establish any minimum "floor" of subscribers for program eligibility. Nevertheless, someone within the agency—whose identity, authority, and reasoning have not been disclosed to us despite valid requests—has created a shifting, extra-statutory requirement. What began as an extra "requirement" of "more than zero" customers to mirror the statute's "fewer than" cap has evolved from requiring a single customer, to "undefined normal customers," and from being measured "at the time of application" to being required "throughout the program." None of these conditions appear anywhere in the Act, which again sets forth only two eligibility criteria: that a provider have no more than two million customers and that it make the certifications required by subsection (d)(4)[48]

---

[48] 47 U.S.C. § 1603(b)

    iii.  And can you explain how allowing Level Three Communications—a company with over 24 billion in assets and the third largest fiber provider in the country —which did not initially qualify for the program is now permitted to participate[49] and given an allocation of all the funds that were "saved" (an amount your report does not define) by denying payments to our company and others when those funds were needed most? How does this square with your own cited language that "[t]he House Report also states the Reimbursement Program is established 'to assist small communications providers ....'"? Si Wireless is precisely the "small communications provider" spoke of here and none of the statutory language would permit the result of running us out of the program—and out of existence—in favor of large company corporate welfare—a result Congress specifically prohibited by the language of the statute enacting this program.

    iv.  This referenced provision clearly also shows that eligibility once obtained cannot be lost for others despite contradicting statutory language but for our company it can be lost based on nonexistent statutory language. In this case application date seems to be of primary importance to your agency without statutory citation or referenced intent. No explanation is provided on why the date one committed to the program and to remove its network and with it its customers as directed would not be the logical date absent clear statutory direction. SI wireless had approximately 30,000 customers when we committed to this program[50].

**4. The Secure Network Act Requires the Commission to Reimburse SI Wireless for Dismantling and Replacing its Huawei Network to Protect National Security, and Withholding Funding from SI Wireless Violates the Law.**

As discussed above in Section I.A, *supra*, section 1603(a) of the Secure Networks Act[51] required the Commission to establish the Reimbursement Program to replace covered equipment. SI Wireless has removed and destroyed an entire network of over 200 sites with two switching centers. It has, among other things, replaced equipment on over 100 sites, redeployed one switch, and moved a switching center to a different location and hardened the location, installed equipment for the core of its interim offering, and installed redundant power backup systems in place. This was all done while waiting for the Commission to reimburse the company for this work—reimbursement that was never reasonably provided and has now ceased. SI Wireless

---

[49] 6th Report and Order at 3

[50] https://docs.fcc.gov/public/attachments/fcc-19-121a1.pdf at 45 (last visited Aug 13, 2025)

[51] 47 U.S.C. § 1603(a).

cannot go any further due to the FCC's failure to comply with its duties to reimburse us equitably in accordance with our need.

Section 1603(d)(2)(C) – Mitigation of Burden – provides that "in developing the application process under this paragraph, the Commission shall take reasonable steps to mitigate the administrative burdens and costs associated with the application process, while taking into account the need to avoid waste, fraud, and abuse in the Program."[52] The FCC's hold on disbursements to SI Wireless is unwarranted as there is no evidence of waste, fraud, or abuse by SI Wireless. Further, contrary to the statute, the FCC's application process now appears to be essentially reopened after being concluded.[53] More than a year had past post application for the Commission to approve a modified plan necessitated by the lack of full funding for SCRP participants. The commission took another 4 months when presented with a modification to correctly ascribe equipment to sites resulting from that first approved modification but required SIW to break this submission into three parts so it could be approved in "a couple weeks" then proceeded to approve only one third of that required submission in a period of 4 months during which time all invoicing and payment for our company was shut down as it was during the 5 month period for the modification. This is not what was asked of your agency. The Commission also issued a large number of extremely onerous and burdensome data requests to SI Wireless, which included over 2,400 individual answers covering more than 50 sections and subparts in revisiting this application. This also while all payments and invoicing were shut down. The FCC has utterly failed in its duty to mitigate the burden on SI Wireless's application process.

SIW was one of the first companies to respond to the FCC's call to remove covered equipment from their networks. This required the company to forgo cash flow even before the start of the application process. The FCC created a short-funded situation that precluded funding for a complete network replacement, and it then became clear when SI Wireless's application was still being considered and approved that it would be necessary to modify the approved plan to deal with the fact that only 39 percent of the necessary funding for completion was available. There was no guarantee of when or if the remainder would become available. Those network operators that chose to continue to put the nation's security at risk and that did not remove covered equipment from their networks could just wait for full funding and possibly order equipment with allocated funds in a way not requiring any modification or shut down of their ability to invoice or be paid. SI Wireless, however, who did as asked, was left unassisted with the situation of having to figure out how best to make some kind new sustainable business plan from a reconfigured network using only the 39% of funds available to it at that time and possible ever. Instead of realizing the burden on our company and its unique needs to complete this quickly, your agency and its administrators responded with ever increasing hurdles to receive payments and paying us less than 7% to date of the estimated cost of network replacement over the ensuing three years of what was mandated to be a one-year replacement period.

The administrative burden the FCC has placed on SI Wireless, in contravention of the mitigation requirement in section 1603(d)(2)(C), has been extreme. SI Wireless has been

---

[52] 47 U.S.C. § 1603(d)(2)(C).

[53] To the extent that the FCC has reopened SI Wireless's application, and it is not clear that the Commission has done so, SI Wireless must be afforded the opportunity to cure any deficiencies. 47 U.S.C. § 1603(d)(3)(B).

required to jump through every imaginable hoop in order to receive what to date is only less than 7% of replacement funds and just over 13% of overall funding for removing and replacement of its network. Insufficient to generate virtually any type of cash flow for this company at all. As a result of responding to the FCC's pressing call for carriers to remove hazardous Huawei equipment, SI Wireless is now in a situation where replacement of its network is the only means available to generate cashflow. SI Wireless is on the verge of bankruptcy, and if the Commission had acted as required under the law to promptly reimburse the company, SI Wireless would not be in its current precarious financial situation, and its customers would now have the service they had previously enjoyed for years restored.

Section 1603(d)(5)(A) requires the Commission to "make reasonable efforts to ensure that reimbursement funds are distributed equitably among all applicants for reimbursements under the Program according to the needs of the applicants".[54] There are few and likely no applicants who were originally more in "need" of reimbursement funds that SI Wireless and certainly none at this time after you have frozen all payments to us for over a year. The company removed its old network and source of revenues at the earliest date in order to comply with what was supposed to be a one year performance period.[55] SI Wireless obtained commitments from many small businesses and individuals (with dependent families) to do the work necessary to accomplish the removal of covered equipment in the amount of time then understood and in reliance upon the FCC representations that the company would be timely reimbursed for its efforts. Many of these small businesses and individuals have agreements to receive subsistence level payments through the performance period and the remainder when this company is paid. Many contractors who committed to the project have been left without the promised work—having turned down other opportunities to remain available—when the project became underfunded and delayed. Had the Commission paid SI Wireless according to its demonstrated needs, and equitably as required by the statute, the company would not now be facing extreme financial distress. Nor would its vendors, contractors, and employees be facing similar circumstances. Most importantly, customers in historically underserved rural areas would once again have access to a better and more affordable service option.

### Repayment

Because SI Wireless has complied fully with the Secure Networks Act and all FCC rules, we do not anticipate that any funds would ever be found to have been improperly paid. In addition, every single invoice submitted by SI Wireless is reviewed and approved by Ernst & Young (EY), the FCC's Fund Administrator, before payment. This process ensures that all disbursements have already been vetted and determined to be legitimate and allowable expenses under the Program. Further, under the Secure Networks Act, repayment obligations arise only if the Commission finds a violation of the Act or its rules, provides formal notice of that violation, and allows 180 days to cure. Prior to that when as here the alleged problem is with an

---

[54] 47 U.S.C. § 1603(d)(5)(A).

[55] 47 U.S.C. § 1603(d)(6)(A) ("shall be completed not later than one year"). The FCC's delays in providing funding to SI Wireless as required by statute will likely cause the Commission to violate Congress's one-year deadline.

application there is another cure period in 47 U.S.C. § 1603(d)(3)(B). No such cure period has ever commenced. All we can say on ability to repay is that your agency certainly in refusing to reimburse us for ongoing expenses is obviously eroding our ability to pay any of our bills every day.

## II. Conclusion

SI Wireless is a small rural provider of advanced communication services that neither had nor has the resources to dismantle its Huawei network while simultaneously providing service to customers at the same level they are accustomed to. We could not—and never planned to—construct and operate a second network prior to removal of our Huawei network and receipt of Reimbursement Program funds to replace our network. Having prepared in every way to accomplish the task of completely dismantling and replacing what had took SI Wireless over two years to build initially in a period shorter than that, SI Wireless's reconstruction plan has been hindered from the beginning by scant, delayed and haphazard payments that have spread discord among its contractors—followed by no payments at all for over a year. The Commission has failed to follow the statute and disburse funds according to need and prioritize a company like SI Wireless that would be put out of business due the funding shortfall while continuing to fund virtually all other companies in the program including those receiving ongoing operating funds from your agency at much higher levels.

As SI Wireless has previously informed the Commission, the company is in grave danger of failing economically. SI wireless has received only 13.5% in total for the project or 7% of the approved budget to replace its network under the program. SI Wireless has been forced to undertake debt financing to restore equipment to over 100 sites. Assuming that SI Wireless is able to survive —something far from certain at this stage—SI Wireless will provide critical competition and service in rural areas, driving down prices and increasing quality for all consumers. SI Wireless' network can also reach remote areas where fiber cannot, such as deep into farmland. The company has been working with technology-based agribusiness firms that have agreed to implement pilot programs to increase food production and allow for savings of resources such as water and fertilizer in these areas. SI Wireless was also selected to lead a program to build out unbuilt portions of a national carrier's footprint for full mobility that would have gained our customers access once again to the national services we were able to provide before voluntarily subjecting ourselves to the unfulfilled promises from your agency.[56] The actions of your agency killed this opportunity as well by informing the carrier that you were "litigating" with us, inflicting further damage to our company.

Perhaps an easy reason to stop this freeze is SI Wireless' ability to essentially replace the availability of the economic impact of the now terminated ACP program for 191,000 citizens in our service area. By restoring our funding, your agency could achieve an immediate, tangible public benefit—something you can take pride in—while we, as always, will do the work. These benefits alone warrant your agency releasing this unlawful hold, aside from your agency's clear and undeniable legal obligation to do so.

If months of legal process and the production of 89 gigabytes of information—generated in response to more than 2,400 questions, most of them unrelated to the actual issue at hand—do

---

[56] *See* Exhibit E

not persuade you, then we ask once again that you come visit and at least make decisions of such importance on the basis of what you can find out in less than a days' time if you did. If you wait too long, however, SI Wireless may cease to exist and good and affordable service in our rural and lower income service areas will also be missing and likely for good.

While this was not a requirement under the Secure Network Act or under the FCC's rules, SI Wireless nonetheless did provide advanced communications service to customers at all times alleged to be relevant by the FCC. The *2020 Supply Chain Order* and the FCC's September 2021 webinar encouraged network operators to start removing equipment that presented serious threats to national security before SCRP implementation, and represented to those carriers that they would not be penalized for doing so. SI Wireless relied on those representations when it engaged in its network replacement project, and the FCC's promises ring hollow when it is, in fact, penalizing SI Wireless for answering the call to action to secure its network and protect American citizens from the threat of Chinese-made equipment. There is simply no justification for continuing the hold on disbursement of funds to our company.

Respectfully submitted,

*/s/ Leslie Williams*

Leslie Williams
President
SI Wireless, LLC

cc:     Joseph Calascione, Chief, Wireline Competition Bureau, FCC
        Patrick Webre, Acting Chief, Enforcement Bureau, FCC
        Mark Stephens, Managing Director, FCC
        Adam Candeub, General Counsel, FCC

## EXHIBIT LIST
### *(In Support of SI Wireless Response to FCC Funding Hold)*

| Exhibit | Title / Description | Date |
|---|---|---|
| Exhibit A | Sworn Customer Declarations | July-Aug 2025 |
| Exhibit B | Email re: FCC call on equipment destruction – Carri Bennett | 9/13/2021 |
| Exhibit C | SI Wireless Confidential Plan Jan 2022 | Jan 2022 |
| Exhibit D | SI Wireless Plan Confidential 030623 | 3/6/2023 |
| Exhibit E | Declaration of Patrik Melander, Chairman & CEO Connect5G | 7/28/2025 |

**APP 260**

DECLARATION OF Thomas C. Karnes

I, Thomas C. Karnes, declare as follows:

1. Personal Background
   I am over the age of 18 and competent to make this declaration. I was employed by or affiliated with Rural Connect at all relevant times discussed below.
2. Agreement with SI Wireless
   In or around April 2021, my company entered into an agreement with SI Wireless, LLC to receive advanced communications service.
3. Provision and Use of Service
   Under that agreement, SI Wireless began providing us with advanced communications service in 2021.
   That service was active and ongoing as of January 2022 and continued beyond that date.
   To the best of my knowledge, SI Wireless maintained the provision of service to us throughout the relevant period covered by the FCC's Reimbursement Program.
4. Clarification of the Record
   I am making this declaration to clarify any suggestion that SI Wireless had no customers receiving service at the time of its application or in the months that followed. That is not correct in my case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 5th day of August, 2025.

Thomas C. Karnes
Manager/ Network Engineer
ckarnes53@gmail.com

**APP 261**

**DECLARATION OF Robin Wood**

I, Robert W. Wood Jr., declare as follows:

1. **Personal Background**
   I was employed by or affiliated with Ken-Ten Wireless at all relevant times discussed below.

2. **Agreement with SI Wireless**
   In or around April 2021, my company entered into an agreement with SI Wireless, LLC to receive advanced communications service.

3. **Provision and Use of Service**
   Under that agreement, my company took advanced communications service from SI Wireless in 2021.
   That service was active and ongoing as of January 2022 and continued beyond that date.

4. **Communication with the FCC**
   Approximately **4 to 5 months ago**, I was contacted by staff from the Federal Communications Commission (FCC) regarding SI Wireless.

5. **Confirmation to the FCC**
   I confirmed to the FCC that I had received service from SI Wireless as agreed.

6. **Clarification of the Record**
   I am making this declaration as SI Wireless has requested this information.

7. **Statement Regarding Health**
   I have recently been diagnosed with dementia. Despite this diagnosis, I believe the facts stated in this declaration are accurate and true based on my personal recollection and involvement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _18_ day of _July_ , 2025.

Robin Wood
President/Owner

robin@woodcommunications.com

731-796-6000

## TENNESSEE NOTARY ACKNOWLEDGEMENT

STATE OF TENNESSEE

COUNTY OF _Obion_

On this _18th_ day _July_ 2025_, before me personally appeared _Robert W Wood Jr._

Known to be the person(s) described and who and executed the foregoing instrument, and acknowledged that such person(s) executed the same as such person's free act and deed.

WITNESS MY HAND and Official Seal on this _18th_ day of _July_ 2024.

_Paula Nowell_

NOTARY PUBLIC

My Commission Expires: _8-28-2027_

PAULA NOWELL
STATE OF TENNESSEE NOTARY PUBLIC
MADISON COUNTY

**DECLARATION OF [Full Name]**

I, Robert W. Wood III, declare as follows:

1. **Personal Background**

   I am the son of Robin Wood and have been affiliated with Ken-Ten Wireless during all relevant times discussed below.

2. **Agreement with SI Wireless**

   In or around April 2021, Ken-Ten Wireless entered into an agreement with SI Wireless, LLC to receive advanced communications service.

3. **Provision and Taking of Service**

   Based on my personal knowledge, Ken-Ten Wireless took advanced communications service from SI Wireless in 2021. That service was active and ongoing as of January 2022 and continued beyond that date.

4. **Knowledge of Prior Declaration**

   I have reviewed the declaration signed by Robin Wood and, based on my personal knowledge, believe the information contained in that declaration is true and correct.

5. **Clarification of the Record**

   I am making this declaration to assist in clarifying the record concerning Ken-Ten Wireless's receipt of service from SI Wireless.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of July , 2025.

Signature: _____

Name: Robert W. Wood III

Scanned with
CamScanner
APP 264

## TENNESSEE NOTARY ACKNOWLEDGEMENT

STATE OF TENNESSEE

COUNTY OF _Obion_

On this _18th_ day _July_ , before me personally appeared _Robert W. Wood III_

Known to be the person(s) described and who and executed the foregoing instrument, and acknowledged that such person(s) executed the same as such person's free act and deed.

WITNESS MY HAND and Official Seal on this _18th_ day of _July_ 2024.

_Paula Nowell_

NOTARY PUBLIC

My Commission Expires: _8-27-2027_

*PAULA NOWELL
STATE OF TENNESSEE NOTARY PUBLIC
MADISON COUNTY*

# DECLARATION OF Linda S. McAlpin

I, Linda McAlpin, declared as follows:

1. **Agreement with SI Wireless**
   In or around April 2021, I entered into an agreement with SI *Wireless, LLC* to receive broadband service (Agreement Attached).

2. **Provision and Use of Service**
   Under that agreement, SI Wireless began providing us with broadband *service in* 2021.
   However, shortly after that, we discontinued using the service. *Not because there* were any problems, but because we realized we didn't need it for our purposes.

3. **Communication with the FCC**
   Approximately **4 to 5 months ago**, I was contacted by staff from the Federal Communications Commission (FCC) regarding SI Wireless.

4. **Confirmation to the FCC**
   I confirmed to the FCC that I had received service from SI Wireless as agreed.

5. **Status of Service Relationship**
   I did not notify SI Wireless that I wished to cancel service, nor did I return the equipment provided to me under the agreement. At no time did I communicate to SI Wireless that we had discontinued service.

6. **Clarification of the Record**
   I am making this declaration as SI Wireless is asking me for clarification.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this __21st_ day of _____July___, 2025.

*Linda McAlpin*

Linda McAlpin

[Email / Contact Information, optional]

linray@wk.net

Scanned with
CamScanner

APP 266

**STATE OF TENNESSEE**

**COUNTY OF** _Madison_

Personally appeared before me, the undersigned, a Notary Public, _____ the within named bargainor, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged that such person executed the within instrument for the purposes therein contained.

WITNESS MY HAND and Official Seal on this the __23rd__ day of __July__, 2025.

NOTARY PUBLIC

Paula Nowell

My Commission Expires: _8-28-2027_



## DECLARATION OF KASEY KRUEGER

I, Kasey Krueger, declare as follows:

1. **Agreement with SI Wireless**
   In or around April 2021, my company entered into an agreement with SI Wireless, LLC to receive advanced communications service.

2. **Provision and Use of Service**
   Under that agreement, my company took advanced communications service from SI Wireless in 2021. That service was active and ongoing as of January 2022 and continued beyond that date.

3. **Clarification of the Record**
   I am making this declaration as SI Wireless has requested this information.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 31st day of July, 2025.


Kasey Krueger
CEO
DTC Communications

kkrueger@staff-dtc.com

## DECLARATION

I,Michael A Houston, declare and affirm as follows:

1. I am over the age of 18 and competent to make this declaration based on personal knowledge.

2. I was formerly employed by Teved Inc., a company contracted to support and monitor wireless traffic for SI Wireless's license-preservation customers under the Secure and Trusted Communications Networks Reimbursement Program (SCRP).

3. In that role, I personally installed and later serviced active devices at the following customer locations:

- **Ken-Ten Wireless** – 1312 Stad Ave, Union City, TN 38261 (2 devices)

- **Rural Connect** – 1378 N Cavalier Dr, Alamo, TN 38001

- **DTC Communications** – 111 High Street, Alexandria, TN 37012

- **Honea Broadband** – 108 College Street East, Fayetteville, TN 37334

- **McAlpin Broadband** – 4027 State Route 1748 W, Mayfield, KY 42066

4. In mid and late 2022, I returned to several of these locations to perform SIM card replacements and verify continued network connectivity.

5. During those visits, I personally observed that the devices were powered on, connected, and transmitting data. I documented throughput measurements at the time, including screenshots of active data traffic. The task is exhibit 1 which one screenshot of my speedtest being run on location though the network.

6. In 2023, I provided a screenshot of throughput performance from one of these customer locations, demonstrating continued network activity well beyond the FCC's January 2022 eligibility cutoff.

7. Based on my direct involvement, I can confirm that these devices remained in active use at customer sites through at least late 2022, with evidence of ongoing usage into 2023.

8. I am willing to provide supporting documentation, including throughput screenshots and site visit details, upon request.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this __11_ day of August, 2025.

Signature: _____

**Name**: Michael A Houston
**Employer**: Teved Inc.
**Title at Teved**: EVP, Partner
**Location**: Plantation, FL

Honca Broadband Location



**Subject:** FW: FW: FCC call on equipment destruction
**From:** <erics@cleartalk.net>
**Date:** 02/08/2023, 8:55 PM
**To:** "Joe Clark" <joeclark3154@gmail.com>, <leslie.williams@siwirelessllc.com>

See below in the chain , Sep 13 2021 they are saying go ahead and take the equipment down and then what is the date they said we were supposed to have subs on the network? I think in January 2022 makes no sense and we need to point that out. Find that date they say we need to have subs on the network please

thanks

**From:** natalie@cleartalk.net <natalie@cleartalk.net>
**Sent:** Tuesday, February 7, 2023 3:38 PM
**To:** erics@cleartalk.net
**Subject:** FW: FW: FCC call on equipment destruction

Eric, please see below.. This is the one I thought you might have been looking for.

**From:** Joe Clark <joeclark3154@gmail.com>
**Sent:** Tuesday, February 7, 2023 11:39 AM
**To:** Natalie Lopiccolo <natalie@cleartalk.net>
**Subject:** Re: FW: FCC call on equipment destruction

I think we can possibly use this for what Eric is looking for. Did you see anything else talking about timeframes for doing work on this program in general? I'm not sure if there was anything else typed out in emails or not.

On Tue, Feb 7, 2023 at 12:03 PM Eric Steinmann <erics@cleartalk.net> wrote:

Maybe this?

**From:** Bennet, Carri [mailto:Carri.Bennet@wbd-us.com]
**Sent:** Monday, September 13, 2021 12:51 PM
**To:** 'Eric Steinmann' <erics@cleartalk.net>; 'Adilia Aguilar' <adilia@cleartalk.net>; gishihara@cleartalk.net
**Subject:** RE: FCC call on equipment destruction

Eric,

I just spoke to the FCC. As long as you have everything documented and can show that the equipment has been rendered unusable and that no data is accessible (and that it is destroyed here and not overseas) then you should be good to go. The FCC is issuing guidance in the next few days to few weeks. They are not seeking to penalize anyone or make the process more cumbersome, but you need to keep really good records on the process.

**From:** Eric Steinmann <erics@cleartalk.net>
**Sent:** Friday, September 10, 2021 7:36 PM
**To:** Bennet, Carri <Carri.Bennet@wbd-us.com>; 'Adilia Aguilar' <adilia@cleartalk.net>; gishihara@cleartalk.net
**Subject:** RE: FCC call on equipment destruction

Ok thank you we have a truck going out on Monday but can turn him around based on the discussion if needed.

Exhibit B - 002

Please let us know as soon as you hear something

I think it has to be stated that the time frame for this program has been put off repeatedly and some of the people who have taken equipment down cant store it forever plus the longer they wait the more the valie for reimbursement may decrease so we would like an indication from the FCC that if they have used responsible and well documented methods to dispose of and where appropriate recycle to raw material this equipment that it will not be held against them by the FCC

Thanks Carrie

**From:** Bennet, Carri <Carri.Bennet@wbd-us.com>
**Sent:** Friday, September 10, 2021 3:50 PM
**To:** 'Eric Steinmann' <erics@cleartalk.net>; 'Adilia Aguilar' <adilia@cleartalk.net>; 'gishihara@cleartalk.net' <gishihara@cleartalk.net>
**Subject:** FCC call on equipment destruction

The FCC wants to talk to me on Monday – can you all hold until then so I can get some clarity?

The WCB also announced the creation of a Help Desk for the Reimbursement program. Please see the PN below. Not sure if the folks answering questions at EY will have the answers so I will run this to ground

DA-21-1131A1.pdf (fcc.gov)

**Carri Bennet**
Partner
Womble Bond Dickinson (US) LLP

| d: | 202-857-4519 | 2001 K Street, NW |
| m: | 240-604-7239 | Suite 400 South |
| e: | Carri.Bennet@wbd-us.com | Washington, DC 20006 |

WOMBLE
BOND
DICKINSON

wamblebonddickinson.com

  

---

This email is sent for and on behalf of Womble Bond Dickinson (US) LLP. Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.

Exhibit C - 001

# CONFIDENTIAL - NOT FOR PUBLIC INSPECTION

## SI WIRELESS, LLC

## FRN: 0019623834

## COMPANY BACKGROUND AND THE PLAN

### Company Background

SI Wireless, LLC ("SIW" or "the Company") served as a rural roaming affiliate for Sprint (prior to Sprint being acquired by T-Mobile and Sprint terminating the roaming affiliation agreement). The Company had a fully deployed CDMA, 4G LTE and 5G-capable Huawei network across 204 sites providing advanced communications service to approximately 30,000 customers within Western Tennessee, Eastern Kentucky, and Southern Illinois. The SIW network was deployed on sites primarily owned by large tower companies.

Pending funding from the Secure and Trusted Communications Networks Reimbursement Program ("the Program"), the Company stands ready with a series of loans and reassembly of a diverse and experienced management team to successfully launch and operate its new network. SIW plans to redeploy to the service areas with secure equipment after the Program completion as either: 1) a roaming affiliate of a large carrier; or 2) a standalone or affiliated provider of fixed high-speed internet services to a primarily rural customer base.

Form 477 shows only a small group of subscribers as services were transitioned for most of our customers to other providers in late December 2019/early 2020 after it became apparent that the federal government would no longer support Huawei equipment and services and after Sprint terminated the Company's roaming agreement due to its impending sale to T-Mobile. Coverage maps and service plans are attached, submitted as part of the Form 5640 application.

### The Plan

SIW is in confidential negotiations with a large national carrier for SIW to be an affiliate and anticipates that it will serve as many customers as it had prior to 2020, provided it is fully funded by the Program. SIW will deploy and relaunch its network as it existed before 2020 (with essentially the same footprint included in the area launched).

SIW has begun the de-installation of its equipment and expects to have the de-installation, destruction and recycling completed by the time it receives its first reimbursement from allocation

This plan assumes 1-for-1 replacement of the SIW network using primarily Nokia equipment for the replacement, replacing all microwave radios with those compatible with a redeployed Nokia network,

Exhibit C - 002

including spectrum usage in AWS bands. Average cost from the cost catalog has been used for price estimates.

The history of the Company as a Sprint affiliate in the past, along with the experience and make-up of the current management and ownership team will ensure the success of the Plan.

Absent reaching a major carrier agreement on favorable terms, SIW will relaunch its network to provide quality internet-only fixed wireless services focusing initially on the smaller cities, towns, and rural areas within its existing coverage areas in Western Tennessee, Eastern Kentucky, and Southern Illinois.

Lease and Site Analysis will be performed to ensure that no intervening events such as additional colocation, a change in planning and zoning rules, etc. will prevent re-colocation at the given sites.

Re-Analyze Engineering and Site Impacts will include reviewing any changes in engineering standards, newly required mount analysis, availability of Microwave paths and/or fiber availability to ensure colocation at a given site is feasible.

RFP for Equipment- this may be broken into several RFPS for the different type of equipment.

Equipment order - This will likely be done in a couple tranches to ensure availability of equipment to keep workflow going across the portfolio of sites.

Facility Order changes- SIW has Switch ready facilities but there may be changes due to connectivity to the world outside (business partners, roaming partners and vendors) as technology has evolved .

Site Construction Adjustments- The Planning for site construction will need to account for the particulars of the equipment SIW will be deploying and the accelerated time frame required.  The resources need to be identified, trained in any new procedures and in any required safety areas and ensured to be fully certified for the work needed.

In reality, work on the above will likely start sooner than indicated in the timeline, at the time an allocation is made and a revised plan in accordance with the allocation is presented and approved.

Carbondale Switch Install- If SIW does not get a fully funded allocation, this switch may be bypassed, and the build out concentrated in Tennessee with the allocated resources.

Tennessee New Tower Builds- Planning and Zoning review and land acquisition for this will start as early as when the allocation is received.

Tennessee Switch Install- SIW has done these installs in as little as three months in the past and the switch room may only require some upgrades to a/c and power so there is little timeline concern here.

Tennessee Site Install- SIW has a lot of experience deploying sites in the Western part of this state and if it can be done in a year, SIW is well suited to get this done.

RF and Drive Testing- This will start to occur as soon as sites are put on air.

Exhibit C - 003

## Covered/Non-covered equipment

The Plan also assumes reimbursement not only for the Huawei equipment, but for all equipment (microwave equipment, routers, subscriber antennas, etc.) purchased for use with the Huawei equipment that is no longer compatible with replacement equipment.

## Assumptions

Based on a detailed analysis performed by a large tower company[1], SIW assumed re-colocation on 64% of the current sites, with new builds on 36% of the sites. The sites that show greater than or equal to 90% of structural capacity are not reasonable for SIW to co-locate on as: 1) current major carrier equipment modifications may have or likely will push the structural capacity over 100% prior to our current deployments; and 2) these towers will not allow for sufficient future growth to be achieved, resulting in wasted deployment expense.

SIW has determined it is more cost effective in these primarily rural areas where land is plentiful to replace a site than to modify an existing one. For that reason, we have priced for replacement of these sites which, in turn, means a reduction in operating expense as we will have no leasing cost for the land.

The Company had 202 sites deployed previously and accordingly we have priced 72 (36%) of these sites to be replaced with new sites in the attached.

---

[1] Engineering performed by American Tower Corporation or their vendors for certain sites where SIW is collocated on. Refer to attachments for detailed analysis and copies of engineering reports.

**CONFIDENTIAL - NOT FOR PUBLIC INSPECTION**
**UPDATED PLAN/PHASE ONE PLAN TO DEAL WITH PARTIAL FUNDING**

**CONFIDENTIAL - NOT FOR PUBLIC INSPECTION**

SI Wireless, LLC ("SIW" or "the Company") submitted its application for the Secure and Trusted Communications Networks Reimbursement Program ("SCRP") on January 20, 2022. The Company's original plan involved deinstallation and replacement of a 204 site (2 test cell) cellular network with associated switches and connectivity on a one-for-one basis with full mobility. Because SIW has only been funded for 39.4% of the costs, the Company is modifying its plan to deal with the funding shortfall.

The modification will follow the original proposal which involved the Company first shutting down its existing network, temporarily transitioning customers to other networks, and then bringing up the replacement network, restoring former customers and adding new customers to the new network.

The Company noted in its original approved application, that absent a major carrier agreement on favorable terms, SIW would relaunch its network to provide quality internet-only fixed wireless initially focusing in smaller cities, towns and rural areas where it had been operating and where there is a need for high speed broadband service. Focusing on these rural areas serves the public interest because there is not sufficient high speed broadband service for consumers to access. A major mobile carrier affiliation arrangement continues to be possible if the Reimbursement Program is fully funded by Congress and the additional funding becomes available to layer in mobility. Given the delays in timing, SIW must pivot to a fixed wireless service to restore service. The fixed wireless service will allow restoration of broadband services to be brought back to portions of the service territory pending additional funding when additional areas can be restored along with mobility. This phased hybrid fixed/mobile approach serves the public interest and is consistent with SIW's original approved plan in the best possible manner given the current partial funding allocated. The advantages of starting with a fixed wireless network will also serve the public interest by allowing SIW to provide broadband access to rural areas where there is currently no high-speed internet access and provide a platform to launch mobile coverage if, and when, the additional funding becomes available. SIW has commenced testing Tarana equipment as a partial solution for this deployment and has found that Tarana provides excellent fixed wireless service. This solution requires approximately $900 of equipment to be installed at each customer location as well as a truck roll for the installation. Accordingly, SIW seeks clarification on whether the costs are reimbursable as it did not have these costs in its former plan.

Testing is also underway with Samsung equipment, which can be used for both fixed wireless access and mobility. Samsung is currently being utilized by all companies that SIW is discussing a future affiliation arrangement with should it be able to relaunch its mobility network. As a reminder, SIW was a former Sprint affiliate and supported the operations of its network as such. Airspan is also being evaluated by SIW as a possible hybrid fixed/mobile solution. The combination of these three vendors' equipment will allow the Company to have coverage in all frequency bands including low frequency spectrum bands while in the case of Samsung and Airspan allow for lower cost common CPE's, smartphones and no truck rolls. SIW can demonstrate that by deploying these three vendors equipment that it will be able to operate a hybrid fixed and mobile network within the approved funding should Congress allocate the

balance of the funding. Should Congress not approve additional funding, SIW will be able to at least deliver a fixed wireless network on the percentage allotted to it by the FCC.

Having deployed Tarana test sites to verify the RF models, SIW has been able to adjust its RF models for greater than expected real word results. SIW is moving forward on a mix of collocating and acquiring sites that fit this new model, which maintains the mix of colocations to new builds projected in the original model. (Note that due to structural issues and in some cases legal concerns (related to zoning and environmental issues) or cost issues many new builds were required in the original approved plan and will be required in this plan).

With that said, new sites will not match one-for-one with the decommissioned site. More sites will be required to achieve the same coverage footprint due to capacity and propagation issues associated with the fixed wireless network. This is also due to the deployment of CBRS bands in addition to other bands for throughput. These higher spectrum bands propagate less than the PCS spectrum licensed to SIW. However, overall cost will be relatively similar as network core costs in a fixed wireless network will decrease while site counts will increase. In sum, SIW will be able to pivot and stay within its original approved funding amount with the reduction due to the lack of full funding. Should full funding become available, SIW will be in a position to layer the mobility piece into the fixed wireless access network.

Given that the SCRP only rewarded 39.4% of total funding, the Company is resubmitting the modified plan to show in this phase 1, the decommissioning of the 204 SIW sites and all switches, eliminating all covered equipment from the network. This allows the Company the ability to complete the first phase of the project within one year and accomplish the goal of a complete rip and destruction of covered equipment, but also to have a sustainable business model offering fixed wireless services if the remaining funding and reaffiliation never materializes. As of submittal of this narrative, the decommissioning work is substantially accomplished and SIW has made substantial reimbursement requests so that it can pay costs associated with the decommissioning and destruction process. The delay in processing these invoices now exceeds 5 months in some cases and has put SIW in peril with its vendors because it has not been able to make timely payments for the completed work and is beginning to lose credibility with its vendors who will not continue to do the work needed to complete the project. Should the remaining funds be allocated by Congress, SIW will adapt the fixed wireless access network to a full mobility voice and data network for traditional cellular customers that also provides services to fixed wireless customers.

This possibility of full mobility requires building certain functionality into each site deployed, such as additional base cabinets and battery backup, that would not necessarily be needed to deploy a fixed wireless network only. SIW plans to embed these costs into the sites so that it has the capability to support mobility when, and if, the additional funding becomes available.

The critical rationale for the Company's decisions includes:
- o Given the shutdown of the network resulting from T-mobile's acquisition of Sprint, the Company transitioned its customers in a way that would offer them continuity of services but, in the process, cut nearly all of SIW's revenue sources. Meanwhile, expenses associated with the network with much fewer customers are still being incurred.

- o Decommissioning the original 'covered' network encompasses roughly $21 million of reimbursable costs and therefore, only leaves $50 million of the 39.4% of allocation available for use to build the network.
- o When, and if, the remaining $110 million is allocated, the Company will be able to adapt the network to a full-service mobility network.
- o Time is not on SIW's side as it is experiencing severe cash flow problems. The Company has already asked vendors to get a head start on this project and needs reimbursement funding to keep the vendors paid and willing to continue the work needed to complete the project. Getting the decommissioning invoices processed is critical.   SIW is able to get this work done, meet the FCC's timetables and be in a place where it can sustainably operate long term even if the remaining funds don't materialize, but only if the Company gets paid promptly for the work completed in a timely manner.  It is critical for SIW to establish a working relationship with the Fund Administrator to allow SIW to keep its vendors timely paid.

Additionally, there are some important general effects to understand in this plan revision which is going from mobility to fixed wireless (and then layering in mobility if, and when, additional funding becomes available.

- o Fixed wireless is data centric and requires deep spectrum bandwidth. The Company's licensed spectrum is 15 MHz deep in most areas and 22.5 MHz in others; it is not sufficient for this fixed wireless product and, as such, the Company will have to use a combination of priority access (PAL) and general access (GAA) CBRS spectrum and additional other spectrum available to it in commercial 3GPP bands.
- o 3.5 (CBRS) does not propagate as well as 1.9 GHz PCS spectrum, especially through heavy foliage.  Accordingly, the Company will need to build new towers or utilize more towers to cover the same area.  Tower placement will also have to change.
- o Switching and core charges are much higher in a mobile network and a fraction of that in a fixed wireless network. This means there will be a decrease in core costs and site related costs will increase necessitating some of the reallocations proposed in SIW's modification proposal

Because the timing of the Reimbursement Program had been delayed for several years, the Company began testing both Cambium and Tarana equipment to be ready to deploy when the Reimbursement Program got underway. The Tarana equipment has initially been selected as it has shown it can deliver 300 MBps at 4+ mile distances and provide excellent broadband speeds to rural consumers who do not have access to high-speed broadband in our service footprint. As such, SIW has chosen to move forward with Tarana equipment in portions of the network, which has a proprietary interface and is best suited for providing quality fixed wireless services to its customers as borne out by the satisfaction of the customers participating in test deployments.  SIW has not been sitting on the sidelines. Rather it has been actively working on solutions as the Reimbursement Program evolved.

For Phase 1 of the program, the Company plans to spend the first allocation of $71.6m as follows:
- o $21 million: 100% decommissioning of the Company's original 204 sites and switch equipment
- o $50.6 million: deploy rural internet on approximately 60 new sites (new builds and colocations) and services applicable to redeployment. SIW will keep turning on more sites until funds run

out. This will require substantial cost estimate modifications. This initial deployment will concentrate on about 15 out of the original 44 counties served.

The specific changes to the initial plan submitted and the new plan proposed include reallocation adjustments from the initial submitted cost estimates to arrive at the new overall cost estimates to adhere to the phase 1 plan, including:

- Additional cost estimates specific to a fixed wireless network
- Additional cost estimates specific to 2 phases of the plan
- Additional cost estimates to cover the cost of accessing decommissioned equipment on towers and placing new equipment on towers.
- Tarana and/or Samsung specific cost estimates quoted higher than cost catalog amounts or not included in the cost catalog.

Given the lack of full funding, the Company does not intend to locate on all the same sites in which it is decommissioning its equipment due to the need to have additional sites spaced appropriately to handle fixed wireless traffic and to eventually handle mobile traffic should additional funding be made available through congressional appropriation. Accordingly, the original site location IDs will not match up with the new additional locations. Because there is not a one-for-one geographic correlation with the sites being ripped and those being replaced, the Company has deducted certain costs for prior locations, added new locations and corresponding cost estimates. This could potentially mean a shrinkage of the redeployed network coverage foot print even after its fully funded because it will be built to handle both fixed and mobile traffic and need much more capacity. The Company will allocate sites from the eastern part of its existing coverage footprint, terminate tower leases on those sites and deploy new sites in the western portion of its network where other carriers do not adequately serve. Because of a proliferation of structurally deficient sites SIW collocated on in Jackson, Tennessee (which is more populated) and the time frame of approximately two years required to redevelop sites in that urban location, the sites from this location are being redeployed into nearby rural areas which needs broadband services more so than Jackson, TN. This will best serve the public interest because it will focus on customers that lack a broadband service provider and also provide sites and eventual coverage to rural customers who lost cellular service when Sprint's network was acquired by T-Mobile and T-mobile did not renew the Sprint affiliation agreement with SIW for these areas and the sites were eventually decommissioned by SIW as part of the rip and replace. For processing ease, SIW will still associate the replacement site as being linked to a decommissioned site until those are used up, but there will be a geographic site discrepancy on some, but not all, of these sites. The FCC will need to approve the modification to allow for new additional locations beyond those in the original plan.

Given the Company is performing 100% of the decommissioning during Phase 1, the items allocated to both ripping and replacing (cost catalog items 5.16.2 and 5.16.3), assume 100% of ripping with only partial replacing. The replacement portion for the RRUs and antennas is part of one unit under Tarana and Samsung equipment pricing, but for the purposes of the plan, the Company, has allocated half of the original costs to each cost category. Additionally, one half of a category termed remove and replace will initially be billed for the removal effort only.

The Company will continue to modify the cost estimates in order to encompass the phase 1 plan in correlation with work performed. If requested, SIW can provide a preliminary phase 1 and phase 2 plan, broken out by cost catalog item.

Please refer to Attachment A for maps detailing out the original footprint and the preliminary footprint of the revised plan.





APP 282



July 28, 2025

To Whom It May Concern,

Connect 5G, Inc. serves as a consultant to SI Wireless for the reinstatement of their wireless network. In this capacity, on March 26, 2025, I attended a meeting in person with the technical team of one of the major carriers who expressed interest in collaborating with SI Wireless. During this meeting, representatives from the carrier stated their intention to finalize an agreement with SI Wireless, indicating it would one of the first smaller company they would collaborate with to deploy network equipment beneficial to both parties.

Following this initial meeting, Connect 5G did not receive any further communication from the carrier regarding the continuation of this proposed collaboration.

Sincerely,

Patrik Melander
Chairman and CEO
Connect 5G, Inc.

**APP 283**

# SCRP Status Update

FCC Form 5640

OMB Control No. 3060-1270

File No. SC-SU0003879

## Applicant Information

Applicant FRN   0019623834

Applicant Name SI Wireless, LLC

Applicant Email leslie.williams@siwirelessllc.c

Applicant Phone 8064441375

Applicant Address PO Box 8826

Applicant City    Columbia

Applicant State   SC

Applicant ZIP Code 29202

## Contact Information

[✔] Is the contact the same as the contact listed on the Application Request for Funding Allocation? If not, please list below.

Contact Name Leslie Williams

Contact Email leslie.williams@siwirelessllc.c(

Contact Phone 8064441375

Contact Address  PO Box 8826

Contact City     Columbia

Contact State    SC

Contact ZIP Code  29202

*Indicate which deadline you are meeting with this filing.

2025-09-30     .

*Explain whether you are finding commercially available equipment in the marketplace.  If not, then explain efforts taken to obtain replacement equipment.

As we are not receiving reimbursements and are owed over 70 million in completed work we are not able to get more equipment at this time.

## Program Compliance

*Indicate whether recipient has fully complied with (or is in the process of complying with) all requirements of the Reimbursement Program.

☑ Yes ☐ No

*Indicate whether recipient has permanently removed from its communications network all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipients application request for funding.

☐ Yes ☑ No

If recipient has not yet completed the removal process, what estimated percentage of the removal process have you completed?

95

*Indicate whether recipient has replaced all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☐ Yes ☑ No

If recipient has not yet completed the replacement process, what estimated percentage of the replacement process have you completed?

15

*Indicate whether recipient has disposed of all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☐ Yes ☑ No

If recipient has not yet completed the disposal process, what estimated percentage of the disposal process have you completed?

95

*Indicate whether recipient has fully complied with (or is in the process of complying with) the timeline submitted by the recipient. If not, provide explanation for deviation.

☑ Yes ☐ No

**APP 287**

## Certifications

\* By checking the box and providing the electronic signature where indicated below, the Certifying Official on behalf of the filer certifies under penalty of perjury that:

☑ (1) The Certifying Official is authorized to submit this status report on behalf of the above-named filer and, based on information known to me or provided to me by employees responsible for the information being submitted, the information set forth in this status report has been examined and is true, accurate, and complete, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. The Certifying Official acknowledges that any false, fictitious, or fraudulent information or statement, or the omission of any material fact on this status report or on any other document submitted by the filer may subject the filer and the undersigned to punishment by fine or forfeiture under the Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or can lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812). (2) The filer is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that the filer will maintain detailed records, including receipts, of all costs eligible for reimbursement actually incurred for a period of 10 years; and will file all required documentation for its expenses. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.

## Certifier Information

| | | | |
|---|---|---|---|
| Certifier Signature | Leslie Williams | Certifier Phone | 8064441375 |
| Certifier Name | Leslie Williams | Certifier Email | leslie.williams@siwirelessllc.cc |
| Certifier Title | President | | |
| Date Signed | 2025-10-01 | | |

APP 289

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 25-1112**                                    **September Term, 2025**

**FCC-SCRP0001013**

**Filed On:** October 1, 2025

In re: SI Wireless, LLC,

        Petitioner

**BEFORE:**    Millett, Pillard, and Garcia, Circuit Judges

## O R D E R

Upon consideration of the petition for writ of mandamus, the response thereto, the reply, and the supplement to the reply; the motion for leave to file portions of the response under seal and the opposition thereto; and the motion for leave to file portions of the reply and the supplement under seal, it is

**ORDERED** that the motions for leave to file under seal be denied. The parties have failed to overcome the "strong presumption in favor of public access to judicial proceedings." Abdelhady v. George Washington Univ., 89 F.4th 955, 958 (D.C. Cir. 2024) (quoting EEOC v. Nat'l Children's Ctr., Inc., 98 F.3d 1406, 1409 (D.C. Cir. 1996)). The Clerk is directed to file the sealed submissions on the public docket. It is

**FURTHER ORDERED** that the petition for writ of mandamus be denied. Petitioner has failed to establish that it has "no other adequate means to attain" its desired relief. In re Flynn, 973 F.3d 74, 78 (D.C. Cir. 2020) (en banc) (per curiam) (quoting Cheney v. U.S. Dist. Ct. for D.C., 542 U.S. 367, 380 (2004)). On July 11, 2025, Federal Communications Commission ("FCC") staff sent petitioner a letter that the FCC would continue to freeze reimbursement payments. According to the FCC, petitioner can apply to the FCC for relief from that funding freeze and, if the FCC denies relief, can seek judicial review of that denial. See 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); 47 C.F.R. § 1.115(a). Petitioner has not demonstrated otherwise. We are confident that the FCC will act promptly in resolving any application for review of its letter and in otherwise deciding whether to maintain the funding freeze. Our denial of the mandamus petition is without prejudice to petitioner refiling in the event of significant additional delay.

**APP 291**

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

## No. 25-1112                    September Term, 2025

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.

### **Per Curiam**

**APP 292**



Steve Leckar
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

KALBIAN
HAGERTY LLP
ATTORNEY AND COUNSELLORS AT LAW

888 17ᵗʰ Street, NW, Suite 1200
Washington, DC 20006

October 10, 2025

**By E-Mail and First-Class Mail**
Dan Daly, Esq.
Office of the Chief Financial Officer
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

*Re: SI Wireless, LLC*
*File No. EB-FD-24-00036576*

Dear Mr. Daly:

SI Wireless, LLC ("SI") respectfully urges the Office of the Chief Financial Officer ("CFO") to lift the extended funding hold imposed on the company under the Secure and Trusted Communications Networks Reimbursement Program ("SCRP").

On August 15, 2025, SI responded to the CFO's July 11 hold-renewal letter and addressed every issue raised. SI included sworn declarations from customers and a technician to establish that the firm has had customers receiving advanced communications service throughout its participation in the SCRP.

On October 1, 2025, the Court of Appeals for the District of Columbia Circuit denied our mandamus petition without prejudice. In so doing the Court made clear its expectations: "We are confident that the FCC will act promptly in resolving any application for review of its letter and in otherwise deciding whether to maintain the funding freeze. Our denial of the mandamus petition is without prejudice to the petitioner refiling in the event of significant additional delay."

Each additional week of the FCC's delay compounds the financial harm to SI. The firm responded swiftly to the Commission's entreaties urging providers to remove Chinese-made wireless equipment on an accelerated basis. Its approved business plan and modification disclosed the firm's then-current operation and how it intended to meet the SCRP's objectives and timetable. SI jettisoned the Covered Equipment in a timely manner. It has the equipment on hand and completed installations that would have yielded a fully functioning network long ago had reimbursements been made. The delay caused by the two years of the FCC's choking off SI's financial lifeline is tantamount to death by a thousand cuts.



Apart from SI's private interests, needless administrative lassitude disserves the public interest. First and foremost, rural consumers in SI's marketplace are being deprived of affordable service. Meanwhile the FCC's temporizing undermines congressional and public confidence in the agency's ability to manage the Program responsibly. The threat to this country's communications networks from Chinese actors was deemed a national emergency by Congress and the Commission. The FCC's continued lag obstructs the speedy remediation that Congress expected.

We ask that the CFO promptly resume SI's SCRP reimbursements or inform us when SI reasonably can expect a decision. If any further specific information would result in a determination—at this point we think there shouldn't be such a need inasmuch as SI held nothing back from the CFO (and Enforcement) inquiry—please advise us.

Sincerely,

Stephen C. Leckar

cc: Leslie Williams
   Joseph Calascione
   Patrick Webre, Esq.
   Mark Stephens
   Adam Candeub, Esq.

# United States Court of Appeals
## For The District of Columbia Circuit

**No. 25-1112**                    **September Term, 2025**

**FCC-SCRP0001013**

**Filed On:** October 1, 2025

In re: SI Wireless, LLC,

        Petitioner

**BEFORE:**    Millett, Pillard, and Garcia, Circuit Judges

## O R D E R

Upon consideration of the petition for writ of mandamus, the response thereto, the reply, and the supplement to the reply; the motion for leave to file portions of the response under seal and the opposition thereto; and the motion for leave to file portions of the reply and the supplement under seal, it is

**ORDERED** that the motions for leave to file under seal be denied. The parties have failed to overcome the "strong presumption in favor of public access to judicial proceedings." Abdelhady v. George Washington Univ., 89 F.4th 955, 958 (D.C. Cir. 2024) (quoting EEOC v. Nat'l Children's Ctr., Inc., 98 F.3d 1406, 1409 (D.C. Cir. 1996)). The Clerk is directed to file the sealed submissions on the public docket. It is

**FURTHER ORDERED** that the petition for writ of mandamus be denied. Petitioner has failed to establish that it has "no other adequate means to attain" its desired relief. In re Flynn, 973 F.3d 74, 78 (D.C. Cir. 2020) (en banc) (per curiam) (quoting Cheney v. U.S. Dist. Ct. for D.C., 542 U.S. 367, 380 (2004)). On July 11, 2025, Federal Communications Commission ("FCC") staff sent petitioner a letter that the FCC would continue to freeze reimbursement payments. According to the FCC, petitioner can apply to the FCC for relief from that funding freeze and, if the FCC denies relief, can seek judicial review of that denial. See 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); 47 C.F.R. § 1.115(a). Petitioner has not demonstrated otherwise. We are confident that the FCC will act promptly in resolving any application for review of its letter and in otherwise deciding whether to maintain the funding freeze. Our denial of the mandamus petition is without prejudice to petitioner refiling in the event of significant additional delay.

**APP 296**

# United States Court of Appeals
#### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 25-1112**                    **September Term, 2025**

Pursuant to D.C. Circuit Rule 36, this disposition will not be published.

### **Per Curiam**

Page 2

**APP 297**



Steve Leckar
sleckar@kalbianhagerty.com
(202) 223-5600 Telephone
(202) 223-6625 Facsimile

# KALBIAN HAGERTY LLP
ATTORNEYS AND COUNSELORS AT LAW

888 17th Street, NW, Suite 1200
Washington, DC 20006

December 3, 2025

**By E-Mail and First-Class Mail**

The Hon. Brendan Carr
Chairman
Federal Communications Commission
45 L St., N.E
Washington, D.C. 29202

The Hon. Anna M. Gomez
Commissioner
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

The Hon. Olivia Trusty
Commissioner
Federal Communications Commission
45 L St., N.E.
Washington, D.C. 29202

> Re: *SI Wireless, LLC*
> *File No. EB-FD-24-00036576*
> *SCRP #0001013   FRN0019623834*

Dear Chairman Carr and Commissioners Gomez and Trusty:

We represent SI Wireless, LLC ("SI"), a small business and participant in the Secure and Trusted Communications Program ("SCRP"). The FCC's Chief Financial Officer ("CFO") suspended SI's reimbursements on July 11, 2024—formally imposing a funding freeze that was implemented in the spring of 2024. SI responded to the CFO's freeze and a parallel investigation by the Enforcement Bureau ("EB") by producing over 84 Gigabytes of data, responding to literally thousands of interrogatories (including subparts), and voluntarily submitting to a five-hour interview with the staff in November 2024—over a year ago. SI concurrently provided the CFO with copies of its responses to the EB.

Last April, after the Commission had never responded to SI's request that it direct the CFO to lift the freeze order, SI petitioned the Court of Appeals for the District of Columbia Circuit to issue a writ of mandamus to compel the CFO to act on SI's request. On July 11, 2025, while that action was pending, the CFO issued a second hold-renewal letter. On August 15, 2025, SI wrote to the CFO and addressed every issue that office's July 11th notice had raised. SI's correspondence included sworn declarations from customers and a technician to establish that the firm has had customers receiving advanced communications service throughout its participation in the SCRP—an issue which the CFO's office asserted underlay its concerns.

**APP 299**



KALBIAN
HAGERTY

On October 1, 2025, the Court of Appeals denied SI's mandamus petition, albeit without prejudice. In so doing the Court made clear its expectations: "We are confident that the FCC will act promptly in resolving any application for review of its letter and in otherwise deciding whether to maintain the funding freeze. Our denial of the mandamus petition is without prejudice to the petitioner refiling in the event of significant additional delay."

The Court of Appeals' confidence in the FCC's willingness to act promptly appears to have been misplaced. On October 15th SI wrote the CFO and requested that it promptly resume SI's SCRP reimbursements or inform us when SI reasonably could expect a decision. A copy of that letter was sent to those high-ranking officers whom the CFO's second freeze order had copied, viz., Wireline Competition Bureau Chief Joseph Calascione; Enforcement Bureau Acting Chief Patrick Webre; Managing Director Mark Stephens; and General Counsel Adam Candeub. Neither the CFO nor any of the foregoing FCC decisionmakers ever responded to our request.

We realize the federal government shutdown that extended between October 1-November 12, 2025, impacted the FCC's normal operations. Even so, the CFO had possessed SI's full responses to its most recent freeze for six weeks when the government-wide shutdown began. And as we wrote on October 15th, each additional week of the FCC's delay only compounds the unabated financial harm to SI. The firm responded swiftly to the Commission's entreaties urging providers to remove Chinese-made wireless equipment on an accelerated basis. The company's approved business plan and modification disclosed its then-current operation and how it intended to meet the SCRP's objectives and timetable. SI then removed the Covered Equipment in a timely manner as required by the Secure and Trusted Communications Networks Act. Although the firm received reimbursement for most of the removal work, it never received the full reimbursement needed to purchase all the replacement equipment. The equipment that was reimbursed was installed on towers and SI could have restored a fully functioning network long ago had the FCC provided the remaining reimbursement on time.

Compounding the problem, SI cannot get a response from anyone in a position of authority at the FCC. The CFO won't answer correspondence; Commissioners tell SI to go to Enforcement; the Enforcement Bureau completes the circle by not returning telephone calls and emails. Such bandying ill-suits a government agency.

Separate and apart from SI's private interests, continued needless administrative lassitude disserves the public interest. First and foremost, rural consumers in SI's marketplace are being deprived of affordable service. Meanwhile the FCC's temporizing undermines congressional and public confidence in the agency's ability to manage this Program responsibly. The threat to this country's communications networks from Chinese actors was deemed a national emergency by Congress and the Commission alike. The FCC's continued lag obstructs the speedy remediation that Congress expected.

**APP 300**



We ask that the Commission direct the CFO promptly to resume SI's SCRP reimbursements or inform us when the company can expect a decision from the CFO. If any further specific information would result in a determination—at this point we think there shouldn't be such a need as SI held nothing back from the CFO (and the Enforcement Bureau)—please advise us.

Respectfully,

Stephen C. Leckar

cc: Joseph Calascione, Esq.
Patrick Webre, Esq.
Mark Stephens
Adam Candeub, Esq.
Leslie Williams

**APP 301**

# SCRP Status Update

FCC Form 5640

OMB Control No. 3060-1270

File No. SC-SU0004176

## Applicant Information

Applicant FRN   0019623834

Applicant Name   SI Wireless, LLC

Applicant Email   leslie.williams@siwirelessllc.c

Applicant Phone   8064441375

Applicant Address   PO Box 8826

Applicant City   Columbia

Applicant State   SC

Applicant ZIP Code   29202

## Contact Information

☑ Is the contact the same as the contact listed on the Application Request for Funding Allocation? If not, please list below.

Contact Name   Leslie Williams

Contact Email   leslie.williams@siwirelessllc.cc

Contact Phone   8064441375

Contact Address   PO Box 8826

Contact City   Columbia

Contact State   SC

Contact ZIP Code   29202

\*Indicate which deadline you are meeting with this filing.

2025-12-29

## Explanation of Effort and Availability of Commercial Equipment
*Provide an explanation of efforts undertaken, and challenges encountered, in permanently removing, replacing, and disposing of covered communications equipment or service.

This is the fifth quarterly update we have submitted since reimbursements to SI Wireless were placed on hold in July 2024. Unfortunately, we must again report that there has been no substantial change since our last filing. At all times, SI Wireless has complied with the mandate of the program. We promptly removed the Huawei network that had previously supported our operations, consistent with FCC direction and in furtherance of Congress's objective to secure the nation's communications infrastructure. However, because reimbursements for the replacement work have not been released, we have been unable to rebuild a comparable network as contemplated by the program guidelines, and the financial strain continues to mount. We are now in the position of having to scale back and, in some cases, decommission replacement work already completed during our participation in this program, beginning with equipment on our most expensive leases. As a result, we have had to ask customers to seek alternative providers. In many areas, there are few or no viable options for these customers, and where alternatives do exist, they are often double or more the cost of our service. This is particularly concerning given that a large portion of the population we once served — and are striving to serve again — lives in West Tennessee, where 17.9% of residents are below the poverty line, compared with 11.1% nationally, underscoring the need for affordable broadband in these rural communities. The consequences of the funding hold currently in place extend beyond SI Wireless to the customers and partners we serve. Rural customers are losing access to reliable and affordable service. At the same time, many small businesses and contractors who have supported our work under the program remain hopeful that the funding hold will soon be released and that they will be compensated as the program outlines, allowing the program's objectives to be fully realized.
***Note***
It has become increasingly clear that the Commission has no intention of lifting the hold imposed on SI Wireless. The rationale for that hold has never been clearly articulated and has shifted repeatedly over time, despite no material change in SI Wireless's compliance or circumstances.

The Commission has stated that it was unable to confirm whether SI Wireless had customers, based in part on purported outreach to those customers. However, SI Wireless has since submitted sworn declarations from those very customers—each confirming that SI Wireless provided service during the relevant period. The Commission has not reconciled those declarations with its stated conclusion.

To be clear, SI Wireless's circumstances did not arise from noncompliance or delay, but from the decision to speak publicly and truthfully about structural flaws in the Program—concerns that the Commission itself later echoed to Congress more than a year after we first raised them publicly.

Taken together, the Commission's prolonged inaction, shifting rationales, and failure to address sworn customer declarations have placed SI Wireless in an untenable position. The practical effect of the continued hold is to force SI Wireless to exhaust its financial resources and incur more than $80 million in debt while awaiting payment of funds the Commission has already determined to be reimbursable.

At this point, the continued delay appears designed to outlast SI Wireless's ability to survive financially, effectively removing us from the Program through attrition rather than through any stated finding of noncompliance.

*Explain whether you are finding commercially available equipment in the marketplace.  If not, then explain efforts taken to obtain replacement equipment.

As we are not receiving reimbursements and are owed over 80 million in completed work we are not able to get more equipment at this time. It should also be noted that the equipment we were approved to get years ago (4G) is legacy as 5G is current and 6G is being explored

**APP 304**

\* If there is additional information relevant to the preceding questions or that you believe the Commission should be aware of, please include the information below.

## ProgramCompliance

*Indicate whether recipient has fully complied with (or is in the process of complying with) all requirements of the Reimbursement Program.

[✔] Yes  [ ] No

*Indicate whether recipient has permanently removed from its communications network all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipients application request for funding.

[✔] Yes  [ ] No

If recipient has not yet completed the removal process, what estimated percentage of the removal process have you completed?

*Indicate whether recipient has replaced all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

[ ] Yes  [✔] No

If recipient has not yet completed the replacement process, what estimated percentage of the replacement process have you completed?

45

*Indicate whether recipient has disposed of all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

[✔] Yes  [ ] No

If recipient has not yet completed the disposal process, what estimated percentage of the disposal process have you completed?

*Indicate whether recipient has fully complied with (or is in the process of complying with) the timeline submitted by the recipient. If not, provide explanation for deviation.

[ ] Yes  [✔] No

*The filer has indicated no to a question in this section, please provide additional information.

As we are not receiving reimbursements and are owed over 80 million in completed work we are not able to get more equipment at this time. It should also be noted that the equipment we were approved to get years ago (4G) is legacy as 5G is current and 6G is being explored

## Certifications

\* By checking the box and providing the electronic signature where indicated below, the Certifying Official on behalf of the filer certifies under penalty of perjury that:

☑ (1) The Certifying Official is authorized to submit this status report on behalf of the above-named filer and, based on information known to me or provided to me by employees responsible for the information being submitted, the information set forth in this status report has been examined and is true, accurate, and complete, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. The Certifying Official acknowledges that any false, fictitious, or fraudulent information or statement, or the omission of any material fact on this status report or on any other document submitted by the filer may subject the filer and the undersigned to punishment by fine or forfeiture under the Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or can lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812). (2) The filer is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that the filer will maintain detailed records, including receipts, of all costs eligible for reimbursement actually incurred for a period of 10 years; and will file all required documentation for its expenses. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.

## Certifier Information

Certifier Signature    Leslie Williams

Certifier Phone    8064441375

Certifier Name    Leslie Williams

Certifier Email    leslie.williams@siwirelessllc.cc

Certifier Title    President

Date Signed    2025-12-30

# SCRP Status Update

FCC Form 5640

OMB Control No. 3060-1270

File No. SC-SU0004462

## Applicant Information

Applicant FRN  0019623834

Applicant Name  SI Wireless, LLC

Applicant Email  leslie.williams@siwirelessllc.c

Applicant Phone  8064441375

Applicant Address  PO Box 8826

Applicant City  Columbia

Applicant State  SC

Applicant ZIP Code  29202

## Contact Information

☑ Is the contact the same as the contact listed on the Application Request for Funding Allocation? If not, please list below.

Contact Name  Leslie Williams

Contact Email  leslie.williams@siwirelessllc.c

Contact Phone  8064441375

Contact Address  PO Box 8826

Contact City  Columbia

Contact State  SC

Contact ZIP Code  29202

*Indicate which deadline you are meeting with this filing.

2026-03-30

**APP 311**

## Explanation of Effort and Availability of Commercial Equipment

*Provide an explanation of efforts undertaken, and challenges encountered, in permanently removing, replacing, and disposing of covered communications equipment or service.

This update reflects a pattern that can no longer be understood as ordinary administrative delay.

On November 26, 2024, SI Wireless met in person with Commission staff to address all outstanding issues related to the funding hold. That meeting was followed by continued exchanges through December 2024. At the conclusion of those discussions, the Commission stated that it had received all information it required and that nothing further was needed from SI Wireless.

The record, by the Commission's own account, was complete.

Since that time, the Commission has taken no meaningful action.

There have been no follow-up requests.
No additional inquiries.
No engagement with the evidence submitted.
No explanation of how the Commission is evaluating the record.

The only communication SI Wireless has received since December 2024 was the Commission's July 2025 letter renewing the funding hold. Aside from that, the Commission's only activity has been filings made in court—communications directed to litigation, not to SI Wireless, and not toward resolving the hold.

In other words, after confirming that the record was complete, the Commission ceased engagement entirely.

That silence now spans more than a year.

This is not a situation involving missing information or unresolved factual questions. The Commission has already stated that it has what it needs. Yet it has neither acted nor explained why it has not acted.

What remains is a funding hold that continues indefinitely—without explanation, without engagement, and without any discernible path toward resolution.

The consequences are real and ongoing. SI Wireless has been forced to scale back operations and dismantle portions of the replacement network built in reliance on reimbursement under the Program. Contractors and vendors remain unpaid for work already performed. Rural customers have lost access to affordable service or have been pushed to higher-cost alternatives.

These harms are not the result of new developments. They are the direct and foreseeable result of inaction after the Commission acknowledged it had everything it needed to proceed.

For those observing this Program, the implications are difficult to ignore. An approved participant complied with federal directives, responded to extensive inquiries, and was told the record was complete. Since then, there has been no engagement—only the continuation of a hold that grows more consequential with each passing day.

At some point, prolonged silence in the face of a complete record ceases to look like

*Explain whether you are finding commercially available equipment in the marketplace. If not, then explain efforts taken to obtain replacement equipment.

As we are not receiving reimbursements and are owed over 80 million in completed work we are not able to get more equipment at this time. It should also be noted that the equipment we were approved to get years ago (4G) is legacy as 5G is current and 6G is being explored

\* If there is additional information relevant to the preceding questions or that you believe the Commission should be aware of, please include the information below.

## Program Compliance

*Indicate whether recipient has fully complied with (or is in the process of complying with) all requirements of the Reimbursement Program.

☑ Yes ☐ No

*Indicate whether recipient has permanently removed from its communications network all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipients application request for funding.

☐ Yes ☑ No

If recipient has not yet completed the removal process, what estimated percentage of the removal process have you completed?

90

*Indicate whether recipient has replaced all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☐ Yes ☑ No

If recipient has not yet completed the replacement process, what estimated percentage of the replacement process have you completed?

50

*Indicate whether recipient has disposed of all covered communications equipment or services that were in the recipient's network as of the date of the submission of the recipient's application request for funding.

☐ Yes ☑ No

If recipient has not yet completed the disposal process, what estimated percentage of the disposal process have you completed?

90

*Indicate whether recipient has fully complied with (or is in the process of complying with) the timeline submitted by the recipient. If not, provide explanation for deviation.

☑ Yes ☐ No

*The filer has indicated no to a question in this section, please provide additional information.

As we are not receiving reimbursements and are owed over 80 million in completed work we are not able to get more equipment at this time. It should also be noted that the equipment we were approved to get years ago (4G) is legacy as 5G is current and 6G is being explored

## Certifications

\* By checking the box and providing the electronic signature where indicated below, the Certifying Official on behalf of the filer certifies under penalty of perjury that:

☑ (1) The Certifying Official is authorized to submit this status report on behalf of the above-named filer and, based on information known to me or provided to me by employees responsible for the information being submitted, the information set forth in this status report has been examined and is true, accurate, and complete, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. The Certifying Official acknowledges that any false, fictitious, or fraudulent information or statement, or the omission of any material fact on this status report or on any other document submitted by the filer may subject the filer and the undersigned to punishment by fine or forfeiture under the Communications Act (47 U.S.C. §§ 502, 503(b), 1606), or fine or imprisonment under Title 18 of the United States Code (18 U.S.C. § 1001, §§ 286-287, and § 1343), or can lead to liability under the False Claims Act (31 U.S.C. §§ 3729-3733, and §§ 3801-3812). (2) The filer is in compliance with the statute, rules, and orders governing the Reimbursement Program, including but not limited to allocations, draw downs, payments, obligations and expenditures of money, and the Certifying Official acknowledges that failure to be in compliance and remain in compliance with those statutes, rules, and orders may result in the denial of funding, cancellation of funding commitments, and/or recoupment of past disbursements. The Certifying Official acknowledges that the filer will maintain detailed records, including receipts, of all costs eligible for reimbursement actually incurred for a period of 10 years; and will file all required documentation for its expenses. The Certifying Official acknowledges that failure to comply with the statute, rules, and orders governing the Reimbursement Program could result in civil or criminal prosecution by law enforcement authorities.

## Certifier Information

| | | | |
|---|---|---|---|
| Certifier Signature | Leslie Williams | Certifier Phone | 8064441375 |
| Certifier Name | Leslie Williams | Certifier Email | leslie.williams@siwirelessllc.cc |
| Certifier Title | President | | |
| Date Signed | 2026-03-31 | | |

**APP 317**

April 10, 2026

Marlene H. Dortch, Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, DC 20554

Re: SI Wireless FRN: 0019623834
Program Participant: SCRP0001013 for Extension of RRD Term

Dear Ms. Dortch,

SI Wireless, LLC ("SI Wireless") respectfully requests a six-month extension of its Removal, Replacement, and Disposal ("RRD") under the Secure and Trusted Communications Networks Reimbursement Program ("Reimbursement Program"), extending the current deadline from May 8, 2026, to November 8, 2026. SI Wireless files this request pursuant to 47 CFR § 1.50004(h)(2) and FCC Form 5640 Part H2. As detailed below, due to circumstances beyond its control, SI Wireless seeks a six-month extension of its RRD deadline to complete the replacement of its Huawei equipment. Its completion deadline, which was extended for an additional year by the Federal Communications Commission ("FCC" or "Commission") on May 8, 2025, expires on May 8, 2026.

Throughout its entire participation in the Reimbursement Program, SI Wireless has committed itself to quickly completing the removal, replacement, and disposal of Huawei equipment in its network.SI Wireless has acted diligently and in good faith, followed its FCC-approved plan and modification without deviation, and incurred substantial costs in reliance on the Commission's prior approvals.

Until the imposition of the funding hold, SI Wireless was progressing toward completion in accordance with program expectations and timelines, with no material delays or performance deficiencies attributable to SI Wireless.

The FCC's continued hold on all funding disbursements to SI Wireless, effective July 11, 2024, has made it impossible for SI Wireless to complete its necessary replacement work by May 8, 2026. This funding hold is the sole and determinative cause of SI Wireless's inability to meet the current deadline. Without access to additional funding, SI Wireless cannot complete the replacement network.

But for the continued suspension of funding, SI Wireless would have completed, or been in a position to complete, its RRD obligations within the existing deadline. The delay is not the result of any action or inaction by SI Wireless, but rather the direct consequence of circumstances imposed externally and beyond its control.

SI Wireless remains willing to resolve any inquiries related to the funding hold so that it may continue to participate in the Reimbursement Program and continue to provide services to

**APP 319**

underprivileged, rural communities in alignment with the public interest. SI Wireless remains ready to promptly resume full deployment and complete its obligations upon payment of approved and owed funds currently withheld, and the restoration of ongoing funding necessary to complete the project. Thus, SI Wireless respectfully requests a six-month extension of its May 8, 2026, deadline until November 8, 2026. SI Wireless respectfully submits that the facts presented herein satisfy the standard for an extension of the RRD deadline under 47 CFR § 1.50004(h)(2).

Sincerely,

/s/ Leslie Williams
Leslie Williams
President
SI Wireless, LLC

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Protecting Against National Security Threats to the | )     WC Docket No. 18-89 |
| Communications Supply Chain Through FCC | ) |
| Programs | ) |
| | ) |

**ORDER**

Adopted: May 1, 2026                                       Released: May 1, 2026

By the Chief, Wireline Competition Bureau:

## I. INTRODUCTION

1. In this Order, the Wireline Competition Bureau (Bureau) addresses the Petitions filed by several recipients in the Secure and Trusted Communications Networks Reimbursement Program (Rip-and-Replace Program or Program) requesting extensions of their removal, replacement, and disposal (RRD) terms. For the reasons explained below, the Bureau grants the requests identified below, conditioned on enhanced reporting by the recipients to ensure that recipients make progress and will complete their RRD work within the extended term.

2. In light of the time that has passed since the allocation of full funding for all Priority 1 recipients in April 2025, in addition to the time that recipients have had to complete their RRD work since their initial approvals in 2022, we expect that all recipients will be able to complete their RRD work within their terms, as extended by this Order and without further extensions. When providers applied to participate in the Program and when applications to the Program were approved in July 2022, recipients were on notice that they had one year from that approval to obtain their first reimbursement and one year from the first reimbursement to finish their RRD work, subject to any extensions.[1] It has now been almost four years since the applications were approved.[2] While recipients faced difficulties due to the initial funding shortfall that resulted in a pro-rata allocation of 39.5% of each recipient's approved cost estimates,[3] that issue has been resolved for over a year.[4] Recipients have similarly now had significant time to overcome delays associated with other previous justifications for additional time, such as unexpected weather events or labor shortages. As a result, we anticipate that recipients will be able to complete their RRD work by the end of their respective terms and that no further extensions will be necessary.[5]

---

[1] *See* 47 CFR § 1.50004(g)(1) and (h).

[2] *Wireline Competition Bureau Announces the Grant of Applications for the Secure and Trusted Communications Networks Reimbursement Program*, WC Docket No. 18-89, Public Notice, 37 FCC Rcd 8590 (WCB 2022).

[3] *See id.* at 8591.

[4] *Wireline Competition Bureau Announces Availability of Additional Funding for the Rip-and-Replace Program*, WC Docket No. 18-89, Public Notice, 40 FCC Rcd 2520 (WCB 2025) (*SCRP Additional Funding Public Notice*).

[5] *See Wireline Competition Bureau Reminds Priority 1 Rip-and-Replace Program Recipients of Their May 8, 2026 Removal, Replacement, and Disposal Deadline*, WC Docket No. 18-89, Public Notice, DA 26-14 (WCB Jan. 6, 2026); *Enforcement Bureau and Wireline Competition Bureau Joint Enforcement Advisory for Rip-and-Replace*

(continued....)

of them all by October 2026.[157] Point therefore expects to finish its RRD work with just one six-month extension.[158]

### E.    Reimbursement Holds

#### 1.    Flat Wireless, LLC – SCRP0001103

56.    Flat Wireless, LLC (Flat) seeks an extension based on delays arising from a funding hold currently placed upon the recipient.  Specifically, Flat states that the Commission instituted a hold on providing Program reimbursement to Flat.[159]  As a result, Flat contends it has not been able to make the necessary progress on its RRD work, despite "good-faith efforts to continue its network replacement activities to the extent possible, including procuring replacement equipment and taking other steps necessary to deploy and operate portions of the new network."[160]  In addition, Flat states that it has already "decommissioned and destroyed all of its Huawei equipment" (thus serving the core Program goal of eliminating covered equipment) and, if the funding hold is lifted, "will use its absolute best efforts to" to finish installing its replacement equipment with just one extension.[161]

#### 2.    SI Wireless, LLC – SCRP0001013

57.    SI Wireless, LLC (SIW) likewise seeks an extension based on delays arising from a funding hold.[162]  SIW states that prior to the funding hold it "was progressing toward completion in accordance with program expectations and timelines," but the funding hold has "made it impossible for SI Wireless to complete its necessary replacement work" by the current RRD deadline.[163]  According to SIW, the funding hold is the sole cause of its inability to meet the current deadline, and is a matter beyond its control.[164]  Finally, SIW asserts that if reimbursements are resumed it stands fully ready to "complete its obligations[.]"[165]

## IV.    CONCLUSION

58.    Based on the justifications discussed above, the Bureau grants the extension requests for the Program recipients listed above.  The new RRD term expiration date for each recipient is listed in Appendix A to this Order.

---

[157] *Id.* at 3-4.

[158] *Id.* at 7 ("With an additional six months, [Point] anticipates further advancements in FTTH changeouts and router swaps.  Point expects to meet this deadline if an extension is granted."); Point Broadband Response to RFI on Petition for Extension (Apr. 17, 2026) (Point expects to finish RRD work with one extension provided there are no unforeseen obstacles).

[159] Flat Wireless, LLC Petition for Extension, WC Docket No. 18-89, at 1-2 (filed Apr. 10, 2026).

[160] *Id.* at 2.

[161] *Id.* at 1-2.

[162] SI Wireless, LLC Petition for Extension, WC Docket No. 18-89, at 1 (filed Apr. 10, 2026).

[163] *Id.*

[164] *Id.*

[165] *Id.* at 2.

APP 323

59.     Accordingly, IT IS ORDERED that, pursuant to section 4(i)-(j) of the Communications Act of 1934, as amended, 47 U.S.C. § 154(i)-(j), and sections 0.204, 0.291, and 1.50004(h)(2) of the Commission's rules, 47 CFR §§ 0.204, 0.291, 1.50004(h)(2), the Petitions for Extension filed by the Program recipients addressed in this Order are GRANTED as conditioned herein on enhanced reporting by the recipients in their quarterly status updates.

FEDERAL COMMUNICATIONS COMMISSION


Joseph S. Calascione
Chief
Wireline Competition Bureau

**APP 324**

**TECH POLICY**

# Small carriers fight to survive amid delayed Huawei rip-and-replace funds

The FCC chairwoman warns that rural areas are set to lose cell service if Congress does not fill a $3 billion funding shortfall.

 By Eva Dou

May 2, 2024 at 2:06 p.m. EDT

Jerry Whisenhunt, general manager of Pine Telephone Company in a rural corner of Oklahoma, has some choice words about the Washington bigwigs who ordered him to rip up his mobile network but have failed to cough up the promised funding to help him replace it.

"It's kind of a train wreck," he said. "They're slow as Christmas getting things done."

Four years after Congress ordered U.S. network operators to remove all telephone and internet equipment made by the China-based companies Huawei and ZTE, citing security risks, the "rip-and-replace" program remains stalled due to a $3 billion funding shortfall — a shortfall that is larger than the $1.9 billion Congress appropriated for the task.

The Federal Communications Commission is now warning that some rural areas may lose cell service altogether if more funding does not materialize soon, as small carriers struggle to stay afloat against the pressure to spend millions of dollars replacing their networks.

In a letter sent Thursday to Sen. Maria Cantwell (D-Wash.), chair of the Senate Commerce Committee, FCC Chairwoman Jessica Rosenworcel said 40 percent of local network operators cannot complete the removal of Huawei and ZTE equipment without more money and that some risked shutdown of their operations. "Several recipients have recently informed the Commission that they foresee significant consequences that could result from the lack of full funding, including having to shut down their networks or withdraw from the program," Rosenworcel wrote.

Rosenworcel wrote that for certain operators, "a shutdown of all or part of their networks could eliminate the only provider in some regions."

**APP 327**

Cantwell's office did not immediately have a comment on the letter Thursday. The committee she chairs recently acknowledged that some rural providers are "on the verge of bankruptcy" due to the state of the rip-and-replace program. Last week, she released the Spectrum and National Security Act, which proposes to restore the FCC's commercial auction authority and use the proceeds to fill the $3 billion gap.

The rip-and-replace program's woes suggest the kind of logistical snarls and ballooning costs that are likely to ripple across more of the U.S. economy as officials look to increase restrictions on China-based vendors amid an intensifying U.S.-China rivalry. The looming TikTok ban could have broader spillover effects for the online-video ecosystem, social media experts say, while law enforcement officers say they will be hamstrung in fighting crime if they are banned from using drones manufactured by China's DJI.

**Follow** Technology    Follow

Huawei and ZTE equipment has always been de facto banned from major U.S. networks built by the likes of Sprint or Verizon, with U.S. officials considering the gear at higher risk of infiltration by China's intelligence agencies. Small, rural U.S. operators were allowed to buy gear from Huawei and ZTE through the 2000s and most of the 2010s, as the phone calls and internet traffic they carried were considered less sensitive.

However, as China has made swift technological strides and become viewed as a near-peer rival, the bar has shifted. Security hawks have pointed out that U.S. military bases are often based in rural areas and that the idea of rural internet traffic being less sensitive should be rethought. Huawei and ZTE have maintained that they do not help China's government spy and that their products are not a security threat.

In 2020, Congress passed the Secure and Trusted Communications Networks Act, directing the FCC to set up the rip-and-replace program. The FCC quickly discovered that an additional $3 billion would be needed to fully fund the program. With limited cash in hand, the FCC began giving small carriers 39.5 percent of what they needed to do a full replacement in 2022 and 2023.

Leslie Williams, president of Jackson, Tenn.-based SI Wireless, said his network has been down since 2022 for the gear replacement, with no revenue coming in since. Williams said he's had to take out loans to try to keep afloat, and that invoices submitted for reimbursement through the program have taken an average of 150 days to be processed, with the longest one taking 354 days. He said SI Wireless has only received a bit more than $24 million from the FCC, around 13 percent of the $181 million needed to complete the rip-and-replace.

On the customer side, he said, the result has been dead zones in rural stretches of Tennessee and Kentucky where there used to be cell reception.

"Currently, customers are without service," he said.

**APP 328**

Network operators are required under the terms of the program to fully remove Huawei and ZTE equipment within a year of receiving the first tranche of funds. With the remaining 61 percent of funds not forthcoming, the FCC is receiving a flood of letters from carriers across the nation complaining that they have been stuck holding the bag and pleading for extensions.

Plateau Telecommunications, a small carrier in Clovis, N.M., said in a filing with the FCC in April that the underfunding of the rip-and-replace program has forced it to "pivot" to fewer cell towers and a reduced footprint, and even so, it is running behind schedule. "It is increasingly evident that achieving our mid-July completion target is not feasible," the company wrote.

Mark Twain Communications, a small carrier in northeast Missouri, told the FCC that it is unable to complete the rip-and-replace due to the lack of funding coupled with skyrocketing costs. "Vendors have been unwilling to negotiate costs and many have increased prices due to high demand," the company reported. "Mark Twain has found replacement equipment over double the cost."

The Bristol Bay Cellular Partnership, a carrier with a staff of 14 in the town of King Salmon, Alaska, pleaded for an extension and the rest of the funds. "The fuel surcharge is at times up by 45 percent," the carrier wrote, saying its 17 sites are accessible only by plane and boat. "It is difficult for the smaller companies to compete."

Viaero Wireless, in Fort Morgan, Colo., also reported that it was stuck. "Congress' inaction and the lack of funding is completely outside of our control," Viaero wrote.

Those asking for more time even included the board of trustees of Northern Michigan University. NMU, which operates 79 cell sites in the rural portions of Michigan's Upper Peninsula in addition to providing higher education, told the FCC about the challenges it has faced in trying to replace its equipment with limited funds, including its discovery that it would have to build a new cell tower.

"The new tower must overcome a 30′ ground elevation differential, resulting in a replacement structure of 330 feet," NMU's board of trustees wrote.

In her letter on Thursday, Rosenworcel wrote that carriers in the program are supposed to have all their Huawei and ZTE gear removed by May 29 to Feb. 4, 2025, depending on when they received their initial distribution of funds. She reported that the FCC has so far granted 64 extensions, including 52 based at least partly on the funding shortfall.

"The Commission stands ready to assist Congress in any efforts to fully fund the Reimbursement Program," she wrote.

Whisenhunt, the Pine Telephone Company general manager in Oklahoma, said he is facing the prospect of shutting down parts of his network, with the rest of the rip-and-replace funds nowhere in sight. He said that even without the millions of dollars in expenses of replacing equipment, parts of his coverage area across Choctaw Nation land were unprofitable due to the sparse population.

**APP 329**

"For rural companies like us, it's dire," Whisenhunt said. "There's a certain segment of the population here, and in Choctaw Nation, that just will lose service."

*Jeanne Whalen contributed to this report.*